

## State of New Jersey

PHILIP D. MURPHY
*Governor*

SHEILA Y. OLIVER
*Lt. Governor*

OFFICE OF THE ATTORNEY GENERAL
DEPARTMENT OF LAW AND PUBLIC SAFETY
DIVISION OF LAW
PO Box 45029
Newark, NJ 07101

GURBIR S. GREWAL
*Attorney General*

MICHELLE L. MILLER
*Director*

July 30, 2018

**VIA HAND DELIVERY**
Deputy Clerk of the Court
Superior Court of New Jersey
Chancery Division, General Equity Part
Wilentz Justice Complex
212 Washington Street – 8th Floor
Newark, New Jersey 07102

Re:   Grewal v. Defense Distributed, et al.
      Docket No.:   ESX-C-    -18

Dear Sir/Madam:

I am the Deputy Attorney General responsible for the representation of plaintiff Gurbir S. Grewal, Attorney General of the State of New Jersey ("Plaintiff"), in the above-referenced action.

Enclosed please find an original and two (2) copies of the following documents in support of the filing of this action: (1) Order to Show Cause with Temporary Restraints Pursuant to Rule 4:5-2; (2) Verified Complaint; (2) Certification of New Jersey Office of Homeland Security Director Jared Maples, with accompanying exhibit; (3) Certification of Deputy Chief of Detective Christopher W. Donohue; (4) Certification of Investigator Aziza Salikhova; and (5) Memorandum of Law.

As reflected in the Order to Show Cause, Plaintiff seeks the Court's <u>ex</u> <u>parte</u> consideration and entry of temporary restraints. Such request is premised upon the need for this Court's immediate intervention to halt the publishing, exporting and/or distributing by defendants Defense Distributed and Cody R. Wilson of printable-gun computer files, which they plan to do

124 Halsey Street • TELEPHONE: (973) 877-1280 • FAX: (973) 648-4887
*New Jersey Is An Equal Opportunity Employer • Printed on Recycled Paper and Recyclable*

July 30, 2018
Page 2

this Wednesday, August 1, 2018.

I request that one (1) copy of the above-referenced papers be file-stamped and provided to my office.

Respectfully submitted,

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY

By: _____
Lara J. Fogel
Deputy Attorney General

Enclosures

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY
Division of Law
124 Halsey Street
P.O. Box 45029
Newark, New Jersey 07101
Attorney for Plaintiff

By:  Lorraine K. Rak (035771985)
     Deputy Attorney General, Section Chief
     Lara J. Fogel (038292006)
     Melissa Medoway (028422011)
     Jesse J. Sierant (049342013)
     Deputy Attorneys General
     Affirmative Civil Enforcement
     (973) 877-1280

SUPERIOR COURT OF NEW JERSEY
CHANCERY DIVISION, ESSEX COUNTY
DOCKET NO. _____

| | |
|---|---|
| GURBIR S. GREWAL, Attorney General of the State of New Jersey,<br><br>                   Plaintiff,<br><br>            v.<br><br>DEFENSE DISTRIBUTED, CODY R. WILSON, and JANE and JOHN DOES 1-20, individually and as owners, officers, directors, shareholders, founders, members, managers, agents, servants, employees, representatives and/or independent contractors of DEFENSE DISTRIBUTED, and XYZ CORPORATIONS 1-20,<br><br>                  Defendants. | **Civil Action**<br><br><br><br>**ORDER TO SHOW CAUSE WITH TEMPORARY RESTRAINTS PURSUANT TO RULE 4:52** |

THIS MATTER being brought before the Court by Lara F. Fogel, Deputy Attorney General, for plaintiff Gurbir S. Grewal, Attorney General of New Jersey ("Plaintiff"), seeking relief by

way of temporary restraints pursuant to R. 4:52, based upon the facts set forth in the Verified Complaint and supporting Certifications and Brief filed herewith; and it appearing that immediate and irreparable harm will likely result before notice can be given and a hearing held, and for good cause shown.

It is on this ___ day of _____ **ORDERED** that defendants Defense Distributed and Cody Wilson (collectively, "Defendants"), appear and show cause before the Superior Court of New Jersey, Chancery Division – General Equity Part, Essex County, at the Wilentz Justice Complex in Newark, New Jersey, at _____am/pm or as soon thereafter as counsel can be heard, on the _____ day of _____, 2018, why an Order should not be issued preliminarily enjoining and restraining Defendants from:

A. Publishing, exporting, and distributing the printable-gun computer files as described in the Verified Complaint whether through the websites located at https://defdist.org, https://defcad.com, and https://ghostgunner.net, or otherwise;

B. Destroying, concealing, altering, transferring, disposing or removing in any manner, directly or indirectly, any books or records, information stored in computer-maintained form (such as electronic mail) and any other "document," as that term is defined in Rule 4:18-1(a), in their possession, subject to their control or available to them, that directly or indirectly relate to Defense Distributed, including memberships, donations, web content, advertisements and sales records;

C. Failing to make and/or keep any books or records, information stored in computer-maintained form (such as electronic mail) and any other "document," as that term is defined in Rule 4:18-1(a) that directly or

2

indirectly relate to Defense Distributed, including memberships, donations, web content, advertisements and sales records;

D.  Continuing the temporary injunctive and ancillary relief already ordered by the Court; and

E.  Granting such other relief as the Court deems equitable and just.

And it is further **ORDERED** that pending the return date herein, Defendants are temporarily enjoined and restrained from:

A.  Publishing, exporting, and distributing the printable-gun computer files as described in the Verified Complaint whether through the websites located at https://defdist.org, https://defcad.com, and https://ghostgunner.net, or otherwise;

B.  Destroying, concealing, altering, transferring, disposing or removing in any manner, directly or indirectly, any books or records, information stored in computer-maintained form (such as electronic mail) and any other "document," as that term is defined in Rule 4:18-1(a), in their possession, subject to their control or available to them, that directly or indirectly relate to Defense Distributed, including memberships, donations, web content, advertisements and sales records; and

C.  Failing to make and/or keep any books or records, information stored in computer-maintained form (such as electronic mail) and any other "document," as that term is defined in Rule 4:18-1(a) that directly or indirectly relate to Defense Distributed, including memberships, donations, web content, advertisements and sales records.

And it is further **ORDERED** that:

1.  Defendants may move to dissolve or modify the temporary restraints herein contained upon two (2) days' notice to the Plaintiff's attorney.

3

2.    A    copy    of    this    Order    to    Show    Cause,    Verified Complaint,  Brief  and  Certifications  submitted  in  support  of  this application  shall  be  served  upon  the  Defendants  personally  (or by  other  means)  within  _____  days  of  the  date  hereof,  in accordance  with  R.  4:4-3  and  R.  4:4-4,  this  being  original process.

3.    Plaintiff  must  file  with  the  Court  its  proof  of service  of  the  pleadings  on  the  Defendants  no  later  than  three (3) days before the return date.

4.    Defendants  shall  file  and  serve  a  written  response  to this  Order  to  Show  Cause  and  the  request  for  entry  of  injunctive relief  and  proof  of  service  by  _____,  2018. The  original  documents  must  be  filed  with  the  Clerk  of  the Superior  Court  in  the  county  listed  above.  A  directory  of  these offices  is  available  in  the  Civil  Division  Management  Office  in the     county     listed     above     and     online     at http://www.njcourts.gov/forms/10153_deptyclerklawref.pdf.    You must  send  a  copy  of  your  opposition  papers  directly  to  Judge _____,  whose  address  is  Superior  Court  of  New Jersey,  Chancery  Division,  General  Equity  Part,  Essex  County, Wilentz  Justice  Complex,  212  Washington  Street  -  8th  Floor, Newark,  New  Jersey  07102.    You  must  also  send  a  copy  of  your opposition  papers  to  the  Plaintiff's  attorney,  whose  name  and address  appears  above.    A  telephone  call  will  not  protect  your

4

rights; you must file your opposition and pay the required fee of $_____ and serve your opposition on your adversary, if you want the Court to hear your opposition to the injunctive relief the Plaintiff is seeking.

5. Plaintiff must file and serve any written reply to the Defendants' Order to Show Cause opposition by _____, 2018. The reply papers must be filed with the Clerk of the Superior Court in the county listed above and a copy of the reply papers must be sent directly to the Chambers of Judge _____.

6. If the Defendants do not file and serve opposition to this Order to Show Cause, Plaintiff's application will be decided on the papers on the return date and relief may be granted by default, provided that the Plaintiff files a proof of service and a proposed form of Order at least three (3) days prior to the return date.

7. If the Plaintiff has not already done so, a proposed form of Order addressing the relief sought on the return date (along with a self-addressed return envelope with return address and postage) must be submitted to the Court no later than three (3) days before the return date.

8. Defendants, take notice that the Plaintiff has filed a lawsuit against you in the Superior Court of New Jersey. The Verified Complaint attached to this Order to Show Cause states

5

the basis of the lawsuit. If you dispute this Verified Complaint, you, or your attorney, must file a written Answer to the Verified Complaint and proof of service within thirty-five (35) days from the date of service of this Order to Show Cause; not counting the day you received it.

These documents must be filed with the Clerk of the Superior Court in the county listed above. A directory of these offices is available in the Civil Division Management Office in the county listed above and online at http://www.njcourts.gov/forms/10153_deptyclerklawref.pdf. Include a $_____ filing fee payable to the "Treasurer, State of New Jersey." You must also send a copy of your Answer to the Plaintiff's attorney whose name and address appear above. A telephone call will not protect your rights; you must file and serve your Answer (with the fee) or judgment may be entered against you by default. Please note: Opposition to the Order to Show Cause is not an Answer and you must file both. Please note further: if you do not file and serve an Answer within thirty-five (35) days of this Order to Show Cause, the Court may enter a default against you for the relief Plaintiff demands.

9. If you cannot afford an attorney, you may call the Legal Services office in the county in which you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529). If you do not have an attorney and are not

6

eligible for free legal assistance you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A directory with contact information for local Legal Services Offices and Lawyer Referral Services is available in the Civil Division Management Office in the county listed above and online at http://www.judiciary.state.nj.us/prose/10153_depty clerklawref.pdf.

10.  The Court will entertain argument, but not testimony, on the return date of the Order to Show Cause, unless the Court and parties are advised to the contrary no later than _____ days before the return date.

_____

Hon.

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY
Division of Law
124 Halsey Street
P.O. Box 45029
Newark, New Jersey 07101
Attorney for Plaintiff

By:  Lorraine K. Rak (035771985)
     Deputy Attorney General, Section Chief
     Lara J. Fogel (038292006)
     Melissa Medoway (028422011)
     Jesse J. Sierant (049342013)
     Deputy Attorneys General
     Affirmative Civil Enforcement
     (973) 877-1280

|  |  |
|---|---|
| | SUPERIOR COURT OF NEW JERSEY<br>CHANCERY DIVISION, ESSEX COUNTY<br>DOCKET NO._____ |
| GURBIR S. GREWAL, Attorney General of the State of New Jersey,<br><br>                    Plaintiff,<br><br>          v.<br><br>DEFENSE DISTRIBUTED, CODY R. WILSON, and JANE and JOHN DOES 1-20, individually and as owners, officers, directors, shareholders, founders, members, managers, agents, servants, employees, representatives and/or independent contractors of DEFENSE DISTRIBUTED, and XYZ CORPORATIONS 1-20,<br><br>                    Defendants. | **Civil Action**<br><br><br>**VERIFIED COMPLAINT** |

Plaintiff Gurbir S. Grewal, Attorney General of the State of New Jersey ("Attorney General"), with an office located at 124 Halsey Street, Fifth Floor, Newark, New Jersey 07101, by way

of this Verified Complaint states:

## PRELIMINARY STATEMENT

1.    In just two days, Defense Distributed and its founder Cody R. Wilson (collectively, "Defendants") are planning to take an unprecedented and dangerous action – to publish computer files that enable anyone, including terrorists, domestic abusers, criminals, gang members, and juveniles, to print firearms using a three-dimensional ("3D") printer right from the comfort of their own homes.  Worse still, the codes they plan to post enable individuals to print assault weapons that are illegal under the laws of the State of New Jersey ("New Jersey" or "State").    Further, because the printed guns do not have serial numbers, they would not be traceable, which would undermine law enforcement's ongoing efforts to solve and reduce gun crime.    The implications for public safety and homeland security are clear and the risk is imminent; once Defendants open that Pandora's Box, it can never be closed.

2.    For years, the Federal Government and multiple federal courts recognized that Defense Distributed's plans posed a direct threat to public safety and national security across the United States, and so the Government barred the company from publishing the Computer Aided Design ("CAD") files.    In response, Defendants sued the Federal Government, seeking a

2

declaration that the CAD files were not subject to regulation. Despite the Federal Government's proper challenge to Defense Distributed's ability to publish these codes, the Federal Government just recently disclosed that it settled this litigation. Troublingly, the Federal Government abruptly flipped positions (even after multiple courts had agreed about the pending risk to public safety) and decided to allow Defense Distributed to move forward with its plans to share these computer codes on the Internet, available to all.

3. New Jersey law provides a separate and independent basis for preventing Defense Distributed and Cody Wilson from moving forward. New Jersey's public nuisance law provides a cause of action to hold firearm manufacturers accountable – and to enjoin imminent violations of the law – when their plans would facilitate the illegal sale of weapons to criminals and other prohibited users, and when the manufacturer has done too little to prevent that illegal market from developing. More than that, Defense Distributed and Wilson's codes will enable individuals to create firearms without serial numbers, again in direct contravention of State law.

4. In light of the grave and imminent harm posed with the release of printable-gun computer files, which can and will be used to create illegal and untraceable firearms in New Jersey,

3

the Attorney General submits this Verified Complaint in connection with an Order to Show Cause with Temporary Restraints in order to immediately halt Defendants from publishing, exporting and/or distributing the printable-gun computer files, which they plan to do on August 1, 2018.

## PARTIES

5.    Plaintiff, as the Attorney General of New Jersey, brings this action on behalf of the residents of New Jersey. The Attorney General, as the sole legal advisor and attorney for the State, is authorized to bring this suit in the interest and protection of the public in New Jersey. N.J.S.A. 52:17A-4; Mayor & Council of Borough of Alpine v. Brewster, 7 N.J. 42, 52 (1951).

6.    Defendant Defense Distributed is incorporated in the State of Texas with a mailing address of 2320 Donley Drive, Suite C, Austin, Texas 78758.

7.    Defendant Cody R. Wilson ("Wilson") is the director and founder of Defense Distributed and at all times relevant to this action, has controlled, directed and/or participated in the operation of Defense Distributed. Upon information and belief, Wilson maintains a mailing address of 2510 Tracy Trail, Austin, Texas 78728.

8.    John  and  Jane  Does  1  through  20  are  fictitious individuals  meant  to  represent  the  owners,  officers,  directors, shareholders,  founders,  members,  managers,  agents,  servants, employees,  representatives,  and/or  independent  contractors  of Defense  Distributed  who  have  been  involved  in  the  conduct  that gives  rise  to  this  Verified  Complaint,  but  who  are  heretofore unknown  to  the  Plaintiffs.    As  these  defendants  are  identified, Plaintiff  shall  amend  the  Verified  Complaint  to  include  them.

9.    XYZ  Corporations  1  through  20  are  fictitious corporations  meant  to  represent  any  additional  corporations  that have  been  involved  in  the  conduct  that  gives  rise  to  this Verified  Complaint,  but  that  are  heretofore  unknown  to  the Plaintiff.    As  these  defendants  are  identified,  Plaintiff  shall amend  the  Verified  Complaint  to  include  them.

<u>GENERAL  ALLEGATIONS  COMMON  TO  ALL  COUNTS</u>

A.    <u>Background  of  Defendants  and  CAD  Files</u>:

10.  At  all  relevant  times,  Defense  Distributed  has maintained  a  website  at  https://defdist.org  ("DD  Website").    The

"About" section of the DD Website provides as follows:

7/26/2018    About | Defense Distributed



# ABOUT

Defense Distributed is a non-profit, private defense firm principally engaged in the research, design, development, and manufacture of products and services for the benefit of the American rifleman. Since 2012, DD has been headquartered in Austin, Texas.

Media inquiries: crw@defdist.org

11.  The stated objective of Defense Distributed is for everyone to have access to guns and to undermine the efficacy of firearm safety regulations.

12.  Defendant Cody Wilson, who is a self-proclaimed anarchist and believes that "governments should live in fear of their citizenry," founded Defense Distributed.

13.  In 2012, Defense Distributed began exporting technical data related to firearms through the publication of CAD files, without restriction, on the Internet.

14.  Defendants' CAD files are computer files for the creation of guns and gun components through the use of 3D printers.

6

15.  Through the CAD files, Defense Distributed has enabled anyone anywhere to automatically manufacture firearms on 3D printers.

16.  Defendants posted their CAD files on https://defcad.org ("DefCad Website"), a website they created to serve as an open-source repository for weapons designs.

17.  The DD Website currently states as follows:

Defense Distributed |

ⒹⒹ  ABOUT  CONSULTING  LOGIN  JOIN

AUGUST 1
2018

Defense Distributed relaunches DEFCAD after reaching a settlement agreement with the US Department of State, concluding a multi-year federal lawsuit. The age of the downloadable gun begins.

18.  The DefCad Website includes data to automatically manufacture the "Liberator" pistol, which is a plastic firearm

7

that contains a six ounce piece of steel that can be easily removed enabling the firearm to be undetected in walk-through metal detectors.    The DefCad Website depicts the Liberator pistol as follows:



LIBERATOR

DD DEFDIST
JUL 12, 2018

19.    Through the related website of https://ghostgunner.net ("GG Website"), Defense Distributed also manufactures and sells a "computer-controlled milling machine" called the "Ghost Gunner," which is designed to allow its owner to carve gun parts out of aluminum.    The GGG Website depicts the Ghost Gunner as follows:



800-880-8257    Cart

HOME   PRODUCTS   DOWNLOADS   FAQ   DEALERS   ABOUT .



## GHOST GUNNER 2
### An open source hardware project

Ghost Gunner is a general purpose CNC mill, built upon a large body
of open source work, grbl g-code motion control, and popular
microcontrollers.

View specifications ▸
Learn more ▸

SHOP NOW

## FOR 80 PERCENT RECEIVERS AND FRAMES
### No prior CNC experience required

Ghost Gunner is specially designed to manufacture a growing library of mil-spec 80 percent lowers to
completion. With simple tools and point and click software, the machine automatically finds and aligns
to your 80% lower to get to work. No prior CNC knowledge or experience is required to manufacture
from design files. Legally manufacture unserialized rifles and pistols in the comfort and privacy of home.

**B. <u>Federal Court Litigation and Settlement</u>:**

20. In May 2013, the United States Department of State's Directorate of Defense Trade Controls ("DDTC") advised Defense Distributed that its publication of CAD files without authorization from the DDTC potentially violated the International Traffic in Arms Regulations ("ITAR") administered by DDTC.

21. The violation stemmed from the fact that the CAD files were being made available outside of the United States via the Internet.

9

22. DDTC concluded that several of the published CAD files were subject to regulation under ITAR.

23. To make the CAD files available outside of the United States, ITAR required Defendants to seek preapproval of publication from the DDTC.

24. On May 6, 2015, Defense Distributed as well as the Second Amendment Foundation, Inc. ("SAF") and Conn Williamson (collectively, "DD/SAF/CW"), commenced an action in the United States District Court for the Western District of Texas, Case No. 1:15-cv-00372-RP ("Texas Litigation").

25. DD/SAF/CW sought a declaration that the DDTC's preapproval requirement for privately generated unclassified information was unconstitutional and violated the First, Second, and Fifth Amendments.

26. DD/SAF/CW also sought to enjoin the DDTC from enforcing the prepublication approval requirement against them.

27. In opposing DD/SAF/CW's request, Lisa V. Aguirre, the Director of the Office of Defense Trade Controls Management testified that:

    (a)    "[t]he 'Liberator' firearm included in Defense Distributed's CAD designs presented a specific and unique risk to the national security and foreign policy interests of the United States";

    (b)    making the CAD files available online would provide terrorist organizations with firearms,

which could be used against the United States or its allies; and

(c)    "[a]ccess to weapons technology coupled with the uncontrolled ubiquitous means of productions... could contribute to armed conflict, terrorist or criminal acts, and seriously undermine global export and non-proliferation regimes designed to prevent the dangerous and destabilizing spread and accumulation of weapons and related technologies."

28.    After a hearing, the District Court denied DD/SAF/CW's request for a preliminary injunction and found, among other things, that the public interest in national defense and national security outweighed any countervailing interests.    The United States Court of Appeals for the Fifth Circuit affirmed the denial.    Defense Distributed v. United States Dept. of State, 838 F.3d, 451, 461 (5th Cir. 2016), cert. denied, 138 S. Ct. 638 (2018).

29.    The Texas Litigation continued until April 30, 2018, when DD/SAF/CW advised the District Court that the parties reached a tentative settlement.

30.    On June 28, 2018, the parties informed the District Court that DD/SAF/CW and the Federal Government reached an approved settlement.

31.    The settlement agreement was available on the Internet on or around July 12, 2018, and provides:

11

(a)  The Federal Government will commit to draft and pursue a notice of proposed rulemaking and final rule that would exclude the data on the CAD files at issue from ITAR regulation;

(b)  The Federal Government will announce on or before July 27, 2018, a temporary modification to exclude the data on the CAD files from ITAR regulation;

(c)  The Federal Government will issue a letter to DD/SAF/CW on or before July 27, 2018, advising that certain files are approved for public release and are exempt from the ITAR licensing requirements;

(d)  The Federal Government will acknowledge that the temporary modification referenced above permits "any United States person" "to access, discuss, use, reproduce, or otherwise benefit from the technical data" that is the subject of the litigation;

(e)  The Federal Government's payment of $39,581 to DD/SAF/CW; and

(f)  Filing of the stipulation of dismissal no sooner than August 1, 2018, which it ultimately filed on July 27, 2018.

C. **Imminent Publication of Printable-Gun CAD Files**:

32. Because of the settlement with the Federal Government, Defendants announced that they will re-launch their CAD file repository on August 1, 2018.

33. Thus, at present, the DefCad Website provides as follows:

7/26/2018                                                                    DEFCAD



34.    The    DefCad    Website    will    contain    a    repository    of firearm    computer    files    for    "more    exotic    DIY    semi-automatic weapons."

35.    The    DefCad    Website    also    accepts    user    financial contributions    and    has    a    user    comment    feature    where    information can    be    posted    or    shared.

36. Defendant Wilson intends the DefCad Website to serve as "a searchable, user-generated database of practically any firearm imaginable."

37. The database "will be available to anyone anywhere in the world with an uncensored internet connection, to download, alter, remix, and fabricate into legal weapons with tools like 3D printers and computer-controlled milling machines."

38. Defendant Wilson publicly stated, "What's about to happen is a Cambrian explosion of the digital content related to firearms.... [a]ll this Parkland stuff, the students, all these firearms of 'common sense gun reforms'? No. The internet will serve guns, the gun is downloadable... No amount of petitions or die-ins or anything else can change that."

**D. Direct and Immediate Threat to the
Public Health and Safety of New Jersey:**

39. During the pendency of the Texas Litigation, Defendants "developed a trove" of 3-D-printable weapon computer files, including AR-15s.

40. Assault weapons like the AR-15 and semiautomatic weapons were designed for military use.

41. In New Jersey, weapons like the AR-15 and semiautomatic weapons are banned as illegal assault weapons. N.J.S.A. 2C:39-1w(1); N.J.S.A. 2C:39-5(f).

14

42. Printable-gun computer files will allow anyone with a 3D printer to download a code and create a fully operational gun.

43. Because the 3D printed firearms will not have serial numbers or other identifiable marks, they will never be traceable by law enforcement. The ability to trace a firearm is critical when law enforcement investigates gun-related crimes.

44. Further, New Jersey law prohibits certain categories of persons from purchasing firearms, including individuals convicted of certain violent crimes and other offenses involving acts of domestic violence and individuals suffering from certain mental illnesses.

45. If Defendants' actions are allowed, anyone with access to a 3D printer will be able to manufacture a firearm, regardless of the disqualifiers under New Jersey law.

46. Any person in New Jersey can log onto the DefCad Website and register by merely inputting a username and email address.

47. The DefCad Website does not require a certain age, a criminal background, or any other eligibility factor.

48. Through the DD Website and DefCad Websites, Defendants declared that it will start publishing the printable-gun computer files on August 1, 2018.

15

## E. Post-Settlement Proceedings:

49. Defendants' actions subvert New Jersey's system of gun regulation and threaten the health, safety, and welfare of our citizens.

50. Responding to this threat, on July 26, 2018, the Attorney General sent a cease-and-desist letter ("New Jersey Cease-And-Desist Letter"), instructing Defense Distributed not to publish the files online.

51. Defense Distributed responded to the New Jersey Cease and Desist Letter the next day. Although Defense Distributed said that it would "attempt to restrict files made available on the internet to prevent download within New Jersey" by blocking users with New Jersey-based IP Addresses from accessing the files, it made clear its intent to proceed with publication of the codes on August 1, 2018.

52. On July 25, 2018, The Brady Campaign to Prevent Gun Violence, Everytown for Gun Safety Action Fund, Inc., and Giffords (collectively, "Proposed Intervenors") sought to intervene in the Texas Litigation and requested a temporary restraining order and a preliminary injunction to enjoin Defense Distributed from publishing the printable gun-computer files at issue here to prevent immediate and irreparable harm to United States national security.

16

53. On Friday, July 27, 2018, a hearing was held before the Honorable Robert Pitman wherein both of the Proposed Intervenors' motions were denied.

54. On July 29, 2018, Defense Distributed and SAF (collectively, "DD/SAF") filed a Complaint in the United States District Court for the Western District of Texas (Case No. 1:18-cv-00637), seeking declaratory and injunctive relief, damages, and attorney's fees against the Attorney General and Michael Feuer, the Los Angeles City Attorney.

55. DD/SAF initiated this lawsuit against the Attorney General in response to the New Jersey Cease-And-Desist Letter, alleging, among other things, that it constitutes an unconstitutional prior restraint.

56. Notably, DD/SAF state in their Complaint that "[b]ut for Defendant Grewal's letter, Defense Distributed would freely distribute the files in New Jersey."

57. In their Complaint, DD/SAF also allege that "[t]he Second Amendment Foundation's members and supporters are among Defense Distributed's audience" and that "SAF has over 650,000 members and supporters nationwide, including members in . . . New Jersey."

58. On July 30, 2018, the Commonwealth of Pennsylvania, Governor Tom Wolf, Attorney General Josh Shapiro and the

17

Pennsylvania State Police filed a Complaint against Defense Distributed, DEFCAD, Ghost Gunner and Wilson (collectively, "PA Defendants") for declaratory judgment and a preliminary injunction, as well as a motion for a temporary restraining order and preliminary injunction to enjoin the PA Defendants from publishing the printable-gun computer files at issue here.

## COUNT I
## PUBLIC NUISANCE

59. Plaintiff incorporates the allegations contained in Paragraphs 1 through 58 above, as if more fully set forth herein.

60. By publishing printable-gun computer files to New Jersey residents, Defendants will intentionally and recklessly flood the illegal firearms market in New Jersey and pose a direct threat to the public health and safety of New Jersey.

61. Defendants know or should know that the publication of the printable-gun computer files will bring illegal firearms into existence in New Jersey, which will result in increased crime, injury, and death to New Jersey residents.

62. Defendants' intentional and reckless conduct will create an unreasonable and significant interference with the public health, public safety, and public peace of the residents of New Jersey.

18

63. Defendants' conduct, if left unabated, will have long-lasting effects on the health and safety of New Jersey residents.

64. As demonstrated by their own statements, Defendants know or have reason to know that their actions will have a significant impact on the health and safety of New Jersey residents.

## COUNT II
### NEGLIGENCE

65. Plaintiff incorporates the allegations contained in Paragraphs 1 through 64 above, as if more fully set forth herein.

66. New Jersey law prohibits the types of weapons that Defendants seek to create in publishing their printable-gun computer files.

67. By publishing printable-gun computer files to New Jersey residents so that individuals may create their own illegal firearms, Defendants' conduct is wholly proscribed by New Jersey law. N.J.S.A. 2C:39-5(f).

68. Defendants' conduct, if left unabated, will have a long-lasting, direct and proximate impact on the safety and health residents of New Jersey.

69. Defendants' conduct, if left unabated, will result in increased crime, injury, and death to New Jersey residents.

## PRAYER FOR RELIEF

**WHEREFORE**, based upon the foregoing allegations, Plaintiff respectfully requests that the Court enter judgment:

(a) Awarding judgment in its favor and against Defendants on each cause of action asserted in the Verified Complaint;

(b) Permanently enjoining Defendants and their owners, officers, directors, founders, members, managers, agents, servants, employees, representatives, independent contractors, and all other persons or entities directly under their control, from engaging in an activity that is the subject of Plaintiff's request for temporary and preliminary injunctive relief, as set forth in the accompanying Order to Show Cause with Temporary Restraints Pursuant to Rule 4:52;

(c) Requiring Defendants to abate any public nuisance that their conduct has created;

(d) Ordering Defendants to pay costs and fees, including attorneys' fees, for the use of the State of New Jersey; and

(e) Granting such other relief as the interests of justice may require.

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY
Attorney for Plaintiff

By: _Lara J. Fogel_____
Lara J. Fogel
Deputy Attorney General

Dated:  July 30, 2018
        Newark, New Jersey

20

## RULE 4:5-1 CERTIFICATION

I certify, to the best of my information and belief, that the matter in controversy in this action is not the subject of any other action pending in any other court of this State, but that an action titled Defense Distributed, et al. v. Gurbir S. Grewal, et al., Case No. 1:18-cv-00637 has been commenced in the United States District Court, Western District of Texas. I further certify, to the best of my information and belief, that the matter in controversy in this action is not the subject of a pending arbitration proceeding in this State, nor is any other action or arbitration proceeding contemplated. I certify that there is no other party who should be joined in this action at this time.

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY
Attorney for Plaintiff

By: _Lara J. Fogel_____
Lara J. Fogel
Deputy Attorney General

Dated:  July 30, 2018
Newark, New Jersey

21

<u>**RULE 1:38-7(c) CERTIFICATION OF COMPLIANCE**</u>

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with <u>R.</u> 1:38-7(b).

> GURBIR S. GREWAL
> ATTORNEY GENERAL OF NEW JERSEY
> Attorney for Plaintiff
>
> By: _____
> Lara J. Fogel
> Deputy Attorney General

Dated:    July 30, 2018
          Newark, New Jersey

<u>**DESIGNATION OF TRIAL COUNSEL**</u>

Pursuant to <u>R.</u> 4:25-4, Lara J. Fogel, Deputy Attorney General, is hereby designated as trial counsel on behalf of Plaintiffs.

> GURBIR S. GREWAL
> ATTORNEY GENERAL OF NEW JERSEY
> Attorney for Plaintiff
>
> By: _____
> Lara J. Fogel
> Deputy Attorney General

Dated:    July 30, 2018
          Newark, New Jersey

22

## VERIFICATION

I, Aziza Salikhova, of full age, hereby certify as follows:

1.    I am an Investigator with the New Jersey Division of Consumer Affairs ("Division"), Office of Consumer Protection.

2.    I have read the foregoing Verified Complaint and on my own personal knowledge and review of documents in possession of the Division, I know that the facts set forth herein are true and they are incorporated in this certification by reference, except for those alleged upon information and belief.

3.    I certify that the above statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

_____
AZIZA SALIKHOVA

Dated:    July 30, 2018
          Newark, New Jersey

23

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY
Division of Law
124 Halsey Street
P.O. Box 45029
Newark, New Jersey 07101
Attorney for Plaintiff

By:  Lorraine K. Rak (035771985)
     Deputy Attorney General, Section Chief
     Lara J. Fogel (038292006)
     Melissa Medoway (028422011)
     Jesse J. Sierant (049342013)
     Deputy Attorneys General
     Affirmative Civil Enforcement
     (973) 877-1280

|  |  |
|---|---|
|  | SUPERIOR COURT OF NEW JERSEY CHANCERY DIVISION, ESSEX COUNTY DOCKET NO._____ |
| GURBIR S. GREWAL, Attorney General of the State of New Jersey,<br><br>        Plaintiff,<br><br>    v.<br><br>DEFENSE DISTRIBUTED, CODY R. WILSON, and JANE and JOHN DOES 1-20, individually and as owners, officers, directors, shareholders, founders, members, managers, agents, servants, employees, representatives and/or independent contractors of DEFENSE DISTRIBUTED, and XYZ CORPORATIONS 1-20,<br><br>        Defendants. | **Civil Action**<br><br><br><br>**CERTIFICATION OF NEW JERSEY OFFICE OF HOMELAND SECURITY <u>DIRECTOR JARED MAPLES</u>** |

I, Jared Maples, of full age, certify as follows:

1.    I have been the Director of the New Jersey Office of Homeland Security and Preparedness (NJOHSP) since June 5, 2017.

1

2.    In this role, I serve as the Governor of New Jersey's designated Homeland Security Advisor (HSA) and am the Cabinet level executive responsible for coordinating and leading New Jersey's Counterterrorism, Cybersecurity and Emergency Preparedness efforts.

3.    I previously served in NJOHSP as the Director of the Division of Administration, from 2016 to 2017.    The Division encompasses information technology and security, human resources, and facilities management and financial activities for the Office, including oversight of millions of dollars in federal homeland security grant funding.

4.    Prior to joining NJOHSP, I spent over a decade at the Central Intelligence Agency (CIA) in a variety of leadership roles, and previously worked at the US Department of Defense in the Office of the Secretary of Defense.

5.    As a seasoned intelligence officer, my career has focused on executive strategy development and execution, organizational and operational change management, emergency operations response, internal security investigations and personnel protection in high threat environments.    I have traveled around the world on behalf of the US Government, including many deployments to areas of active hostilities.

6.    I have a Master's degree in Business Administration from Georgetown University, a Bachelor's degree from Villanova

2

University, and an Associate's degree from Valley Forge Military College.

7.    Domestic terrorism and mass shootings are an unfortunate reality and a source of growing concern.  Access to weapons has been an enabling component to these incidents.

8.    NJOHSP provides Active Shooter Response Resources to bolster the preparedness and resilience of New Jersey and its residents in the event of an active shooter incident.

9.    The computer-aided design (CAD) codes of Defense Distributed and Cody R. Wilson (collectively, "Defendants") will allow individuals across New Jersey to automatically manufacture on 3D printers lethal firearms that are untraceable and that can be modified to be virtually undetectable in metal detectors.

10.    This is concerning to NJOHSP because terrorists and other networks directing violence at the United States and in New Jersey could use this technology to manufacture guns, including assault firearms.  Those guns would be untraceable by law enforcement.  That means if a gun were used to commit an act of violence, law enforcement would be unable to determine who manufactured, purchased, or transferred the gun.

11.    Unregulated and untraceable guns would significantly curtail law enforcement's ability to apprehend the persons involved in the act of violence and stop them from committing future acts of violence.  The proliferation of untraceable guns

3

would also give terrorist groups a significant advantage and deprive NJOHSP the ability to gather the necessary intelligence to combat them and reduce their threat they pose to our citizens.

12. NJOHSP and other New Jersey law enforcement agencies have traced guns thousands of times, and such traces are a critical tool to help solve crimes. We use the results of these traces to identify the methods by which firearms entered the illegal market and to devise strategies to disrupt these criminal networks. But if there were to be a proliferation of untraceable 3D guns, crimes and criminal networks might go unsolved and the perpetrators might go on to commit additional acts of violence.

13. Indeed, in 2013, journalists in Israel were able to print a Defense Distributed gun and get within arm's reach of the country's prime minister at the government capitol. (Lazar Berman, Journalists Print Gun, Point It at Netanyahu, Times of Israel (July 13, 2013), available at https://bit.ly/2mD6AOJ.) We at NJOHSP are concerned that if 3D gun codes are generally available, similar incidents could occur on New Jersey soil.

14. Upon review of Defendants' January 2, 2015 Commodity Jurisdiction Request to the United States Department of State Directorate of Defense Trade Controls, Defendants' CAD files can be used to "automatically find, align, and mill" a firearm, such

4

as an AR-15, on a 3D printer or other manufacturing device. (See Ex. A, pg. 2.) Manufacture of a firearm in this manner requires considerably less technical knowledge than the manufacture of a weapon relying on conventional technical data that may be currently publicly available, but which only provides guidance on how to create a firearm and requires additional craftsmanship, know-how, tools, and materials from the manufacturer.

15. Posting of Defendants' CAD files on the Internet without restriction would make those files available throughout New Jersey to any Internet user, thereby permitting the export of those files to any New Jersey resident or visitor with access to Defendants' website. The likely effect of this publishing would be to cause significant harm to the health, safety, peace, and comfort of the citizens of New Jersey.

16. For example, the "Liberator" firearm included in Defendants' CAD designs presents a specific and unique risk to State security since the Liberator is a plastic firearm that can be produced in a way as to be both fully operable and virtually undetectable by conventional security measures. 3D firearms can defeat normal detection such as metal detectors and wands, and present a problem to public safety in venues such as airports, arenas, schools, government buildings, and/or courthouses.

5

17. Making Defendants' CAD files available through unrestricted access on the Internet would provide terrorists and crime organizations with firearms at their convenience, subject only to access to a 3D printer, an item that is widely commercially available. (See e.g., https://www.staples.com/3D-Printers/cat_CL211598?fids=&sr=true&sby=2&min=&max=&myStoreId=&deptFid=.) Terrorist groups and other bad actors could then manufacture and use such weapons against New Jersey citizens.

18. Unrestricted access to Defendants' CAD files would likewise provide armed criminal or terrorist organizations with access to firearms components and replacement parts.

19. Access to weapons technology coupled with the uncontrolled and increasingly ubiquitous means of production, such as 3D printers, could contribute to terrorist or criminal acts and undermine New Jersey's efforts to reduce gun violence within the State.

20. For the foregoing reasons, Defendants' effort to post these CAD files through the Internet represents a direct threat to New Jersey's homeland security.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

_____
JARED MAPLES

Dated: July 30, 2018

# EXHIBIT A

**MATTHEW A. GOLDSTEIN, PLLC**
1012 14TH STREET NW
WASHINGTON, D.C. 20005

**VIA ELECTRONIC FILING**

January 2, 2015

PM/DDTC, SA-1, 12th Floor
Office of Defense Trade Controls
Bureau of Political Military Affairs
U.S. Department of State
Washington, D.C. 20522-0012

**SUBJECT:  Commodity Jurisdiction Request for Ghost Gunner Machine, Plastic Mounting Jig, User Instructions, and Software** (Defense Distributed, Inc., PM/DDTC Code M-34702)

Dear Sir or Madam:

Pursuant to Section 120.4 of the International Traffic in Arms Regulations ("ITAR") (22 C.F.R. Sections 120-130), Defense Distributed requests a commodity jurisdiction determination from the Directorate of Defense Trade Controls ("DDTC") on the Ghost Gunner machine (the "Ghost Gunner"), its plastic mounting jig, user instructions, and software for production, operation, and use of the Ghost Gunner.

The Ghost Gunner is an approximately one-foot-cubed black box that uses a drill bit mounted on a head that moves in three dimensions to automatically carve digitally-modeled shapes into polymer, wood or aluminum. It functions as a 3-axis computer-numerically-controlled ("CNC") press that can be used to manufacture parts to firearms controlled under U.S. Munitions List ("USML") Category I. It can also be used to manufacture items that are not controlled under the USML. The machine was designed, developed, and manufactured by Defense Distributed to automatically manufacture publicly available designs with nearly zero user interaction.

As discussed below, the Department of Defense recommended that Defense Distributed submit this commodity jurisdiction request.

Export jurisdiction over the Ghost Gunner, Jig, software, and instructions is uncertain because, although the Department of Commerce Export Administration Regulations ("EAR") maintain a control listing for jigs, fixtures, and other metal-working items "exclusively designed for use in the manufacture of firearms" under Commerce Control List ("CCL") Export Control Number ("ECCN") 2B018.n, there is no corresponding carve-out for these items and related software and technical information otherwise controlled by USML Category I generally; and Category I(i) controls technical data and defense services directly related to firearms, with technical data directly related to the manufacture or production of firearms designated as Significant Military Equipment.

Please note that a letter from Defense Distributed authorizing my law firm to file this request was uploaded with this DS-4076 submission. Please direct any questions and all correspondence related to this request to my office. Communications to me at matthew@goldsteinpllc.com are preferred.

Commodity Jurisdiction Request
January 2, 2015
Page 2 of 9

## I.   BACKGROUND

### A.   Defense Distributed

Defense Distributed is a Texas corporation, registered with the Department of State under PM/DDTC Code M-34702. The company has developed technical information that can be used to produce, manufacture, and assemble various parts components, accessories, and attachments to firearms controlled under USML Category I. This includes information for the design and production of the Ghost Gunner, software necessary to operate Ghost Gunner, and code that allows production of certain items by the Ghost Gunner.[1]

Following notification from DDTC in May 8, 2013, that the agency requires U.S. Government prior approval before publications of otherwise ITAR-controlled technical data into the public domain (Attachment 1), Defense Distributed has submitted requests for U.S. Government clearance of technical data to the Department of Defense Office of Prepublication and Security Review ("DOPSR").[2] On October 1, 2014, DOPSR returned a Defense Distributed request for clearance of technical information on the Ghost Gunner for public release, stating that commodity jurisdiction over the item was uncertain and recommending that Defense Distributed submit a commodity jurisdiction request. See Attachment 2.

### B.   The Ghost Gunner

Existing CNC machines are expensive or too inaccurate to manufacture firearms for the casual user. Defense Distributed developed the Ghost Gunner to address this problem by miniaturizing the build envelope to just large enough to mill common firearm receivers, which in turn improves rigidity, reduces material cost and simultaneously relaxes certain design limits, allowing Defense Distributed to sell an inexpensive machine with more than enough accuracy to manufacture firearms.

The first design tested on the Ghost Gunner was for an AR-15 lower receiver and the Ghost Gunner was able to automatically find, align, and mill a so-called "80%" lower receiver, which was not a firearm prior to milling. The Ghost Gunner has since undergone several design revisions to reduce machine chatter, backlash, and jitter, all with the goal of keeping total design cost low.

Photographs of Ghost Gunner are provided at Attachment 3 and rendered images of the machine with the plastic jig are provided at Attachment 4.

---

[1] This commodity jurisdiction request seeks a determination of the code necessary to operate Ghost Gunner. It does not seek a determination on the various project files specific to production of certain items by the Ghost Gunner.

[2] In complying with DDTC prepublication review requirements on publication of technical information into the public domain, Defense Distributed does not intent to, nor should it be considered to, waive any defense, claim or right under law.

Commodity Jurisdiction Request
January 2, 2015
Page 3 of 9

A schematic drawing for the Ghost Gunner is provided at Attachment 5.

Ghost Gunner form, fit, function, and performance characteristics include the following:

- It uses a compact, powder coated A36 steel frame and thick stainless T-slot rail, with preloaded ball bearings for maximum rigidity. Linear motion is achieved with low-backlash direct-drive ball screws mounted in-line with the cutting surface, thus preventing torsional gantry chatter while machining.

- It incorporates an electronic probe that automatically detects when the machine comes into contact with the work piece, allowing automatic part discovery and alignment. Ghost Gunner requires conductive parts if auto-discovery and alignment are used.

- It can manually machine nonconductive materials, but this requires manual calibration of a part to the machine - following a few simple instructions - as is required with existing CNC machines.

- Its moving parts are entirely sealed from chip debris. All bearings are sealed and contain wipers to prevent foreign contaminate entry. The rails are stainless steel and are factory lubricated, but do require periodic wiping to prolong life. End Mills dull over time and are considered a consumable.

- To contain aluminum chips, it includes a chip collection tray and all moving components are fully enclosed.

- It is capable of manufacturing deep pockets due to its horizontal gantry, which allows gravity to pull chips away from the cutting surface before they can build up and dull the end mill, as is the case on traditional CNC designs.

- It uses industry standard ER-11 collets, and ships with both 1/4" and 5/32" collets.

- It uses a standard IEC power cord and is compatible with any 110/220V circuit. No external power brick is used; the machine is entirely self-contained.

- It has two ports: Power (IEC standard) and USB (Type 'B').

- Its machinable dimensions are 140 x 75 x 60mm (~5.50 x 2.95 x 2.35")

- Its maximum part dimensions are 230 x 90 x 100mm (~9.05 x 3.50 x 3.90")

- Its overall footprint is 330 x 280mm (~13 x 11")

- Its weight is 20kg (~45 pounds)

Commodity Jurisdiction Request
January 2, 2015
Page 4 of 9

- Its Spindle Speed is 10,000+ RPM (Final Value TBD)

- Its software requirements are Windows 7 or higher. Mac version TBD

As noted above, Ghost Gunner is capable of manufacturing more than just firearm receivers. With Defense Distributed's open source Physibles Development SDK ("pDev"), designers can distribute files via the company's '.dd' file format, which contains all installation and assembly instructions, any required jig files to hold a part in place (that users can print with a 3D printer), and all machine definitions and code to physically manufacture a particular design. To a casual user, the .dd file is a one-stop solution to manufacturing any aluminum physible that the public can design to fit into the build envelope. Defense Distributed will be developing in and supporting this format.

The .dd file format is itself open source and not constrained to the Ghost Gunner or Defense Distributed; any user can define any existing machine's specific parameters via the machine parameters list. A single file can contain specific code and installation instructions for any number of machines. A user with both a Ghost Gunner and a Tormach P1100 could manufacture a particular .dd file on either machine and manufacture the same physible with zero additional user knowledge, as only the instructions required for a particular machine are revealed to the end user. The .dd file format is a CNC response to 3D printing's universal .stl file format. However, Ghost Gunner will also accept TinyG code from any CAM program.

In operation, users provide the parts for milling. They can then simply plug their computer into the Ghost Gunner, install the Ghost Gunner software, and download any compatible .dd design file. 3D printable jigs are used to hold each part in place as each milling step is performed. For example, milling an eighty percent AR-15 lower receiver requires two jig pieces to secure the lower in place while the trigger pocket is milled, and then two more jig pieces are installed to drill the trigger pinholes. As most eighty percent firearms require deep pocket milling, Ghost Gunner's mounting table is parallel to the end mill shaft. This orientation maximizes 3D printed jig strength, minimizes jig complexity, and mechanically aligns the part to the machine upon insertion into the Maker Slide-patterned, Open Source T Slot stainless rails.

Defense Distributed expects its typical order fulfillment will contain the fully assembled Ghost Gunner CNC, plastic mounting jig designed to secure 80% AR-15 receivers, operating software and instructions. Defense Distributed also intends to place instructions and computer code needed to build and use Ghost Gunner into the public domain as Open Source technology.

Block 13 ("Sales information) is not provided with this request because the Ghost Gunner is still in development as Defense Distributed awaits arrival of various production pieces and continues to make any required changes to the product. As such, the company has not yet delivered any machines (i.e., no completed sales). However, the company has accepted 469 pre-orders and 413 advance deposits from prospective purchasers. Each of these orders, except for one, are intended for domestic sale. In addition, consistent with U.S. law, final sales will carry conditions that limit purchases to private use (i.e., not for commercial or military use).

Commodity Jurisdiction Request
January 2, 2015
Page 5 of 9

### C.    User Instructions and Operating Software for the Ghost Gunner

The current draft User Instructions for the Ghost Gunner accompanies this commodity jurisdiction request at Attachment 6.  It contains information on how to attach a "80%" lower receiver to Ghost Gunner, such that Ghost Gunner can mill and drill all required holes to transform the lower receiver into a firearm.  Ghost Gunner presents numerous User Instructions, User Graphics, and User Selections to the operator.  Ghost Gunner performs work via Calibration Code and Milling Code.  Ghost Gunner also assists the user in creating 3D printable Jigs, if needed.

The software necessary to produce and operate the Ghost Gunner includes AutoDesk Inventor and a simple executable application that can interpret CNC part files and TinyG code. Additional information detailing the purpose, function, and capability of the software, as requested by DDTC's DS-4076 Commodity Jurisdiction (CJ) Guidance for Software, accompanies this commodity jurisdiction request at Attachment 7.

### II.    COMMODITY JURISDICTION STANDARD

The standard applicable to Department of State and other agency considerations of commodity jurisdiction is set forth at ITAR Section 120.3.  ITAR Subsection 120.3(a) extends Department of State jurisdiction to any item that meets the criteria of a defense article described on the USML or that provides equivalent performance capabilities; and ITAR Section 120.3(b) provides that a specific article not presently described on the USML shall be determined in the future as a defense article if it provides a critical military or intelligence advantage.

### A.    Relevant USML Control Listings

Subparagraph (h) to USML Category I controls components, parts, accessories, and attachments for firearms to .50 caliber inclusive.  The Ghost Gunner does not meet the Category I(h) criteria because it is not a component or part to a firearm.  Rather, it is a machine that can be used for the manufacture of such articles.

Subparagraph (i) to USML Category I controls technical data, to include "software" as defined at Section 120.45(f), and defense services directly related to the firearms and components, parts, accessories, and attachments for firearms to .50 caliber inclusive.  Technical data directly related to the manufacture or production of firearms controlled in Category I is designated as Significant Military Equipment.

The USML does not contain a control listing that describes items used for the manufacture of firearms.  Instead, that listing is contained on the EAR Commerce Control List ("CCL") entry for ECCN 2B018.n, which controls "Jigs and fixtures and other metal-working implements or "accessories" of the kinds exclusively designed for use in the manufacture of firearms.  ECCN 2D018 controls software" for the "development", "production" or "use" of equipment controlled by 2B018; and ECCN 2E018, in turn, controls "Technology" for the "use" of equipment controlled by 2B018.

Commodity Jurisdiction Request
January 2, 2015
Page 6 of 9

The scope of the CCL controls on firearms manufacturing equipment and technology is unclear because the EAR only controls items not described on the USML and Category I does not contain any carve-out from ITAR control for software or technology controlled under ECCNs 2D018 and 2E018. To the contrary, if literally applied, USML Category I(i) treats such technical information as Significant Military Equipment.

Because there is no specific carve-out in Category I or elsewhere in the USML for software or technology controlled by 2D018 and 2E018, it is very difficult to distinguish between technical data for the manufacture or production of firearms controlled in Category I and technology for the development, production, and use of equipment used to manufacture firearms controlled at 2D018 and 2E018. This is a primary concern of the present commodity jurisdiction request.

Nevertheless, EAR control is consistent with U.S. Implementation of Wassenaar Controls. Specifically, ECCNs 2B018, ECCN 2E018, and 2B018 are Wassenaar Arrangement-based controls, subject to the National Security reason for control and which correspond to Category 2 of the Wassenaar Arrangement List of Dual-Use Items. In fact, 2B018 is titled, "Equipment on the Wassenaar Arrangement Munitions List."

Although relevant text of the ITAR and EAR control listings lack clarity, it appears that the U.S. Government decided to implement export controls on firearms manufacturing equipment and associated technical information in the EAR when it first implemented the Wassenaar Arrangement controls for such items. Accordingly, Defense Distributed believes that the Ghost Gunner does not meet criteria of a defense article described on the USML and that it does not provide equivalent performance capabilities to an article described on the USML.

Defense Distributed further notes that the DDTC should consider amending USML Category I to provide an express carve-out for EAR items controlled under ECCNs 2B018.n, ECCN 2E018, and 2B018. Alternatively, if DDTC intends to control firearms manufacturing equipment under the USML, it should make this clear in the regulations. Towards this end, any determination on the instant request that imposes ITAR control should be widely disseminated and shared with the firearms manufacturing industry.

B.    Ghost Gunner Does Not Provide a Critical Military or Intelligence Advantage.

As noted above, ITAR Section 120.3(b) provides that a specific article not presently described on the USML shall be determined in the future as a defense article if it provides a critical military or intelligence advantage.

The function and performance of the Ghost Gunner does not provide a critical military or intelligence advantage. Rather, it is essentially a jig press based on a simple design that is easily replicated by any skilled machinist. In fact, the Ghost Gunner can be produced by persons with no formal engineering background.

Commodity Jurisdiction Request
January 2, 2015
Page 7 of 9

In addition, Ghost Gunner builds on technology readily available in the Open Source community, including the gshield 3 axis motion hardware (http://synthetos.myshopify.com/products/gshield-v5), the grbl g-code parser and motion controller (https://github.com/grbl/grbl), and the Arduino microcontroller (http://arduino.cc).

Further, instructions and/or electronic files for production of jig presses with similar form, fit, and function to the Ghost Gunner are publicly available for download at a variety of web addresses, to include the following:

http://aresarmor.com/store/Item/Polymer-80-Black
http://www.thingiverse.com/thing:160266
https://github.com/DefiantCad/defcad-repo/tree/master/Rifles/AR-15_80_percent_lower_v5-shadowfall/AR-15_80_percent_Lower_Drill_Jig_v1-Shadowfall
http://www.advancedrifles.com/3d-printed-jig-version-2-0/
http://www.80percentarms.com/products/80-ar-15-easy-jig
http://www.sierranevadaarms.com/jig.pdf
http://www.rockethub.com/projects/24384-80-lower-receiver-ar15-ar10-rudius-1911

## III. CONCLUSION

Considering the apparent intent of the U.S. Government in implementing relevant Wassenaar Arrangement controls in the EAR, Defense Distributed believes that the Ghost Gunner does not meet the criteria of an article described on the USML. In addition, the Ghost Gunner does not provide a critical military or intelligence advantage. Accordingly, Defense Distributed respectfully requests that the Department of State issue a commodity jurisdiction determination stating that the Ghost Gunner, its plastic mounting jig, operating software, and production and operation instructions do not meet the criteria of ITAR 120.3 and are subject to Department of Commerce jurisdiction under the EAR.

Defense Distributed authorizes the release for general publication of the information contained in Block 5 of the DS-4076 Form. However, other information in this request and documents submitted with Defense Distributed's DS-4076 Submission contain sensitive business information that is proprietary, confidential, and exempt from disclosure under the Freedom of Information Act, 5 U.S.C. Section 552, and is also protected under the Trade Secrets Act, 18 U.S.C. Section 1905. Accordingly, pursuant to ITAR Section 130.15, Defense Distributed requests that information in this submission other than that contained in Block 5 be withheld in the event of a request for its disclosure.

Commodity Jurisdiction Request
January 2, 2015
Page 8 of 9

Thank you for your prompt attention to this matter and please contact me at 202-550-0040 or at matthew@goldsteinpllc.com if any additional information is needed

Yours truly,

Matthew A. Goldstein
Legal Counsel

COMPANY CERTIFICATION:

Cody Wilson, the Principal of Defense Distributed, certifies that he is the duly authorized representative of Defense Distributed; and that in such capacity, he certifies that he has carefully read the foregoing Commodity Jurisdiction request; and that the contents of the request are true and correct to the best of his knowledge, information and belief after reasonable inquiry into the matters discussed.

Signature                                          1/2/2015
                                                   Date

ATTACHMENTS TO LETTER OF EXPLANATION:

Attachment 1        May 8, 2013 DDTC Letter to Defense Distributed

Attachment 2        October 1, 2014 DOPSR Letter to Defense Distributed

Attachment 3        Photographs of Ghost Gunner Machine

Attachment 4        Rendered Images of Ghost Gunner Machine

Attachment 5        Ghost Gunner Schematics

Attachment 6        Ghost Gunner User Instructions

Attachment 7        Answers to DS-4076 Commodity Jurisdiction (CJ) Guidance for Software

www.GoldsteinPLLC.com

Scanned by CamScanner

Commodity Jurisdiction Request
January 2, 2015
Page 9 of 9

## OTHER ATTACHMENTS INCLUDED WITH DS-4076 SUBMISSION:

DD_DS4076.pdf

DD_Attorney_Authorization_Letter_Block_2-1.pdf

[Instant document] DD_Cover_Ltr_Block_6-1.pdf

DD_Certification_Block_19-1.pdf

United States Department of State

*Bureau of Political-Military Affairs*
*Directorate of Defense Trade Controls*

*Washington, D.C. 20522-0112*

APR 1 5 2015

In Reply refer to
DDTC Case CJ 1083-14 (RE-ISSUE)

YOUR SUBMISSION DATED: January 2, 2015

COMMODITY JURISDICTION DETERMINATION FOR:  Ghost Gunner
Machine, Plastic Mounting Jig, User Instructions, and Software

The product described in your submission is a one cubic foot box that functions as
a 3-axis, computer-numerically-controlled (CNC) press capable of automatically
milling parts out of various materials through software designs.

A technical review of your commodity jurisdiction (CJ) request has been
concluded by the requisite agencies of the United States Government.  A split
jurisdiction determination of this request has been determined, as follows:

> The Department of State has determined that the **Ghost Gunner, its**
> **plastic mounting jig, operating software, and production and**
> **operation instructions are not subject to the jurisdiction of the**
> **Department of State.**  However, export may require authorization from
> the Department of Commerce (DOC).  Please consult the DOC Office of
> Exporter Services at (202) 482-4811 to make a Classification Request
> (CCATS) and satisfy other applicable requirements prior to export.

> The Department of State has determined that the **project files,**
> **data files, or any form of technical data for producing a**
> **defense article, including an 80% AR-15 lower receiver, are**
> **subject to the jurisdiction of the Department of State in**
> **accordance with the International Traffic in Arms**
> **Regulations (ITAR) (22 CFR 120 through 130).**  They are

Continued on Page Two

Cody R. Wilson
Defense Distributed, Inc.
1101 W 34th Street, #340
Austin, TX 78705
crw@defdist.org

Page Two

In Reply refer to
DDTC Case CJ 1083-14

designated as technical data under Category I(i) of the United States Munitions List (USML). A license or other approval is required pursuant to the ITAR prior to any export or temporary import.

Should you not agree with this determination and have additional facts not included in the original submission, you may submit a new CJ request. If you do not agree with this determination and have no additional facts to present, you may request that this determination be reviewed by the Deputy Assistant Secretary of State for Defense Trade Controls.

Should you require further assistance on this matter, please contact Samuel Harmon at (202) 663-2811 or HarmonSC@state.gov.

Sincerely,

C. Edward Peartree
Director
Office of Defense Trade Controls Policy

Cc: Matthew A. Goldstein
1012 14th Street, NW, Suite 620
Washington, DC 20005
matthew@goldsteinpllc.com

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY
Division of Law
124 Halsey Street
P.O. Box 45029
Newark, New Jersey 07101
Attorney for Plaintiff

By:   Lorraine K. Rak (035771985)
      Deputy Attorney General, Section Chief
      Lara J. Fogel (038292006)
      Melissa Medoway (028422011)
      Jesse J. Sierant (049342013)
      Deputy Attorneys General
      Affirmative Civil Enforcement
      (973) 877-1280

|  |  |
|---|---|
| | SUPERIOR COURT OF NEW JERSEY<br>CHANCERY DIVISION, ESSEX COUNTY<br>DOCKET NO._____ |
| GURBIR S. GREWAL, Attorney General of the State of New Jersey,<br><br>Plaintiff,<br><br>v.<br><br>DEFENSE DISTRIBUTED, CODY R. WILSON, and JANE and JOHN DOES 1-20, individually and as owners, officers, directors, shareholders, founders, members, managers, agents, servants, employees, representatives and/or independent contractors of DEFENSE DISTRIBUTED, and XYZ CORPORATIONS 1-20,<br><br>Defendants. | Civil Action<br><br><br>CERTIFICATION OF DEPUTY CHIEF OF DETECTIVES CHRISTOPHER W. DONOHUE |

I, Christopher W. Donohue, of full age, certify as follows:

1.    I am a citizen of the United States and a resident of the State of New Jersey ("New Jersey").

1

2.    I am over 21 years of age.

3.    I am the Deputy Chief of Detectives, shield #1783, of the Gangs/Organized Crime Bureau of the New Jersey Division of Criminal Justice ("DCJ").

4.    I graduated with honors from the Westchester County Police Academy, in Valhalla, New York in 1996, and became an Investigator for the New York County District Attorney's Office in New York City in the same year.   I attained the rank of Senior Investigator and Field Training Officer (FTO) before leaving in November of 2001.

5.    In 2001, I became a detective with DCJ and was assigned to the Gangs/Organized Crime Bureau.   I was promoted to the rank of Lieutenant in 2009, and remained assigned to the Gangs/Organized Crime Bureau.   In 2014, I was promoted to the rank of Deputy Chief of Detectives of the Gangs/Organized Crime Bureau.

6.    In my current capacity as Deputy Chief of Detectives, I am responsible for overseeing all criminal investigations administered by the Gangs/Organized Crime Bureau.   The Gangs/Organized Crime Bureau is responsible for investigating groups and/or individuals associated with street gangs and organized crime who commit criminal offenses in violation of New Jersey State law, such as narcotics trafficking, weapons offenses, money laundering, and murder.   The vast majority of

2

cases investigated by the Gangs/Organized Crime Bureau involve a firearm.

7.    During my career, I have investigated and supervised hundreds of cases involving organized crime, narcotics trafficking, weapons offenses, homicide, and money laundering. Throughout my career, I have served as an affiant on numerous wiretap applications, as well as search and arrest warrant applications.

8.    In addition to attending the Westchester County Police Academy, I have also received specialized training over the course of my career from agencies, such as the New York City Police Department, the New Jersey State Police ("NJSP"), the United States Drug Enforcement Administration, and the NY/NJ High Intensity Drug Trafficking Area.  I have also participated in numerous in-service trainings from the New York County District Attorney's Office and DCJ.  I have also received meritorious commendations from the New Jersey Attorney General, the New York City Police Department, the Federal Bureau of Investigation, the United States Drug Enforcement Administration, the NJSP, and the United States Attorney's Office.

9.    I am trained in and qualified to carry several types of firearms.  Twice a year, I am required to attend in-service trainings and qualify to carry firearms.  I have attended these

3

twice-a-year trainings and qualifications every year since 1996.

10. Printable-gun computer files allow anyone with a third dimensional ("3D") printer to download a code and create a fully operational gun. Because the 3D printed firearms will not have serial numbers or other identifiable marks, they will never be traceable by law enforcement. This completely subverts New Jersey's system of gun regulation and threatens the health, safety, and welfare of our citizens.

11. A serial number is required to be placed on all firearms so that they can be traced to their original owners if they are ever used to commit a criminal offense. Law enforcement traces firearms by finding the owner's name in the gun dealer's records, and then interviewing that person and any other person to whom he sold the gun, and so on. Through this process, law enforcement is able to determine the manufacturer of the gun, the date it was sold, the dealership, and the purchaser. This information assists law enforcement in determining what happened to a particular gun after it left the dealer by learning the history of who owned the gun.

12. Being able to trace a gun is critical in the investigation of gun-related crimes. The computer-aided design (CAD) codes of defendants Defense Distributed and Cody R. Wilson (collectively, "Defendants") will allow individuals across New Jersey to automatically manufacture untraceable guns

4

on 3D printers. If law enforcement is unable to trace 3D guns to determine their owners, law enforcement will be critically hampered in its ongoing efforts to solve gun crimes and prevent new gun crimes from being committed. This poses a direct and immediate threat to public health, safety, and welfare.

13. Defendants' codes for 3D guns will also enable individuals to print assault weapons, which are illegal in New Jersey under N.J.S.A. 2C:39-5(f).

14. In addition, Defendants' codes for 3D guns will be available to everyone in New Jersey, regardless of age, criminal status, history of mental illness, or other disqualifying characteristic. There will thus be no way for law enforcement to prevent guns from winding up in the hands of those who are prohibited from purchasing firearms under New Jersey law, including the following:

    a. those who have been convicted of crimes and disorderly persons offenses involving acts of domestic violence (prohibited by N.J.S.A. 2C:58-39(c)(1));

    b. those who are drug dependent (N.J.S.A. 2C:58-3(c)(2));

    c. those who are confined for mental disorders to hospitals, mental institutions or sanitariums (N.J.S.A. 2C:58-3(c)(2));

5

d.   those who suffer from a physical defect or disease that would make it unsafe for them to handle firearms (N.J.S.A. 2C:58-3(c)(3));

e.   those who have been confined for a mental disorder (N.J.S.A. 2C:58-3(c)(3));

f.   those who are alcoholics and are unable to produce proof demonstrating that they no longer suffer from that particular disability in a manner that would interfere with or handicap them in the handling of firearms (N.J.S.A. 2C:58-3(c)(3));

g.   juveniles (N.J.S.A. 2C:58-3(c)(4));

h.   those for whom the issuance of a permit to purchase a handgun or firearms purchaser identification card would not be in the interests of the public health, safety, or welfare (N.J.S.A. 2C:58-3(c)(5));

i.   those who are subject to restraining orders issued pursuant to the "Prevention of Domestic Violence Act" prohibiting them from possessing firearms (N.J.S.A. 2C:58-3(c)(6);

j.   those who were adjudicated delinquent for offenses which, if committed by an adult, would constitute a crime involving the unlawful use or possession of weapons, explosives, or destructive devices (N.J.S.A. 2C:58-3(c)(7));

6

k. those who had a firearm seized pursuant to the Prevention of Domestic Violence Act (N.J.S.A. 2C:58-3(c)(8)); and

l. those who are named on the consolidated Terroristic Watchlist maintained by the Terrorist Screening Center administered by the Federal Bureau of Investigation (N.J.S.A. 2C:58-3(c)(9)).

15. The New Jersey Legislature has passed these laws prohibiting the foregoing groups of individuals from obtaining permits to purchase handguns and firearms purchaser identification cards because the legislative judgment is that if such persons had access to guns, there would be a direct threat to public safety. However, if Defendants' codes for 3D guns are readily available to the general public, everyone with access to a 3D printer will be able to manufacture a gun, and law enforcement will have no way to ensure that guns are not possessed by persons who are prohibited from possessing them under current New Jersey law. This undermines the legislative will and poses a direct and immediate threat to public health, safety, and welfare of New Jersey residents.

16. Of particular concern are certain persons who are prohibited from purchasing, owning, possessing, or controlling any and all firearms under N.J.S.A. 2C:39-7(b), due to their prior convictions for aggravated assault, arson, burglary,

escape, extortion, homicide, kidnapping, robbery, aggravated sexual assault, sexual assault, bias intimidation, endangering the welfare of a child, stalking, or a crime involving domestic violence. Those persons face a mandatory term of imprisonment with at least five years of parole ineligibility if they purchase, own, possess, or control a firearm. But the 3D codes will allow them to easily download firearms, which will severely hamper law enforcement's ongoing efforts to keep dangerous guns out of the hands of dangerous criminals.

17. I was able to log on to the Defense Distributed website (located at https://defcad.com) and register simply by providing a username and email address. There was nothing on the website requiring that I attest to being over a certain age, not having a criminal background, or being otherwise ineligible to possess a weapon. The website indicated that the download will be free starting August 1, 2018. Thus, on August 1, 2018, any person in New Jersey will be able download the 3D gun codes for free, regardless of that person's eligibility to legally purchase or possess a weapon.

8

18.    I read Defense Distributed's Complaint filed on July 29, 2018, in the Western District of Texas, where it claimed that "[u]sers with New Jersey based IP addresses are currently blocked from accessing the files[.]"    Later that day, I attempted to and was still able to log on to the website using a smartphone while in New Jersey, contrary to Defense Distributed's claim.

19.    Even were Defense Distributed's controls effective, that does not fix the problem.  I still would be able to travel to the State of New York quickly, download the code one time, return to New Jersey, and print the 3D guns in New Jersey indefinitely.

20.    In sum, Defendants' codes for 3D guns will facilitate the illegal possession of weapons to criminals and other unlawful users, will undermine New Jersey's comprehensive scheme for keeping guns out of dangerous criminals' hands, and will undermine the safety of New Jersey residents.  Based upon my experience, to allow individuals to download the 3D gun from Defendants' website will result in printable 3D guns that will flood the illegal firearms market and pose a direct threat to the public safety of New Jersey.

9

I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

CHRISTOPHER W. DONOHUE

Dated:  July 30, 2018

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY
Division of Law
124 Halsey Street
P.O. Box 45029
Newark, New Jersey 07101
Attorney for Plaintiff

By:  Lorraine K. Rak (035771985)
     Deputy Attorney General, Section Chief
     Lara J. Fogel (038292006)
     Melissa Medoway (028422011)
     Jesse J. Sierant (049342013)
     Deputy Attorneys General
     Affirmative Civil Enforcement
     (973) 877-1280

|  |  |
|---|---|
|  | SUPERIOR COURT OF NEW JERSEY CHANCERY DIVISION, ESSEX COUNTY DOCKET NO._____ |
| GURBIR S. GREWAL, Attorney General of the State of New Jersey,<br><br>                              Plaintiff,<br><br>                    v.<br><br>DEFENSE DISTRIBUTED, CODY R. WILSON, and JANE and JOHN DOES 1-20, individually and as owners, officers, directors, shareholders, founders, members, managers, agents, servants, employees, representatives and/or independent contractors of DEFENSE DISTRIBUTED, and XYZ CORPORATIONS 1-20,<br><br>                              Defendants. | Civil Action<br><br><br>CERTIFICATION OF<br>INVESTIGATOR<br>**AZIZA SALIKHOVA** |

I, Aziza Salikhova, of full age, certify as follows:

1.   I make this Certification based upon my personal knowledge and review of documents in my possession.

2.   I am currently employed as an Investigator with the New Jersey Division of Consumer Affairs ("Division"), Office of Consumer Protection.   I have held this position since approximately March 10, 2001.

3.   In that capacity, I am responsible for investigating possible violations of New Jersey laws and regulations.

4.   Defense Distributed has a website[1] located at https://defdist.org ("DD Website").   The "About" section of the DD Website provides as follows:

7/26/2018                                          About | Defense Distributed

# ABOUT

Defense Distributed is a non-profit, private defense firm principally engaged in the research, design, development, and manufacture of products and services for the benefit of the American rifleman. Since 2012, DD has been headquartered in Austin, Texas.

Media inquiries: crw@defdist.org

5.   Defendants have posted their Computer Aided Design ("CAD") files on https://defcad.org ("DefCad Website"), a

---

[1]   On July 26, 2018 I was able to access Defense Distributed's websites located at https://defdist.org, https://defcad.com, and https://ghostgunner.net.   I completed electronic captures of these web sites which are available to be produced upon request.

2

website they created to serve as an open-source repository for weapons designs.

6.    The DD Website currently states as follows:

Defense Distributed |

(DD) ABOUT  CONSULTING  LOGIN  JOIN

## AUGUST 1
## 2018

Defense Distributed relaunches DEFCAD after reaching a settlement agreement with the US Department of State, concluding a multi-year federal lawsuit. The age of the downloadable gun begins.

7.    The DefCad Website includes data to automatically manufacture the "Liberator" pistol, which is a plastic firearm. The DefCad Website depicts the Liberator pistol as follows:

3



8.    Through the related website of https://ghostgunner.net ("GG Website"), Defense Distributed also manufactures and sells a "computer-controlled milling machine" called the "Ghost Gunner," which is designed to allow its owner to carve gun parts out of aluminum.    The GG Website includes the following depiction of the Ghost Gunner:

4



📞 800-880-8257    🛒 Cart

HOME    PRODUCTS    DOWNLOADS    FAQ    DEALERS    ABOUT ▾

GHOST GUNNER 2
An open source hardware project

Ghost Gunner is a general purpose CNC mill, built upon a large body
of open source work, grbl g-code motion control, and popular
microcontrollers.

View specifications ▶
Learn more ▶

SHOP NOW

FOR 80 PERCENT RECEIVERS AND FRAMES
No prior CNC experience required

Ghost Gunner is specially designed to manufacture a growing library of mil-spec 80 percent lowers to
completion. With simple tools and point and click software, the machine automatically finds and aligns
to your 80% lower to get to work. No prior CNC knowledge or experience is required to manufacture
from design files. Legally manufacture unserialized rifles and pistols in the comfort and privacy of home.

9.   On July 26, 2018, I created a user account on the DefCad Website.  During the process I was not asked to verify my age, criminal background, or any other factors that would render me ineligible to possess a firearm.

I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

_____
AZIZA SALIKHOVA

Dated:  July 30, 2018
        Newark, New Jersey

SUPERIOR COURT OF NEW JERSEY
CHANCERY DIVISION, ESSEX COUNTY
DOCKET NO. ESX-C-

| | |
|---|---|
| GURBIR S. GREWAL, Attorney General of the State of New Jersey, <br><br> Plaintiff, <br><br> v. <br><br> DEFENSE DISTRIBUTED, CODY R. WILSON, and JANE and JOHN DOES 1-20, individually and as owners, officers, directors, shareholders, founders, members, managers, agents, servants, employees, representatives and/or independent contractors of DEFENSE DISTRIBUTED, and XYZ CORPORATIONS 1-20, <br><br> Defendants. | Civil Action |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ORDER
TO SHOW CAUSE WITH TEMPORARY RESTRAINTS**

GURBIR S. GREWAL
ATTORNEY GENERAL OF
THE STATE OF NEW JERSEY
Division of Law
124 Halsey Street
P.O. Box 45029
Newark, New Jersey 07101
(973) 877-1280
Attorney for Plaintiff

Of Counsel and On the Brief
Lorraine K. Rak (035771985)
Deputy Attorney General, Section Chief
Lara J. Fogel (038292006)
Melissa Medoway (028422011)
Jesse J. Sierant (049342013)
Deputy Attorneys General
Affirmative Civil Enforcement

## PRELIMINARY STATEMENT

In just two days, Defense Distributed and its founder Cody Wilson are planning to take an unprecedented and dangerous action - to publish Computer Aided Design ("CAD") files that enable anyone, including terrorists, domestic abusers, criminals, gang members and juveniles, to print firearms using a three-dimensional ("3D") printer directly from the comfort of their own homes. Worse still, the codes they plan to post enable individuals to print extremely dangerous 'assault weapons' that are illegal under New Jersey law. And that is not all - because the printed guns would not have serial numbers, they would not be traceable by law enforcement, which would undermine law enforcement's ongoing efforts to solve and reduce gun crime. The implications for public safety and homeland security are clear and the risk is imminent; once Defendants open that Pandora's Box, it can never be closed. This lawsuit seeks to enjoin Defendants from heading down this path.

For years, the Federal Government and multiple federal courts recognized that Defense Distributed's plans posed a direct threat to public safety and national security across the United States, and so the Government barred the company from publishing the CAD files. Indeed, the Federal Government stated in litigation that Defense Distributed's plans to publish these

2

firearm codes posed a specific and unique risk to the national security and foreign policy interests of the United States. That was, unfortunately, unsurprising; founder Cody Wilson had made clear that the company's objective is for everyone to have access to guns and to make any firearm regulations impossible, even stating that "common sense gun reforms" would no longer be possible. And although the Federal Government had properly challenged Defense Distributed's ability to publish codes that will enable terrorists and criminals to print firearms, just recently the Federal Government disclosed that it had earlier settled this litigation. Troublingly, the Federal Government has now abruptly flipped positions (even after multiple courts had agreed about the pending risk to public safety) and decided to allow Defense Distributed to proceed with its plans to share these computer codes on the Internet, available to all.

But New Jersey law provides a separate and independent basis to prevent Defense Distributed and Cody Wilson from engaging in this dangerous, irreversible conduct. New Jersey's public nuisance law provides a cause of action to hold firearm manufacturers accountable – and to enjoin imminent violations of the law – when their plans would facilitate the illegal sale of weapons to criminals and other prohibited users, and when the manufacturer has done too little to prevent that illegal market

3

from developing.  And that is what will happen here - Defendants will make accessible codes that will allow terrorists, domestic violence abusers, criminals, gang members and juveniles to print guns at home, even though they cannot lawfully possess them. More than that, Defendants' codes will enable individuals to create firearms without serial numbers, again in direct contravention of state law.  But Defendants have done nothing to prevent the flood of illegal, 3D-printed weapons that is sure to result, and as noted above, have instead wholeheartedly embraced and encouraged these troubling results.

In light of the grave and imminent harm posed with the release of printable-gun computer files, which can, and will, be used to create illegal and untraceable firearms in New Jersey, the Attorney General requests that the Court immediately enter an order enjoining and restraining Defendants from publishing and distributing these dangerous printable-gun computer files, which Defendants plan to publish this Wednesday, on August 1, 2018.

FACTUAL BACKGROUND

In 2012, Defense Distributed, founded by Cody Wilson, began exporting technical data related to firearms through the publication of CAD files, without restriction, on the Internet. (Defense Distributed v. U.S. Dept. of State, Civil Action No.

4

1:15-CV-00372-RP, W.D. Tex. ("DD v. U.S."), Dkt. 32, p.1; Dkt. 8, pp. 5-6; Defense Distributed v. U.S. Dept. of State, 838 F.3d 451, 460-61 (5th Cir. 2016).) These files are computer files with instructions for how to create guns and gun components through the use of three-dimensional printers. (DD v. U.S., Dkt. 32, p.5.) Defense Distributed posted these CAD files on DefCad.org ("Website"), a website it created to serve as an open-source repository for weapons designs. (DD v. U.S., Dkt. 32; Dkt. 8.) The site accepts user financial contributions and has a users' comments feature where information can be posted or shared. (See https://defdist.org/; https://defcad.com.) The files Defense Distributed put online included data to automatically manufacture its first model—what it termed the "Liberator" pistol. (DD v. U.S., Dkt. 32, 8.) The Liberator is a plastic firearm that contains a six ounce piece of steel that can be easily removed enabling the firearm to be undetected in walk-through metal detectors. (DD v. U.S., Dkt. 32; Dkt. 8.)

In May 2013, the State Department's Directorate of Defense Trade Controls ("DDTC") advised Defense Distributed that its publication of CAD files without authorization from the DDTC potentially violated the International Traffic in Arms Regulations ("ITAR") administered by DDTC. (Executive Order 13637(n)(iii); 22 C.F.R. §§ 120-130.) The violation stemmed

5

from the fact that the CAD files were being made available outside the United States via the Internet. (DD v. U.S., Dkt. 32, pp. 5-7.) After a review, DDTC concluded that several of the CAD files were subject to regulation under ITAR. (DD v. U.S., Dkt. 32, pp. 5-7.) To make the CAD files available outside the United States, ITAR required Defendants to seek preapproval of publication. (DD v. U.S., Dkt. 32.)

On May 6, 2015, Defense Distributed, the Second Amendment Foundation ("SAF") and Conn Williamson (collectively, "DD/SAF/CW") brought suit in the United States District Court for the Western District of Texas, seeking a declaration that the DDTC's preapproval requirement for privately generated unclassified information was an unconstitutional government action and violated the First, Second, and Fifth Amendments. (DD v. U.S., Dkt. 1.) When the Federal Government opposed the suit, Lisa V. Aguirre, the Director of the Office of Defense Trade Controls Management, testified that: (a) "[t]he 'Liberator' firearm included in DD/SAF/CW's CAD designs presented a specific and unique risk to the national security and foreign policy interests of the United States"; (b) making the CAD files available online would provide terrorist organizations with firearms, which could be used against the United States or its allies; and (c) "[a]ccess to weapons

6

technology coupled with the uncontrolled ubiquitous means of productions . . . could contribute to armed conflict, terrorist or criminal acts, and seriously undermine global export and non-proliferation regimes designed to prevent the dangerous and destabilizing spread and accumulation of weapons and related technologies." (DD v. U.S., Dkt. 32-1, ¶ 35.)

After a hearing, the District Court denied DD/SAF/CW's request for a preliminary injunction, finding among other things that the public interest in national defense and national security outweighed any countervailing interests. (DD v. U.S., Dkt. 43.) The Fifth Circuit affirmed the denial, relying on the same national security concerns. (Defense Distributed v. U.S. Dept. of State, 838 F.3d, 451, 461 (5th Cir. 2016), cert. denied 138 S. Ct. 638 (2018).)

Litigation continued until April 30, 2018, when DD/SAF/CW notified the court that the parties had reached a tentative settlement. The parties approved the settlement on June 28, 2018. The settlement agreement, which was only recently made publicly available, provided:

a.) The Federal Government will commit to draft and pursue a notice of proposed rulemaking and final rule that would exclude the data on the CAD files at issue from ITAR regulation;

7

b.)   The Federal Government will announce on or before July 27, 2018, a temporary modification to exclude the data on the CAD files from ITAR regulation;

c.)   The Federal Government will issue a letter to DD/SAF/CW on or before July 27, 2018, advising that certain files are approved for public release and are exempt from the ITAR licensing requirements;

d.)   The Federal Government will acknowledge that the temporary modification referenced above permits "any United States person . . . to access, discuss, use, reproduce, or otherwise benefit from the technical data" that is the subject of the litigation;

e.)   The Federal Government's payment of $39,581 to DD/SAF/CW; and

f.)   The Federal Government will file a stipulation of dismissal no sooner than August 1, 2018, which it ultimately filed on July 27, 2018.   (DD v. U.S., Dkt. 112.)

Relying on that settlement, Defendants announced their plans to re-launch the CAD file repository on August 1, 2018. (See https://defdist.org/; https://defcad.com.)   In addition to older models, the Website will contain a repository of firearm computer files for "more exotic DIY semi-automatic weapons." (Andy Greenberg, "A Landmark Legal Shift Opens Pandora's Box for

DIY Guns, Wired (July 10, 2018), available at https://www.wired.com/story/a-landmark-legal-shift-opens-pandoras-box-for-diy-guns/.) The new database "will be available to anyone anywhere in the world with an uncensored internet connection to download, alter, remix, and fabricate into legal weapons with tools like 3D printers and computer-controlled milling machines." (Ibid.) According to Wilson, "What's about to happen is a Cambrian explosion of the digital content related to firearms . . . [a]ll this Parkland stuff, the students, all these firearms of 'common sense gun reforms'? No. The internet will serve guns, the gun is downloadable... No amount of petitions or die-ins or anything else can change that." (Ibid.)

Throughout the litigation with the Federal Government, Defendants "developed a trove of other 3-D-printable weapon blueprints, including Assembly AR-15s and AR-10s." (Deanna Paul, "Meet the man who might have brought on the age of 'downloadable guns,'" Washington Post (July 18, 2018), available at https://www.washingtonpost.com/news/post-nation/wp/2018/07/18/meet-the-man-who-wants-to-bring-on-the-age-of-downloadable-guns-and-may-have-already-succeeded/?utm_term=.725b8a04f11a.) Members of the United States armed forces routinely use firearms in semiautomatic mode

9

in combat conditions, and the designs of many semiautomatic firearms are inherently military. (Giffords Law Center Comment Letter to the Director of Defense Trade Controls, July 9, 2018, at 4.) Assault rifles like the AR-15 were originally designed for military use. (Giffords Law Center Comment Letter to the Director of Defense Trade Controls, July 9, 2018, at 4.) The military included the option to fire in semiautomatic mode because military combat sometimes requires use of a firearm in semiautomatic mode. (Giffords Law Center Comment Letter to the Director of Defense Trade Controls, July 9, 2018, at 4.) Shooting in semiautomatic mode is more accurate and hence more lethal. (With AR-15s, Mass Shooters Attack with the Rifle Firepower Typically Used by Infantry Troops, NY Times, Feb. 28, 2018, https://www.nytimes.com/interactive/2018/02/28/ar-15-rifle-mass-shootings.html.) In fact, military-style semiautomatic firearms were used to perpetrate the tragedies that occurred in an elementary school in Newtown, Connecticut, at a music festival in Las Vegas, Nevada, at a workplace in San Bernardino, California, in a movie theatre in Aurora, Colorado, and at a high school in Parkland, Florida, among others. (Giffords Law Center Comment Letter to the Director of Defense Trade Controls, July 9, 2018, at 5.)

Because of the dangerous nature of these weapons, New

10

Jersey and seven (7) other states, including New York and California, have banned them.    (See Giffords Law Center to Prevent Gun Violence, Assault Weapons at http://lawcenter.giffords.org/gun-laws/policy-areas/hardware-ammunicition/assault-weapons/.)    In New Jersey, certain AR-15 semiautomatic models are banned as assault weapons and ownership is highly restrictive.    N.J.S.A. 2C:39-1w(1); N.J.S.A. 2C:39-5(f).    But printable-gun computer files will allow them to be printed anyway.

Defendants' printable-gun computer files will allow individuals across New Jersey to generate lethal firearms that are untraceable.    This means that if a printed gun was used in an act of violence or other crime, law enforcement would be unable to determine who manufactured, purchased, or transferred the gun — taking away a critical tool that New Jersey law enforcement consistently uses in seeking to combat and reduce gun crime.    In addition, at least some of the printed plastic guns can be modified to be virtually undetectable in metal detectors, which poses a public safety problem for venues such as airports, arenas, schools, and courthouses.

Responding to this threat, on July 26, 2018, Attorney General Grewal sent a cease-and-desist letter (the "New Jersey Cease-And-Desist Letter"), instructing Defense Distributed not

to publish the files online.  Defense Distributed responded the next day.  Although Defense Distributed said that it would "attempt to restrict files made available on the internet to prevent download within New Jersey" by blocking users with New Jersey-based IP addresses from accessing the files, it made clear its intent to proceed with publication of the codes on August 1.

On July 25, 2018, The Brady Campaign to Prevent Gun Violence, Everytown for Gun Safety Action Fund, Inc. and Giffords (collectively, "Proposed Intervenors") sought to intervene in the Texas litigation and requested a temporary restraining order and a preliminary injunction to enjoin Defense Distributed from publishing the printable gun-computer files at issue here to prevent immediate and irreparable harm to United States national security.  On Friday, July 27, 2018, a hearing was held before the Honorable Robert Pitman wherein both of the proposed Intervenors' motions were denied.

On July 29, 2018, Defense Distributed filed a Complaint in the United States District Court for the Western District of Texas seeking declaratory and injunctive relief, damages, and attorney's fees against Attorney General Grewal and Michael Feuer, the Los Angeles City Attorney ("Feuer").  Defense Distributed and SAF initiated this lawsuit against Grewal in

12

response to the New Jersey Cease-And-Desist Letter, alleging, among other things, that it constitutes an unconstitutional prior restraint.

On July 30, 2018, the Commonwealth of Pennsylvania, Governor Tom Wolf, Attorney General Josh Shapiro and the Pennsylvania State Police (together, the "Plaintiffs") filed a complaint against Defense Distributed, DEFCAD, Ghost Gunner and Cody Wilson (collectively, "PA Defendants") for declaratory judgment and a preliminary injunction, as well as a motion for a temporary restraining order and preliminary injunction to enjoin the PA Defendants from publishing the printable-gun computer files that are at issue in the instant litigation.

This lawsuit followed.

LEGAL ARGUMENT

**BECAUSE AN IMMEDIATE AND DIRECT THREAT TO PUBLIC SAFETY IN NEW JERSEY EXISTS, INJUNCTIVE RELIEF IS WARRANTED**

The Court should grant the State's application for injunctive relief to safeguard the health and safety of New Jersey's residents. Defendants' planned dissemination of computer codes directing the manufacture and assembly of untraceable and unlicensed firearms endangers the citizens of this State and violates New Jersey's public nuisance and negligence laws. The codes allow anyone with a 3D printer to

13

create a fully operational gun with a few clicks. Defendants seek to make the codes available to everyone, including criminals, juveniles, and domestic abusers, which undermines New Jersey's comprehensive scheme for keeping guns out of criminals' hands and jeopardizes the safety of New Jersey residents.

All the preliminary relief factors point in favor of enjoining Defendants from publishing their codes. To obtain relief, the moving party must demonstrate by clear and convincing evidence that: (1) relief is needed to prevent irreparable harm; (2) the applicant's claim rests on settled law and has a reasonable probability of succeeding on the merits; and (3) a balancing of hardships reveals that greater harm would occur if a stay is not granted than if it were. See Crowe v. DeGioia, 90 N.J. 126, 132-34 (1982); Brown v. City of Paterson, 424 N.J. Super. 176, 183 (App. Div. 2012). When a case presents an issue of "significant public importance," as here, courts must also consider a fourth factor: harm to the public interest. See Garden State Equality v. Dow, 216 N.J. 314, 320-21 (2013). Notably, "[i]n acting only to preserve the status quo, the court may 'place less emphasis on a particular Crowe factor if another greatly requires the issuance of a remedy.'" Brown, 424 N.J. Super. at 183. As this brief explains, each factor points in favor of granting the State's application for injunctive relief.

14

A.    **Plaintiff will suffer immediate and irreparable injury if a preliminary injunction is not issued.**

First, injunctive relief is needed to prevent irreparable harm. "Harm is generally considered irreparable in equity if it cannot be redressed adequately by monetary damages." Crowe, 90 N.J. at 132. Threats to public safety are the quintessential irreparable harm; indeed, "danger of increased mortality" is "as irreparable a harm as any that can be imagined." Somerset Air Service, Inc. v. Township of Bedminster, 2006 WL 861498, at *4 (Sup. Ct. Law Div., Somerset Cnty., Apr. 4, 2006).

The irreparable harm here is clear: the moment that Defendants post their codes on the Internet, it can be downloaded, saved, and forever used to print guns with a few clicks. And that poses a grave and permanent threat to public safety. First, the availability of these codes means that individuals who are otherwise banned for purchasing and possessing firearms will be able to print them; law enforcement cannot stop individuals from owning 3D printers. That means the "codes will be available to everyone in New Jersey—regardless of age, criminal status, history of mental illness, or other disqualifying characteristic. There will thus be no way for law enforcement to prevent guns from winding up in the hands of those who are prohibited from purchasing firearms under New Jersey law, including" individuals on the FBI Terroristic Watch

15

List, persons with criminal convictions (even for violent offenses), domestic abusers (even if subject to ongoing restraining orders), and juveniles. (Certification of Deputy Chief of Detective Christopher W. Donohue ("Donohue Cert."), ¶ 14.) This "will severely hamper law enforcement's ongoing efforts to keep dangerous guns out of the hands of dangerous criminals." (Id. ¶16.) And not only does this give criminals access to weapons, but to illegal ones – Defendants' codes will also "enable individuals to print assault weapons, which are illegal in New Jersey." (Id. ¶ 13.)

Another irreparable harm is sure to follow – the use of these codes will make it harder for law enforcement to solve and reduce gun crime. Because "the 3D printed firearms will not have serial numbers or other identifiable marks, they will never be traceable by law enforcement." (Id. ¶ 10). As Deputy Chief Donohue explains,

> A serial number is required to be placed on all firearms so that they can be traced to its original owners if they are ever used to commit a criminal offense. Law enforcement traces firearms by finding the owner's name in the gun dealer's records, and then interviewing that person and any other person to whom he sold the gun, and so on. Through this process, law enforcement is able to determine the manufacturer of the gun, the date it was sold, the dealership, and the purchaser. This information assists law enforcement in determining what happened to a particular gun after it left the dealer

16

> by learning the history of who owned the gun.
>
> Being able to trace a gun is critical in the investigation of gun-related crimes. The [CAD] codes of [Defendants] will allow individuals across New Jersey to automatically manufacture untraceable guns on 3D printers. If law enforcement is unable to trace 3D guns to determine their owners, law enforcement will be critically hampered in its ongoing efforts to solve gun crimes and prevent new gun crimes from being committed. This poses a direct and immediate threat to public health, safety, and welfare.

(Id. ¶¶ 11-12.)

And the Director of the New Jersey Office of Homeland Security and Preparedness, Jared Maples, agrees, noting that law enforcement agencies "use the results of these traces to identify the methods by which firearms entered the illegal market and to devise strategies to disrupt these criminal networks. But if there were to be a proliferation of untraceable 3D guns, these crimes and criminal networks might go unsolved and the perpetrators might go on to commit additional acts of violence." (Certification of New Jersey Office of Homeland Security Director Jared Maples ("Maples Cert."), ¶ 12.)

The risks to homeland security are equally pressing. As Director Maples has explained, "terrorists and other networks directing violence at the United States and in New Jersey could use this technology to manufacture guns, including assault

17

firearms." (Id. ¶ 10.) Moreover, "proliferation of untraceable guns would also give terrorist groups a significant advantage and deprive NJOHSP the ability to gather the necessary intelligence to combat them and reduce their threat they pose to our citizens." (Id. ¶ 11.) And finally, at least one code is for a "plastic firearm that can be produced in a way as to be both fully operable and virtually undetectable by conventional security measures. 3D firearms can defeat normal detection such as metal detectors and wands, and present a problem to public safety in venues such as airports, arenas, schools, government buildings, and/or courthouses." (Id. ¶ 16.) As a result, "Defendants' effort to post these CAD files represents a direct threat to New Jersey's homeland security." (Id. ¶ 20.)

For all of these reasons, other courts have recognized that "very strong public interest[s]" would be irreparably harmed by Defendants' threatened conduct. Defense Distributed v. U.S. Dep't of State, 838 F.3d 451, 458 (5th Cir. 2016). Indeed, the U.S. Court of Appeals for the Fifth Circuit refused to allow Defense Distributed to release the same computer files it threatens to release here, because the government's "national defense and national security interest would be harmed forever" if Defense Distributed were permitted to follow through on its threatened activities. Id. at 460; see also Defense Distributed

18

v. U.S. Dep't of State, 121 F. Supp. 3d 680, 689-90 (W.D. Tex. 2015). New Jersey is in the same position now – it has a strong sovereign interest in protecting homeland security within its borders, and that interest would be irreparably harmed if the Court permits Defendants to follow through on their threats.

The Defense Distributed decisions comport with decisions from other courts finding that state governmental interests would be impaired by conduct of the exact kind threatened here. In Tracy Rifle & Pistol LLC v. Harris, 118 F. Supp. 3d 1182 (E.D. Cal. 2015), for example, the court acknowledged California's sovereign interest in enforcing a law that prohibited retail firearms dealers from advertising or displaying handguns, such that the advertisement or display could readily be seen from the outside. The court determined that the State's interest in preventing the proliferation of hand guns outweighed the dealer's interest in having the regulation preliminarily enjoined. See id. at 1183, 1193-95. As that court put it, "[t]he costs of being mistaken, on the issue of whether the injunction would have a detrimental effect on handgun crime, violence, and suicide, would be grave. These costs would affect members of the public, and they would affect the Government which is tasked with managing handgun violence." Id. at 1193. The Ninth Circuit upheld the district court's

19

order allowing the ban to remain in place, likewise recognizing that "serious public risks are implicated" by the activity the firearms dealer sought to undertake. Tracy Rifle & Pistol LLC v. Harris, 637 Fed. App'x 401, 402 (9th Cir. Feb. 23, 2016).

Moreover, the harms to New Jersey identified in Deputy Chief of Detectives Donohue's and Director Maples's Declarations are at least as severe as the harms to "law enforcement and public safety interests" underlying decisions granting states' requests for temporary equitable relief in other contexts. See, e.g. Maryland v. King, 133 S. Ct. 1, 3 (2012) (Roberts, C.J.) (finding that a state was irreparably harmed by a lower court decision enjoining collection of DNA samples from individuals charged with certain crimes because DNA testing "provides a valuable tool for investigating unsolved crimes and thereby helping to remove violent offenders from the general population"); Coleman v. Paccar Inc., 424 U.S. 1301, 1307 (1976) (Rehnquist, C.J.) (finding that the government would suffer irreparable harm if it could not enforce certain motor vehicle safety standards for even a 60-day period, where delay would leave manufacturers "free to produce as many vehicles as they can and . . . obtain substantial stockpiles of noncomplying vehicles for later sale," resulting in a "serious setback" for "the goals of federal motor vehicle safety"). New Jersey would

suffer immeasurably more harm if the State were flooded with the 3-D guns that Defendants seek to make available to everyone.

All these public harms – in the form of increased mortality, increased lawlessness, and decreased security – cannot be addressed outside of an injunction. See Crowe, 90 N.J. at 132. That is so for one simple reason: posting these codes is a bell that can never be un-rung. Criminals, gangs, and terrorist networks only need to download a code once to benefit from it permanently. The consequences of publishing the printable-gun codes are grave and irreversible, and no money can restore or make up for the threats to public safety and law enforcement safety that will follow. Accordingly, the Court should order an injunction to prevent irreparable harm to the residents of New Jersey.

**B.    Plaintiff has demonstrated a settled legal right and a likelihood of success on the merits.**

Second, Defendants' planned actions violate New Jersey public nuisance and negligence law. The Attorney General can therefore demonstrate a reasonable probability of success on the merits. Crowe, 90 N.J. at 133. Nonetheless, "mere doubt as to the validity of [a] claim is not an adequate basis for refusing to maintain the status quo." Crowe, 90 N.J. at 133-34 (citing Naylor v. Harkins, 11 N.J. 435 (1953)). "Indeed, the point of temporary relief is to maintain the parties in substantially the

same condition when the final decree is entered as they were when the litigation began." Id. at 134 (citation and internal quotation marks omitted).

### 1.  Public Nuisance

To state a public nuisance claim, a plaintiff must allege "an unreasonable interference with a right common to the general public." In re Lead Paint Litig., 191 N.J. 405, 425 (2007) (citing The Restatement (Second) of Torts § 821B (1979)). The interference need not involve "conduct that is proscribed by statute or other legislative act." James v. Arms Tech., Inc., 359 N.J. Super. 291, 330 (App. Div. 2003). Rather, a public nuisance may exist "if the conduct complained of involves a 'significant interference' with the public welfare or 'is of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right.'" Id. (quoting Restatement § 821B(2)(a) and (c)). So long as the tortfeasor's conduct was a "substantial factor" in causing the injury, regardless of the presence of other intervening causes, the causation element will be satisfied. James, 359 N.J. Super. at 311.

James controls this case. There, the Appellate Division upheld a public nuisance claim asserted by New Jersey

22

municipalities against firearms manufacturers.    The plaintiffs alleged that the manufacturers intentionally marketed and sold firearms to persons who would bring them illegally into Newark. Id. at 307.    The municipalities alleged that defendants' unlawful "distribution, promotion, and sale of guns" constituted "an unreasonable interference with . . . the public's right to be free from danger," and that the conduct "resulted in . . . significant costs to the City of Newark in order to enforce the laws and to treat the victims of crimes facilitated through the use of [d]efendants' firearms." Id. at 306-307.    The possible actions of intervening third parties did not mean that the municipalities were incapable of establishing that defendants exercised control over the use of illegal firearms. Id. at 332. The nuisance was not the specific guns; instead, the Court focused on the manufacturers' participation in "the creation and supply of this illegal market." James, 359 N.J. Super. at 332. Because manufacturers controlled their own participation in the "creation and supply" of the market, the court held the municipalities had sufficiently pleaded their public nuisance claim, including for causation. Id.

With those principles in mind, the Appellate Division had little trouble understanding why these municipalities had stated a claim against these firearms manufacturers. First, the Court

23

in James explained, "[n]o one can seriously debate" that regulated guns are "dangerous instrumentalities" and thus implicate New Jersey public nuisance law. Id. at 320. Second, the Court held, it would violate New Jersey law for manufacturers to "flood the gun market" through a high volume of sales, while failing to develop "reasonable safeguards over the distribution scheme" and "refus[ing] to oversee or supervise the control of handgun distribution in order to prevent the foreseeable channeling of guns to such an illegal market." Id. at 312. And so, the Appellate Division concluded, when a defendant floods the gun market and fails to take steps to prevent these distributions from ending up in criminals' hands, they could be held responsible under public nuisance law when their acts "facilitate[d] the illegal sale of weapons to criminals and other unlawful users." Id.

There is no doubt that, under James, Defendants will commit a public nuisance if they proceed with their plans to publish computer files, which will allow anyone with a 3-D printer to download a code and create a fully operational gun with just a few clicks. There is no question that these files will interfere with the public's safety by "flood[ing] the market" with illicit arms. Again, as Deputy Chief Donohue explained, the "codes will be available to everyone in New Jersey."

24

(Donohue Cert. ¶ 14.)

In addition, these actions will directly undermine New Jersey's statutory scheme – further evidence that they are creating a public firearms nuisance. For one, under N.J.S.A. 2C:39-9(d), it is illegal to manufacture a weapon without a license. And yet Defendants plan to distribute codes that would enable individuals to do just that – to print a gun at home, without a license, and without going through a Federal Firearms Licensee. For another, "certain persons . . . are prohibited from purchasing, owning, possessing, or controlling any and all firearms under N.J.S.A. 2C:39-7(b), due to their prior convictions for aggravated assault, arson, burglary, escape, extortion, homicide, kidnapping, robbery, aggravated sexual assault, sexual assault, bias intimidation, endangering the welfare of a child, stalking, or a crime involving domestic violence. Those persons face a mandatory term of imprisonment with at least five years of parole ineligibility if they purchase, own, possess, or control a firearm. But the 3D codes will allow them to easily download firearms at home, which will severely hamper law enforcement's ongoing efforts to keep dangerous guns out of the hands of dangerous criminals." (Donohue Cert., ¶ 16.) Still more, Defendants' codes will "enable individuals to print assault weapons, which are illegal

25

in New Jersey under N.J.S.A. 2C:39-5(f)."  (Id. ¶ 13.)

And last—and critically—Defendants made no effort to develop "reasonable safeguards over the distribution scheme" or to "oversee or supervise the control of handgun distribution in order to prevent the foreseeable channeling of guns to such an illegal market."  In fact, just the opposite is true: Defendants actively believe their codes should be accessible to individuals who are prohibited from owning weapons.  Wilson has stated that his database "will be available to anyone anywhere in the world with an uncensored internet connection, to download, alter, remix, and fabricate into legal weapons with tools like 3D printers and computer-controlled milling machines."  (Greenberg, supra.)  According to Wilson, "What's about to happen is a Cambrian explosion of the digital content related to firearms . . . [a]ll this Parkland stuff, the students, all these firearms of 'common sense gun reforms'?  No.  The internet will serve guns, the gun is downloadable . . . No amount of petitions or die-ins or anything else can change that."  (Ibid.)  He also posted a picture of a tombstone in the ground, engraved with the phrase "American Gun Control."  What this all shows is that Defendants' interference with New Jersey's firearm safety regulations is intentional and thus per se unreasonable – and it certainly confirms that Defendants will not put reasonable

safeguards in place to keep guns out of prohibited persons' hands.

All of the other traditional public nuisance factors only confirm that relief is warranted. Defendants are in complete control of the CAD files and their publication, and thus would create, or at a minimum would be a substantial factor in creating, the nuisance by allowing unrestricted access of the files on the Internet through its Website. The public nuisance is also foreseeable to Defendants. Again, Wilson has publicly stated that the database "will be available to anyone anywhere in the world with an uncensored internet connection." (Greenberg, supra.) And Defendants were put on notice by the Federal Government and multiple federal courts that the publication of their CAD files, which permanently make the files available to those with Internet access, would forever harm national defense and national security. (Defense Distributed v. U.S. Dept. of State, 838 F.3d 451, 461 (5th Cir. 2016).) For all these reasons, in light of James, little doubt exists that Defendants' actions constitute a public nuisance.

2.   Negligence

For the same reasons that Plaintiff has proven a public nuisance claim, their plan is also negligent. Defendants' planned widespread dissemination of printable-gun code is

27

negligent because it encourages an illegal gun market, which will foreseeably lead to increased crime and violence in New Jersey, and to an increase in expenditures of government funds to prevent crime and protect the public's health. See James, 359 N.J. Super. at 308-324 (finding legally valid negligence claim against gun manufacturers, trade organizations, and gun distributors and retailers that flooded illegal gun market); see also Ileto v. Glock, Inc., 349 F.3d 1191, 1214-16 (9th Cir. 2003) (reversing dismissal of plaintiffs' claims that gun manufacturers negligently created an illegal secondary market for guns); City of Cincinnati v. Beretta U.S.A. Corp., 95 Ohio St.3d 416, 421-23 (reversing dismissal of city's negligence counts and finding that city had a viable negligence claim against defendant gun manufacturers, trade associations, and distributors).

In James, the trial court denied defendants' motions to dismiss the City of Newark's negligence claim and found that the defendants owed a duty of care to the City of Newark. Id. at 307. In doing so, the trial court considered the "inherent dangerousness of handguns." Ibid. On appeal, the Appellate Division upheld that determination, finding "the dangerous propensity of handguns is self-evident, and the consequence of their misuse is well documented." Id. at 323. Similarly, in

28

the instant case, Defendants have a duty to the citizens of New Jersey.  The printed guns peddled by Defendants are even more dangerous than the guns in <u>James</u>, because they are unserialized and undetectable by traditional law enforcement measures, providing further support for a finding that Defendants owe a duty of care to New Jersey residents.  As in <u>James</u>, the State has a valid, viable negligence claim against Defendants.

Accordingly, the State has demonstrated a probability of ultimate success, as to both its public nuisance and negligence claims.

## C.    On balance, a greater and substantial harm will result if an injunction is not issued.

Any harm to the Defendants arising from the issuance of the requested injunctive relief is clearly outweighed by the resultant harm to New Jersey residents' safety if Defendants flood the illegal gun market and put untraceable weapons in the hands of criminals and minors.  When an interlocutory injunction seeks to maintain the status quo, "a court may take a less rigid view" of the <u>Crowe</u> factors. <u>Waste Mgmt. of N.J., Inc. v. Union County Mun. Utils. Auth.</u>, 399 N.J. Super 508, 520 (App. Div. 2008).  Here, if injunctive relief is granted, Defendants will stand in the same place tomorrow that they stand today. Defendants removed their printable-gun code from the Internet in 2013. <u>Defense Distributed</u>, 121 F.Supp.3d at 687.  An injunction

29

simply preserves this status quo.  Conversely, unfettered access to the printable-gun code poses a severe risk to public safety that is irreversible and permanent.  Again, the codes will be available to everyone - regardless of age, criminal status, or history of mental illness. (Donohue Cert., ¶ 14.)  The only requirement to obtain a gun would be a 3-D printer.  Permitting dissemination of the code would undermine all the systems, laws, and regulations currently in place to ensure that those exact individuals do not possess firearms.  (Id., ¶ 15.) Additionally, the guns would not have serial numbers and would not contain metal. (Donohue Cert., ¶ 14; Maples Declaration, ¶ 16.) They would thus be untraceable and undetectable, further hamstringing law enforcement efforts.  The balance of hardships and the fact that the relief just maintains the status quo both weigh heavily in favor of granting a temporary restraining order.

Notably, the Texas district court and the U.S. Court of Appeals for the Fifth Circuit have already weighed similar harms in determining whether then-plaintiff Defense Distributed was itself entitled to a preliminary injunction.  Ultimately, both courts found that the equities weighed in favor of prohibiting dissemination.  Defense Distributed, 838 F.3d at 458-61.  Even after Defense Distributed contended that "the balance of

30

interests tilts in their favor because 'it is always in the public interest to prevent the violation of a party's constitutional rights,'" the district court rejected that bald assertion as lacking and determined that the public had a "keen interest in restricting the export of defense articles." Defense Distributed, 121 F.Supp.3d at 689. The Fifth Circuit readily agreed. Defense Distributed, 838 F.3d at 458-61. New Jersey has a similar interest in restricting the proliferation of untraceable, undetectable weapons, and so the balancing of equities should yield the same result in this case.

D.    **The public interest favors the issuance of an injunction.**

This case is one of "significant public importance," and, consequently, in determining whether to issue an injunction, the Court must also consider the harm to the public interest. See Garden State Equality, 216 N.J. at 320-21. That is why "Courts, in the exercise of their equitable powers, 'may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved.'" Waste Mgmt of N.J., Inc., 399 N.J. Super at 520-21, quoting Yakus v. United States, 321 U.S. 414, 441 (1944). For many of the reasons already given, this factor likewise weighs strongly in favor of granting the State's application for injunctive relief.

31

Threats to public safety and law enforcement safety are the quintessential harm to the public interest. As the Appellate Division has held, "New Jersey has a strong public interest in protecting the public from the violence and social cost associated with the criminal misuse of firearms." James, 359 N.J. Super. at 320. And as explained above, Defendants' plans directly undermine that public interest. Defendants have made it abundantly clear that they wish to flood New Jersey with untraceable and unlicensed firearms, including illegal assault weapons. Again, Defendant Cody Wilson has stated "All this Parkland stuff, the students, all these dreams of 'common sense gun reforms'? No. The internet will serve guns, the gun is downloadable." (Greenberg, supra.) The code will give minors, felons, and domestic abusers access to guns that they would not otherwise have. (Donohue Cert., ¶ 14.) This will lead to an increase in violence, lawlessness, and, ultimately, mortality.

Moreover, permitting dissemination of the printable gun code undermines the democratic process. The New Jersey Legislature has enacted comprehensive gun restrictions to ensure the safety of New Jersey residents. See N.J.S.A. 2C:58-1 et. seq. The dissemination of Defendants' code undermines those restrictions, undermining the democratic process and harming the public. An injunction must thus be entered to avoid significant

32

and grave harm to the public safety and to New Jersey's statutory scheme.

**E.    This Court should enjoin Defendants from publishing their codes.**

In order to fully protect New Jersey citizens, any injunction must completely preclude Defendants from disseminating the printable-gun code on the Internet. An injunction limited only to publication in New Jersey would be, essentially, a nullity. If the code were disseminated elsewhere, the files could be downloaded and then disseminated further, including on other websites not run by Defense Distributed. That is not academic: when Wilson posted the code for a single gun in 2013 for just a few days before the Federal Government stepped in, that code was downloaded 100,000 times. (Greenberg, supra.) Moreover, a criminal network could access the code in New York, and share it with other members in New Jersey. Merely limiting access from New Jersey IP addresses, as Defense Distributed promises it will do (temporarily) in response to the New Jersey Cease-And-Desist Letter, accomplishes next to nothing. Criminals, gangs, terrorist groups – to name just a few – have a reach that spans across state borders, and would easily access the code, and then continue using it to print firearms in New Jersey. And individuals could likewise do so with ease – all it takes is one trip to New York to download

33

the code, and then that individual could print weapons in New Jersey for years to come. In addition, it is remarkably easy to mask an IP address using a virtual private network ("VPN"). In fact, web providers such as Google Chrome even sell a way to mask IP addresses via VPN through its website. (See https://chrome.google.com/webstore/detail/hide-my-ip-vpn/keodbianoliadkoelloecbhllnpiocoi.)

The only solution that will protect New Jersey's public safety is for this Court to enjoin Defendants from publishing their codes altogether. The consequences of making these codes widely accessible across the United States on the Internet are grave and irreversible, and will plainly and severely impact New Jersey.

## CONCLUSION

For the foregoing reasons, the Attorney General respectfully urges this Court to enter the proffered Order to Show Cause so that temporary, preliminary and thereafter final relief can be entered to ensure that Defendants' publication of the printable-gun computer files for use in New Jersey are restricted and, as such, are no longer in a position to irreversibly endanger the health, safety, peace, and comfort of New Jersey citizens.

Respectfully submitted,

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY

By: _Lara J. Fogel_____
Lara J. Fogel
Deputy Attorney General