This web site was copied prior to January 20, 2005. It is now a Federal record managed by the National Archives and Records Administration. External links, forms, and search boxes may not function within this collection. Learn more.   [hide]



# 1997 REPORT ON THE AVAILABILITY OF BOMBMAKING INFORMATION



PREPARED BY THE UNITED STATES DEPARTMENT OF JUSTICE
AS REQUIRED BY SECTION 709(a) IF THE
ANTITERRORISM AND EFFECTIVE DEATH PENALTY ACT OF 1996

SUBMITTED TO:

THE UNITED STATES HOUSE OF REPRESENTATIVES
AND THE UNITED STATES SENATE

APRIL 1997

## TABLE OF CONTENTS

INTRODUCTION AND SUMMARY

BACKGROUND

I.   THE PUBLIC AVAILABILITY OF INFORMATION ON THE MANUFACTURE
     OF BOMBS, DESTRUCTIVE DEVICES, AND WEAPONS OF MASS DESTRUCTION

   A.   Books, Pamphlets and Other Printed Material

   B.   The Internet

   C.   Summary

II.  THE EXTENT TO WHICH PUBLISHED BOMBMAKING INFORMATION HAS
     FACILITATED THE MANUFACTURE AND USE OF EXPLOSIVES IN ACTS OF
     TERRORISM AND OTHER CRIMINAL ACTIVITY

III. THE LIKELIHOOD THAT PUBLISHED BOMBMAKING INFORMATION WILL
     CONTINUE TO BE USED TO FACILITATE ACTS OF TERRORISM AND OTHER
     CRIMINAL ACTIVITY

IV.  APPLICABILITY OF CURRENT FEDERAL LAW TO THE PUBLICATION AND DISSEMINATION OF BOMBMAKING INFORMATION

    A.  Conspiracy

    B.  Solicitation

    C.  Aiding and Abetting

        1.  18 U.S.C. § 2

        2.  AEDPA Section 323

    D.  18 U.S.C. § 231(a)(1)

V.  THE NEED FOR ADDITIONAL LAWS RELATING TO THE DISSEMINATION OF BOMBMAKING INFORMATION

VI.  CONSTITUTIONALITY OF RESTRICTING OR PENALIZING THE PUBLICATION OR DISSEMINATION OF BOMBMAKING INFORMATION

    A.  First Amendment Principles

        1.  Advocacy of Unlawful Action

        2.  Disclosure or Publication of Lawfully Obtained Information

        3.  "Speech Acts," such as Aiding and Abetting

    B.  Application of First Amendment Principles To Dissemination of Bombmaking Information

        1.  Dissemination with the "Intent" to Facilitate Unlawful Conduct

        2.  Dissemination with the "Knowledge" that a Particular Recipient of the Information Intends to Use it in Furtherance of Unlawful Conduct

    C.  Proposed Modification of the Feinstein Amendment

## INTRODUCTION AND SUMMARY

In section 709(a) of the Antiterrorism and Effective Death Penalty Act of 1996 ["the AEDPA"], Pub. L. No. 104-132, 110 Stat. 1214, 1297 (1996), Congress provided that, in consultation with such other officials and individuals as she considers appropriate, the Attorney General shall conduct a study concerning --

    (1) the extent to which there is available to the public material in any medium (including print, electronic, or film)

that provides instruction on how to make bombs, destructive devices, or weapons of mass destruction;

(2) the extent to which information gained from such material has been used in incidents of domestic

or international terrorism;

(3) the likelihood that such information may be used in future incidents of terrorism;

(4) the application of Federal laws in effect on the date of enactment of this Act to such material;

(5) the need and utility, if any, for additional laws relating to such material; and

(6) an assessment of the extent to which the first amendment protects such material and its private and commercial distribution.

Section 709(b) of the AEDPA, in turn, requires the Attorney General to submit to the Congress a report containing the results of the study, and to make that report available to the public.

Following enactment of the AEDPA, a committee was established within the Department of Justice ["the DOJ Committee"], comprised of departmental attorneys as well as law enforcement officials of the Federal Bureau of Investigation and the Treasury Department's Bureau of Alcohol, Tobacco and Firearms. The committee members divided responsibility for undertaking the tasks mandated by section 709. Some members canvassed reference sources, including the Internet, to determine the facility with which information relating to the manufacture of bombs, destructive devices and other weapons of mass destruction could be obtained. Criminal investigators reviewed their files to determine the extent to which such published information was likely to have been used by persons known to have manufactured bombs and destructive devices for criminal purposes. And legal experts within the Department of Justice reviewed extant federal criminal law and judicial precedent to assess the extent to which the dissemination of bombmaking information is now restricted by federal law, and the extent to which it may be restricted, consistent with constitutional principles. This Report summarizes the results of these efforts.

As explained in this Report, the DOJ committee has determined that anyone interested in manufacturing a bomb, dangerous weapon, or a weapon of mass destruction can easily obtain detailed instructions from readily accessible sources, such as legitimate reference books, the so-called underground press, and the Internet. Circumstantial evidence suggests that, in a number of crimes involving the employment of such weapons and devices, defendants have relied upon such material in manufacturing and using such items. Law enforcement agencies believe that, because the availability of bombmaking information is becoming increasingly widespread (over the Internet and from other sources), such published instructions will continue to play a significant role in aiding those intent upon committing future acts of terrorism and violence.

While current federal laws -- such as those prohibiting conspiracy, solicitation, aiding and abetting, providing material support for terrorist activities, and unlawfully furthering civil disorders -- may, in some instances, proscribe the dissemination of bombmaking information, no extant federal statute provides a satisfactory basis for prosecution in certain classes of cases that Senators Feinstein and Biden have identified as particularly troublesome. Senator Feinstein introduced legislation during the last Congress in an attempt to fill this gap. The Department of Justice agrees that it would be appropriate and beneficial to adopt further legislation to address this problem directly, if that can be accomplished in a manner that does not

impermissibly restrict the wholly legitimate publication and teaching of such information, or otherwise violate the First Amendment.

The First Amendment would impose substantial constraints on any attempt to proscribe indiscriminately the dissemination of bombmaking information. The government generally may not, except in rare circumstances, punish persons either for advocating lawless action or for disseminating truthful information -- including information that would be dangerous if used -- that such persons have obtained lawfully. However, the constitutional analysis is quite different where the government punishes speech that is an integral part of a transaction involving conduct the government otherwise is empowered to prohibit; such "speech acts" -- for instance, many cases of inchoate crimes such as aiding and abetting and conspiracy -- may be proscribed without much, if any, concern about the First Amendment, since it is merely incidental that such "conduct" takes the form of speech.

Accordingly, we have concluded that Senator Feinstein's proposal can withstand constitutional muster in most, if not all, of its possible applications, if such legislation is slightly modified in several respects that we propose at the conclusion of this Report. As modified, the proposed legislation would be likely to maximize the ability of the Federal Government -- consistent with free speech protections -- to reach cases where an individual disseminates information on how to manufacture or use explosives or weapons of mass destruction either (i) with the intent that the information be used to facilitate criminal conduct, or (ii) with the knowledge that a particular recipient of the information intends to use it in furtherance of criminal activity.

## BACKGROUND

In order fully to understand the issues we have been asked to address, it is helpful first to describe the legislative proceedings that prompted enactment of section 709 of the AEDPA.

On May 11, 1995, less than one month after the Oklahoma City terrorist bombing, in testimony before the Subcommittee on Terrorism, Technology and Government Information of the Senate Judiciary Committee, Deputy Assistant Attorney General Robert Litt, of the Justice Department's Criminal Division, explained that "how to" guides for the manufacture of explosives are readily available on the Internet, in bookstores and even in public libraries[1]. To illustrate the point, he observed that, according to a news article, only hours after the Oklahoma City bombing, someone posted on the Internet directions -- including a diagram -- explaining how to construct a bomb of the type that was used in that tragic act of terrorism. Another Internet posting offered not only information concerning how to build bombs, but also instructions as to how the device used in the Oklahoma City bombing could have been improved.

Mr. Litt explained that "expansion of the scope of federal criminal laws dealing with the violent, terrorist activity will permit the Department of Justice to prosecute those who engage in efforts to assist violence and terrorism over the Internet." Mr. Litt observed, however, that despite the dangers posed by the dissemination of such information and the callous disregard of human life shown by those who are responsible for such action, the First Amendment imposes significant constraints on the ability of the federal government to proscribe and penalize such activity.

On June 5, 1995, Senator Feinstein proposed an amendment to a bill (S. 735) that later became the AEDPA. 141 Cong. Rec. S7682 (daily ed. June 5, 1995). The purpose of the amendment was to address the problem of the increasingly widespread "distribution of bombmaking information for criminal purposes." Id. Following some debate in the Senate, Senator Feinstein's amendment was slightly modified, and the full Senate unanimously approved it by voice vote. Id. at S7686. The Senate passed S. 735 on June 7, 1995. 141

Cong. Rec. S7857 (daily ed.).  As passed by the Senate, the Feinstein amendment would have amended 18 U.S.C. § 842 to add a new prohibition:

It shall be unlawful for any person to teach or demonstrate the making of explosive materials, or to distribute by any
means information pertaining to, in whole or in part, the manufacture of explosive materials, if the person intends or
knows, that such explosive materials or information will likely be used for, or in furtherance of, an activity that
constitutes a Federal criminal offense or a criminal purpose affecting interstate commerce.

Id. at S7875.  In conference committee, this prohibition ["the Feinstein Amendment"] was removed from the bill and was replaced with section 709 of the AEDPA -- the requirement for the Attorney General's study and report, quoted above.  142 Cong. Rec. H3336 (daily ed. Apr. 15, 1996).  Senator Biden then moved to recommit the conference report to the conference committee with instructions to the Senate managers to insist on insertion of the Feinstein Amendment.  142 Cong. Rec. S3448 (daily ed. Apr. 17, 1996).  Senator Hatch moved to table Senator Biden's motion, and Senator Hatch's motion was agreed to by a vote of 51 to 48.  Id. at S3450.

Two months later, Senator Feinstein revived her proposal, and the Senate unanimously agreed to include it as an amendment to a bill that later became the National Defense Authorization Act for Fiscal Year 1997.  142 Cong. Rec. S7271-74 (daily ed. June 28, 1996).  Once again, however, the Feinstein Amendment was removed in conference.  142 Cong. Rec. H9303 (daily ed. July 30, 1996).

# I.
## THE PUBLIC AVAILABILITY OF INFORMATION ON THE MANUFACTURE OF BOMBS, DESTRUCTIVE DEVICES, AND WEAPONS OF MASS DESTRUCTION

The first question that section 709 required the Attorney General to study concerns the availability of instructional information describing the fabrication of explosives, destructive devices and other weapons of mass destruction.  Our study confirms that any member of the public who desires such information can readily obtain it.

**A**.  Books, Pamphlets and Other Printed Material.  Most strikingly, a cursory search of the holdings of the Library of Congress located at least 50 publications substantially devoted to such information, all readily available to any member of the public interested in reading them and copying their contents.  The titles of a number of these publications are indicative of their contents.[2]  They include:

 -- Guerrilla's Arsenal: Advanced Techniques For Making Explosives and Time- delay Bombs (Paladin Press, 1994);

 -- The Anarchist Arsenal (Harber, 1992);

 -- Deadly Brew: Advanced Improvised Explosives (Paladin Press, 1987);

 -- The Anarchist's Handbook (J. Flores, 1995);

 -- Improvised Explosives:  How To Make Your Own (Paladin Press, 1985); and

-- <u>Ragnar's Guide to Home and Recreational Use of High Explosives</u> (Paladin Press, 1988).

Other texts, intended for military training, agricultural and engineering use, contain information equally useful to individuals bent upon constructing bombs and other dangerous weapons. Publications in this category include:

-- <u>Explosives In Roadworks: User's Guide</u> (Assoc. of Australian State Road Authorities, 1982);

-- <u>Explosives and Blasting Procedures Manual</u> (U.S. Bureau of Mines, 1982);

-- <u>Military Chemical and Biological Agents: Chemical and Toxicological Properties</u> (Telford Press, 1987); and

-- <u>Clearing Land Of Rocks for Agricultural and Other Purposes</u> (Institute of Makers of Explosives, 1918).

Another collection of some 48 different "underground publications" dealing with bombmaking, contained in the library of the FBI Explosives Unit, reflects a similar diversity of such published material. All of this literature was easily obtainable from commercial sources.

The ready accessibility of such literature is further illustrated by reference to a single page in a recent 70-page catalog of Delta Press, Ltd., of El Dorado, Arizona, captioned "Homemade Explosives." Among the texts featured on that page are <u>Improvised Shape Charges</u>, <u>Two Component High Explosive Mixtures</u>, <u>Improvised Radio Detonation Techniques</u>, and the <u>Anarchists Handbook Series</u>. Another page, captioned "poisons," advertises <u>The Poisoner's Handbook</u>, which it touts as "a complete handbook of poisons, both natural and manmade," including poisonous gases, lethal drugs, poisonous explosive compounds and a "list of sources and some additional chemistry." A number of the titles featured in this publication are commonly featured, along with firearms publications, at local gun shows.

With respect to weapons of mass destruction, there are a number of readily available books, pamphlets, and other printed materials that purport to provide information relating to the manufacture, design and fabrication of nuclear devices. The Department is aware of many publications that claim to provide some fundamentals necessary for the understanding of nuclear weapons, e.g., physics, design, manufacture, or fabrication. They include:

-- <u>The Curve of Binding Energy</u> (J. McPhee, 1974);

-- <u>U.S. Nuclear Weapons: The Secret History</u> (C. Hansen, 1966); and

-- <u>The Swords of Armageddon</u> (C. Hansen, 1986).[3]

Stories of crimes contained in popular literature and magazines also constitute a rich source of bombmaking information. For example, the August 1993 edition of Reader's Digest contains an account of efforts by law enforcement officers to track down the killer of United States Court of Appeals Judge Robert S. Vance and attorney Robert Robinson. That article contained a detailed description of the explosive devices used by the bomber in committing the murders, including such information as the size of the pipe bombs, how the bombs were constructed, and what type of smokeless powder was used in their construction.[4] According to the Arson and Explosives Division of the Bureau of Alcohol, Tobacco and Firearms, in a bombing case originating in Topeka, Kansas, the devices were patterned after the bomb used to

kill Judge Vance.  Upon questioning, the suspect admitted to investigators that he constructed the bomb based on information contained in the <u>Reader's Digest</u> article.

**B.**  <u>The Internet</u>.  Bombmaking information is literally at the fingertips of anyone with access to a home computer equipped with a modem.[5] To demonstrate such availability, a member of the DOJ Committee accessed a single website on the World Wide Web and obtained the titles to over 110 different bombmaking texts, including "Calcium Carbide Bomb," "Jug Bomb," "How To Make a CO2 Bomb," "Cherry Bomb," "Mail Grenade," and "Chemical Fire Bottle."  The user could access and print the text of each of the listed titles.[6]

One of the texts, captioned "Nifty Things That Go Boom," appears to be a computer adaptation of <u>The Terrorist's Handbook</u> (purportedly edited at Michigan State University).  The publication contains chapters that describe and address the procurement (legal and otherwise) of necessary explosives, chemicals and other ingredients, the preparation of chemicals, techniques for transforming such substances into bombs and explosives, and the manufacture of fuses and other ignition systems.

Another of the accessed texts purports to consist of the "Bomb Excerpts" from <u>Anarchy Cookbook</u>.  This text explains in minute detail how to construct dozens of different types of bombs and explosive devices, including fertilizer bombs, dynamite and other explosives made with chemicals and other substances that "can be bought at Kmart, and various hardware supply shops."  The text also details the ways that such devices can be employed following their fabrication.  For example, discussing the use of a bomb constructed from a CO2 cartridge and black powder, it explains:

Insert a fuse. . . .  Now, light it and run like hell!  It does wonders for a row of mailboxes (like the ones in apartment
complexes), a car (place under the gas tank), a picture window (place on window sill), a phone booth (place right under
the phone), or any other devious place.  This thing throws shrapnel, and can make quite a mess!

Similarly, after explaining how to build a thermite bomb, the manual explains:

Now when you see your victim's car, pour a fifty-cent sized pile onto his hood, stick the [magnesium] ribbon in it,
and light it with a blow torch.  Now chuckle as you watch it burn through the hood, the block, and axle, and the
pavement.  BE CAREFUL!  The ideal mixtures can vaporize CARBON STEEL!  Another idea is to use thermite
to get into pay phone and cash boxes.  HAVE FUN!

And, in discussing how to construct a thermite letter bomb using an insulated, padded mailing envelope, the author explains that, when the detonating "explosive is torn or even squeezed hard it will ignite the powdered magnesium . . . and then it will burn the mild thermite.  If the thermite didn't blow up, it would at least burn the fuck out of your enemy (it does wonders on
human flesh!)."[7]

Our review of material accessible on the Internet also reveals the frequent use of "Usenet" newsgroups to facilitate the exchange of information concerning the fabrication and use of explosives and other dangerous

weapons. For example, on August 28, 1996, one participant of a Usenet newsgroup inquired whether anyone had a recipe for C-4 and detonation techniques. The following day, someone responded to the inquiry by posting a detailed formula, explaining that "[t]he production of C-4 is probably beyond what can [be] done in the kitchen, but here is something to get you started." On August 16, 1996, another Usenet participant complained that he had "recently attempted to follow the recipe [for an explosive] posted earlier . . . and nearly blew my arms off!" This prompted the following response:

So what do you want, sympathy? Let me clue you in here. Actually building any of this stuff is illegal, immoral,
    anti-social, and just plain wrong. But then, so are a lot of other fun things. The point is, if you do it, and you blow
    yourself up, it's your own fault. So quit sniveling. [N]ext time, don't cook at home.

**C.** Summary. It is readily apparent from our cursory examination that anyone interested in manufacturing a bomb, dangerous weapon or weapon of mass destruction can easily obtain detailed instructions for fabricating and using such a device. Available sources include not only publications from the so-called underground press but also manuals written for legitimate purposes, such as military, agricultural, industrial and engineering purposes. Such information is also readily available to anyone with access to a home computer equipped with a modem.

## II.
## THE EXTENT TO WHICH PUBLISHED BOMBMAKING INFORMATION
## HAS FACILITATED THE MANUFACTURE AND USE OF EXPLOSIVES
## IN ACTS OF TERRORISM AND OTHER CRIMINAL ACTIVITY

Recent law enforcement experience demonstrates that persons who attempt or plan acts of terrorism often possess literature that describes the construction of explosive devices and other weapons of mass destruction (including biological weapons). Although in some cases there is no hard evidence demonstrating that such individuals actually employed such information in furtherance of their crimes, possession of such information often is strong circumstantial evidence from which such usage can be inferred.

During the execution of a search warrant at the Rex, Georgia residence of Walter Leroy Moody, Jr., the convicted bombing murderer of Judge Robert S. Vance and attorney Robert Robinson, investigators discovered a copy of the Anarchist's Cookbook.

In November 1995, Oklahoma residents Ray and Cecilia Lampley, along with one John "J.D." Baird, began construction of an ammonium nitrate bomb, utilizing a manual for the making of "Homemade C-4," a military plastic explosive. The group intended to destroy either the Jewish Anti-Defamation League building in Houston, Texas, or the Southern Poverty Law Center in Birmingham, Alabama. Following the recipe from the manual, the Lampleys "cooked" the ammonium nitrate, and obtained accelerants, such as nitromethane and powdered aluminum. Additionally, Ray Lampley learned that he needed an initial detonating charge to properly detonate the "homemade C-4," and attempted to make a triacetone triperoxide detonator utilizing instructions from Ragnar's Big Book of Explosives. When the three co-conspirators were arrested by the FBI, law enforcement agents recovered the Anarchist's Cookbook and Homemade Weapons, in addition to the "homemade C-4" text, from the Lampley residence.[8]

Following the February 26, 1993, terrorist bombing of the World Trade Center in New York City, investigators discovered bombmaking manuals in the possession of individuals connected with that crime. Although it is believed that those individuals brought those particular manuals into the United States from a foreign country, the manuals had been copied from books written and printed in the United States and available for purchase from publishers like Paladin Press. The presence of these manuals suggests that the conspirators consulted them in effecting their deadly terrorist scheme.

Between January 1994 and January 1996, a string of some 18 bank robberies occurred across the Midwest. The robberies were committed by individuals brandishing automatic weapons, wearing disguises, and using hoax-bomb devices, apparently to delay pursuit and investigation. Following the arrests of two individuals linked to the series of robberies, investigators conducted searches of safehouses and other locations used by the defendants. Execution of the search warrants resulted in the discovery of numerous weapons, explosives, grenades, and components for manufacturing improvised explosive devices. Additionally, the investigators discovered a library of literature describing neo-guerrilla techniques, including the manufacture and use of explosives.

Beginning in 1991, four members of the "Patriots Council," a Minnesota tax protest group, began to develop a castor-bean derivative known as "ricin," which is one of the most toxic known substances. The members involved learned the process of manufacturing ricin from a mail-order pamphlet. The group planned to suspend the substance in a toxic gel capable of transmission through a skin barrier, and then to place the impregnated gel on doorknobs, handles, and steering wheels. They were considering whether to target IRS agents, U.S. Marshals, or local sheriffs for ricin attacks when the FBI arrested them.[9]

In 1993, Thomas Lavy attempted to cross the Canadian border carrying 130 grams of ricin -- an amount that, if administered in individual doses, would be sufficient to kill over 32,000 people -- as well as four guns and $89,000 in cash. Canadian officials returned Lavy to the United States because of the amount of cash he was carrying. A search of Lavy's cabin by law enforcement officers revealed that he possessed mail-order books, such as The Poisoner's Handbook, Silent Death, and Get Even: The Complete Book of Dirty Tricks, which, among other things, describe how to make and use ricin. Lavy committed suicide before he could be tried.

To the Department's knowledge, no devices producing a nuclear yield have been constructed based on published bombmaking information. However, the Department is aware of approximately 117 threats since 1970 involving detonations of nuclear devices. Approximately half of these nuclear extortion threats have been accompanied by sketches, information, or descriptive phrases gleaned from information in the public domain, including technical reference materials and fictional nuclear "thrillers."

In addition to the incidents recounted above, reported federal cases involving murder, bombing, arson, and related crimes, reflect the use of bombmaking manuals by defendants and the frequent seizure of such texts during the criminal investigation of such activities. See, e.g., United States v. Prevatte, 66 F.3d 840, 841 (7th Cir. 1995) (bombmaker read Anarchist's Cookbook); United States v. Johnson, 9 F.3d 506, 510 (6th Cir. 1993) (search of bombmaker's residence revealed presence of books on explosive devices), cert. denied, 512 U.S. 1212 (1994); United States v. Talbott, 902 F.2d 1129, 1131 (4th Cir. 1990) (execution of search warrant at residence of bombmaker revealed presence of books on bombmaking); United States v. Michael, 894 F.2d 1457, 1459 (5th Cir. 1990) (bombmaker bought books at gun shows to determine how to make bombs, booby traps and silencers); United States v. Levasseur, 816 F.2d 37, 41 (2d Cir. 1987) (execution of search warrant at bomber's residence revealed presence of bombmaking instructions); United States v. Arocena, 778 F.2d

943, 947 (2d Cir. 1985) (members of "Omega 7" group, who conducted terrorist bombings in New York metropolitan area, possessed bombmaking manuals), cert. denied, 475 U.S. 1053 (1986); United States v. Williams, 775 F.2d 1295, 1298 (5th Cir. 1985) (bomb murderer used Marine Corps training manual to construct "mouse trap" bomb), cert. denied, 475 U.S. 1089 (1986); United States v. Bergner, 800 F. Supp. 659, 663 (N.D. Ind. 1992) (bomber consulted Anarchist's Cookbook and other bombmaking texts available at police academy library).

Finally, information furnished by the Bureau of Alcohol, Tobacco and Firearms reveals that such literature is frequently used by individuals bent upon making bombs for criminal purposes. ATF statistics reflect that, between 1985 and June 1996, the investigations of at least 30 bombings and four attempted bombings resulted in the recovery of bombmaking literature that the suspects had obtained from the Internet. Most recently, on August 6, 1996, ATF investigators participated in the investigation of two North Attleboro, Massachusetts, juveniles, aged 11 and 14, who were injured while attempting to make an improvised explosive device. The youths had retrieved from the Internet information on how to make napalm, and were badly burned when a mixture being heated on a kitchen stove ignited.[10]

In sum, it is fair to conclude from scenarios such as those we have described that the availability of bombmaking literature may play a significant role in aiding those intent on using explosives and other weapons of mass destruction for criminal purposes, including acts of terrorism. Moreover, the availability of this information might contribute to youthful experimentation with explosive devices, which could result in serious injury.

## III.
## THE LIKELIHOOD THAT PUBLISHED BOMBMAKING INFORMATION WILL CONTINUE TO BE USED TO FACILITATE ACTS OF TERRORISM AND OTHER CRIMINAL ACTIVITY

It is, of course, impossible to prognosticate with any measure of certainty the extent to which persons wishing to engage in acts of terrorism and other criminal activity will rely upon printed and computer-based information instructing them how to manufacture bombs, other dangerous weapons, and weapons of mass destruction. A statistical survey conducted by the FBI concerning bombing incidents occurring in the United States shows that between 1984 and 1994, the frequency of such incidents has increased almost four-fold. The study, however, did not attempt to correlate the trend with the increased availability of bombmaking information. Therefore, we have no empirical data on what percentage, if any, of the recent increase in the number of bombings is attributable to the increased availability of bombmaking information. However, based upon the recent experiences recounted above, both the FBI and ATF expect that because the availability of such information is becoming increasingly widespread, such bombmaking instructions will continue to play a significant role in aiding those intent upon committing future acts of terrorism and violence.

## IV.
## APPLICABILITY OF CURRENT FEDERAL LAW TO THE PUBLICATION AND DISSEMINATION OF BOMBMAKING INFORMATION

Presently there are four basic ways in which dissemination of bombmaking information could be punished under federal criminal law, depending on the circumstances of the case.[11]  The first three bases for culpability -- federal statutes prohibiting (i) conspiracy, (ii) solicitation, and (iii) aiding and abetting -- do not single out information concerning bombmaking for special treatment.  The fourth basis for culpability -- 18 U.S.C. § 231 -- is directed specifically at the "teaching or demonstrating" of techniques related to the use or manufacture of firearms and explosives.[12]

**A.**  Conspiracy.  A conspiracy to use an explosive to commit "any felony which may be prosecuted in a court of the United States," 18 U.S.C. § 844(h), is explicitly proscribed under 18 U.S.C. § 844(m); and a conspiracy to commit any offense defined in Chapter 40 of Title 18, U.S. Code -- entitled "Importation, Manufacture, Distribution, and Storage of Explosive Materials" -- is prohibited by 18 U.S.C. § 844(n).  In addition, the general federal criminal conspiracy statute, 18 U.S.C. § 371 -- which prohibits conspiring "to commit any offense against the United States" -- makes it unlawful to conspire to commit other federal crimes involving explosives.  A person may not, as part of a conspiracy to commit an independently defined criminal offense, transmit information to a coconspirator concerning how to make or use explosive devices.[13]  Indeed, such transmission of information could be an overt act in support of a conspiracy.[14]

In order to prove that a person disseminating bombmaking information did so as part of a conspiracy to commit a substantive offense, the government need not prove that the substantive offense occurred; however, the government must show, at the very least, that the disseminator (i) knew of the intended unlawful use of the information and (ii) agreed with other conspirators that an offense would be committed.[15]  And, as a general matter, the requisite agreement cannot be proved simply by demonstrating that a person has provided a product to another person knowing that the product would be used in the commission of a crime, where the provider of the product is indifferent to its subsequent use.[16]  "[A] conspiracy requires agreement, and there is a difference between knowing that something will occur [by virtue of one's sale of a product] -- even as an absolute certainty -- and agreeing to bring that same `something' about."  United States v. Lechuga, 994 F.2d 346, 362 (7th Cir.) (Cudahy, J., concurring in pertinent part), cert. denied, 510 U.S. 982 (1993).  It follows that "an isolated sale is not the same thing as enlisting in the venture."  United States v. Blankenship, 970 F.2d 283, 287 (7th Cir. 1992).[17]

**B.**  Solicitation.  The federal criminal solicitation statute, 18 U.S.C. § 373, provides in pertinent part:

Whoever, with intent that another person engage in conduct constituting a felony that has as an element the use,
attempted use, or threatened use of physical force against property or against the person of another in violation
of the laws of the United States, and under circumstances strongly corroborative of that intent, solicits, commands,
induces, or otherwise endeavors to persuade such other person to engage in such conduct, shall be imprisoned not
more than one-half the maximum term of imprisonment or (notwithstanding section 3571) fined not more than one-half
of the maximum fine prescribed for the punishment of the crime solicited, or both; or if the crime solicited is punishable
by life imprisonment or death, shall be imprisoned for not more than twenty years.

Id. § 373(a). Solicitation proscribed by this statute often will take the form of speech, including written speech.[18] Indeed, Congress intended that the statutory phrase "otherwise endeavors to persuade" be construed broadly to cover any situation "`where a person seriously seeks to persuade another person to engage in criminal conduct.'" United States v. Buckalew, 859 F.2d 1052, 1054 (1st Cir. 1988) (Breyer, J.) (quoting S. Rep. No. 307, 97th Cong., 1st Sess. 183-84 (1982)) (emphasis added). In the prototypical solicitation case, the "persuasion" is accompanied by some form of inducement, such as a money payment, or a threat. Such a case raises no First Amendment issues, for reasons we explain infra at 35-38.[19] However, insofar as Congress also intended § 373 to cover cases of "persuasion" taking the form of mere advocacy or urging of unlawful action -- without any threat or inducement -- many such cases could be subject to significant First Amendment constraints under the Brandenburg doctrine. Seeinfra at 29-30 (discussing Brandenburg v. Ohio, 395 U.S. 444 (1969)).[20] Therefore, for purposes of this discussion, we will assume that § 373 would be used principally in the case of "persuasion" accompanied by an inducement (e.g., murder for hire[21]) or an explicit or implicit threat or "command" (e.g., an organized crime boss "asking" an associate to commit a crime).

In such cases, the solicitation itself would not likely be in the form of a transmission of bombmaking information. However, as part of a solicitation scheme, it is conceivable that the solicitor would transmit such information so as to facilitate the crime being solicited. Indeed, such facilitation could provide circumstances that "strongly corroborate" a solicitor's improper intent, thereby satisfying § 373's scienter requirement: Congress indicated that it would be "highly probative" of improper intent if the solicitor "acquired . . . information suited for use by the person solicited in the commission of the offense, or made other apparent preparations for the commission of the offense by the person solicited." S. Rep. No. 307, 97th Cong., 1st Sess. 183 (1982).

Although § 373 does not require either actual agreement (like conspiracy), nor that the crime be committed (like aiding and abetting), it nonetheless could provide a means of addressing dissemination of bombmaking information in only a limited set of cases. For one thing, the statute requires more than mere dissemination of information: there must be some solicitation, command, inducement or other endeavor to persuade. (And the First Amendment might exclude cases of "persuasion" absent any threat, command or inducement.) More importantly, the government must prove "circumstances strongly corroborative" of the solicitor's intent that another person engage in conduct constituting a felony.

**C.** Aiding and Abetting. Two different "aiding and abetting" statutes might have some application in cases where bombmaking information is disseminated: (i) the general federal aiding and abetting statute, 18 U.S.C. § 2, and (ii) section 323 of the AEDPA, which concerns provision of material support or resources for use in certain crimes of terrorism.

**1.** 18 U.S.C. § 2. In 1909 Congress enacted what is now 18 U.S.C. § 2, a general aiding and abetting statute applicable to all federal criminal offenses. That statute in essence provides that "those who provide knowing aid to persons committing federal crimes, with the intent to facilitate the crime, are themselves committing the crime." Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 181 (1994) (citing Nye & Nissen v. United States, 336 U.S. 613, 619 (1949)).[22] Not infrequently, aiding and abetting can take the form of speech, including providing instructions on how to commit a crime to a particular person or to a discrete audience.[23] Section 2 nonetheless is somewhat ineffectual as a tool to address dissemination of information on how to manufacture explosives, for three reasons.

First, there is some question whether aiding and abetting culpability ever can rest solely on the basis of general publication of instructions on how to commit a crime, or undifferentiated sale to the public of a product that <u>some</u> purchaser is likely to use for unlawful ends, or whether, at a minimum, the person supplying the aid must know that a <u>particular</u> recipient thereof will use it in commission of a crime.[24]

Second, even assuming that aiding and abetting could under some circumstances be established by virtue of a publisher's knowledge that unknown recipients of generally published information would use it to commit crimes, § 2 requires that the accomplice have engaged in intentional wrongdoing, rather than mere recklessness. <u>Central Bank of Denver</u>, 511 U.S. at 190. That is to say, the aider must not only know that her assistance will be in the service of a crime; she also must share in the criminal intent. The defendant must "`participate in [the venture] as in something that he wishes to bring about, that he seek by his action to make it succeed.'" <u>Nye & Nissen</u>, 336 U.S. at 619 (quoting <u>United States v. Peoni</u>, 100 F.2d 401, 402 (2d Cir. 1938)).[25] As Judge Hand explained in the seminal <u>Peoni</u> case, the intent standard for criminal aiding and abetting is not the same as the "natural consequences of one's act" test that is the touchstone for "intent" in the civil tort context; criminal intent to aid the crime has "nothing whatever to do with the probability that the forbidden result [will] follow upon the accessory's conduct." <u>Peoni</u>, 100 F.2d at 402. Rather, the aider must have a "purposive attitude" toward the commission of the offense. <u>Id</u>.[26]

Finally, under the plain terms of § 2, the underlying offense must in fact be committed (though the government need not prove by whom it was committed); section 2 merely makes aiders and abettors culpable for their principals' commission of an offense.[27] There is no federal statute generally proscribing an <u>attempt</u> to aid and abet a federal offense (though the Model Penal Code recommended that such a prohibition be codified).[28] Therefore, if a crime has not been committed, the general federal aiding and abetting statute cannot be invoked.

**2.** <u>AEDPA Section 323</u>. Section 323 of the AEDPA, 110 Stat. at 1255 (to be codified as amended section 2339A(a) of Title 18) makes it unlawful to provide "material support or resources" to another person, "knowing or intending that they are to be used in preparation for, or in carrying out," various federal offenses relating to terrorism, or in preparation for, or in carrying out, the concealment from the commission of any such violation. <u>Id</u>. (to be codified at 18 U.S.C. § 2339A(a)).[29] Notably, the statute defines the term "material support or resources" to include, <u>inter alia</u>, "training, . . . and other physical assets." <u>Id</u>. (to be codified at 18 U.S.C. § 2339A(b)).[30]

Section 323 essentially is a prohibition on certain forms of knowing or intentional facilitation of particular terrorist crimes. In two respects, it is broader in scope than the general aiding and abetting statute. First, the facilitator can be culpable even if the underlying offense is not in fact committed. Second, the scienter provision is a bit broader than the "intent" requirement in 18 U.S.C. § 2. Under AEDPA section 323, specific intent to facilitate the underlying offense is not necessary:[31] the person providing the support or resources can be culpable so long as he "<u>know[s]</u>" that the resources provided "are to be used" to prepare for or commit a specified offense. In effect, however, this "knowledge" provision will rarely be of use to a prosecutor, because where -- as in section 323 -- the element of "knowledge" refers to a possible <u>future</u> result of a defendant's conduct, typically the government must prove that the defendant was "aware `that that result is <u>practically certain</u> to follow from his conduct.'" <u>United States v. Bailey</u>, 444 U.S. 394, 404 (1980) (emphasis added) (quoting <u>United States v. United States Gypsum Co</u>., 438 U.S. 422, 445 (1978) (internal citation omitted)).[32]

Furthermore, whatever the scope of the "knowledge" provision, the use of section 323 to address distribution of bombmaking information might nonetheless be limited, for two other reasons. First, section 323 covers facilitation of only certain enumerated crimes. Seesupra note 29. Second, it is not clear whether courts would find that information on how to manufacture or use explosives is "material support or resources." In the case of an actual physical demonstration of the techniques in question, or a one-to-one sale of printed information to someone who purports to be planning a crime, transfer of such information might constitute "training." Otherwise, it is open to question whether a manual on explosives would constitute a "physical asset[]" under § 2339A.[33]

**D.** 18 U.S.C. § 231(a)(1). For the most part, the federal statutes discussed in the previous sections are not directed at dissemination of information, as such. Instead, they are general prohibitions on conduct that can, in particular cases, be violated by providing information to another person.

By contrast, 18 U.S.C. § 231(a)(1) -- like the proposed Feinstein Amendment -- arguably could be characterized as a prohibition on certain forms of speech. Section 231(a)(1) provides that:

> Whoever teaches or demonstrates to any other person the use, application, or making of any firearm or explosive or
> incendiary device, or technique capable of causing injury or death to persons, knowing or having reason to know or
> intending that the same will be unlawfully employed for use in, or in furtherance of, a civil disorder which may in any
> way or degree obstruct, delay, or adversely affect commerce or the movement of any article or commodity in
> commerce or the conduct or performance of any federally protected function . . . [s]hall be fined under this title or
> imprisoned not more than five years, or both.

"Civil disorder," in turn, is defined as "any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of or results in damage or injury to the property or person of any other individual." 18 U.S.C. § 232(1).

This prohibition applies, not to all forms of speech that could cause a civil disorder, but solely to a discrete type of conduct involving expression -- namely, the "teach[ing]" or "demonstrat[ion]" of the use, application, or making of any firearm or explosive or incendiary device, or technique capable of causing injury or death to persons.[34]

It appears that this statute has been used sparingly; there are only two reported decisions involving it.[35] In those two cases, the courts of appeals narrowly construed the scienter provisions of § 231(a)(1) so as to avoid serious constitutional questions. National Mobilization Comm. to End the War in Viet Nam v. Foran, 411 F.2d 934 (7th Cir. 1969); United States v. Featherston, 461 F.2d 1119 (5th Cir.), cert. denied, 409 U.S. 991 (1972). In both cases, the persons charged under § 231(a)(1) were alleged to have instructed discrete groups of students on techniques of violence, with the intent that such techniques would be used in furtherance of civil disorders. The defendants nonetheless complained that the statute was impermissibly vague or overbroad, because its plain terms are not limited to cases of bad intent. Read literally, § 231(a)(1) also could be construed to prohibit well-intentioned persons from teaching techniques of self-defense and sporting activities where such persons have a "reason to know" that some pupils might put the skills they acquire to

unlawful use.  The defendants in <u>Foran</u> and <u>Featherston</u> argued that this apparent reach of § 231(a)(1) rendered the statute facially invalid under the First Amendment.

In order to avoid the substantial constitutional questions raised by the "reason to know" language, both courts of appeals construed the scienter element of § 231(a)(1) narrowly.  The Seventh Circuit, somewhat cryptically, concluded that "[t]he requirement of <u>intent</u> of course `narrows the scope of the enactment by exempting innocent or inadvertent conduct from its proscription."  <u>Foran</u>, 411 F.2d at 937 (citation omitted).  The Fifth Circuit, relying upon the Supreme Court's narrowing construction of similar language in an espionage statute, held that proof of "`bad faith'" is required under § 231(a)(1). <u>Featherston</u>, 461 F.2d at 1121 (quoting <u>Gorin v. United States</u>, 312 U.S. 19, 27-28 (1941)).  The court concluded that "the statute does not cover mere inadvertent conduct.  It requires those prosecuted to have acted with <u>intent or knowledge</u> that the information disseminated would be used in furtherance of a civil disorder."  <u>Id</u>. at 1122 (emphasis added).

The potential use of § 231(a)(1) to reach cases involving dissemination of bombmaking information is limited in three ways.  First, as construed in <u>Featherston</u> and <u>Foran</u>, § 231(a)(1) can apply only where the person doing the teaching or demonstrating either (i) intends that the information will be used in furtherance of a civil disorder or (ii) "knows" that the information will be so used.  As explained <u>supra</u> at 21, as a practical matter the "or knows" prong will rarely be useful:  since the knowledge in question is of a possible future result of a defendant's conduct, the government must prove that the defendant was "aware `that that result is <u>practically certain</u> to follow from his conduct.'"  <u>Bailey</u>, 444 U.S. at 404 (citations omitted) (emphasis added).[36]  Accordingly, the vast majority of cases in which § 231(a)(1) could successfully be invoked will involve defendants who intend that their teaching be used to facilitate or assist in a civil disorder.

Second, it is questionable whether the operative verbs -- "teaches or demonstrates" -- could be read to cover an arms-length sale of a manual to an anonymous or unknown customer.  Finally, the intended or known use of the information conveyed must be "in, or in furtherance of, a civil disorder which may in any way or degree obstruct, delay, or adversely affect commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function."  And a "civil disorder" requires a public disturbance involving violence by assemblages of three or more persons.  Section 231(a)(1) would not, therefore, apply to uses of the information by merely one or two felons.

# V.
## THE NEED FOR ADDITIONAL LAWS RELATING TO
## THE DISSEMINATION OF BOMBMAKING INFORMATION

During the Senate debate on the Feinstein Amendment, Senators Feinstein and Biden identified two sets of circumstances in which the dissemination of bombmaking information ideally should be prohibited:

(i) where the person disseminating the information intends that it be used for unlawful ends;[37] and

(ii) where the person disseminating the information has good reason to know that a particular potential recipient thereof

plans to use that information to engage in unlawful activities.[38]

On the other hand, Senator Feinstein made it plain that she did not wish to prohibit the "legitimate" publication of information about explosives contained in, for instance, the Encyclopedia Britannica (despite the fact that such information certainly could be used by persons who wished to commit violent crimes);[39] and Senator Hatch indicated that any prohibition that is enacted should be drafted carefully, so as not to subject to criminal sanctions, for example, legitimate explosives manufacturers who teach customers and other persons how to manufacture, and make legitimate use of, explosives.[40]

The Department of Justice agrees that it would be salutary if the federal criminal law prohibited dissemination of bombmaking information in the two circumstances described above, while still permitting the "legitimate" publication of information about explosives in the manner described by Senators Feinstein and Hatch.  As the discussion in Part IV demonstrates, however, the present federal criminal code is less than completely effective in accomplishing these objectives:

**1.**  Federal law would in certain cases prohibit or punish the dissemination of bombmaking information where the person disseminating the information intends that it be used for unlawful ends.  For example:

-- If the disseminator enters into an agreement with another person to commit a federal crime, dissemination of bombmaking
   information as a means of furthering that crime would be an overt act in furtherance of a conspiracy. Similarly, if the
   disseminator solicits another person to commit a federal crime of violence -- for example, by offering a reward for its
   commission -- conveyance of the bombmaking information would be evidence "strongly corroborating" an improper intent,
   thereby satisfying the scienter requirement of 18 U.S.C. § 373.

-- If the disseminator provides the information to a particular person with the specific purpose of assisting the recipient in the
   commission of a federal crime, and if the recipient thereafter does commit such an offense, the disseminator would be
   culpable for aiding and abetting that offense.  And, even if the offense is not in fact committed, the disseminator might still
   be culpable for a violation of AEDPA section 323, provided (i) that the offense that he intended to advance was one of
   those enumerated in the statute; and (ii) a court finds that bombmaking information can be considered "material support
   or resources."

-- If the disseminator provides the information to a person or persons in order to prepare for or further a "civil disorder," he
    will have violated 18 U.S.C. § 231(a)(1), assuming that provision of such information constitutes the "teach[ing] or
    demonstrat[ion]" of the making of explosives or incendiary devices.

However, except where the particular requirements of AEDPA section 323 or 18 U.S.C. § 231(a)(1) are met, federal law presently does not provide a ground for prosecution where a disseminator of bombmaking information does not conspire with or solicit another to commit a federal crime, but nevertheless intends to aid the recipients of the information in commission of such criminal conduct, and where no federal crime is in fact committed. Further, federal law does not presently reach the person who disseminates bombmaking information intending that it be used to aid the commission of a state or local criminal offense, notwithstanding the utilization of interstate or foreign commerce to achieve such dissemination and notwithstanding the actual or potential impact of the underlying violation on such commerce.

**2.** If a disseminator of bombmaking information does not have the specific purpose of facilitating a crime, but nonetheless is aware that (i) an enumerated terrorist crime or (ii) a "civil disorder" were <u>practically certain</u> to follow from dissemination of the information to a particular person or persons, then the disseminator might be culpable under AEDPA section 323, or 18 U.S.C. § 231(a)(1), respectively. However, absent such a high degree of "knowledge" of the facilitation of future crimes, current federal law generally would not prohibit or punish the dissemination of bombmaking information in the case where the disseminator does not have the specific purpose of facilitating a crime but nevertheless knows that a particular recipient thereof intends to use it for unlawful ends.

In sum, current federal law does not specifically address certain classes of cases that Senators Feinstein and Biden identified. Accordingly, the Department of Justice agrees with those Senators that it would be appropriate and beneficial to adopt further legislation to address this problem directly, in a manner that does not impermissibly restrict the wholly legitimate publication and teaching of such information, or otherwise violate the First Amendment.

# VI.
## CONSTITUTIONALITY OF RESTRICTING OR PENALIZING THE PUBLICATION OR DISSEMINATION OF BOMBMAKING INFORMATION

Before identifying what further steps Congress can take to address this problem, it is necessary to discuss whether and to what extent the First Amendment limits the government's power to impose criminal culpability on persons publishing or disseminating bombmaking information. In this regard, it should be noted that in <u>Rice v. Paladin Enterprises</u>, Inc., 940 F. Supp. 836 (D. Md. 1996), <u>appeal docketed</u>, No. 96-2412 (4th Cir.), a district court recently held that the First Amendment substantially protects the right of persons to publish such information, regardless of the publishers' intent.

The defendant in that case, publisher Paladin Enterprises, Inc., has (for many years) offered for public sale (principally through a mail-order catalogue) a book entitled <u>Hit Man</u>, which describes in great detail specific methods and techniques of, and strategies for, murder for hire. James Perry ordered and received <u>Hit Man</u> from Paladin. Thereafter, Perry followed a number of instructions in <u>Hit Man</u> in planning, executing, and attempting to hide the evidence of, his contract killing of three people in Montgomery County, Maryland. Perry was convicted of murder, after which the survivors of the victims sued Paladin in federal court for wrongful death, alleging that Paladin had aided and abetted the murders by selling <u>Hit Man</u> to Perry. Paladin moved for summary judgment on the ground that the First Amendment barred recovery. For the purposes of the motion, the parties stipulated the following:

**1.** Paladin had no contact with Perry (or the person who hired him to commit the murders) other than to

sell him <u>Hit Man</u>

and another book.  Paladin had no "specific knowledge" that Perry planned to commit a crime, or that he had been

retained to kill anyone.  940 F. Supp. at 839.

2.   In planning, committing, and concealing his crimes, Perry followed certain descriptions and instructions in <u>Hit Man</u>,

including:  (a) Hit Man's recommendation that a "beginner" hit man use an AR-7 rifle; (b) <u>Hit Man</u>'s instructions on how

to disassemble the AR-7; (c) <u>Hit Man</u>'s detailed instructions on how to drill out the serial number on the rifle; (d) <u>Hit</u>

<u>Man</u>'s detailed instructions on how to create a silencer to use on an AR-7; (e) <u>Hit Man</u>'s detailed instructions on how to

murder victims from close range; and (f) <u>Hit Man</u>'s detailed instructions on how to file the AR-7 so that it would not be

traceable. <u>Id</u>. at 839-40.[41]

3.   Paladin engaged in a marketing strategy intended to maximize sales to the public, including sales to the following targeted

audiences:  authors who desire information for the purpose of writing books about crime and criminals; law enforcement

officers and agencies who desire information concerning the means and methods of committing crimes; persons who

enjoy reading accounts of crimes and the means of committing them for purposes of entertainment; persons who

fantasize about committing crimes but do not thereafter commit them; criminologists and others who study criminal

methods and mentality; and "<u>criminals and would-be criminals who desire information and instructions on how to commit</u>

<u>crimes</u>."  In particular, the parties stipulated that "[i]n publishing, marketing, advertising and distributing <u>Hit Man</u> . . . ,

Paladin <u>intended and had knowledge</u> that their publications would be used, upon receipt, by criminals and would-be

criminals to plan and execute the crime of murder for hire, in the manner set forth in the publications." <u>Id</u>. at 840.[42]

The district court granted Paladin summary judgment.  The court seemed to rely upon two distinct rationales for its decision:  First, the court concluded that the State of Maryland has not "extend[ed] the tort of aiding and abetting to the circumstances of this case," and that "[a] federal court sitting in diversity cannot create new causes of action."  <u>Id.</u> at 842.  Accordingly, the court seemed to conclude that plaintiffs had failed to state a claim under Maryland tort law.  <u>Id</u>.  Second, the court held that, even if an aiding and abetting tort theory were cognizable, Paladin's publication and dissemination of the book was entitled to constitutional protection, and "the First Amendment acts as a bar to liability in the instant case," <u>id</u>. at 843, despite defendants' stipulation that they "intended and had knowledge that their publications would be used, upon receipt, by criminals and would-be criminals to plan and execute the crime of murder for hire, in the manner set forth in the publications."  <u>See</u> <u>also</u> <u>id</u>. at 843-49 (First Amendment analysis).

This recent decision suggests that it is necessary to consider carefully the First Amendment questions that a statute like the Feinstein Amendment would raise.[43]

## A.  First Amendment Principles

Other than the cursory analysis in the Featherston and Foran cases, discussed supra at 22-23, and the district court's recent decision in Rice v. Paladin, discussed supra at 27-28, there is little in the way of judicial analysis directly addressing the First Amendment questions that a statute like the Feinstein Amendment would raise.[44]  However, the courts have substantially addressed the scope of the Free Speech Clause in three related factual contexts that serve to put the constitutional question in perspective:  (i) where the government seeks to restrict the advocacy of unlawful action; (ii) where the government (or a private party using tort law) seeks to restrict or punish the general disclosure or publication of lawfully obtained information; and (iii) where the government punishes conveyance of information as part of a "speech act," such as speech that aids and abets another person's commission of a crime.

**1.**  Advocacy of Unlawful Action.  In the landmark case of Brandenburg v. Ohio, 395 U.S. 444 (1969) (per curiam), the Supreme Court held that "the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless actions and is likely to incite or produce that action." Id. at 447 (footnote omitted).  This test, in other words, requires both an intent and a likelihood that the expression in question -- "advocacy of the use of force or of law violation " -- will incite or produce imminent unlawful action.

A few years later, the Court made clear how demanding the Brandenburg test is.  In Hess v. Indiana, 414 U.S. 105 (1973) (per curiam), the defendant was arrested for loudly stating, at an anti-war rally, "We'll take the fucking street later."  The Court held that Brandenburg prohibited the State from punishing this alleged advocacy of illegality, principally because the defendant's statement "amounted to nothing more than advocacy of illegal action at some indefinite future time."  Id. at 108.  Furthermore, the Court reasoned that " [s]ince the uncontroverted evidence showed that Hess' statement was not directed to any person or group of persons, it cannot be said that he was advocating, in the normal sense, any action." Id. at 108-09.

In light of these precedents,[45] it is doubtful that general publication of written materials advocating illegality can ever be proscribed under the Brandenburg test.[46]  Many of the bombmaking manuals discussed by Congress and identified in this Report could plausibly be said to advocate -- either explicitly or implicitly -- the illegal use of explosives and other weapons.  Insofar as publication of such manuals were criminalized on account of those manuals' advocacy of unlawful conduct, such a prohibition almost certainly could not pass constitutional muster.[47]

**2.**  Disclosure or Publication of Lawfully Obtained Information.  The Brandenburg test, by its terms, applies to advocacy of unlawful conduct.  But the government's principal concern with respect to bombmaking manuals is not their advocacy, but the instructional information they contain.  That information is (at least for the most part) a matter of public record.  As demonstrated elsewhere in this Report, anyone interested in manufacturing a bomb, dangerous weapon or weapon of mass destruction can easily obtain detailed instructions for manufacturing and using such a device, both from legitimate publications and from so-called "underground" publications.  And, presumably, most if not all of the writers and publishers of such

publications do not obtain the information unlawfully, or from classified sources.  The First Amendment imposes significant constraints on the ability of the government to restrict publication of such information.

Although the Supreme Court has been careful never to hold categorically that publication of lawfully obtained truthful information "is automatically constitutionally protected," The Florida Star v. B.J.F., 491 U.S. 524, 541 (1989), nonetheless the Court has, on several occasions, held that "the government may not generally restrict individuals from disclosing information that lawfully comes into their hands in the absence of a `state interest of the highest order.'"  United States v. Aguilar, 115 S. Ct. 2357, 2365 (1995) (quoting Smith v. Daily Mail Pub. Co., 443 U.S. 97, 103 (1979)).  See also Butterworth v. Smith, 494 U.S. 624, 632 (1990).  And even if the state has such an interest, "punishment may lawfully be imposed, if at all, only when narrowly tailored to a state interest of the highest order."  Florida Star, 491 U.S. at 541.[48]

We can assume that there is a "state interest of the highest order" in keeping information on how to make explosives out of the hands of persons who want -- or who would be likely -- to use that information in furtherance of violent crime.[49]  What is more, it is "foreseeable," in the tort-law sense, that some readers will use such information for unlawful ends if the information is made publicly available.  As explained in Part II of this Report, strong circumstantial evidence demonstrates that persons bent upon committing acts of terrorism often rely upon literature for guidance in the construction of explosive devices and other weapons of mass destruction.  Therefore, chances are that even "legitimate" publication of bombmaking information -- such as that found in government-issued manuals and in encyclopedias -- will facilitate some degree of unlawful conduct.

Nevertheless, even where it is foreseeable that widely disseminated information will be used unlawfully, or in a negligent and dangerous manner, courts uniformly have found that the Constitution prohibits imposing culpability or civil liability for distributing or publishing that information.  For example, a number of courts have held that the First Amendment prohibits imposing tort liability on publishers, producers and broadcasters for the foreseeable consequences of their speech where viewers or readers mimicked unlawful or dangerous conduct that had been depicted or described, even if the standards for tortious negligence or recklessness were otherwise satisfied.[50]  Similarly, a number of courts have held that the First Amendment bars recovery for allegedly foreseeable injuries suffered by persons who were following "how-to" instructions.[51]  In a third, related category of cases, courts have held that the Constitution does not permit imposition of criminal penalties or civil liability for written or visual depictions

-- including depictions of "factual" events -- that are likely to alter (or that have in fact changed) persons' attitudes such that those persons are more likely to engage in criminal, dangerous or otherwise undesirable behavior.[52]

Florida Star explicitly leaves open the possibility that, in rare circumstances, the First Amendment might not bar sanctions for the publication of true, lawfully obtained information.[53]  Nevertheless, such an exception almost certainly would not be recognized where, as here, the information is already in the public domain.  The Court's stringent First Amendment test for restrictions on publication of lawfully obtained information, in other words, almost certainly would not permit the government to proscribe the publication or widespread dissemination of bombmaking manuals.  Where similar or equivalent information is widely available elsewhere, the Court has been unwilling to find that a restriction on publication of that information is "narrowly tailored" to address a state interest:  no "meaningful public interest" can be served by further restriction under such circumstances.  Florida Star, 491 U.S. at 535.  "`[O]nce the truthful information [is]

"publicly revealed" or "in the public domain,"'" its dissemination cannot constitutionally be restrained.  Id. (quoting Smith, 443 U.S. at 103 (internal citation omitted)).  See also id. at 539 (one critical problem with the rape-shield statute at issue in Florida Star was that it punished publication of rape victims' identities "regardless of whether the identity of the victim is already known throughout the community").[54]  Congress presumably would not be willing to ban the publication and teaching of all information concerning the manufacture of explosives -- including, for example, information exchanged among professional explosives manufacturers, or contained in the Encyclopedia Britannica and in government manuals.  Seesupra at 24.  As long as this is the case, it is hard to imagine that the First Amendment would permit culpability or liability for publication of other bombmaking manuals that have a propensity to be misused by some unknown, unidentified segment of the readership, since sources of the same information inevitably will remain in the public domain, readily available to persons who wish to manufacture and use explosives.

**3.**  "Speech Acts," such as Aiding and Abetting.  On the other hand, the constitutional analysis is radically different where the publication or expression of information is "brigaded with action,"[55] in the form of what are commonly called "speech acts."  If the speech in question is an integral part of a transaction involving conduct the government otherwise is empowered to prohibit, such "speech acts" typically may be proscribed without much, if any, concern about the First Amendment, since it is merely incidental that such "conduct" takes the form of speech.  "`[I]t has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.'"  Ohralik v. Ohio State Bar Ass'n, 436 U.S. 447, 456 (1978) (quoting Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 502 (1949)).  For example, as the Court in Ohralik explained, there are "numerous examples" of communications -- including communications that convey information -- that are subjected to economic or commercial regulation without implicating the First Amendment, such as:  exchange of securities information; corporate proxy statements; exchange of information among competitors; and employers' threats of retaliation for employees' labor activities. Id. (citations omitted).[56]

Similarly, many inchoate crimes often or always are effected through speech "acts."  Such crimes include conspiracy, facilitation, solicitation, bribery, coercion, blackmail, and aiding and abetting.[57]  Punishing speech -- including the dissemination of information -- when it takes the form of such criminal conduct typically does not even raise a First Amendment question.  As Justice (then-Judge) Kennedy explained, "where speech becomes an integral part of the crime, a First Amendment defense is foreclosed even if the prosecution rests on words alone."  United States v. Freeman, 761 F.2d 549, 552 (9th Cir. 1985), cert. denied, 476 U.S. 1120 (1986).[58]

In particular, "[t]hat `aiding and abetting' of an illegal act may be carried out through speech is no bar to its illegality."  National Org. for Women v. Operation Rescue, 37 F.3d 646, 656 (D.C. Cir. 1994).[59]  What is more, aiding and abetting a crime often consists of providing factual information to another person.  The role of a lookout at a burglary is to inform confederates that someone is coming.  An accomplice of a bank robbery might abet the operation by telling the principal the combination of a safe, or how to evade detection.  The First Amendment is simply inapposite in such cases.[60]  Nor is the situation necessarily different where the information conveyed is already publicly available.  For example, there may be many lawful -- and constitutionally protected -- circumstances in which a person (say, a professor of architecture) may provide the blueprint of a bank to other persons (say, architecture students); but if such blueprints are transferred for the purpose of assisting others in a bank robbery, and if that robbery occurs, the person providing the information is subject to accomplice culpability, even if he obtained the blueprint from a

textbook, from city hall, or from the newspaper.  See also United States v. Edler Industries, Inc., 579 F.2d 516, 521 (9th Cir. 1978) (though the dissemination and export of technological information on how to manufacture military equipment otherwise might generally be protected by the First Amendment, there is no constitutional protection for export of such information as part of "the conduct of assisting foreign enterprises to obtain military equipment"); Constitutionality of the Proposed Revision of the International Traffic in Arms Regulations, 5 Op. O.L.C. 202, 206-09 (1981) (discussing Edler Industries).

In a number of cases, persons have been convicted of aiding and abetting violations of the tax laws by providing explicit instructions to a discrete group of listeners on techniques for avoiding disclosure of tax liability.  See supra notes 23-24.  Defendants in such cases often have invoked the First Amendment; but that constitutional guarantee has rarely, if ever, been a bar to accomplice culpability.  The courts correctly have rejected defendants' reliance on Brandenburg; and, in particular, have refused to accept defendants' arguments that the "imminence" requirements of the Brandenburg test apply to such aiding and abetting cases.  If a defendant has aided and abetted a crime through the dissemination of information -- rather than simply by urging or "advocating" that the crime be committed -- then the government should not need to demonstrate that the speech was intended or likely to "incite" imminent unlawful conduct.  The reasons the strict requirements of the Brandenburg test must be applied to cases of advocacy are that (i) abstract advocacy of unlawful conduct usually is closely aligned with (or sometimes part of) political and ideological speech entitled to the strongest constitutional solicitude; and (ii) the danger the speech will in fact lead to unlawful behavior often is remote and speculative.  These concerns are rarely, if ever, implicated, in cases involving conduct constituting intentional and material aid to the criminal conduct of particular persons.  It follows that the question of whether criminal conduct is "imminent" is relevant for constitutional purposes only where, as in Brandenburg itself, the government attempts to restrict advocacy, as such.  But the tax-avoidance aiding and abetting cases are not subject to Brandenburg because culpability in such cases is premised, not on defendants' "advocacy" of criminal conduct, but on defendants' successful efforts to assist others by detailing to them the means of accomplishing the crimes.[61]

If it were otherwise -- that is, if the Brandenburg test applied to crimes implemented through the use of informative speech -- there would, for example, be no way for the government to prohibit the aiding and abetting of a crime that is intended to occur weeks or months after its planning.  But in fact, if someone in October teaches another person how to cheat on their tax forms to be filed the following April, the person doing the teaching nonetheless can be culpable of aiding and abetting tax fraud.  "The fact that the aider and abettor's counsel and encouragement is not acted upon for long periods of time does not break the actual connection between the commission of the crime and the advice to commit it."  United States v. Barnett, 667 F.2d 835, 841 (9th Cir. 1982).

Just as advocacy of unlawful conduct is entitled to greater constitutional protection than the act of using speech to aid and abet such conduct, Brandenburg itself recognizes another, related distinction that is of equal significance for present purposes.  As we explained above, the Court in Brandenburg held that the First Amendment renders invalid statutes that "forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action."  395 U.S. at 447.  Immediately after stating this constitutional requirement, however, the Court drew a sharp distinction between "`the mere abstract teaching . . . of the moral propriety or even moral necessity for a resort to force and violence'" and "`preparing a group for violent action and steeling it to such action.'"  Id. at 448 (quoting Noto v. United States, 367 U.S. 290, 297-98 (1961)).

As the Court made plain in Noto and in related cases, the latter category of conduct -- "preparing a group

for violent action and steeling it to such action" -- is not entitled to First Amendment protection, even though advocacy ("the mere abstract teaching . . . of the moral propriety") of such violence is protected.  Indeed, even Justice Douglas -- in the course of urging strong constitutional protection for the <u>advocacy</u> of illegality -- freely acknowledged that "[t]he freedom to speak is not absolute; the <u>teaching of methods of terror</u> . . . should be beyond the pale."  <u>Dennis v. United States</u>, 341 U.S. 494, 581 (1951) (Douglas, J., dissenting) (emphasis added).

   The distinction recognized in <u>Brandenburg</u> between advocacy of, and preparation for, unlawful conduct, was exemplified in <u>Scales v. United States</u>, 367 U.S. 203 (1961), a case in which the Court carefully distinguished between the teaching of abstract doctrine -- punishment of which is subject to substantial constitutional constraints -- and the teaching of the <u>techniques</u> of unlawful conduct, which can much more easily be proscribed.  <u>Id</u>. at 233-34.  As to the former, the Court has developed the <u>Brandenburg</u> test, which asks whether the danger is intended, likely and "imminent."  But the constraints of the First Amendment do not apply when the "teaching" goes "beyond the theory itself" to "an explanation of `basic strategy.'"  Scales, 367 U.S. at 244.  At that point, the teaching -- if it is done with the purpose of preparing a group for unlawful action -- is not much different than the information conveyed in a typical aiding and abetting case; accordingly, the Brandenburg protections should largely be inapposite.  See Yates v. United States, 354 U.S. 298, 331-33 (1957) ("systematic teaching" in classes to "develop in the members of [a] group a readiness to engage [in unlawful conduct] at the crucial time," could be punished, even if that conduct was to occur only "when the time was ripe").[62]

   This critical distinction -- between advocacy of unlawful conduct, on the one hand, and "instructions" for unlawful conduct, on the other -- was recognized by Professor Thomas Emerson in his seminal treatise on the First Amendment:

> [C]onduct that amounts to "advice" or "persuasion" [sh]ould be protected; conduct that moves into the area of
> "instructions" or "preparations" [sh]ould not.  The essential task would be to distinguish between simply conveying an
> idea to another person, which idea he may later act upon, and actually participating with him in the performance of an
> illegal act.  It is true that the distinction does not offer automatic solutions and that courts could easily disagree on any
> particular set of facts.  But this process of decision making is related to the nature of "expression" and the functions and
> operations of a system of freedom of expression.  It is therefore a rational method of approaching the problem.

Thomas Emerson, <u>The System of the Freedom of Expression</u> 75 (1970).[63]


## B. <u>Application of First Amendment Principles to Dissemination of Bombmaking Information</u>

   Having reviewed the role of the First Amendment in these three related contexts, we now can address specifically the circumstances under which Senators Feinstein and Biden would seek to proscribe dissemination of bombmaking information.

**1.** <u>Dissemination with the "Intent" to Facilitate Unlawful Conduct</u>. The Feinstein Amendment would make it unlawful, <u>inter alia</u>, for any person to "teach or demonstrate" the making of explosive materials, or to distribute by any means information pertaining to, in whole or in part, the manufacture of explosive materials, where the person "intend[ed]" that such information would be used for, or in furtherance of, an activity that "constitutes a Federal criminal offense or a criminal purpose affecting interstate commerce."  In light of the foregoing discussion in Part VI-A, two things about the constitutionality of this "intent" prohibition are clear:

First, the First Amendment almost certainly would require that the "intent" scienter provision in such a statute be construed to mean an actual, conscious purpose to bring about the specified result.  "Intent" may not be construed as "constructive intent," as in the civil tort context; that is to say, "intent" could not constitutionally be inferred solely by virtue of the fact that criminal offenses were a foreseeable result -- a "natural consequence" -- of the general distribution of bombmaking information.  Anyone who teaches or publishes bombmaking information -- including those who do so for wholly legitimate reasons, such as explosives manufacturers, the military, and encyclopedia publishers -- could foresee that <u>some</u> unknown recipient of the teaching or information will use it for unlawful ends; but the First Amendment would not permit culpability on that basis.  <u>See</u> <u>supra</u> at 30-34.  Instead, an "intent" element must be construed to reach only the person who disseminates the information for the <u>purpose</u> of facilitating criminal conduct.[64]

Second, a prosecution relying upon an "intent" requirement plainly would be constitutional where the teacher intends that a <u>particular</u> student -- or a discrete group of students -- use the information for criminal conduct.  Indeed, if there is such an intent, and a receiver of the information thereafter <u>does</u> use that information to commit a crime, the person who assisted him by showing him how to do so would be culpable as an aider and abettor, and the First Amendment would not bar such accomplice culpability.  <u>See</u> <u>supra</u> at 36-39.  The constitutional analysis should be the same, as in the <u>Featherston</u> case, where the teacher intends that particular students use the information for unlawful ends, but the crime is never committed (such as when the scheme is foiled by detection).  This would be, in essence, a form of "attempted aiding and abetting." Although presently there is no general federal statute prohibiting "attempted aiding and abetting," <u>see</u> <u>supra</u> at 20, that is not because of any constitutional bar:  application of such a statute to the provision of information would not transgress the First Amendment.  Therefore, a statute like the Feinstein Amendment could constitutionally be applied to a case where the person supplying the critical training or information has the intent thereby to assist a particular recipient thereof in unlawful activity, whether or not the crime eventually occurs.[65]  As the Court emphasized in <u>Brandenburg</u> and in earlier cases, the Constitution does not protect the conduct of "preparing a group for violent action" by <u>teaching</u> the techniques of unlawful conduct.  <u>See</u> <u>Noto</u>; <u>Scales</u>; <u>Dennis</u>, 341 U.S. at 581 (Douglas, J., dissenting); Emerson, <u>System of Freedom</u>, <u>supra</u>, at 75; Greenawalt, <u>Speech</u>, <u>Crime</u>, <u>supra</u> note 20, at 244-45.[66]

The more difficult question is whether criminal culpability can attach to <u>general publication</u> of explosives information, when the writer, publisher or seller of the information has the purpose of generally assisting unknown and unidentified readers in the commission of crimes.  This is, in essence, the situation alleged in the recent <u>Rice v. Paladin</u> case.  <u>See</u> <u>supra</u> at 27-28.  To be sure, such a "generalized" attempt to aid crime through publication is "not the same as <u>preparing a group</u> for violent action." <u>Noto</u>, 367 U.S. at 298.  The "joint participation" in a crime that is the hallmark of conspiracy or aiding and abetting is absent here:  the speech is not, in any direct sense, "brigaded with action."  What is more, the danger to the public in such a case is not necessarily greater than that caused by the same exact publication that is made solely for permissible purposes.  The constitutional question is, therefore, more difficult than in the case of intentional <u>concerted</u> action discussed above.

There are few, if any, cases directly on point.[67]  However, in Haig v. Agee, 453 U.S. 280 (1981), the Court suggested that otherwise privileged publication of information can lose its First Amendment protection when the publisher has an impermissible motive.  In Agee, a former CIA employee had his passport revoked as a result of his campaign to publish the names of (and otherwise publicly identify) intelligence agents working in foreign countries, a course of conduct that undermined intelligence operations and endangered agents.  In the context of this serious threat to American national security, the Court held that the First Amendment did not protect Agee's publication of the agents' names.  In so ruling, the Court stressed the following:

> Agee's disclosures, among other things, have the declared purpose of obstructing intelligence operations and the
> recruiting of intelligence personnel.  They are clearly not protected by the Constitution.  The mere fact that Agee is
> also engaged in criticism of the Government does not render his conduct beyond the reach of the law.

Id. at 308-09 (emphasis added).  The Court did not indicate whether Agee's bad intent was, in and of itself, sufficient to strip his speech of its constitutional protection.  In particular, the Court had no occasion to determine whether the First Amendment analysis would be the same if the information Agee published was already in the public domain and/or if the government's interests were not as significant as the protection of intelligence sources.

Nonetheless, in the absence of contrary authority, this passage in Haig v. Agee supports the argument that the government may punish publication of dangerous instructional information where that publication is motivated by a desire to facilitate the unlawful use of explosives.[68]  At the very least, publication with such an improper intent should not be constitutionally protected where it is foreseeable that the publication will be used for criminal purposes; and the Brandenburg requirement that the facilitated crime be "imminent" should be of little, if any, relevance.[69]  Accordingly, we believe that the district court in Rice v. Paladin, seesupra at 27-28, erred insofar as it concluded that Brandenburg bars liability for dissemination of bombmaking information regardless of the publisher's intent.  See also infra note 71.

Having said that, we should note that where there is no concerted action between the publisher and any particular recipient of the information, there might be a significant problem in proving that the person publishing the information has done so with an impermissible purpose.  Most publishers of the bombmaking materials in question will argue that their publication is well-intentioned.  For example, in Rice, the publisher of Hit Man has asserted that its intended audience includes:  authors who desire information for the purpose of writing books about crime and criminals; law enforcement officers and agencies who desire information concerning the means and methods of committing crimes; persons who enjoy reading accounts of crimes and the means of committing them for purposes of entertainment; persons who fantasize about committing crimes but do not thereafter commit them; and criminologists and others who study criminal methods and mentality. See supra at 28.

Nevertheless, proof of improper intent might be possible in certain types of cases.  In many cases the manuals themselves might have "the declared purpose," Agee, 453 U.S. at 309, of facilitating crime.  Although, under Brandenburg, culpability cannot attach merely because the manuals advocate unlawful action, such advocacy could constitutionally be used as probative evidence that the disseminator of accompanying information on the techniques of bombmaking intended by such dissemination to facilitate criminal conduct.  See supra note 47.  What is more, if a publisher of such communications engages in a marketing strategy intended to maximize sales to, inter alia, "criminals and would-be criminals who desire

information and instructions on how to commit crimes," as the publisher of <u>Hit Man</u> allegedly did, and if that publisher's economic success evidently depends upon stimulating a high volume of unlawful use of his product -- <u>i.e.</u>, the publisher's fortunes substantially rise or fall depending on the degree to which his product facilitates unlawful conduct -- there might be sufficient evidence of improper intent.  <u>See</u> <u>Direct Sales</u>, 319 U.S. at 712-13 (where seller of dangerous drugs -- which could be used both for proper and improper purposes -- engaged in marketing strategy to stimulate sales to would-be criminals, and where seller had a "stake in the venture," it was permissible to infer intent to assist criminal operation).  As Justice Holmes explained in a related context, it is fair to assume that items are "designed for" unlawful use where they are "offered for sale in such a mode as purposely to attract purchasers who wanted them for the unlawful [use]." <u>Danovitz v. United States</u>, 281 U.S. 389, 397 (1930).

Finally, if, as Senator Feinstein believed, some of the information contained in the bombmaking manuals has no use <u>other than</u> to facilitate unlawful conduct,[70] that fact, too, would be evidence of an intent to facilitate crime (at least with respect to that particular information).  Publishers of such information undoubtedly would argue that such information has uses other than to facilitate unlawful conduct -- such as to educate law enforcement officials and would-be murder-mystery writers, and simply to entertain persons who enjoy reading accounts of the workings of the criminal mind. <u>See</u> supra at 28 (describing claims made by publisher of <u>Hit Man</u>).  But that assertion would only raise, rather than resolve, the critical question of fact regarding a publisher's intent; it would remain an issue for the trier of fact to determine whether one of the publisher's purposes was to facilitate criminal conduct.

We acknowledge that in many cases, there may be a broad and diverse audience for such communications, including persons who would not use the information as a blueprint for crime, and the communications might have substantial value other than to facilitate crimes.  In such cases, courts might agree that "a strict rule about finding intent is especially important, lest a jury convict because of outrage over the facts someone has chosen to disclose.  A person should not be punished for encouraging a general crime like murder by publicly disclosing facts unless the prosecution's evidence leaves no possible doubt that his purpose has been to aid or cause that criminal result."  Greenawalt, <u>Speech, Crime</u>, <u>supra</u> note 20, at 273.  But where such a purpose is proved beyond a reasonable doubt, as it would have to be in a criminal case, the First Amendment should be no bar to culpability.[71]

**2.**  <u>Dissemination with the "Knowledge" that a Particular Recipient of the Information Intends to Use It in Furtherance of Unlawful Conduct</u>.  The Feinstein Amendment also would have made it unlawful, <u>inter alia</u>, for any person to "teach or demonstrate" the making of explosive materials, or to distribute by any means information pertaining to, in whole or in part, the manufacture of explosive materials, if the person "<u>knows</u>" that such information will be used for, or in furtherance of, "an activity that constitutes a Federal criminal offense or a criminal purpose affecting interstate commerce."  As Senator Biden explained, this "knowledge" provision was intended to address the case where the person disseminating the information has evidence that a <u>particular</u> potential recipient plans to use that information to engage in unlawful activities -- for example, when the person requesting the information expressly indicates that he plans to use the information to learn how to commit violent crimes.  <u>See</u> <u>supra</u> note 38.

It is questionable whether the statutory scienter requirement ("knows") in the Feinstein Amendment would suffice to cover such a situation.  As explained above, supra at 21 & note 32, where a statutory element of "knowledge" refers to a possible future result of a defendant's conduct, the government typically must prove that the defendant was "aware `that that result is <u>practically certain</u> to follow from his conduct.'"  <u>United States v. Bailey</u>, 444 U.S. 394, 404 (1980) (citations omitted).  Thus, even where someone expressly states

that he desires to purchase a product in order to plan a crime, it might be difficult to persuade the trier of fact that it was "practically certain" that the crime would be committed (particularly if, as it turned out, the crime was not in fact committed). It would, therefore, be helpful to identify a more carefully tailored mens rea requirement in order to address Senator Biden's hypothetical situation.

The scenario Senator Biden describes brings to mind other types of "facilitation" statutes, such as state statutes making it a crime to "provide" a person with "means or opportunity" to commit a crime, "believing it probable that he is rendering aid to a person who intends to commit a [crime]." N.Y. Penal Law § 115.05 (McKinney 1996).[72] Such statutes, however, are of general applicability: they do not single out a particular form of facilitation, such as facilitation involving conveyance of information, for especially harsh treatment. And what is more, conviction under such statutes -- as under the federal aiding and abetting statute, 18 U.S.C. § 2 -- requires that the facilitation actually result in the commission of a crime.[73]

A closer analogy, therefore, might be another section of the AEDPA itself. Section 706 of the AEDPA makes it a felony to "knowingly transfer[] any explosive materials, knowing or having reasonable cause to believe that such explosive materials will be used to commit a crime of violence . . . or drug trafficking crime." 110 Stat. at 1295-96 (to be codified at 18 U.S.C. § 844(o)).[74] The "reasonable cause to believe that [the item] will be used [for the unlawful purpose]" standard would seem to address directly the case where the recipient of the product indicates an intent to use it to commit or to facilitate a crime. The constitutional question then becomes whether such a standard can be used where the item being transferred is not "explosive materials," as in AEDPA section 706, but instead information on how to manufacture or use such materials.

There is little case law directly on point. As Professor Greenawalt points out, however, this case is not quite as easy from a First Amendment perspective as "attempted aiding and abetting," which can constitutionally be proscribed because it requires a specific purpose to actually assist in the commission of the crime:

> It is only a minor impairment of freedom to tell people they cannot provide information they want to be used for a
> crime. It is somewhat more serious to tell them that, even if they have no such purpose, they must keep their mouths
> shut. A speaker may conceivably think a communication has significant value for the listener beyond the listener's
> immediate purpose, but, even if the speaker does not think that, perhaps a recognition of the speaker's autonomy
> should include allowing him ordinarily to say what he believes to be true to his acquaintances, regardless of the use he
> thinks they plan to make of it.

> A further argument against such liability is the problem of determining facts accurately and the effect of the resulting
> uncertainty on people who speak. If people become aware that they can be treated as criminal for providing
> information they believe will aid a crime, they may hesitate to give information when they think there is some modest
> chance of criminal use, not trusting that prosecutors and jurors will always be discerning about

perceptions of relevant
                probabilities.

        The implications for free speech are serious enough to warrant careful attention to the problem of communications that
                facilitate.

Greenawalt, Speech, Crime, supra note 20, at 86-87.

   There are two principal reasons why a "facilitation through speech" prohibition without an "intent" requirement would raise serious First Amendment problems.  First, such a facilitation prohibition would be directed specifically and uniquely at facilitation effected by way of conveying information.  In other words, it would not prohibit facilitation, as such, but only a speech-related subset of such conduct.  "The text of the First Amendment makes clear that the Constitution presumes that attempts to regulate speech are more dangerous than attempts to regulate conduct."  44 Liquormart, Inc. v. Rhode Island, 116 S. Ct. 1495, 1512 (1996) (plurality opinion).  The constitutionality of the prohibition therefore is not as clear as it would be if "facilitation through speech" were just one form -- i.e., one application -- of a generally applicable facilitation statute that did not refer specifically to speech.  SeeCohen v. Cowles Media Co., 501 U.S. 663, 669-71 (1991) (whereas First Amendment is not implicated by application of "generally applicable laws" to violations involving speech or the press, there is a greater constitutional problem where, as in Florida Star, the "State itself define[s] the content of publications that would trigger liability").

   Second, as explained above, supra at 30-34, the First Amendment traditionally has been understood to prohibit the use of the criminal or tort law to punish the dissemination of lawfully obtained factual information absent an impermissible purpose for such dissemination; and this is so even where such publication has a "propensity" to be misused by someone in a criminal or tortious manner.  Yet that is, in a sense, precisely what a facilitation prohibition would do in Senator Biden's scenario:  it would punish distribution of lawfully obtained information because the disseminator had reason to believe that such distribution would result in some harm.

   Although the matter is far from certain, in the end we think these First Amendment concerns can be overcome, and that such a facilitation prohibition could be constitutional, if drafted narrowly.  To be sure, the prohibition would be "speech-specific."  But, as with respect to 18 U.S.C. § 231(a)(1), see supra at 21-23, Congress would be singling out "teaching" and "informational" facilitation of crime not because of any hostility to speech itself, but because those are the forms of facilitation that are the most apparent threats to safety not already addressed by accomplice and conspiracy prohibitions and by the facilitation prohibitions found in sections 323 and 706 of the AEDPA.  Congress arguably would simply be filling in a statutory gap, rather than expressing a general hostility to any particular viewpoint.  Accordingly, the constitutional problems should be minimized.  See Edler Industries, 579 F.2d at 520-22 (whereas First Amendment would prohibit export restrictions dealing with general "interchange of scientific and technological information," it is constitutional to restrict such export where the exporter knows or has reason to know that the recipient of the information will use it to produce or operate munitions).  See also Constitutionality of the Proposed Revision of the International Traffic in Arms Regulations, 5 Op. O.L.C. 202, 207-08 (1981).

   Furthermore, such a prohibition could be, in constitutionally significant respects, less problematic than a statute or tort that punishes speech having a propensity to be misused by some unknown recipient.  In the latter type of tort and criminal cases, the practical effect of a penalty would be to deter altogether the dissemination of the information, since there is always a chance that some reader, listener or viewer will turn

the information to bad use, and the only way to avoid this risk is to cease speaking altogether.  Indeed, even where there would in fact be only a slim likelihood that the information would be misused, a jury might be expected to find the requisite degree of "recklessness," particularly if -- as is likely in such cases -- the jury is hostile to the message conveyed in the information and does not believe that it serves any social utility to distribute such information.  The risk of such an outcome effectively could chill the "legitimate" dissemination of bombmaking information even if there is but a slight risk of its misuse.[75]  By contrast, a facilitation prohibition <u>tailored to particular recipients who are likely to make criminal use of the information</u> would not have such a broad chilling effect on such speech.  The person conveying the information would be required only to withhold its distribution to particular persons who pose an apparent risk, and otherwise would be able to continue general publication, distribution or sales.  In other words, such a prohibition would only restrict or deter certain particular transactions, but would not impede general publication.

In drafting a constitutional facilitation statute, we think the safest strategy would be to address Senator Biden's scenario directly -- for example, by barring dissemination of bomb-making information to a particular person, where the disseminator knows that such person <u>intends</u> to use the information for an unlawful purpose.  Under such a statute, the requisite "knowledge" would not be of a <u>future</u> event, but instead, of someone else's <u>present</u> intent.  Therefore, the government would not be required to prove that the disseminator was "practically certain" of the recipient's intent.  <u>See</u> <u>supra</u> at 21 (discussing "practical certainty" standard for "knowledge" of future events).  Instead, it should suffice to prove that the person providing the information was aware of a "high probability" that the recipient had an intent to use the information to commit a crime.  <u>See, e.g.</u>, <u>Barnes v. United States</u>, 412 U.S. 837, 845 (1973); <u>Turner v. United States</u>, 396 U.S. 398, 416 & n.29 (1970); <u>Leary v. United States</u>, 395 U.S. 6, 46 n.93 (1969).[76]  That "knowledge" typically should be found where, as in the cases hypothesized by Senator Biden, the recipient clearly indicates to the disseminator a desire to use the information for criminal purposes.[77]

Alternatively, Congress could decide to track the language of section 706 of the AEDPA, such as the following:

> It shall be unlawful for any person to teach or demonstrate to any particular person the making of explosive materials,
> or to distribute to any particular person, by any means, information pertaining to, in whole or in part, the manufacture of
> explosive materials, with <u>reasonable cause to believe</u> that such particular person will use such teaching, demonstration
> or information for, or in furtherance of, an activity that constitutes a Federal criminal offense or a criminal offense
> affecting interstate commerce.

That formulation would almost certainly cover the case where the recipient of the information expressly indicates an intent to use such information to commit or to facilitate a crime, and would likely be constitutional as applied to such a case.  However, such a "reasonable cause to believe" standard might also deter widespread, general publication of such information where a publisher is aware that certain suspicious persons are in the "audience."[78]  Because of this risk of chilling substantial publication of such information to persons who will <u>not</u> use it unlawfully, such a statute would run a greater risk of constitutional invalidation than a statute (such as that described above) that is more narrowly tailored to the particular hypothetical described by Senator Biden.[79]

Case 1:23-cv-00849-EGB    Document 148-63    Filed 04/30/21    Page 30 of 44    3/22/15, 8:24 PM

## C. **Proposed Modification of the Feinstein Amendment**

For the reasons discussed in the preceding sections, the Feinstein Amendment would be more likely to reach all of the fact situations that Senators Feinstein and Biden wished to address, and would be more likely to pass constitutional muster in most or all of its applications, if it were modified to read as follows:

It shall be unlawful for any person --

(a) to teach or demonstrate the making or use of an explosive, a destructive device, or a weapon of mass destruction, or to
distribute by any means information pertaining to, in whole or in part, the manufacture or use of such an explosive, device or
weapon, intending that such teaching, demonstration or information be used for, or in furtherance of, an activity that
constitutes a Federal criminal offense or a State or local criminal offense affecting interstate commerce;[80] or

(b) to teach or demonstrate to any particular person the making or use of an explosive, a destructive device, or a weapon of
mass destruction, or to distribute to any particular person, by any means, information pertaining to, in whole or in part, the
manufacture or use of such an explosive, device or weapon, knowing that such particular person intends to use such
teaching, demonstration or information for, or in furtherance of, an activity that constitutes a Federal criminal offense or State
or local criminal offense affecting interstate commerce.

For purposes of this section, the term "explosive" has the meaning set out in 18 U.S.C. § 844(j). The term "destructive
device" has the meaning set out in 18 U.S.C. § 921(a)(4). The term "weapon of mass destruction" has the meaning set out in
18 U.S.C.A. § 2332a(c)(2).

The principal differences between this proposal and the Feinstein Amendment itself are the following:

**1.** The Feinstein Amendment could be construed to impose culpability if the person disseminating the information has reason to know that some unidentified, unspecified recipient thereof will use the information for an unlawful purpose, or if such an outcome is the "natural consequence" of publication of the information. Because that construction could cover virtually all public dissemination of such information, it would raise serious constitutional questions. The alternative formulation specifies that the person who disseminates the information must either have the specific purpose of facilitating criminal conduct, or must have knowledge that a particular recipient intends to make improper use of the material. This should, for example, address Senator Biden's example of a sale of a bombmaking manual to a purchaser who has requested it for the express purpose of using such information to accomplish an unlawful end. In such a case, a well-intentioned distributor of the information will be prohibited from providing the information to the requesting party, but may otherwise freely offer the item for sale.

**2.** Under the Feinstein Amendment, it would be unclear whether criminal culpability would attach where

someone disseminates dangerous information about explosives with a conscious purpose of facilitating unlawful conduct by unknown recipients of the information. The alternative formulation would make clear that dissemination with such a specific purpose would be proscribed. While the constitutionality of particular applications of such a prohibition might be somewhat uncertain (depending on whether the evidence truly demonstrates the improper intent beyond a reasonable doubt), we believe that the "intent" prohibition would be facially constitutional.[81]

3.  The alternative formulation would make clear that the "intent" or "knowledge" element refers to the use made of the information that the person disseminates. Accordingly, it does not include the Feinstein Amendment's language regarding "such explosive materials," because that phrase did not have a clear referent: the prohibition should involve dissemination or teaching of information, not dissemination of the explosive materials themselves (which is independently addressed elsewhere in Title 18 and in the AEDPA).

4.  The alternative formulation would broaden the Feinstein Amendment to bring within its ambit teaching and information concerning not only explosives (as defined in 18 U.S.C.§ 844(j)), but also all destructive devices (as defined in 18 U.S.C. § 921(a)(4)) and other weapons of mass destruction (as defined in 18 U.S.C.A. § 2332a(c)(2)).

5.  The alternative formulation would broaden the Feinstein Amendment to cover information about the "use" of explosives, in addition to the manufacture thereof. In the wrong hands, information on how to use explosives (such as the information in Hit Man that was used to commit a multiple homicide, discussed in Rice v. Paladin) can be every bit as dangerous as information on how to create such explosives.

6.  For purposes of clarification and simplicity, the alternative formulation refers to a "State or local criminal offense affecting interstate commerce," rather than to a "criminal purpose affecting interstate commerce." It is unclear how a "criminal purpose" could "affect" interstate commerce.

## ENDNOTES:

[1] See Statement of Robert S. Litt, Deputy Assistant Attorney General, Criminal Division, U.S. Department of Justice, in Mayhem Manuals and the Internet:  Hearings Before the Subcomm. on Terrorism, Technology and Government Information of the Senate Comm. on the Judiciary, 104th Cong., 1st Sess. (1995).

[2] The DOJ Committee considered carefully the question whether the inclusion in this Report of titles of, and illustrative excerpts from, bombmaking texts would enhance the availability of such information to persons bent upon fabricating bombs and other destructive devices. The Committee concluded that such information already is so readily available to such individuals that its publication in a Report to Congress will create no additional risk. Nevertheless, except as specifically noted, the mention of any particular source of bombmaking information in this Report should not be taken as validation or acknowledgement of the accuracy or value of that information.

[3] See also infra note 54 (discussing publication by various periodicals, including the Progressive, of articles describing technical processes of thermonuclear weapons).

[4] See "Hunt for a Mad Bomber," Reader's Digest 77, 79 (August 1993).

[5] Much of the information available in print pertaining to nuclear weapons also can be found on the Internet. A number of websites, for example, have included compilations of nuclear weapons information gleaned from literature elsewhere in the public domain.

[6] The list, captioned "Bombs:  All About Things that Go Boom," includes a warning that the compiler does "not endorse, nor check for

the safety, or validity of these bomb making procedures. Makers of these devices take all responsibility. . . . [A]ll of these devices do or can pose a risk to the creators and other individuals." The compiler further suggests that "[f]or [the reader's] safety please read the recipes carefully two and three times over before attempting."

   It is important to note that, even if a user of the World Wide Web does not know the specific location of a website containing bombmaking information, such data can easily be located with a search engine.

[7] In a colloquy during the Senate's consideration of the Feinstein Amendment, see supra at 3-4, Senators Biden and Feinstein described similar material that members of their staffs had obtained over the Internet. Senator Biden referred to one item that instructed readers how to manufacture a "baby food bomb" from shotgun shells and "other materials that can be obtained by anyone" that are so "powerful that they can destroy a car." 142 Cong. Rec. S3448 (daily ed. Apr. 17, 1996) (statement of Sen. Biden). Senator Feinstein observed that The Terrorist's Handbook is available by mail order and on the Internet. She observed that this book begins by stating that "[w]ether you are planning to blow up the World Trade Center, or merely explode a few small devices on the White House lawn, the `Terrorist's Handbook' is an invaluable guide to having a good time." It then goes on to explain, among other things, how to steal the chemicals necessary for making an explosive from a college laboratory. 142 Cong. Rec. S7272 (daily ed. June 28, 1996) (statement of Sen. Feinstein).

[8] All three defendants were convicted by jury on April 24, 1996, on charges that included conspiracy to make a destructive device to be used to destroy a building used in interstate commerce.

[9] In 1995, all four members were subsequently tried, convicted and sentenced for violating 18 U.S.C. § 175 (unlawful possession of biological weapons). Although the Patriot Council members only possessed 0.7 grams of ricin, this minute amount constitutes more than 100 lethal doses.

   We note that, on November 1, 1995, a senior official of the FBI, testifying before the Senate Permanent Subcommittee on Investigations, apprised the Subcommittee members of the ricin plot, including the use by the conspirators of a publicly available instruction manual describing manufacture of the toxic poison. See Statement of John P. O'Neill, Chief, Counterterrorism Section, FBI, in Global Proliferation of Weapons of Mass Destruction: Hearings Before the Permanent Subcomm. on Investigations of the Senate Comm. on Governmental Affairs, 104th Cong., 1st Sess. 236 (1995). Another senior FBI official furnished identical information to the House Subcommittee on Military Research and Development. See Statement of Robert M. Blitzer, Chief, Domestic Terrorism/Planning Section, FBI, in Chemical-Biological Defense Program and Response to Urban Terrorism: Hearings Before the Subcomm. on Military Research and Development of the House Comm. on National Security, published at 1996 WL 7136609 (Mar. 12, 1996).

[10] See also Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, Arson and Explosives -- Incidents Report 1994, at 41-51 (1995).

[11] This Report deals almost exclusively with the ability of the government to prohibit or restrict the dissemination by private persons of bombmaking information that has not been classified. The Report does not discuss in any detail the separate, broader authority of the government to impose "reasonable restrictions" on its own employees' activities to ensure that those employees do not disclose classified information belonging to the government itself. See generally Snepp v. United States, 444 U.S. 507 (1980).

[12] With respect to information concerning atomic weapons in particular, there is another restriction in federal law that also should be mentioned. The Atomic Energy Act imposes certain restrictions on the dissemination of "Restricted Data," which is defined to include, inter alia, "all data concerning design, manufacture, or utilization of atomic weapons," 42 U.S.C. § 2014(y)(1), unless such information has been expressly "declassified or removed from the Restricted Data category," id. In particular, it is unlawful to communicate, transmit or disclose such "Restricted Data" to any person either (i) with intent to injure the United States or with intent to secure an advantage to any foreign nation, 42 U.S.C. § 2274(a), or (ii) with "reason to believe such data will be utilized to injure the United States or to secure an advantage to any foreign nation," id. § 2274(b). In addition, the Attorney General may apply to a court for an injunction prohibiting impermissible dissemination of such Restricted Data by persons who are "about to engage" in such conduct. 42 U.S.C. § 2280.

   Insofar as Restricted Data includes simply information produced by or for the government -- such as the government's self-generated, classified information -- the extent to which the government may prohibit dissemination of such data by those who are granted access to it is a matter outside the principal scope of this Report. Seesupra note 11; infra note 44. However, there is a serious

question whether Restricted Data also includes information developed or compiled by private citizens who have not had access to classified government documents. See generally Mary M. Cheh, The Progressive Case and the Atomic Energy Act: Waking to the Dangers of Government Information Controls, 48 Geo. Wash. L. Rev. 163, 180-88 (1980). The position of the Department of Energy is that such "privately generated" information concerning nuclear weapon design can be Restricted Data subject to the statutory restrictions on dissemination, see 62 Fed. Reg. 2252, 2254, 2261 (Jan. 15, 1997) (proposing new 10 C.F.R. § 1045.21, which would make this point explicitly); and the only court to opine on the matter has confirmed this statutory construction, see United States v. Progressive, Inc., 467 F. Supp. 990, 998-1000 (W.D. Wis.), rehearing denied, 486 F. Supp. 5 (W.D. Wis.), appeal dismissed, 610 F.2d 819 (7th Cir. 1979). Insofar as the Restricted Data provisions do encompass certain privately generated information concerning nuclear weapons, see 62 Fed. Reg. at 2253-54 (discussing the types of information that the Department of Energy presently considers Restricted Data), the Atomic Energy Act would provide another statutory means of limiting the dissemination of such forms of bombmaking information. However, because Senator Feinstein's initiative in the last Congress was not directed specifically to information about such nuclear weapons, we will limit our discussion of Restricted Data to this footnote, except to note the following: As discussed infra at 30-34 & note 54, any attempt by the government to restrict or punish the dissemination of Restricted Data that was already in the public domain would run up against significant First Amendment constraints, absent an intent by the disseminator to injure the United States or to secure an advantage to any foreign nation.

[13] Cf., e.g., United States v. Rowlee, 899 F.2d 1275, 1278 (2d Cir.) (defendant properly convicted of conspiracy to defraud United States based on having provided instruction and assistance to others in avoiding income tax liability), cert. denied, 498 U.S. 828 (1990); United States v. Daly, 756 F.2d 1076, 1081-82 (5th Cir. 1985) (defendant properly convicted of conspiracy to defraud United States based on having disseminated information to members of church on how to file tax returns so as to hamper IRS investigation).

[14] See, e.g., United States v. Donner, 497 F.2d 184, 192 (7th Cir. 1972) (speech, including otherwise constitutionally protected speech, can constitute overt act in furtherance of conspiracy), cert. denied, 419 U.S. 1047 (1974).

[15] See generally Direct Sales Co. v. United States, 319 U.S. 703 (1943); United States v. Falcone, 311 U.S. 205 (1940); United States v. Pinckney, 85 F.3d 4, 8 (2d Cir. 1996).

[16] See Direct Sales; Falcone; United States v. Blankenship, 970 F.2d 283 (7th Cir. 1992).

[17] See also Lechuga, 994 F.2d at 349-50 (opinion for four judges of 11-member en banc panel); id. at 362-63 (opinion of three other judges, concurring on this point). However, where the commodity in question has an "inherent capacity" to be used unlawfully, and where the provider of the product has a stake in the success of the illegal venture for which that product is used, a regular course of conduct involving such sales may support proof of a conspiracy. Direct Sales, 319 U.S. at 711-13.

[18] See, e.g., United States v. McNeill, 887 F.2d 448, 450-52 (3d Cir. 1989), cert. denied, 493 U.S. 1087 (1990).

[19] Similarly, the First Amendment does not protect an offer to engage in an unlawful transaction or activity. See, e.g., Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 496 (1982); Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations, 413 U.S. 376, 388 (1973); Braun v. Soldier of Fortune Magazine, Inc., 968 F.2d 1110, 1116-21 (11th Cir. 1992), cert. denied, 506 U.S. 1071 (1993); Norwood v. Soldier of Fortune Magazine, Inc., 651 F. Supp. 1397, 1398-1402 (W.D. Ark. 1987).

[20] See District of Columbia v. Garcia, 335 A.2d 217, 224 (D.C.) (distinguishing between constitutionally protected advocacy and "the act of enticing or importuning on a personal basis for personal benefit or gain"), cert. denied, 423 U.S. 894 (1975). See also People v. Rubin, 158 Cal. Rptr. 488, 491 (Cal. Ct. App. 1979) (discussing distinction between "general advocacy of crime" and solicitation of crime accompanied by "offer of reward"), cert. denied, 449 U.S. 821 (1980). Professor Kent Greenawalt has argued that the Brandenburg requirements (such as the requirement of "imminent" criminal conduct) should be relaxed in the case of private, nonideological solicitations to crime, even where there is no inducement or threat, but only persuasion. Kent Greenawalt, Speech, Crime, and the Uses of Language 261-65 (1989). While this argument has some force, we are not aware that any court has yet endorsed it.

[21] See, e.g., United States v. Razo-Leora, 961 F.2d 1140, 1147 (5th Cir. 1992).

[22] Subsection 2(a) reads: "Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission is punishable as a principal." This statute does not create a distinct federal offense; rather, it merely abolishes

Case 1:23-cv-00849-EGB     Document 148-63     Filed 04/30/21     Page 34 of 44     3/22/15, 8:24 PM

the common-law distinction between principals and accessories. <u>United States v. Superior Growers Supply, Inc.</u>, 982 F.2d 173, 177-78 (6th Cir. 1992).

[23] <u>See, e.g.</u>, <u>United States v. Kelley</u>, 769 F.2d 215, 216-17 (4th Cir. 1985) (defendant aided and abetted tax fraud by instructing others on how to prepare false forms); <u>United States v. Buttorff</u>, 572 F.2d 619, 623 (8th Cir.) (same), <u>cert. denied</u>, 437 U.S. 906 (1978).

[24] The law is unsettled on the question of how much contact, or "proximity," is required between the principals and the accomplice -- that is to say, to what extent the accomplice must "know" who it is he is aiding. In a series of cases similar to those cited <u>supra</u> note 23, courts have found that defendants could be held culpable for aiding and abetting tax-code violations merely by virtue of having provided instruction on unlawful tax-fraud techniques to a discrete group of listeners who had indicated a specific interest in violating the law. <u>See also, e.g.</u>, <u>United States v. Rowlee</u>, 899 F.2d 1275 (2d Cir.), <u>cert. denied</u>, 498 U.S. 828 (1990); United States v. Freeman, 761 F.2d 549 (9th Cir. 1985), cert. denied, 476 U.S. 1120 (1986); <u>United States v. Daly</u>, 756 F.2d 1076 (5th Cir. 1985); <u>United States v. Moss</u>, 604 F.2d 569 (8th Cir. 1979), <u>cert. denied</u>, 444 U.S. 1071 (1980). manufacture phencyclidine. The facts alleged in the search warrant established that Barnett provided essential information for the specific purpose of assisting Hensley in the commission of a crime.

A harder question is whether aiding and abetting can be established with even less direct connection between the aider and the principals. In <u>Buttorff</u>, the court of appeals held that the aiding and abetting "joint participation" test was satisfied by virtue of tax-evasion instructions that defendants had provided at "large public gatherings," presumably to persons whom they did not personally meet. 572 F.2d at 622-23. <u>United States v. Barnett</u>, 667 F.2d 835 (9th Cir. 1982), suggests that this same theory of aiding and abetting could be applied to written instructions sent by mail to a customer whom the publisher had never met. In that case, the defendant allegedly advertised in a magazine that it was making available for mail-order purchase a catalog of instructions for manufacture of phencyclidine, and sent such instructions -- along with the name of a "reliable" chemical supplier -- to a person who submitted the required $10 purchase price. <u>Id.</u> at 840. In the context of determining whether there was probable cause for a warrant to search the seller's premises, the court held that these allegations were sufficient to allege that the publisher had aided and abetted the recipient's manufacture of phencyclidine. The court reasoned that:

> [I]t is unnecessary for the government to show that Barnett [the seller of the instructions] ever met with Hensley [the buyer] in order to
> prove that he aided and abetted him in his attempt to manufacture phencyclidine. The facts alleged in the search warrant established
> that Barnett provided essential information for the specific purpose of assisting Hensley in the commission of a crime.

<u>Id.</u> at 843. (The opinion does not indicate whether the "facts alleged" in the search warrant included more than what is described above.)

By contrast, part of the aiding-and-abetting rationale in <u>Buttorff</u> and <u>Barnett</u> may have been implicitly questioned in <u>Superior Growers</u>. In that case, the Sixth Circuit held that an indictment had not adequately charged conspiracy to aid and abet marijuana possession against proprietors of a garden-supply store. The indictment alleged, <u>inter alia</u>, that the defendants "occasionally provided information and advice on how to grow marijuana to various customers"; but there was no allegation that any particular customer in fact used such advice to commit a crime. The court held that the "providing information" allegation "ultimately falls short" of alleging the requisite intent to aid and abet, "because it does not state that the publications or information were given with defendants' knowledge that a particular customer was planning to grow marijuana, and with defendants' intent to assist that customer in the endeavor." 982 F.2d at 178. According to the court, in other words, it was insufficient for the government merely to demonstrate that the proprietors intended to aid and abet their customers; it was essential to prove that the proprietors had knowledge that their customers were manufacturing marijuana "or intended to manufacture marijuana." <u>Id.</u> at 175.

[25] This standard applies even where the federal crime being assisted involves the unlawful use of explosives. <u>See, e.g.</u>, <u>United States v. Hewitt</u>, 663 F.2d 1381, 1385 (11th Cir. 1981) (describing elements of aiding and abetting a violation of 18 U.S.C. § 844(h)).

[26] Judge Hand's view of the intent required for criminal aiding and abetting was not shared by all courts, some of which argued that it was sufficient that the aider and abettor knew of the purpose of the principal -- <u>i.e.</u>, that the crime was a natural consequence of the assistance. The classic statement of this position is found in <u>Backun v. United States</u>, 112 F.2d 635, 636-37 (4th Cir. 1940). The Supreme Court, in <u>Nye & Nissen</u>, nominally resolved the debate by adopting Judge Hand's view. <u>But see</u> <u>United States v. Ortega</u>, 44 F.3d 505, 508 (7th Cir. 1995) (defendant could be culpable of aiding and abetting even in the absence of evidence that he wanted the

unlawful act to succeed, if defendant "rendered assistance that he believed would (whether or not he cared that it would) make the principal's success more likely"); United States v. Zafiro, 945 F.2d 881, 887-88 (7th Cir. 1991) (dicta) (aiding and abetting should be established even absent intent to assist illegal activity, if abettor "knowingly provides essential assistance" that cannot readily be obtained from other sources), aff'd on other grounds, 506 U.S. 534 (1993).

27 See, e.g., Superior Growers, 982 F.2d at 177-78; United States v. Campa, 679 F.2d 1006, 1013 (1st Cir. 1982).

28 See United States v. Giovannetti, 919 F.2d 1223, 1227 (7th Cir. 1990) (citing American Law Institute, Model Penal Code § 2.06(3) (a)(ii)).  Although attempted aiding and abetting is not a crime, the converse is not true:  it is unlawful to aid and abet an attempted crime, provided the underlying attempt is itself an unlawful act.

29 The substantive crimes that may not be "support[ed]" under section 323 are:  18 U.S.C. §§ 32, 37, 81, 175, 351, 831, 842(m) and (n), 844(f) and (i), 956, 1114, 1116, 1203, 1361, 1362, 1363, 1366, 1751, 2155, 2156, 2280, 2281, 2332, 2332a, 2332b, and 2340A, and 49 U.S.C. § 46502.

30 The full definition of "material support or resources" is:  "currency or other financial securities, financial services, lodging, training, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, transportation, and other physical assets, except medicine or religious materials."  Id.

31 See H.R. Conf. Rep. No. 482, 103d Cong., 2d Sess. 232 (1994) (noting that, under the original version of 18 U.S.C. § 2339A, it would not be necessary to prove that the facilitator had a "specific intent to commit the underlying action").

32 Accord Model Penal Code § 2.02(2)(b)(ii) (Official Draft and Revised Comments, 1985); id., Explanatory Note on § 2.02, at 236-37 n.13; United States v. Meling, 47 F.3d 1546, 1558 (9th Cir.), cert. denied, 116 S. Ct. 130 (1995); United States v. Powell, 929 F.2d 724, 726, 728 (D.C. Cir. 1991).  The government need not prove that the defendant had this level of knowledge with respect to all of the particular details of the future result, such as the identity of those who are harmed.  Meling, 47 F.3d at 1558.  Thus, under section 323, for example, if a defendant was virtually certain that particular recipients would in fact use the provided resources to commit a terrorist crime, it would be immaterial whether the defendant knew precisely when or where the criminal conduct would occur.

33 Insofar as it can be argued that Congress intended that "training" be considered a "physical asset" for purposes of the statute, a strong argument could be made that a book containing the substance of such "training" also should be considered a "physical asset." But it is unclear whether a court would adopt this reasoning with respect to a book containing information otherwise readily available in the public domain.

34 It is notable that Congress did not prohibit all knowing or intentional facilitation of civil disorders -- it focused principally on such facilitation accomplished by way of teaching or demonstration.  Teaching was not Congress's sole focus, however:  Subsection 231(a) (2) makes it unlawful to "transport[] or manufacture[] for transportation in commerce any firearm, or explosive or incendiary device, knowing or having reason to know or intending that the same will be used unlawfully in furtherance of a civil disorder."  It appears that Congress simply addressed those forms of facilitation -- teaching (§ 231(a)(1)) and the transport of weapons (§ 231(a)(2)) -- that were the most apparent threats to civil order not already addressed adequately by accomplice and conspiracy prohibitions.

35 In addition, the United States Attorney for the District of Arizona recently brought an indictment under § 231(a)(1) against six members of the "Viper" Militia who allegedly had been engaged in, or had conspired to engage in, substantial and detailed training of others in the means by which explosives could be used in civil disorders.  United States v. Nelson, et al., Cr-96-280-PHX-EHC (D. Ariz.).  In December 1996, all six defendants admitted their guilt.  Three defendants pled guilty to a substantive violation of § 231(a)(1), and three others pled guilty to conspiracy to violate § 231(a)(1).

36 Although this is a demanding standard, nonetheless a person teaching the use of explosives cannot avoid culpability by deliberately ignoring facts that would lead him to be aware that the recipient of the teaching is "practically certain" to use it in furtherance of a civil disorder.  See generally 1 E. Devitt, C. Blackmar, M. Wolff & K. O'Malley, Federal Jury Practice and Instructions § 17.09 (4th ed. 1992).

37 See, e.g., 141 Cong. Rec. S7685 (daily ed. June 5, 1995) (statement of Sen. Feinstein); 142 Cong. Rec. S7273 (daily ed. June 28, 1996) (statement of Sen. Feinstein). See also 141 Cong. Rec. S7684-85 (daily ed. June 5, 1996) (statement of Sen. Hatch) (agreeing to

inclusion of "intent" requirement in Feinstein Amendment).

[38] See, e.g., 141 Cong. Rec. S7685 (daily ed. June 5, 1995) (statement of Sen. Biden) (describing situation where information is sent to a particular person who has expressly indicated that he desires such information so that he can make unlawful use of it); 142 Cong. Rec. S3449 (daily ed. Apr. 17, 1996) (statement of Sen. Biden) (same); 142 Cong. Rec. S7274 (daily ed. June 28, 1996) (statement of Sen. Biden) (same).

[39] 141 Cong. Rec. S7683 (daily ed. June 5, 1995) (statement of Sen. Feinstein).

[40] Id. at S7684-85 (statement of Sen. Hatch); see also id. at S7685 (statement of Sen. Biden) (agreeing with Senator Hatch that explosives manufacturers should not be subject to culpability simply because there is a chance that some persons who receive information from the manufacturers might use that information for unlawful purposes). Senator Hatch apparently was concerned about whether the statute would deter manufacturers from providing lessons on the manufacture and use of explosives. But it should be noted that the Feinstein Amendment would only have restricted the dissemination of information concerning the "making" or "manufacture" of explosive materials, and not the use of such materials.

[41] In addition, Perry followed instructional references from Hit Man in planning and executing the murders, including information about: how to solicit and obtain prospective clients in need of murder-for-hire services; requesting up-front money for expenses; registering at a motel in the vicinity of the crime, paying with cash and using a fake license tag number; committing the murders at the victims' home; how to make the crime scene look like a burglary; cleaning up and carrying away the ejected shells; breaking down the gun and discarding the pieces along the roadside after the murders; and using a rental car with a stolen tag. Id. at 840.

[42] As explained infra note 71, there was some dispute between the parties as to the meaning of this "intent" stipulation, and the court's resolution of that dispute affected its ultimate constitutional analysis.

[43] As we explain infra at 39 n.62, 43, 44-45 n.71, we think that the district court's First Amendment analysis in Rice is, in some respects, open to question. Plaintiffs have appealed the district court decision to the United States Court of Appeals for the Fourth Circuit. Rice v. Paladin Enterprises, Inc., No. 96-2412.

[44] The Feinstein Amendment was addressed to the dissemination by private persons of bombmaking information that has not been classified. Accordingly, our discussion of the First Amendment is limited to situations in which the government seeks to restrict the dissemination of such privately generated, unclassified information. This Report does not discuss in any detail the constitutionality of governmental restrictions on its own employees' activities to ensure that those employees do not disclose classified information belonging to the government itself. See supra note 11. As the Supreme Court explained in Snepp v. United States, 444 U.S. 507, 509 n.3 (1980), such restrictions on employee conduct generally will not violate the First Amendment so long as they are a "reasonable means" of protecting the government's "compelling interest in protecting . . . the secrecy of information important to our national security." See also, e.g., United States v. Morison, 844 F.2d 1057 (4th Cir.), cert. denied, 488 U.S. 908 (1988); McGehee v. Casey, 718 F.2d 1137 (D.C. Cir. 1983).

[45] See also NAACP v. Claiborne Hardware, Inc., 458 U.S. 886, 927-28 (1982).

[46] See High Ol' Times, Inc. v. Busbee, 456 F. Supp. 1035, 1040 (N.D. Ga. 1978) (no instance in which the written word alone has ever met the Brandenburg test), aff'd, 621 F.2d 141 (5th Cir. 1980). See also Herceg v. Hustler Magazine, Inc., 814 F.2d 1017, 1023 (5th Cir. 1987) (questioning, but not deciding, whether the Brandenburg test could ever be satisfied by written materials), cert. denied, 485 U.S. 959 (1988). In the early days of the Supreme Court's First Amendment jurisprudence, by contrast, the Court repeatedly held that the Constitution did not protect published, written advocacy of unlawful conduct. See, e.g., Fox v. Washington, 236 U.S. 273 (1915); Schenck v. United States, 249 U.S. 47 (1919); Frohwerk v. United States, 249 U.S. 204 (1919); Abrams v. United States, 250 U.S. 616 (1919); Gitlow v. New York, 268 U.S. 652 (1925). The reasoning of these cases does not in any significant sense survive Brandenburg. See Brandenburg, 395 U.S. at 449 (expressly overruling Whitney v. California, 274 U.S. 357 (1927)).

[47] The First Amendment would not, however, prohibit the evidentiary use of such advocacy to demonstrate a disseminator's intent in conveying bombmaking information. SeeWisconsin v. Mitchell, 508 U.S. 476, 489 (1993). Therefore, insofar as criminal culpability for dissemination of such information depends upon the distributors' intent -- for example, upon whether a disseminator of bombmaking manuals had the conscious purpose of helping others to use the information to engage in unlawful conduct, see infra at

40-44 -- the substance of the advocacy in such manuals could be used as material evidence of such intent.

[48] On occasion, the Court has indicated that this demanding standard applies only to information concerning "`a matter of public significance.'"  See, e.g., Florida Star, 491 U.S. at 533 (quoting Smith, 443 U.S. at 103). See alsoDun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 759-61 (1985) (plurality opinion) (speech on matters of "purely private concern" entitled to less First Amendment protection in defamation cases); id. at 764 (Burger, C.J., concurring in pertinent part); id. at 773-74 (White, J., concurring in pertinent part). But see Florida Star, 491 U.S. at 541 (omitting the "matter of public significance" standard in the Court's ultimate holding, quoted in the text above).  However, even if speech of "purely private concern" is entitled to a lesser degree of protection, the Court in Florida Star was willing to conclude that the identity of a rape victim is a "matter of public significance."  If that is so, it is safe to assume the Court would find that information on how to construct explosives likewise concerns a "matter of public significance."

[49] In Florida Star, the Court noted that the state's interest in "the physical safety of [rape] victims, who may be targeted for retaliation if their names become known to their assailants," was a "highly significant" interest.  491 U.S. at 537.  Presumably, the governmental interest in preventing the havoc caused by explosive-related crimes is at least as, if not more, significant.

[50] See, e.g., Herceg v. Hustler Magazine, Inc., 814 F.2d 1017 (5th Cir. 1987) (First Amendment bars liability against magazine where reader accidentally committed suicide while attempting technique of autoerotic asphyxiation described therein), cert. denied, 485 U.S. 959 (1988); Yakubowicz v. Paramount Pictures Corp., 536 N.E.2d 1067 (Mass. 1989) (First Amendment bars liability against producer of motion picture where viewers killed a youth while allegedly imitating the violence depicted therein); DeFilippo v. NBC, Inc., 446 A.2d 1036 (R.I. 1982) (First Amendment bars liability against television network where viewer accidentally committed suicide while attempting hanging stunt he saw on the "Tonight Show"); Olivia N. v. NBC, Inc., 126 Cal. App. 3d 488 (Cal. Ct. App. 1981) (First Amendment bars liability against television network where viewers raped a minor with a bottle while allegedly imitating such a rape depicted in television drama).  See generally Greenawalt, Speech, Crime, supra note 20, at 284-85 (1989):

Certain artistic depictions and portrayals may lead some members of the audience to commit crimes, and that possibility exists in

connection  with work that undeniably constitutes expression as well as work whose status is more arguable. Sex and violence, and

particularly violent sex, are the main subjects of concern. . . .  These asserted connections are plainly an inadequate basis for holding

the communicators criminally liable for the crimes that may be committed after exposure to the communication.  In any real instance, the

most that can be said is that the communicator disregarded a risk that what he said would cause criminal behavior, a risk of which he

was aware or should have been aware.  Given the extreme difficulty of estimating that in any particular instance the person who receives

the communication, or even one of an audience of millions, will commit a crime as a consequence, demonstrating a substantial and

unjustifiable risk of the sort needed to establish recklessness or negligence would be very hard.  In any event, the First Amendment

would preclude liability on those theories because courts and jurors should not be in the business of assessing the unjustifiability of

risks by engaging in ad hoc weighing of the expressive value of a particular program or communication against the dangers it creates. . . .

The dangers of interference with forms of expression are grave enough also to bar civil recovery when victims of crimes by consumers

sue those responsible for communications on a theory of reckless or negligent causation.  For example, if a viewer "acts out" a violent

scene from a television drama, the victim cannot recover against the company that has shown the program. . . .  If portrayals in literature,

movies, television, photography, and the fine arts may ever be forbidden or made the subject of civil liability because of a propensity to

cause crimes, the great danger of a particular sort of communication must be powerfully shown, and the proscribed communications must
be very clearly defined.

[51] See, e.g., Smith v. Linn, 563 A.2d 123 (Pa. Super. Ct. 1989) (First Amendment barred liability against publisher of diet book after reader died as result of following diet), aff'd mem., 587 A.2d 309 (Pa. 1991); Alm v. Van Nostrand Reinhold Co., 480 N.E.2d 1263 (Ill. App. Ct. 1985) (First Amendment barred liability against publisher of "how-to" book where reader had been injured while following instructions therein); Walt Disney Productions, Inc. v. Shannon, 276 S.E.2d 580 (Ga. 1981) (First Amendment barred liability against producer and broadcaster of television program where child sustained injuries while seeking to reproduce a sound effect demonstrated for children on "Mickey Mouse Club"). Cf. Winter v. G.P. Putnam's Sons, 938 F.2d 1033 (9th Cir. 1991) ("[g]uided by the First Amendment and the values embodied therein," id. at 1036, court held that mere negligence could not form the basis of liability against book publisher where mushroom enthusiasts became ill from eating mushrooms that the book had described as safe to eat).

[52] See, e.g., American Booksellers Ass'n v. Hudnut, 771 F.2d 323, 328-29 (7th Cir. 1985) (statute permitting civil liability against producers of depictions of sexually explicit subordination of women is unconstitutional, even accepting the premises that "[m]en who see women depicted as subordinate are more likely to treat them so" and that people are likely to "act in accordance with the images and patterns" they find in such expression), aff'd mem., 475 U.S. 1001 (1986); Video Software Dealers Ass'n v. Webster, 968 F.2d 684 (8th Cir. 1992) (invalidating on constitutional grounds state statute prohibiting the sale or rental to minors of videos "depicting violence"); Eclipse Enterprises v. Gulotta, 942 F. Supp. 801 (E.D.N.Y. 1996) (invalidating on constitutional grounds local law criminalizing sale to minors of trading cards depicting a "heinous crime, an element of a heinous crime, or a heinous criminal"); Zamora v. CBS, 480 F. Supp. 199 (S.D. Fla. 1979) (First Amendment bars liability against television networks to recover damages where television violence allegedly caused viewer to become addicted and desensitized to violent behavior, resulting in his killing an 83-year-old woman). See also Watters v. TSR, Inc., 715 F. Supp. 819 (W.D. Ky. 1989) (First Amendment bars liability against manufacturer of "Dungeons and Dragons" game for failure to warn, where "mentally fragile" person committed suicide after having become consumed with the role-playing nature and fantasy of the game), aff'd on other grounds, 904 F.2d 378 (6th Cir. 1990). Cf. Winters v. New York, 333 U.S. 507, 519 (1948) (invalidating as unconstitutionally vague a criminal law that had been construed to prohibit circulation of publications depicting violence that "influence generally persons to commit crimes of violence against the person").

The results of the First Amendment analysis do not change if these cases are alternatively viewed as involving implied advocacy of undesirable or unlawful conduct. For example, in Kingsley Int'l Pictures Corp. v. Regents of the Univ. of New York, 360 U.S. 684 (1959), the State refused to grant a license for exhibition of the film "Lady Chatterley's Lover," because that film allegedly "present[s] . . . adultery as a desirable, acceptable and proper pattern of behavior." Id. at 685. The Court characterized the State as having "prevent[ed] the exhibition of a motion picture because that picture advocates an idea -- that adultery under certain circumstances may be proper behavior." Id. at 688. Even ten years prior to Brandenburg, the Court held that the Constitution "protects advocacy of the opinion that adultery may sometimes be proper, no less than advocacy of socialism or the single tax." Id. at 689.

[53] 491 U.S. at 541. For example, although Florida Star strongly suggests that the government cannot impose "categorical prohibitions," id. at 539, on the dissemination of a prescribed type of information -- without regard to scienter, the reasonableness of the disclosure, the efficacy of the restriction, and the manner in which the State otherwise can prevent the information's disclosure -- the Court nevertheless implied in Florida Star that the First Amendment might permit liability under the common law tort of invasion of privacy for dissemination of true, lawfully obtained information, where the government has not facilitated the disclosure of the information, the information had not previously been publicized, a reasonable person would find the disclosure of the information "highly offensive," and some scienter requirement is satisfied. Id. at 538-40.

[54] See also Oklahoma Pub. Co. v. District Court, 430 U.S. 308, 311-12 (1977) (per curiam); Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 595-96 (1976) (Brennan, J., concurring):

Much of the information that the Nebraska courts enjoined petitioners from publishing was already in the public domain, having been
revealed in open court proceedings or through public documents. Our prior cases have foreclosed any serious contention that further
disclosure of such information can be suppressed before publication or even punished after publication.

An infamous case in which this principle was put to the test involved the prior restraint imposed upon publication by the periodical

the Progressive of an article describing technical processes of thermonuclear weapons. See United States v. Progressive, Inc., 467 F. Supp. 990 (W.D. Wis.), rehearing denied, 486 F. Supp. 5 (W.D. Wis.), appeal dismissed, 610 F.2d 819 (7th Cir. 1979). While there is, to this day, substantial debate about whether the prior restraint violated the First Amendment, the district judge in that case acknowledged that such a restraint could be imposed, if at all, only because significant and dangerous information in the article was not "in the public realm." 467 F. Supp. at 993, 999. "[N]owhere in the public domain is there a correct description of the type of design used in United States thermonuclear weapons." Id. at 999. (The information at issue in that case had been classified as "Restricted Data," id. at 998, although the author of the article had not had access to any classified documents. See supra note 12 (discussing "Restricted Data" under the Atomic Energy Act).) The magazine moved for rehearing on the ground that the information was in fact in the public domain; but the district court once more found that the article "contains a comprehensive description of radiation coupling, along with [two] other . . . key concepts, that is not found in the public realm." 486 F. Supp. at 9. The plain import of the district court's decisions is that the prior restraint could not be imposed if the critical information were, in fact, "in the public realm." The government seemed to concede this point: During pendency of the Progressive's appeal of the prior restraint, the substance of the article was published in other journals, see L.A. Powe, Jr., The H-Bomb Injunction, 61 U. Colo. L. Rev. 55, 70 (1990), at which time the government moved for dismissal of the appeal, see 610 F.2d 819. Thereafter, the Progressive published the article, and the government never attempted to prosecute anyone for publication of the information after such information was in the public domain.

55 Brandenburg, 395 U.S. at 456 (Douglas, J., concurring).

56 A related principle is that generally applicable common-law causes of action typically will not offend the First Amendment in cases where they are applied to expressive conduct such as publication or broadcast. See, e.g., Cohen v. Cowles Media Co., 501 U.S. 663 (1991) (First Amendment does not bar liability for breach of contract where defendant newspaper published confidential source's name); Zacchini v. Scripps-Howard Broadcasting Co., 433 U.S. 562 (1977) (First Amendment does not bar liability for tort of unlawful appropriation of "right to publicity" where television station broadcast "human cannonball" act in its entirety). However, it should be noted that the First Amendment does impose significant limits on the use of a "generally applicable" cause of action where an element of that cause of action inevitably (or almost always) depends on the communicative impact of speech or expression. See, e.g., Hustler Magazine, Inc. v. Falwell, 485 U.S. 46 (1988) (First Amendment generally does not permit liability, under the generally applicable tort of intentional infliction of emotional distress, for publication of a parody of a public figure). See also Cohen, 501 U.S. at 671 (distinguishing Hustler).

57 See generally Greenawalt, Speech, Crime, supra note 20.

58 Accord United States v. Mendelsohn, 896 F.2d 1183, 1186 (9th Cir. 1990) ("No first amendment defense need be permitted when words are more than mere advocacy, `so close in time and purpose to a substantive evil as to become part of the crime itself.'") (citation omitted); United States v. Barnett, 667 F.2d 835, 842 (9th Cir. 1982) ("The first amendment does not provide a defense to a criminal charge simply because the actor uses words to carry out his illegal purpose. Crimes . . . frequently involve the use of speech as part of the criminal transaction."). This rationale applies, for instance, to conspiracies and other unlawful agreements. See Brown v. Hartlage, 456 U.S. 45, 55 (1982): "The fact that . . . an [unlawful] agreement necessarily takes the form of words does not confer upon it, or upon the underlying conduct, the constitutional immunities that the First Amendment extends to speech." See also United States v. Rowlee, 899 F.2d 1275, 1278 (2d Cir.) (First Amendment does not protect speech acts constituting an illegal conspiracy), cert. denied, 498 U.S. 828 (1990); United States v. Fleschner, 98 F.3d 155, 158-59 (4th Cir. 1996) (First Amendment does not protect speech acts in furtherance of an illegal conspiracy).

59 Accord Barnett, 667 F.2d at 842-43; United States v. Buttorff, 572 F.2d 619, 623-24 (8th Cir.), cert. denied, 437 U.S. 906 (1978).

60 See Greenawalt, Speech, Crime, supra note 20, at 85:

Much more commonly than people commit noncommunicative crimes "purely" by communication, they cooperate, by talking, in the

commission of crimes that involve noncommunicative acts. . . . The reasons of ordinary penal policy for covering communicative efforts

to carry out ordinary crimes are obvious, and the criminal law sensibly draws no distinction between communicative and other acts.

Although assertions of fact generally fall within a principle of freedom of speech, what these sorts of factual statements

contribute to

the general understanding of listeners is minimal, and the justifications from free speech that apply to speakers do not reach communications that are simply means to get a crime successfully committed. The relevance of free speech is so slight in respect

to such highly specific information related to an immediate practical purpose that it can be disregarded here.

[61] For cases recognizing this distinction, see, e.g., United States v. Johnson, 952 F.2d 565, 578 n.13 (1st Cir. 1991), cert. denied, 506 U.S. 816 (1992); Rowlee, 899 F.2d at 1279-80; Freeman, 761 F.2d at 552; Buttorff, 572 F.2d at 624 (defendants went "beyond mere advocacy": they "explained how to avoid withholding"); People v. Bohmer, 120 Cal. Rptr. 136, 144 n.1 (Cal. Ct. App.), cert. denied, 423 U.S. 990 (1975). See also Greenawalt, Speech, Crime, supra note 20, at 247 n.13. In Freeman, for example, Justice (then Judge) Kennedy concluded that, because some of the counts of the indictment arguably were premised on the defendant's abstract advocacy of tax evasion, a Brandenburg-like jury instruction was appropriate for such counts. Id. at 551-52. But where the defendant directly counseled someone on how to file false tax returns, "a First Amendment defense is foreclosed even if the prosecution rests on words alone." Id. at 552. Conversely, advocacy of unlawful conduct is entitled to the protection of the Brandenburg test, which cannot be circumvented merely by labeling such advocacy as "aiding and abetting." See, e.g., Gay Lesbian Bisexual Alliance v. Sessions, 917 F. Supp. 1548, 1556 (M.D. Ala. 1996). See also Bond v. Floyd, 385 U.S. 116, 133 (1966). In this regard, it is worth noting that the general federal aiding and abetting statute -- 18 U.S.C. § 2 -- punishes as a principal whoever "counsels" a federal offense. See supra note 22. We are not aware of any modern case in which culpability under § 2 was premised solely on "counseling" in the form of encouragement (or advocating that a crime be committed), without any actual aid or assistance to the principal. Insofar as § 2 were construed to permit culpability in such a "pure" advocacy situation, it is likely -- at least absent special circumstances, such as implicit coercion or a fiduciary relationship between the pertinent parties -- that the prosecution would be required to satisfy the Brandenburg standards. See also supra note 20.

[62] The district court in Rice v. Paladin, see supra at 27-28, thus erred in concluding that the Brandenburg standard applies to speech "which advocates or teaches lawless activity." 940 F. Supp. at 845 (emphasis added). As we explain in the text, the constitutional analysis can differ quite a bit depending on whether a case involves the "advocacy" or the "teaching" of lawless activity.

[63] As Professor Emerson suggests, there may not always be a bright line between "advising" a group of persons that they should engage in criminal conduct and "teaching" that same group specific techniques that the teacher intends for the group to use in such crimes: in particular factual circumstances, these are likely to be two points on a fluid continuum of conduct. Whether a particular instance of teaching will fall outside the Brandenburg protections for advocacy likely will depend on the "explicitness and concreteness" of the teaching. Scales, 367 U.S. at 253. Teaching "in the abstract" the philosophical or political beliefs of a certain author is constitutionally protected, see id. at 252 n.27; while, on the other end of the scale, instruction on how to use a pencil to kill a person in the case of an uprising, see id. at 250-51, is not protected (at least insofar as the teacher intends for the students to make use of such a technique). Somewhere in the middle are cases having aspects both of advocacy and of "teaching." For instance, exhorting a crowd of young men to "avoid the draft by feigning insanity (or burning your draft cards)" in some sense "teaches" the audience a method of unlawful conduct; but it does not really provide the audience any information it does not already know, and thus probably should more appropriately be viewed as a form of advocacy entitled to some constitutional solicitude (albeit not as much as that to which "pure" advocacy is entitled).

[64] See also Gorin v. United States, 312 U.S. 19, 27-28 (1941) (in order to avoid a serious constitutional question, Court construes "intent" requirement in espionage statute dealing with dissemination of information to "require[] those prosecuted to have acted in bad faith") (emphasis added).

[65] Perhaps the First Amendment would impose a requirement that there be some realistic risk that the crime will occur. For example, if the information is conveyed to persons who would not under any circumstances use it for unlawful ends, the threat of danger is so remote that the speech arguably should not be punished regardless of bad intent. Courts might find, for example, that culpability can attach only where the defendant both intended and had reason to believe that the information would or could be unlawfully used. Cf. United States v. Dworken, 855 F.2d 12, 19 & n.6 (1st Cir. 1988).

[66] It is important once again to distinguish training with bad intent from advocacy with bad intent. Though a purpose to facilitate a crime is sufficient to permit punishment of the former, such a bad purpose is necessary but not sufficient when it comes to restrictions on pure advocacy; in the latter case, Brandenburg imposes the additional requirements (i) that the speech be directed to inciting imminent crime, and (ii) that such imminent wrongdoing is likely to occur, in fact.

67 For example, the cases where a private party has sought to impose tort liability on the basis of "negligent" or "reckless" publication or broadcast, see supra at 31-33 & notes 50-53, have not involved situations where the publisher or broadcaster had the purpose of fomenting criminal conduct. Such intent is present in aiding-and-abetting and conspiracy cases, but in those cases, the person providing the information is, in a much more direct sense, actually participating with the recipient of the information in the performance of an illegal act.

The precedents that come closest to the situation described in the text are the aiding-and-abetting decisions in Buttorff and Barnett. See supra note 24. In Buttorff, the court of appeals rejected a First Amendment argument where the "joint participation" consisted of tax-evasion instructions that defendants provided at "large public gatherings," presumably to persons they did not personally meet. 572 F.2d at 622-23. In Barnett, a First Amendment argument was rejected (albeit in the context of determining whether there was probable cause for a warrant to search premises) where the only contact between the accomplice and the principal was that the latter received from the former mail-order instructions for the manufacture of phencyclidine, along with the name of a "reliable" chemical supplier, in exchange for the $10 purchase price. 667 F.2d at 840. As explained in note 24, supra, there is some question whether aiding and abetting can be established by virtue of arms-length transactions such as those in Buttorff and (especially) Barnett. But that is quite a different question than whether the Constitution would bar such culpability. Insofar as those cases hold that there is no First Amendment defense for transmission of information with the intent to facilitate crimes, they are consistent with the conclusion we reach in the text above.

68 The recent case of United States v. Aguilar, 115 S. Ct. 2357 (1995), provides further support for permitting prohibition of improperly motivated publication of dangerous instructional information. The defendant in that case urged a narrow construction of a statute banning disclosure of wiretap authorizations, on the ground that a broad reading of the statute would threaten to violate the principle that "the government may not generally restrict individuals from disclosing information that lawfully comes into their hands in the absence of a `state interest of the highest order.'" Id. at 2365 (quoting Smith, 443 U.S. at 103). The Court, while endorsing that basic principle, nonetheless rejected defendants' argument, in part on the ground that "the statute here in question does not impose such a restriction generally, but only upon those who disclose wiretap information `in order to [ob]struct, impede, or prevent'" a wiretap interception. Id. (quoting 18 U.S.C.
§ 2232(c)).

There are many other contexts, as well, in which First Amendment protection depends upon whether a speaker has some "bad" intent, rather than on the degree of harm that the speech might cause. For example, advocacy of unlawful action will be treated very differently under Brandenburg depending on whether it is "directed to" inciting imminent unlawful conduct, even though such a bad intent does not ordinarily increase the threat to public safety. Similarly, under the earlier Smith Act cases, the Court, in order to avoid serious constitutional questions, strained to construe the Act to require bad intent, even though such intent should not have been relevant if, as the Court insisted, the touchstone for constitutional analysis was the risk of a "clear and present danger." See, e.g., Scales, 367 U.S. at 221-22, 229-30; Dennis, 341 U.S. at 499-500 (plurality opinion). See also id. at 516 (defendants' intent and their "power to bring about the evil" were separate necessary elements of the offense). And, most famously, the First Amendment prohibits imposition of liability for publication of a false and defamatory statement about a public figure, unless the publisher acts with "actual malice," i.e., with knowledge that the statement was false or with reckless disregard of whether it was false or not. See, e.g., Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 510 (1991); New York Times Co. v. Sullivan, 376 U.S. 254, 279-80 (1964). Similarly, the Court in Florida Star suggested that, whereas the categorical prohibition on the publication of rape victims' names at issue in that case was unconstitutional, the constitutional calculus might be different if the statute included a scienter requirement. 491 U.S. at 539.

69 See Greenawalt, Speech, Crime, supra note 20, at 273: "The constitutional standard here should be that a person intend that the crime be committed and that it be reasonably likely that it will be committed in the `near future.'" See also supra note 65.

70 See 141 Cong. Rec. S7683 (daily ed. June 5, 1995) (statement of Sen. Feinstein) (describing instructions from the Terrorist Handbook for construction of items -- such as "toilet paper roll booby traps" and "baby food bombs" --- the sole purpose for which allegedly is "to kill somebody"). Cf. Posters 'n' Things, Ltd. v. United States, 511 U.S. 513, 521 & n.11 (1994) (construing statutory prohibition on sale of items "primarily intende. . . for use" with drugs to cover "multiple-use" items for which the "likely use" by "customers generally" is drug-related).

71 In a civil case, on the other hand, Professor Greenawalt's concern about constraining juries' discretion would be more directly implicated, but the First Amendment should be no bar where an improper intent is proved by clear and convincing evidence. See, e.g., Masson, 501 U.S. at 510; Gertz v. Robert Welch, Inc., 418 U.S. 323, 342 (1974). In Rice v. Paladin itself, the publishers of Hit Man had no specific knowledge that they had sold the book to particular persons who planned to commit a crime. Therefore, for reasons

discussed in this Report, the First Amendment would permit liability to attach only if defendants had the requisite "intent" that Hit Man be used to facilitate crimes.  For purposes of summary judgment, defendants stipulated that they "intended" that "their publications would be used, upon receipt, by criminals and would-be criminals to plan and execute the crime of murder for hire, in the manner set forth in the publications."  Joint Statement of Facts ¶ 4b (referenced at 940 F. Supp. at 840).  That concession would, for purposes of summary judgment, seem to foreclose a constitutional defense, except for the fact that defendants argued (in their briefs) that all they meant by this stipulation of "intent" was that they "knew" the information contained in Hit Man would be read and used by an audience that includes criminals.  See Memorandum of Points and Authorities in Support of Defendant Paladin Enterprises, Inc.'s Motion for Summary Judgment, at 14; Reply Memorandum of Points and Authorities in Support of Defendant Paladin Enterprises, Inc.'s Motion for Summary Judgment, at 14-15.  In other words, defendants argued that they had stipulated to "intent" only in the sense that that concept is understood in the civil tort context: i.e., one "intends" the natural consequences of one's acts.  Accordingly, defendants argued, they only "intended" that Hit Man would be used for unlawful purposes in the same way that Stephen King "intends" his novels will be used for unlawful purposes:  in both cases, the publisher allegedly "knows" that publication likely will "produce" unlawful conduct by some, unknown, reader or readers.  Reply Memorandum of Points and Authorities in Support of Defendant Paladin Enterprises, Inc.'s Motion for Summary Judgment, at 15.  As we have explained in this memorandum, the First Amendment does not permit a publisher of factual information to be subject to liability merely on the basis of this type of "intent." See supra at 30-34.  Invoking this principle, the district court in Rice granted Paladin's motion for summary judgment, but only because the court accepted Paladin's representation that the stipulation of "intent" meant only that Paladin "knew" that some readers would misuse the book's information.  940 F. Supp. at 846.

However, even assuming arguendo that the defendants' own construction of the "intent" stipulation were correct, that still would not justify the grant of summary judgment, since it would leave unanswered the question whether Paladin also had the specific purpose of facilitating murder.  Paladin stipulated (for purposes of summary judgment) that it engaged in a marketing strategy intended to maximize sales to the public, including to "criminals and would-be criminals who desire information and instructions on how to commit crimes."  As we explain in the text, if Paladin in effect encourages unlawful use of its product so that it can increase its profits - - for instance, if Hit Man is "offered for sale in such a mode as purposely to attract purchasers who want[] [it] for the unlawful [use]," Danovitz, 281 U.S. at 397 -- or if there is other evidence that Paladin publishes Hit Man with the actual purpose of furthering criminal conduct, the publisher might be found to have sold Hit Man for the purpose of facilitating murder.  If the finder of fact determined that that "intent" was proved by clear and convincing evidence, the First Amendment should not bar liability.  We also should note, however, that, wholly apart from the First Amendment question, it is not clear whether the plaintiffs in Rice alleged a cognizable "aiding and abetting" tort claim under Maryland law, a question that we have no occasion to address.  But see supra note 24 (discussing whether, under federal criminal law, aiding and abetting can be established by virtue of arms-length transactions with anonymous purchasers).

[72] See also Ariz. Rev. Stat. Ann. § 13-1004 (1996); Ky. Rev. Stat. Ann. § 506.080 (Baldwin 1996); N.D. Cent. Code § 12.1-06-02 (1995).

[73] As far as we can tell, there are no published opinions concerning the use of such statutes to prosecute facilitation committed by way of conveying information, nor have such statutes ever been the subject of a First Amendment challenge.

[74] Similar prohibitions using a "reasonable cause to believe that the product will be unlawfully used" standard are found in statutes dealing with chemicals and equipment that can be used to produce controlled substances.  See, e.g., 21 U.S.C. §§ 841(d)(2) (distribution of chemicals), 843(a)(7) (distribution and export of chemicals, equipment, and other products), 960(d)(3),(4) (export of chemicals).

[75] See supra note 50 (quoting Greenawalt, Speech, Crime, supra note 20, at 284-85).

[76] See also, e.g., United States v. Hayden, 64 F.3d 126, 133 (3d Cir. 1995) (citing United States v. Caminos, 770 F.2d 361, 365-66 (3d Cir. 1985)); United States v. Honeycutt, 8 F.3d 785, 787 (11th Cir. 1993), cert. denied, 511 U.S. 1024 (1994); United States v. Feroz, 848 F.2d 359, 360 (2d Cir. 1988); United States v. Corral-Martinez, 592 F.2d 263, 269-70 (5th Cir. 1979).  This standard is derived from § 2.02(7) of the Model Penal Code:

When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person is aware of a
high probability of its existence, unless he actually believes that it does not exist.

The Ninth Circuit recently held that the § 2.02(7) "aware of a high probability" standard is appropriate "only in situations where the evidence justifies an argument of willful blindness," and that absent a willful blindness situation the government must prove that the defendant had "actual knowledge or awareness" of the existence of the fact constituting an element of an offense. United States v. Aguilar, 80 F.3d 329, 332 (9th Cir. 1996) (en banc). We take issue with this holding. The Model Penal Code definition of "knowledge" conforms to the common understanding of knowledge, and that definition should be used regardless of whether a case involves an issue of "willful blindness." See Jonathan L. Marcus, Note, Model Penal Code Section 2.02(7) and Willful Blindness, 102 Yale L.J. 2231 (1993). To require that a criminal defendant achieve certainty before he can be said to "know" an operative fact would preclude conviction in virtually any case in which a defendant has committed an offense in reliance on information supplied by others. But most of what we "know" as historical fact has been related to us orally or in writing. Indeed, as Justice (then Judge) Kennedy explained in a case involving a related question:

> [W]e commonly act on less than complete information and in this world may never know one-hundred-percent certainty. "`Absolute
> knowledge can be had of very few things,' said the Massachusetts court, and the philosopher might add `if any.' For most practical
> purposes, "knowledge" `is not confined to what we have personally observed or to what we have evolved by our own cognitive faculties.'"

United States v. Jewell, 532 F.2d 697, 706 n.6 (Kennedy, J., dissenting) (9th Cir.) (quoting Rollin M. Perkins, Criminal Law 775 (2d ed. 1969) (internal citations omitted)), cert. denied, 426 U.S. 951 (1976).

77 See, e.g., Leary, 395 U.S. at 47 (defendant's "knowledge" that marijuana was imported can be established if supplier told defendant the source of the drugs).

78 For example, persons who, with no bad intent, post information to certain Usenet newsgroups on the Internet may have reason to know that a certain subscriber to that service often expresses intense hatred of the government. While it is uncertain whether a fact-finder would conclude that such knowledge constitutes "reasonable cause to believe that [that subscriber] will use such information for, or in furtherance of," a crime, the chill caused by the risk of such a finding would raise significant First Amendment questions, because, unless there were a way to prevent access to the suspicious person, the content-provider might have little choice but to cease her "postings" altogether. Similarly, a person demonstrating the proper use of explosives to a classroom full of well-intentioned students (or purchasers of the product) may sense that a particular student seems suspicious, or may discover that one listener asks questions that might subtly suggest an improper motive for wanting to learn the techniques in question. The possible application of a facilitation prohibition to such a case might well cause the teacher to cease instruction (or, at the very least, exclude the suspicious-looking persons, where that is feasible). Because of this possibility, courts might be more inclined to question the constitutionality of the prohibition.

79 Moreover, as Professor Greenawalt argues, it is unlikely that the First Amendment would permit criminal culpability to attach on a "facilitation" theory absent the speaker's knowledge of a substantial risk that the communication will facilitate a crime:

> My own sense is that a legislature may appropriately accept whatever curtailment of expression is involved in a prohibition on
> facilitation that the actor believes is likely . . . . However, a principle of free speech provides a powerful reason why liability should not
> extend to all negligent or reckless acts of communication, that is, to situations where the speaker is wholly unaware of the use to be
> made of what he says or thinks there is only some modest risk it will be used for a criminal purpose.

Greenawalt, Speech, Crime, supra note 20, at 87.

80 In order to be sustained under the First Amendment, the "intent" scienter requirement in this prohibition must be understood to refer to cases where the person disseminating the information has a "conscious purpose" that it be used unlawfully, or (at the very least) a material stake in seeing that it be used for such purposes. "Intent" should not be construed to encompass cases where criminal activity is not in fact the intended result, but is merely a "foreseeable" result, or a "natural consequence," of the publication of the information in question. Seesupra at 30-34, 40.

Case 1:23-cv-00849-EGB    Document 148-63    Filed 04/30/21    Page 44 of 44

[81] In order to avoid a chilling effect on protected speech, courts might construe such a prohibition as limited to cases where it is reasonably likely that the information will in fact facilitate such criminal conduct.  See supra at 43 & note 69.


Return to . . . **CCIPS home page**  ‖  **Justice Department home page**

---

*Updated page March 22, 1999*
*usdoj-crm/mis/mdf*

---