## DEPARTMENT OF COMMERCE

### Bureau of Industry and Security

**15 CFR Parts 732, 734, 736, 740, 742, 743, 744, 746, 748, 758, 762, 772, and 774**

**[Docket No. 191107–0079]**

**RIN 0694–AF47**

### Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**AGENCY:** Bureau of Industry and Security, Department of Commerce.

**ACTION:** Final rule.

**SUMMARY:** On May 24, 2018, the Department of Commerce published a proposed rule in conjunction with a Department of State proposed rule to revise Categories I (firearms, close assault weapons and combat shotguns), II (guns and armaments), and III (ammunition/ordnance) of the USML and transfer items that no longer warrant control on the USML to the Commerce Control List (CCL). This final rule responds to and adopts changes based on the comments received on the Commerce proposed rule and is being published simultaneously with a final rule by the Department of State that will revise Categories I, II, and III of the USML to describe more precisely the articles warranting continued control on that list. These revisions complete the initial review of the USML that the Department of State began in 2011 and the conforming changes made to the EAR to control these items not warranting control under the International Traffic in Arms Regulations (ITAR).

**DATES:** This rule is effective March 9, 2020.

**FOR FURTHER INFORMATION CONTACT:** Steven Clagett, Office of Nonproliferation Controls and Treaty Compliance, Nuclear and Missile Technology Controls Division, tel. (202) 482–1641 or email *steven.clagett@bis.doc.gov.*

**SUPPLEMENTARY INFORMATION:**

### Background

On May 24, 2018, the Department of Commerce (referred to henceforth as "the Department") published the proposed rule, *Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)* (83 FR 24166) (referred to henceforth as the "Commerce May 24 rule") in conjunction with a Department of State proposed rule to revise Categories I, II, and III of the USML (referred to henceforth as the "State May 24 rule"). The Department of Commerce is issuing this final rule that describes how articles the President determines no longer warrant control under USML Category I—Firearms, Close Assault Weapons and Combat Shotguns; Category II—Guns and Armament; and Category III—Ammunition/Ordnance will be controlled on the CCL of the Export Administration Regulations (EAR) and is being published in conjunction with a final rule on Categories I, II, and III from the Department of State, Directorate of Defense Trade Controls (DDTC), completing the initial review of the USML that began in 2011 and making conforming changes to the EAR to control these items on the Commerce Control List (CCL).

The changes described in this final rule and in the State Department's companion final rule on Categories I, II, and III of the USML are based on a thorough interagency review of those categories, after which the Department of State concluded that the items added to the CCL in this final rule do not provide a critical military or intelligence advantage to the United States and, in the case of firearms, do not have an inherently military function. The Departments of Defense, State, and Commerce have, therefore, determined that the EAR is the appropriate source of authority to control these firearms, ammunition, and other articles previously controlled under Categories I–III of the USML. There is a significant worldwide market for items in connection with civil and recreational activities such as hunting, marksmanship, competitive shooting, and other non-military activities.

This final rule does not deregulate the transferred items. BIS will require authorization to export or reexport to any country a firearm or other weapon that is being moved from the USML to the CCL by this final rule, including releases of related technology and software to foreign persons in the United States. Rather than decontrolling firearms and other items, in publishing this final rule, BIS, working with the Departments of Defense and State, is continuing to ensure that appropriate regulatory oversight will be exercised over exports, reexports, and transfers (in-country) of these items while reducing the procedural burdens and costs of export compliance on the U.S. firearms industry and allowing the U.S.

Government to make better use of its export control resources.

Certain software and technology capable of producing firearms when posted on the internet under specified circumstances is being controlled under this final rule in order to protect important U.S. national security and foreign policy interests; however, communication of ideas regarding such software or technology is freely permitted. Moreover, nothing in this final rule prohibits U.S. persons within the United States from acquiring firearms of any type—there are other laws and regulations that control the acquisition of firearms in the U.S.

### Structure of 600 Series

BIS has created Export Control Classification Numbers (ECCNs), referred to as the "600 series," to control items that will be removed from the USML and controlled under the CCL, or items from the Wassenaar Arrangement on Export Controls for Conventional Arms and Dual Use Goods and Technologies Munitions List (Wassenaar Arrangement Munitions List or WAML) that are already controlled elsewhere on the CCL.

These ECCNs are referred to as the "600 series" because the third character in each of the new ECCNs is "6." The first two characters of the "600 series" ECCNs serve the same function as any other ECCN as described in § 738.2 of the EAR. The first character is a digit in the range 0 through 9 that identifies the Category on the CCL in which the ECCN is located. The second character is a letter in the range A through E that identifies the product group within a CCL Category. With few exceptions, the final two characters identify the WAML category that covers items that are the same or similar to items in a particular "600 series" ECCN. Category II of the USML and category ML2 of the WAML cover large caliber guns and other military weapons such as: Howitzers, cannon, mortars, anti-tank weapons, projectile launchers, military flame throwers, and recoilless rifles.

Items that are currently controlled in Category II of the USML will be controlled on the CCL under four new "600 series" ECCNs. Placement of the items currently in USML Category II into the CCL's 600 series is consistent with existing BIS practice of using 600 series ECCNs to control items of a military nature.

Items currently controlled in Categories I and III of the USML will be controlled in new ECCNs in which the third character is a "5." These items are not appropriate for 600 series control because, for the most part, they have

civil, recreational, law enforcement, or other non-military applications. As with 600 series ECCNs, the first character represents the CCL category, the second character represents the product group, and the final two characters represent the WAML category that covers items that are the same or similar to items in the ECCN.

*Relation to USMIL*

Pursuant to section 38(a)(1) of the Arms Export Control Act (AECA), all defense articles controlled for export or import, or that are subject to brokering controls, are part of the USML under the AECA. All references to the USML in this final rule are to the list of defense articles that are controlled for purposes of export, temporary import, or brokering pursuant to the ITAR, 22 CFR parts 120 through 130, and not to the list of AECA defense articles on the United States Munitions Import List (USMIL) that are controlled by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) for purposes of permanent import under its regulations at 27 CFR part 447. All defense articles described in the USMIL or the USML are subject to the brokering controls administered by the U.S. Department of State in part 129 of the ITAR. The transfer of defense articles from the ITAR's USML to the EAR's CCL for purposes of export controls does not affect the list of defense articles controlled on the USMIL under section 38 of the AECA, 22 U.S.C. 2778, for purposes of permanent import or brokering controls.

**Overview**

For the Commerce May 24 rule, BIS received nearly 3,000 comments and posted 1,540 unique comments and 135 bulk comments, which were representative of issues raised by 1,256 commenters. BIS appreciates the constructive comments it received to improve the Commerce May 24 rule and incorporated changes where appropriate. BIS also received many comments that were outside the scope of the Commerce May 24 rule and thus that are not addressed here. The Commerce May 24 rule and this final rule address U.S. export controls. BIS does not regulate the domestic sale or use of firearms in the United States, or the transfer of firearms or related software or technology between U.S. persons within the United States.

BIS reviews the comments it received in the preamble to this final rule in three parts. First, BIS describes the comments of general applicability. Then, it describes the comments received on specific proposed provisions included in the Commerce May 24 rule. Finally, this final rule describes the changes being adopted from the proposed rule and revisions being made to what was proposed in the Commerce May 24 rule. As this final rule is being published in conjunction with the companion Department of State rule, the preamble may also reference the State Department's analysis related to these changes.

**Comments of General Applicability**

*USML Review Criteria*

*Comment 1:* Multiple commenters took issue with the proposed transfer from the USML to the CCL of weapons that the Department of State determined, in conjunction with its interagency partners (including BIS), are not inherently for military end use, citing the fact that military and law enforcement personnel regularly use them. Many commenters asserted that being commercially available is not a good indicator of whether these weapons merit the oversight of the Department of State. In addition, several commenters disputed that the U.S. market should be the basis for assessing the commercial availability of firearms, as this is not the market to which the proposed rule would be directed. Many commenters also asserted that semi-automatic weapons should not be seen as just another product to be promoted, bought, and sold like washing machines or any other consumer product. Commenters supportive of the rule, however, agreed that export controls of commercial firearms and ammunition which are not inherently military, have no critical military or intelligence advantage, and have predominant commercial applications correctly belong under the EAR.

*BIS response:* The fact that a military uses a specific piece of hardware is not a dispositive factor when determining whether it has an inherently military function. Given that the majority of the items referenced in these comments that will transfer to the CCL through this final rule are widely available in retail outlets in the United States and abroad, and widely utilized by the general public in the United States, it is reasonable for the Department of State to determine that they do not serve an inherently military function, absent specific characteristics that provide military users with significantly enhanced utility, such as automatic weapons, sound suppressors, and high capacity magazines.

With respect to revisions of Categories I–III, the review was focused on identifying the defense articles that are now controlled on the USML that are either (i) inherently military and otherwise warrant control on the USML or (ii) if of a type common to non-military firearms applications, possess parameters or characteristics that provide a critical military or intelligence advantage to the United States. If a defense article satisfies one or both of those criteria, it remained on the USML. For example, while the U.S. military supplies some of its service members with sidearms for military use, a sidearm also has many uses outside of the military, such that its function is not inherently military and therefore a sidearm does not warrant control on the USML. Alternatively, squad automatic weapons do not generally have such non-military uses and will remain controlled on the USML. Any single non-military use, however, does not negate such a weapon's inherently military function.

BIS notes that the scope of items "subject to the EAR," includes basic commercial items, dual-use items, and military items not warranting ITAR control. The EAR control structure is well-suited to control this range of items, and BIS has particular historical expertise in controlling dual-use items. The Departments of State and Commerce also recognize that there are variations in commercial availability of firearms, but these variations do not overcome the Department of State's assessment that the subject firearms do not provide a critical military or intelligence advantage such that they warrant control under the ITAR. In addition, all exports of firearms are subject to the laws of the importing country, and the U.S. Government does not issue licenses for exporters to ship firearms to countries where the end use is illegal.

*Comment 2:* Many commenters asserted that many semi-automatic rifles are easily converted to fully automatic firearms and for this reason semi-automatic firearms and the parts and components needed to do this should be retained on the USML.

*BIS response:* BIS agrees that certain components may be used to convert a semi-automatic firearm into a fully automatic firearm. A fully automatic weapon is subject to the ITAR. The component(s) needed to turn a semi-automatic into a fully automatic are also retained on the USML. Therefore, the export of the component needed to turn the semi-automatic into a fully automatic would require an ITAR license or other approval. In addition, if the ITAR component was incorporated into the semi-automatic firearm, the now automatic weapon would be

regulated by the ITAR as an automatic weapon and because of the inclusion of the ITAR component within the firearm. To address exports of semi-automatic firearms intended to be made automatic with a foreign-origin component that was not subject to the ITAR, BIS as a result of this comment has revised § 740.2 in this final rule to restrict the use of EAR license exceptions involving these components or parts, as described below in the regulatory changes made in this final rule.

*Commerce's Mission and the Regulation of Firearms*

*Comment 3:* Many commenters expressed concerns about the role and function of BIS regarding the items that are transferred from the USML to the CCL. Some commenters expressed concerns that BIS has neither the appropriate resources nor the appropriate expertise or mission to process associated applications for exports of firearms. Several commenters asserted BIS is not set up for the proper vetting of those parties in export transactions to ensure that they are not acting as middlemen for terrorists or other subversive entities that will use them against our troops or our allies or, even worse, civilian populations. Several other commenters asserted that BIS's enforcement office, with no staff in Latin America, Africa, or many other parts of the world, is not equipped to take the same level of preventive measures for end-use controls. Many commenters asserted that the transfer of these firearms to Commerce control is inconsistent with the statutory framework enacted by Congress to regulate the export of arms.

*BIS response:* The mission of BIS is to advance U.S. national security, foreign policy, and economic objectives by ensuring an effective export control and treaty compliance system and promoting continued U.S. strategic technology leadership. BIS controls many items on the CCL that implement U.S. commitments to the Wassenaar Arrangement and other multilateral regimes related to national security. These controls are supplemented by U.S. controls on additional items as well as broad catch-all controls targeting end uses and end users of concern.

BIS licenses are subject to an interagency review process that includes review by the Departments of State, Defense, and Energy, which allows BIS to supplement its technical expertise with that of its interagency partners on matters of national security, foreign policy, regional stability, and national defense. The interagency review process for Commerce licenses is

specified in Executive Order 12981 and in part 750 of the EAR. The well-established and transparent interagency review process (including specifying the timelines for each step of the review process) ensures that a variety of perspectives and expertise from these U.S. Government agencies are able to inform the Commerce license review process to ensure only those exports that are consistent with U.S. export control interests will be approved. BIS also emphasizes that it has flexibility in how it approves licenses and can include additional safeguards as may be warranted. The interagency review process also helps to inform how licenses are approved.

BIS has decades of experience licensing firearms and related items that has prepared it well for licensing these additional firearms and related items that this final rule moves to the CCL. BIS is also prepared because of its experiences with licensing other items that have moved from the USML to the CCL, including such sensitive items as components "specially designed" for use in military aircraft, and certain "spacecraft," including satellites, and space vehicles. In addition, BIS estimates that existing staff will be able to manage the anticipated increased workload of approximately 6,000 additional license applications.

In addition to its experience in the licensing arena, BIS has substantial law enforcement experience. BIS's Export Enforcement (EE) is a dedicated law enforcement organization recognized for its expertise, professionalism, integrity, and accomplishments. EE accomplishes its mission through preventive and investigative enforcement activities and then, pursuing appropriate criminal and administrative sanctions against export violators. EE works with the Department of Justice to impose criminal sanctions for violations, including incarceration and fines, and with the Office of Chief Counsel for Industry and Security to impose civil fines and denials of export privileges. EE also works closely with other federal law enforcement agencies, including the Federal Bureau of Investigation and the Department of Homeland Security, when conducting investigations or preventative actions.

EE has Export Control Officers (ECOs) in offices that cover different regions of the world and are not limited to the specific country in which the EE personnel are located. The ECOs are supplemented by other personnel who engage in enforcement-related activities. For example, BIS regularly sends BIS enforcement agents on temporary duty assignments overseas under the Sentinel Program where they go to areas not

easily covered by existing ECOs. BIS also works with certain foreign governments on enforcement as well as transshipment issues. In conducting pre-license checks or post shipment verifications, BIS also uses the resources the Department has with various Foreign Commercial Service (FCS) officers that are located at embassies and consulates around the world. Upon BIS's request, Department of State Foreign Service Officers at embassies and consulates often assist BIS with pre-license checks when the FCS is not present.

BIS has resources it and the other agencies use to identify parties of concern to transactions, not all of which are public. The information BIS and other agencies use to vet licenses and transactions is not static and is being continuously improved to better target and exclude entities or individuals that should not be receiving items subject to the EAR.

BIS also notes that this final rule imposes a requirement to file Electronic Export Information (EEI) in Automated Export System (AES) for nearly all exports of firearms being moved to the CCL. The EAR includes robust recordkeeping requirements that have been enhanced further for the firearms being moved to the CCL. BIS can and does on a regular basis contact parties to a transaction to request all records related to a particular export or reexport or series of exports or reexports. These record requests may also involve in-person visits from representatives of EE.

BIS does not agree that the controls will be inconsistent with the statutory framework enacted by Congress to regulate the export of firearms. The firearms that warrant ITAR control will continue to be subject to the AECA and its requirements as applicable. The firearms not warranting ITAR control that this final rule will control under the EAR will be subject to the Export Control Reform Act of 2018 (ECRA) (50 U.S.C. 4801–4852). For example, BIS has regulated long barrel shotguns (a type of firearm) under the statutory framework enacted by Congress in the earlier Export Administration Act (EAA) and now under ECRA. The same will be true for the firearms that this final rule adds to the CCL. Congress stated that one of the purposes of ECRA is "[t]o control the release of items for use in— (i) the proliferation of . . . conventional weapons; (ii) the acquisition of destabilizing numbers or types of conventional weapons; (iii) acts of terrorism . . ." 50 U.S.C. 4811(2)(A).

*Comment 4:* One commenter asserted that BIS does not have resources to enforce export controls, even before the

addition of 30,000 firearms export licenses as a result of this rule predicted by the Commerce May 24 rule.

*BIS response:* BIS clarifies here that the reference to 30,000 licenses in the Commerce May 24 rule represented the increase as a result of the total USML to CCL review process, not solely the USML Categories I–III items. The estimate of 10,000 licenses is the number of anticipated State licenses that will be impacted by the transfer to Commerce in the Commerce May 24 rule. The larger 30,000 number was included for context for the overall USML to CCL review process and its implementation. As noted in the response to Comment 3 above, BIS estimates the transfer resulting in approximately 6,000 license applications. BIS has invested considerable effort in assessing the increased licensing and enforcement responsibilities that will be incurred following publication of this final rule and has determined that it is within its means and resources to effectively administer the subject export controls.

### The Effect of the Shift in Regulatory Jurisdiction of Certain Firearms

*Comment 5:* Several commenters asserted that reducing regulations on firearms and ammunition is dangerous. One commenter asserted that moving firearms to the CCL where they would be subject to loosened controls seems inconsistent with enhancing national security. Another commenter asserted that as even the National Rifle Association (NRA) has acknowledged, ''items on the USML controlled under ITAR are generally treated more strictly, whereas regulation under the CCL is more flexible.'' Many commenters asserted that the proposal weakens controls over semi-automatic assault weapons including AR–15s and AK–47s, 50 caliber sniper rifles, and high-capacity ammunition magazines.

*BIS response:* The EAR control structure is more flexible and will reduce the burden on the regulated, but the items will still be controlled. For example, the EAR is a more flexible control structure because it does not require a purchase order for a license. This is more efficient and flexible than the ITAR but does not undermine U.S. national security. The applicant still needs to specify the parties to the license, end use, and items to be authorized, but not having to present a purchase order allows a more flexible licensing arrangement. The ability under the EAR to create country-based license exceptions, *e.g.,* License Exception Strategic Trade Authorization (STA), is another example. License

Exception STA will only be available for the .x parts and components under 0A501, but this is another example of the more flexible EAR control structure. In other words, greater flexibility under the EAR does not mean decontrol.

Further, having the ITAR control items that are in commercial use and do not have an inherent military function does not help promote U.S. national security, because it takes time and resources away from the Department of State that could be better used to focus on items that do warrant ITAR control. BIS has decades of experience in regulating dual-use items, including long barreled shotguns controlled under 0A984 and certain chemicals and toxins that have commercial applications, but are controlled for chemical and biological weapons reasons, *e.g.,* ricin and sarin gas. *See, e.g.,* 50 U.S.C. 4811(2)(A)(i) (stating that one of the policies of ECRA is to control the proliferation of weapons of mass destruction). BIS also has a proven track record for licensing and enforcing the controls for other items that have moved from USML to the CCL.

BIS further clarifies that the AK–47 automatic firearm and any other automatic firearm are retained on the USML. The semi-automatic firearms this rule adds to the CCL will require a U.S. Government authorization for export.

*Comment 6:* One commenter noted that according to the State May 24 rule, ''The Department of Commerce estimates that 4,000 of the 10,000 licenses that were required by the [State] Department will be eligible for license exceptions or otherwise not require a separate license under the EAR.'' The commenter noted that the Commerce May 24 rule clarifies, ''The other 4,000 applicants may use license exceptions under the EAR or the ''no license required'' designation, so these applicants would not be required to submit license applications under the EAR.'' The commenter asserted that ''while it recognizes that other forms of oversight may be available, this dramatic difference in the number of licenses raises our concern.''

*BIS response:* This comment on the meaning of the 4,000 Department of State licenses that will not require a license under the EAR creates a good opportunity for BIS to clarify how the EAR controls are structured. Under the EAR, an exporter does not have a right to export. If the EAR does not impose a license requirement or some other prohibition, the exporter may proceed under the No License Required (NLR) designation. The NLR designation may be available for certain 0x5zz.y exports, but otherwise all other exports will

require a U.S. Government authorization. Therefore, the reference to 6,000 being authorized under licenses and 4,000 under license exceptions and a small subset as NLR, is not a dramatic change. When BIS imposes a license requirement under the EAR, this means the exporter will need to meet all of the applicable requirements of a license exception, or obtain a license from BIS to proceed with the export. The license exceptions or portions of license exceptions that will be available for these items moved to the CCL, including some of the new requirements and limitations added, will be sufficient to protect U.S. export control interests.

### 3D Printing of Firearms

*Comment 7:* Three-dimensional (3D) printing is a type of additive manufacturing based on the principle of combining numerous, extremely thin layers of a physical material (including plastics, metals, and even living cells) in a controlled build process and joining them to gradually build up a physical, three-dimensional object. Computer controlled manufacturing may be either subtractive or additive. Subtractive manufacturing includes traditional manufacturing methods such as turning, grinding or milling, where metal or other material is removed from the base shape to form the final product. For example, you take a steel block and remove material until it becomes the final item. In additive manufacturing, which is often referred to as 3D printing, material such as metal or plastic is laid down in very thin layers one upon the other fusing together until the final net shape is achieved. In both instances, the adding or removing of the material is controlled by a computer without human intervention. 3D printers utilize electronic digital files to process the materials into a physical object, and these files can be distributed over the internet. A 3D printer or computer numerically-controlled (CNC) equipment uses Computer Aided Manufacturing (CAM) files in G-code or AMF format as executable code to produce certain items. There are currently technological limitations for the effectiveness of 3D printing of firearms, but the concept has been demonstrated and the ability to manufacture commercially viable firearms is inevitable given the increasing improvements of 3D printing equipment and 3D printing materials. Congress directed that the export control system under ECRA is intended to have ''the flexibility to be adapted to address new threats in the future,'' and this final rule implements that instruction. 50 U.S.C. 4811(8).

Technology and software are required for 3D printing of firearms and are critical for the 3D printing manufacturing process. Publicly posting such technology and software online without restriction creates the risk that foreign persons and countries, including countries of concern, will be able to obtain technology and software for 3D printing of firearms. In the absence of controls on the export, reexport, or in-country transfer of such technology and software, such items could be easily used in the proliferation of conventional weapons, the acquisition of destabilizing numbers of such weapons, or for acts of terrorism. As noted earlier, Congress expressly directed that ECRA should be used to address these risks. 50 U.S.C. 4811(2)(A).

Like 3D printing, CNC milling or machining is an automated manufacturing process controlled by technology and software. CNC milling/turning/grinding are all subtractive manufacturing processes in which the computerized equipment removes layers of material from a base—known as the workpiece or the blank—to produce a manufactured part or item. As with 3D printing, the posting online of CNC technology and software needed to create working firearms creates export control concerns.

Under the ITAR, the unrestricted public dissemination of technical data (as defined in section 120.10 of the ITAR) in a manner that allows access by foreign persons—including through the internet—is an export requiring appropriate authorization. For purposes of the CCL, Commerce has historically taken the approach (with limited exceptions) that material is not subject to export control if it has been ''published'' within the meaning of 15 CFR 734.7, including through posting on the internet. The proposed rules published by the Departments of State and Commerce took these differences in the ITAR and EAR control structures into account, and the Commerce proposed rule acknowledged these differences to ensure commenters had an opportunity to fully take these differences into account when submitting their comments on the Commerce rule. *See* page 24167 of the Commerce May 24 rule and 15 CFR 734.7.

Comments on the Commerce proposed rule reflected the commenters' understanding of these differences between the ITAR and EAR control structures. BIS received many comments expressing concerns about 3D printing of firearms and whether appropriate controls would be in place under the EAR. It also received a small number of commenters that supported the part 734 criteria. The commenters critical of the part 734 criteria provided the following input:

(1) Part 734 criteria should be changed to regulate 3D printing, even if the information would otherwise be publicly available. These commenters were concerned that the application of the part 734 criteria appears to give rise to the possibility of widespread and openly sanctioned circulation of open source, non-proprietary instructions for using computer-aided design (CAD) files to produce operable firearms via 3D-printing technology, or text files to produce such firearms via CNC milling of the firearms. Commenters requested BIS to weigh the fact that the part 734 criteria would make posting on the internet of ECCN 0E501 technology (*e.g.,* 3D printer specs) for the production of an ECCN 0A501 firearm publicly available information that is no longer subject to the EAR.

(2) Allowing 3D-printed gun technology and software to be posted freely online for use with 3D printers will make it easier to obtain firearms in the U.S. and abroad. These commenters were concerned that the combination of internet dissemination and do-it-yourself 3D production is problematic because the government would have no oversight of the producer, the end use or the end user of the firearm. Other commenters in this area were greatly concerned about the perceived loss of controls on 3D gun-printing plans, which these commenters asserted has increasingly assisted bad actors in enhancing their capabilities to inflict atrocities around the world. Several commenters cited *Defense Distributed* v. *Department of State,* a lawsuit filed in the U.S. District Court for the Western District of Texas and appealed to the U.S. Court of Appeals for the Fifth Circuit,, in support of the State Department's decision to restrict the 3D printing of firearms under the ITAR (*i.e.,* requiring appropriate authorization under the ITAR prior to allowing unrestricted posting on the internet).

(3) Unregulated 3D printing would undermine U.S. efforts, as well as governments overseas, to vet parties obtaining firearms, and to track 3D printed firearms. These commenters noted that with access to 3D printing machines and plans on how to build a gun, anyone could circumvent U.S. laws that seek to prevent known criminals from obtaining U.S. firearms. Other commenters in this area were particularly concerned that these changes would result in an increase in the number of untraceable firearms in circulation because as 3D printing technology becomes more widely available, the likelihood that it may be used to construct operable firearms that are exempt from serialization requirements would increase.

(4) The transfer of control of these items to the CCL would undermine longstanding U.S. efforts to counter proliferation of small arms in the world. Commenters in this area noted that they couldn't understand how allowing untraceable 3D printing of firearms would serve U.S.-recognized goals to combat illicit trafficking of firearms. Commenters in this area also noted that the United States is the world's largest donor, as the commenter understands it, to helping countries build their ability to trace weapons, secure weapons stockpiles, and to destroy those stocks when warranted. However, according to the commenter, this transfer of authority to Commerce appears to open the door to unfettered 3D printing of firearms, which threatens to undermine nearly all those efforts.

One commenter asserted that the proposed changes may result in increased circulation of plans for non-automatic weapons produced by 3D printing technology, and this may be at odds with the Wassenaar Arrangement.

A small number of commenters supported the application of the criteria in part 734 and emphasized that the information is so widely available in various formats that trying to control it would not be practical or warranted. One commenter noted that America boasts hundreds of millions of privately-owned firearms and has produced countless books, magazine articles, videos, websites, and online forums that exhaustively detail firearm technology and use. Thus, this commenter asserted it is difficult to imagine any information about the design, development, production, manufacturing, and use of firearms that is not already within the public domain and this same information is commonly available overseas. Other commenters that supported the part 734 criteria asserted that they had concerns generally over their First Amendment rights being possibly violated unless the criteria in part 734 applied equally to information posted online. These commenters requested an end to any harassing or censorship of firearm instructors within the U.S., as well as bloggers, writers, and those posting online guides or tutorials discussing technology about defense items because these activities seem to be a clear violation of the First Amendment right to free speech. Given the foreign policy and national security interests at stake, Commerce believes that the restrictions imposed by this rule

are appropriately tailored. Commerce is also aware of, and has taken into account, the constitutional and statutory concerns raised by the plaintiffs in the *Defense Distributed* case and by the plaintiffs in *Washington* v. *Dep't of State,* No. 2:18–cv–01115–RSL (W.D. Wash.). Commerce also notes that it has received correspondence from members of Congress concerning the issues raised in *Defense Distributed.*

*BIS response:* The Commerce May 24 proposed rule addressed the application of part 734, including § 734.7, for items (specifically for certain information and software) proposed for transfer from USML Categories I–III (*see* 83 FR 24167). These criteria support the free exchange of public information and, as a general matter, do not warrant being changed. However, the concerns commenters raised about the specific application of part 734 criteria to 3D printing of firearms suggests that modification to the proposed controls is warranted.

With the transfer of certain firearms from the USML to the CCL, rifles, pistols, revolvers and related parts and components will fall within ECCN 0A501, and BIS will be responsible for their licensing. This transfer adds to Commerce's existing licensing jurisdiction over most shotguns and shotgun shells as well as optical sighting devices. The items that remain on the ITAR include fully automatic and selective fire weapons, weapons for caseless ammunitions, silencers and certain high capacity (50 rounds or greater) magazines, and certain military-specific ammunition such as tracers.

BIS recognizes that several commenters, including a large number of private citizens, expressed concern over global access to 3D printing technology and software with the transfer of certain firearms to the CCL. BIS also recognizes that several commenters and plaintiffs in *Washington* v. *Dep't of State* raised concerns about risks to public safety related to domestic access to 3D printing technology and software. BIS shares the concerns raised over the possibility of widespread and unchecked availability of the software and technology internationally, the lack of government visibility into production and use, and the potential damage to U.S. counter proliferation efforts. In this final rule, BIS addresses the concerns raised about 3D printing of firearms by making certain technology and software capable of producing firearms subject to the EAR when posted on the internet under specified circumstances. This control will help ensure that U.S. national security and foreign policy interests are not undermined by foreign persons' access to firearms production technology. Although the Department of State determined that such technology and software do not warrant continued control under the USML, maintaining controls over such exports under the EAR remains in the national security and foreign policy interests of the United States, as described below. As noted in other places in the Commerce final rule, the movement of items from the USML is not a decontrol, and appropriate controls must be in place to protect U.S. national security and foreign policy interests, such as by maintaining Commerce licensing authority over certain technology and software capable of producing firearms subject to the EAR when posted on the internet under specified circumstances as described in this final rule. And although the domestic transfer of commodities is outside the purview of BIS jurisdiction, the concerns related to the unrestricted posting of CAD files on the internet, more accurately described in this final rule as CAM files, have been addressed in this final rule and nothing in this final rule affects existing federal or state laws that pertain to the manufacture, possession, use, or commercial sale of firearms.

BIS provides more information about the specific changes below under the Description of Regulatory Changes under the heading Revision of ''Published.''

BIS does not agree with the commenter that stated that the part 734 criteria are at odds with the Wassenaar Arrangement. As described both in the proposed rule and this final rule, part 734 remains consistent with the Wassenaar Arrangement. BIS's changes in this final rule, however, ultimately addressed this commenter's concern.

In response to commenters who favored the part 734 criteria as outlined in the proposed rule, BIS notes that information regarding firearms, including information for production of firearms, is often widely available, and nothing described below would restrict persons from publishing books or magazines, such as those that could be found in a local public library, and that the changes made to part 734 described below are limited to addressing a specific fact pattern (posting on the internet of certain types of files) that warrants U.S. Government oversight to ensure unrestricted releases are not being made to persons of concern outside the United States or to foreign persons in the United States. BIS also took into account these commenters' support for the part 734 criteria and their First Amendment concerns but did not adopt the approach that they advocated. Given concerns regarding First Amendment restrictions the control is appropriately tailored to only impact technology and software in an electronic format, such as AMF or G-code, that is ready for direct insertion into a computer numerically controlled machine tool, additive manufacturing equipment to produce the firearm frame or receiver or complete firearm. This technology and software are functional in nature, having the capability to cause a machine to use physical materials to produce a firearm frame or receiver or complete firearm. Limitations on the dissemination of such functional technology and software do not violate the right to free expression under the First Amendment. Nor does the final rule violate the right to keep and bear arms under the Second Amendment. The rule does not prohibit U.S. persons within the United States from acquiring firearms of any type; indeed, nothing in this rule prohibits persons within the United States from developing, discussing, or transferring by hand or mail (*e.g.,* by the U.S. Postal Service or a common carrier) CAM files related to 3D-printing technology and software. The domestic transfer of commodities is outside of the scope of BIS jurisdiction and would be within the purview of domestic law. The release of controlled technology in the United States would only be regulated to the extent it would constitute a deemed export (*i.e.,* release to a foreign person). This means transfers between U.S. persons within the United States are not regulated under the EAR so long as there is no release to a foreign national. The ITAR takes a similar approach. BIS's approach in using targeted changes is not intended to otherwise change the other criteria in part 734 that these commenters assert they strongly support.

In response to the comments received on the proposed rule, BIS has reflected on the need to take into account various interests in regulating technology and software for the 3D printing of firearms. At the time of the proposed rule, BIS believed that its existing framework struck the appropriate approach in providing for national security and foreign policy control of firearms that would transfer to the CCL. Since that time, BIS has had considerable time to review the comments related to 3D printing of firearms. Although the military usefulness of 3D printed firearms is not significant, there are other U.S. national security and foreign policy interests, as described by commenters, in regulating the unlimited

access to certain files for the 3D printing of firearms that the framework of BIS regulations as described in the proposed rule did not adequately address. As the State Department noted in the *Defense Distributed* litigation, unrestricted export of such files abroad could have a potential detrimental effect on aspects of U.S national security and foreign policy, including by undercutting efforts to combat the illicit trafficking of firearms or possession of firearms by hostile parties or dangerous organizations, as well as other efforts to assist other countries in protecting domestic and international security. BIS believes this potential detrimental effect on U.S. national security and foreign policy warrants the control of the export of certain files for the 3D printing of firearms set forth in this rule.

At the same time, BIS recognizes that there is a longstanding tradition to encourage the free exchange of ideas as already acknowledged in BIS regulations, such as in 15 CFR 734.7. The agency takes seriously its responsibility to regulate judiciously, seeking to assert jurisdiction only as needed and consistent with its statutory authority. As set forth in the Export Control Reform Act of 2018, 50 U.S.C. 4801–4852, Commerce's policy is to use export control only to the extent necessary to restrict the export of items that would make a "significant contribution to the military potential of another country . . . which would prove detrimental to the national security of the United States" or "further significantly the foreign policy of the United States or to fulfill its declared international obligations." 50 U.S.C. 4811(1)(A)–(B). Further, Commerce must ensure that its controls are "tailored to focus on those core technologies and other items that are capable of being used to pose a serious national security threat to the United States." 50 U.S.C. 4811(2)(G).

Because of the national security and foreign policy risks associated with the unlimited access and unrestricted production of 3D printed firearms, BIS is offering a tailored approach, consistent with its statutory obligations, that places restriction on the posting on the internet of files for the printing of certain firearms and their critical elements. As set forth in § 734.7(c) in this final rule, only technology or software for the complete firearm, its frame, or its receiver are subject to BIS licensing requirements, aligning BIS controls with existing statutory concepts set forth in the definition of "firearm" under the Gun Control Act (GCA), 18 U.S.C. 921(a)(3). Recognizing that libraries and academic institutions within the United States may already carry books or other materials related to firearms manufacturing, BIS does not seek to regulate this existing landscape of activity for the items transferred from the USML to CCL, consistent with its treatment of firearms it controlled on the CCL prior to this final rule. Instead, since the harm identified with unrestricted dissemination has been tied to the easy and untraceable distribution in electronic format that the internet provides, BIS has crafted its rule to regulate dissemination in this space as it poses a significant risk to U.S. national security and foreign policy.

As a result, Commerce has reached the conclusion that U.S. national security and foreign policy necessitate that BIS maintain controls over the 3D printing of firearms when such software and technology is posted on the internet. The potential for the ease of access to the software and technology, undetectable means of production, and potential to inflict harm on U.S. persons and allies abroad present a grave concern for the United States. Without regulatory oversight, U.S. foreign relations and national security interests could be seriously compromised. For these reasons, this final rule provides that technology and software ready for insertion into an automated manufacturing tool that makes use of the software or technology to produce a firearm frame, receiver, or complete firearm is subject to the EAR, consistent with the regulation of such software and technology when previously controlled under the USML.

*Vetting Transaction Parties and Monitoring Exports*

*Comment 8:* Many commenters were concerned about a possible reduction in the monitoring of the end users of exported firearms and publicly available information about this monitoring. These commenters asserted that public reporting of Blue Lantern information is mandatory and there are readily available statistics about the results. Some commenters requested that if the proposed rules move forward, the BIS program be strengthened to address the need to monitor the end users of exported firearms.

*BIS response:* BIS does not publish end-user monitoring information in the same format as the Department of State, but the same type of information is available publicly from BIS. The new ECRA maintains an annual reporting requirement to Congress that provides an additional layer of transparency. Specifically, under Section 1765(a)(6) of ECRA, the Secretary of Commerce shall submit a report to Congress that includes a summary of export enforcement actions, including of actions taken to implement end-use monitoring of dual-use, military, and other items subject to the EAR. BIS already has practices in place to continuously evaluate its end-use monitoring program and to improve it as opportunities to do so are identified. BIS intends to continue those efforts for the firearms that are moved to the CCL with this final rule.

*Registration Requirement for Screening*

*Comment 9:* Several commenters expressed concerns that BIS will not have access to the same databases and background information that the Department of State uses to evaluate license applications since the EAR does not require registration. These commenters asserted that not including a registration requirement will deprive regulators of an important source of information and decrease transparency and reporting regarding gun exports. Some commenters recommended removing or limiting the registration fee for manufacturers but keeping the requirement for registration. Another commenter suggested waiving the fee for manufacturers who do not, in reality, export these items.

*BIS response:* BIS, along with the Department of State, considered these concerns and determined that the interagency license review process maintains appropriate oversight of the items at issue. BIS's export licensing requirements and process are calibrated both to the sensitivity of the item and the proposed destination. Additionally, all requests for export licenses for firearms remain subject to interagency review, including by the Department of State.

BIS does not need the information included in the ITAR registration requirement to regulate those items under the EAR. To apply for a license under the EAR, the applicant is required to create a free account in BIS's online submission system called SNAP–R. The SNAP–R account includes basic information about the exporter. In addition, each party identified on the license application is reviewed. The requirements to file EEI in AES is another important way that BIS obtains information needed to effectively track exports.

BIS agrees that if there were a registration requirement, removing or limiting the fee for registration would ease the burden on small businesses and individuals. However, as noted above, BIS does not believe that the information included in the registration requirements is necessary for BIS to

effectively license and enforce the EAR. Therefore, registration requirements, even if they are free, would impose an unnecessary burden on individuals, small companies, and manufacturers.

*Brokering*

*Comment 10:* Many commenters asserted that the proposed changes to USML Categories I–III would mean that brokers of semi-automatic weapons and related ammunition will be exempt from registration and licensing that is currently triggered by their inclusion as defense articles on the USML. Other commenters correctly understood that State would continue to impose brokering controls for items which moved to the CCL that are also listed on the USMIL. One of these commenters asserted that they are pleased to see that the State May 24 rule attempts to maintain effective oversight of arms brokers by ensuring that brokers must register with the Department of State and seek a license. This commenter asserted that these provisions are critical in helping mitigate illegal arms trafficking to major conflict zones and transnational criminal organizations.

*BIS response:* BIS clarifies that the Department of State in its May 24 rule and its final rule retains brokering controls for items which are now listed on the CCL that are also listed on USMIL. BIS directs the public to review the State final rule for information on the brokering controls under the ITAR. The Department of State in its companion rule noted it does not intend to impose a double licensing requirement for individuals undertaking activities on behalf of another to facilitate a transaction that will require licensing by the Department of Commerce. In practical terms, this means the vast majority of exporters who only export firearms on the CCL directly from the U.S. or reexport U.S.-origin firearms on the CCL are not "brokers" and will not have to register with DDTC.

*Congressional Oversight*

*Comment 11:* Multiple commenters expressed concerns that this final rule would reduce congressional oversight of arms transfers because BIS does not have to notify Congress of firearms sales in excess of $1 million, as the Department of State does. These commenters asserted that: (1) Congress needs to be able to review these types of firearms sales to ensure large risky exports do not proceed; (2) Congress has played an important role in stopping several risky firearms sales because of the congressional notification requirement (commenters provided

examples of sales from 2017 to Turkey and the Philippines that they asserted were blocked by Congress); (3) congressional notifications are a valuable tool for the public to be able to see when large firearms sales are being proposed; and (4) certain members of Congress have asserted their concern that not including a congressional notification requirement under the EAR would be counter to congressional intent.

*BIS response:* The Department of State in its companion rule also acknowledges those concerns and notes that those firearms that the U.S. Government deemed through the interagency review process to warrant continued control under the ITAR as defense articles will remain subject to congressional notification requirements in conformity with section 36 of the AECA and Executive Order 13637. In this response, BIS also puts the congressional notification issue into context under the EAR and the statutes that the regulations implement for items "subject to the EAR."

BIS notes that at the time of publication of the Commerce May 24 rule, the Export Administration Act (EAA) did not include a congressional notification requirement for firearms, nor did any other statute that the EAR implements for firearms. Therefore, BIS did not include a congressional notification requirement because it did not want to prejudge congressional intent in this area. On August 13, 2018, the President signed the National Defense Authorization Act for Fiscal Year 2018, which included ECRA. Congress did not include in ECRA any requirements for congressional notification for firearms and related items exports. Therefore, BIS is not including a congressional notification requirement in the final rule.

*Overseas Trafficking, Proliferation, and Diversion of Firearms*

*Comment 12:* Multiple commenters expressed a general concern that the transfer to the CCL increases the risk of overseas trafficking, proliferation, or diversion. Multiple commenters also expressed concerns about the BIS end-use monitoring (EUM) capabilities and the impact the companion Department of State rule has on the Department of State's EUM programs. Many commenters asserted that the decision to relax controls on the export of firearms will make it easier for terrorists to obtain the same dangerous firearms that have been used in mass shootings in the United States. Many commenters also asserted that these firearms are weapons of choice for criminal

organizations, narcotics traffickers, and gun traffickers, and making it easier for them to get firearms will make their activities worse and further fuel armed conflict abroad.

*BIS response:* This final rule does not deregulate the export of firearms. All firearms and major components being transferred to the CCL will continue to require a U.S. Government authorization. Further, BIS has both a robust EUM program and a law enforcement division sufficiently capable of monitoring foreign recipients' compliance with their obligations regarding the transfer, use, and protection of items on the CCL. Additionally, the Federal Bureau of Investigation and the Department of Homeland Security will continue to investigate and enforce civil and criminal violations of the export control laws as appropriate.

BIS does not agree that moving these firearms to the CCL will mean less oversight to prevent gun trafficking. Exporting these firearms will require a U.S. Government authorization. The EAR also includes a robust set of end-use and end-user controls that will supplement the CCL based license requirements. Similar to the ITAR, BIS will impose appropriate conditions as needed on authorizations or not approve certain transactions if there is a concern over risk of diversion. BIS also will maintain a robust end-use verification program for the firearms and other items moved to the CCL from USML Categories I–III. In addition, most firearms will require submission of a license, and the license review policies would lead to a denial for exports to terrorists. The EAR also includes sections in part 744, *e.g.,* § 744.14 for Foreign Terrorist Organizations (FTO), that impose additional restrictive license requirements and license review policies for terrorists identified under certain designations on the Department of Treasury's Specially Designated Nationals (SDN) list. This is significant because it excludes the use of any EAR license exceptions; imposes a license requirement for all items subject to the EAR, including the firearms being moved to the CCL; and acts as an additional safeguard for transactions involving EAR items located outside the U.S. that the Department of Treasury controls are not able to reach.

BIS included provisions in the Commerce May 24 rule and in this final rule to address this issue by including a presumption of denial license review policy under the regional stability reason for control for these types of end users. Specifically, in this final rule, the license review policy in § 742.6(b)(1)(ii)

is a policy of denial when there is reason to believe the transaction involves criminal organizations, rebel groups, street gangs, or other similar groups or individuals, that may be disruptive to regional stability, including within individual countries.

*Comment 13:* One commenter, a human rights organization, asserted that ''it has for many years called attention to the risks associated with untrammeled export of small arms and light weapons around the world.'' This commenter asserted that ''these arms have been associated with the deployment of child soldiers and the rise of insurgent groups.'' This commenter also asserted that ''these firearms are easier to divert than larger weapons and often end up in the illicit market.''

*BIS response:* BIS does not agree that there is anything in the EAR that will make the possibility of diversion any greater than it was under the ITAR. These concerns of diversion are taken into consideration by the export control system and underlie the basis for some of the agency's controls. BIS also notes that the U.S. Government continuously monitors the export control system to determine where the most likely points of diversion are and takes actions to prevent potential diversion points by using existing license review policies, rescinding or revoking prior authorizations, or imposing new license requirements or other prohibitions.

### Impact on Foreign Law Enforcement

*Comment 14:* One commenter expressed concern that foreign law enforcement personnel in particular are at risk of having the firearms and ammunition that would be transferred to the CCL used against them. Another commenter asserted that moving these firearms to the CCL will make it hard for foreign law enforcement to counter gun trafficking.

*BIS response:* These assertions are mitigated by the fact that, as stated previously: (1) These articles remain subject to BIS's EUM programs that vet potential end users of concern, and (2) applications for firearms and ammunition licenses will be approved only if the end use is permitted under the laws and supervision of the importing country.

BIS notes that this final rule is consistent with U.S. multilateral commitments, *e.g.,* to the Wassenaar Arrangement and the United Nations for conventional arms reporting. The support documentation requirements are consistent with Organization of American States (OAS) requirements to require an import certificate issued by

the importing country. This support document requirement applies to other countries that also impose a requirement for an import certificate prior to allowing an import of a firearm, permitting these other countries to better control the flow of firearms coming into their countries. In addition, U.S. law enforcement agencies, including BIS's Office of Export Enforcement, also coordinate with law enforcement agencies outside the U.S., as was referenced above in the BIS response to Comment 3. The area of preventing illegal transshipments is a good example of where various countries have worked together, including law enforcement agencies, regulators, and policy makers, to come up with standards and protocols to reduce illegal transshipments, and this work will continue.

### Human Rights Issues

*Comment 15:* A number of commenters suggested the proposed rule, if made final, may have a negative impact on human rights in foreign countries. BIS also received many comments asserting ''it is now recognized that rape and sexual assault are systematically used as weapons of war in conflicts around the world.'' One of these commenters asserted that ''in interviews with women and girls who have survived sexual violence during conflict, a very high number of their stories include descriptions of the torture they endured at the point of a gun. Although the particular models of firearms involved are seldom identified, there is no doubt that a military-style weapon contributed to gross violations of their human rights.'' Many commenters asserted that even after a conflict has officially ended, the weapons left behind are used all too often by perpetrators of domestic violence.

*BIS response:* BIS will use its resources and expertise in this area to vet parties involved in transactions subject to the EAR for human rights concerns. Similarly, as part of the aforementioned continuing interagency review of export licenses for firearms, the Departments of State and Defense will remain active in the interagency review process of determining how an item is controlled and will review export license applications on a case-by-case basis for national security and foreign policy reasons, including the prevention of human rights abuses. As stated previously in this final rule and in the companion rule published by the Department of State, the Department of State will continue vetting potential end users when reviewing Commerce

licenses, to help prevent human rights abuses.

BIS does not anticipate authorizing exports of firearms to regions involved in active conflicts because of the presumption of denial license review policy for regional stability. Commerce on its licenses as well as in its license exceptions includes certain requirements and conditions to ensure subsequent disposition or use of the item will continue to be in accordance with U.S. export control interests. These requirements are enhanced by the EAR end-use controls in part 744, which in many cases apply to transfers (in-country). Ultimately, the issue raised by this commenter is one of the reasons why the license review process is done in a careful and deliberative way to ensure as much as possible that the items authorized for export will not subsequently be used in ways not in accordance with the regulations, as well as larger U.S. national security and foreign policy interests.

### Effect on Other Countries

*Comment 16:* Some commenters asserted moving these firearms to the CCL would increase the likelihood for greater destabilization and conflict worldwide as well as for these weapons to be trafficked back into the U.S. for nefarious uses here. Some commenters asserted that ''military-style semi-automatic rifles and their ammunition, are weapons of choice for criminal organizations in Mexico and other Latin American countries that are responsible for most of the increasing and record levels of homicides in those countries.'' These commenters asserted that this will only send more asylum seekers fleeing to U.S. borders.

*BIS response:* BIS does not agree that the transfer of items to the CCL would increase the likelihood of greater destabilization and conflict worldwide, or specifically in Mexico or other Latin American countries. As described above, each foreign government decides what firearms may be imported into its country. In addition, as noted above, these items will be controlled for regional stability, so each license application will be reviewed to evaluate whether the export of these firearms may contribute to destabilizing that foreign country or other regional stability concerns.

### U.S. Nationals and Interests Overseas

*Comment 17:* Some commenters asserted that this change in licensing jurisdiction could lead to an unfortunate future situation where our own combat troops face troublemakers armed with American-made weaponry.

*BIS response:* The U.S. export control system, whether that is the export controls implemented under the EAR or the ITAR, is focused on protecting U.S. national security and foreign policy interests. Effective controls are in place under the EAR to ensure as much as possible that items subject to EAR do not endanger U.S. troops, U.S. nationals, or other U.S. interests is one of the key objectives of EAR controls. This final rule is intended to ensure that items being moved to the EAR will not endanger U.S. interests. BIS, as well as the Department of State, works to ensure that diversions do not occur, but it is a concern not unique to firearms moved to the CCL, and something the U.S. export control system is designed to counter.

### Consistency With U.S. Multilateral Commitments

*Comment 18:* Other commenters suggested that this rule contravenes international commitments the United States has made through mechanisms such as the Wassenaar Arrangement. One commenter asserted that the U.S. has already alienated many of our allies, and this rule change will further aggravate relations by pushing more firearms into their countries.

*BIS response:* The transfer of the concerned items to the CCL does not contravene U.S. international commitments, as the U.S. Government will continue to apply a high level of control to these items and require U.S. Government authorization for all exports of firearms and major components. Further, the controls being implemented under the EAR with this final rule are consistent with U.S. multilateral commitments, *e.g.,* to the Wassenaar Arrangement, the United Nations, and the OAS. BIS notes that foreign governments decide what items may be imported into their countries and how such items will be regulated within that country. Regardless of the U.S. export control system, an exporter must still meet the requirements of an importing country and if the importing country does not allow the importation of these items or requires certain requirements to be met, those foreign regulatory or other legal parameters set the parameters and scope for what may be imported, who may use such items, and for what end uses.

### Reporting Requirement for Political Contributions and Fees to the EAR To Prevent Corruption in the Arms Trade

*Comment 19:* One commenter asserted that the transfer of certain Categories I–III items from ITAR to EAR control will mean the loss of the reporting requirements outlined in 22 CFR part 130. This commenter asserted that part 130 requires exporters to report payment of certain political contributions, fees, and commissions related to the sale of defense articles and services to the armed forces of a foreign country or international organization to the DDTC and because the EAR does not have the same type of reporting requirement, this may result in increased corruption in arms sales. The same commenter asserted that "in many countries around the world, corruption is rampant within their arms procurement systems, as foreign officials seek to steal funds from their national budgets for their personal gain," so not including a reporting requirement in the EAR may make the corruption worse. The same commenter asserted that under the Commerce May 24 rule, BIS would limit its ability to obtain useful information on U.S. defense companies and prosecute bribery.

*BIS response:* BIS does not agree with these assertions. The Foreign Corrupt Practices Act (FCPA) already prohibits this type of corruption activity and provides a robust regulatory scheme. FCPA applies to all items subject to the EAR, including items that will be moved from the USML to the CCL. Therefore, imposing a separate reporting requirement is not needed under the EAR to prevent this type of illegal activity. BIS highlights here in the preamble of this final rule that any party involved in a transaction "subject to the EAR" must also follow any other applicable U.S. laws, including the FCPA. Questions on the FCPA should be directed to the Department of Justice and the U.S. Securities and Exchange Commission (SEC).

### Commenters Asserting Burdens Will Be Reduced (for Purposes of E.O. 13771)

*Comment 20:* A firearms trade association commenter asserted that "it has reviewed the proposed rule thoroughly with its membership . . . and most members have told it that the final versions of the rules would eventually be beneficial because they would significantly reduce the overall burden and cost of complying with controls on the export of commercial firearms and ammunition." This trade association noted that "[a]ll who responded told us that there would be an initial short-term increase in burden and cost because of the need to re-classify thousands of commodity, software, and technology line items and SKUs affected by the new rules, but that the long-term regulatory burden reduction would significantly outweigh the short-term need to adjust internal compliance programs and practices." One firearms industry trade association commenter noted that most of "its members, particularly the small- and medium-sized companies, believe that the changes will be economically beneficial for them because the eventual regulatory simplification and cost reductions will allow them to consider exporting when they might not have otherwise." Additionally, many small independent gunsmiths commented about the disproportionate negative impact the costs of ITAR compliance had on their businesses. Several commenters asserted that by moving such items to the EAR, many domestic manufacturers who do not export would be relieved of the significant financial burden of registering under the ITAR. One trade association commenter asserted that the costs for their members would be reduced because under the Commerce system, there are no fees to apply for licenses. This commenter also asserted that their burdens would be reduced because the Commerce license application forms are vastly simpler compared to the Department of State license application forms.

One commenter asserted that "one of the benefits under the EAR will be that controls on less sensitive and widely available basic parts, components, and technology are more tailored and allow for less burdensome trade with close allies through license exceptions." This same commenter also asserted that "sales with regular customers can be combined in to fewer license applications, thus reducing overall paperwork to achieve the same policy objectives."

One trade association commenter asserted that these changes "will lead to growth for U.S. companies, more jobs in the United States, and related economic benefits for the cities and states where the members reside while accomplishing the same national security and foreign policy objectives they have always had." One commenter asserted that the items being moved to the CCL are manufactured in many parts of the world and that by engaging more with the world, U.S. firearms manufacturers will improve their knowledge and capability. One commenter that identified himself as a U.K. citizen, who often travels to the U.S. and visits sporting goods stores, asserted that the price of certain items, *e.g.,* cartridge cases and bullets, are less than half the price charged in the U.K. The commenter asserted, "fix this and U.S. manufacturers will see a significant increase in demand from U.K. based firearms owners."

*BIS response:* BIS agrees that the Commerce May 24 rule would reduce the overall regulatory burden of complying with U.S. export controls, including through regulatory simplification and cost reductions that may allow certain persons, *e.g.,* small independent gunsmiths, to consider exporting when they might not have otherwise because of the economic burden of complying with the ITAR. One of the strengths of the EAR control structure is its focused approach on exports without unduly burdening persons that are not a party to an export transaction. Not requiring domestic manufacturers to register with BIS is a good example of the more focused EAR controls. The fact that BIS does not charge a registration fee to be able to apply for a Commerce license is another financial benefit.

The EAR is a more tailored control structure, and this more flexible control structure will reduce burdens and create more opportunities to export. One of the key benefits of the more flexible Commerce licensing processes is the ability for applicants to combine multiple transactions on license applications for sales to regular customers. Because BIS does not require a purchase order, the overall number of licenses an exporter may need to submit is reduced.

The changes included in this final rule may lead to increased sales opportunities for U.S. exporters and related economic benefits for the United States, while also accomplishing the same national security and foreign policy objectives of the U.S. export control system. Because of the more flexible EAR control structure, parties outside the U.S. may want to purchase more items, such as ECCN 0A501.x parts or components that were previously avoided because of no *de minimis* eligibility under the ITAR. This rule might also lead to increased export activity because parties outside the U.S. may import more U.S. origin firearms because of the more flexible Commerce licenses that do not require a purchase order. Importantly, any additional exports that may occur are the same types of exports that would have been otherwise approved under the ITAR.

As asserted by some of the commenters, the changes made by this final rule may help to foster innovation in the United States by encouraging collaboration with companies outside the United States, and this may lead to better U.S. products. They may also encourage more people to be interested in purchasing items from the United States.

*Commenters Asserting Burdens Will Not Be Reduced (for Purposes of E.O. 13771)*

*Comment 21:* One anonymous commenter asserted that moving these items to the CCL would create a small cost-savings for its company in registration and licensing fees, but the commenter did not see a demonstrated equivalent in terms of paperwork reduction or real time savings. This commenter asserted that the issue for small companies having to pay the registration fees due to their manufacturing activities is better resolved by changing the definition of manufacturer to add a minimum size requirement. The same commenter asserted that the EAR does not include a concept of defense services and the technology controls are more narrowly focused and apply in limited contexts as compared to the ITAR, and this change represents an improvement in terms of the commenter's ability to share information needed for marketing firearms and for repairing them internationally. However, this commenter asserted that the same result could be achieved via amendment to the ITAR. The same commenter asserted that ''the improvements and savings are quantified using the 43.8 minutes for BIS application vs. the 60 minutes for DDTC application and that this metric provides no meaningful data from which to extrapolate total process savings or if any is really generated.'' This commenter also asserted that other additional burdens proposed in the Commerce May 24 rule also need to be accounted for, *e.g.,* increasing the quantity and type of data elements which will be required for AES filing. The same commenter asserted that there will be burdens and expenses of transition related to reclassification of all products, re-training of all employees, and advanced training needed for compliance personnel. The commenter acknowledged that it understands this burden is considered short term; however, the commenter asserted that the benefits of moving these items to the CCL still has not been adequately explained to justify these short-term burdens. This same commenter asserted that other than utilizing a different application form and the change in the agency receiving applications, it has not been demonstrated exactly what, if any, process improvement this represents.

*BIS response:* While this commenter did not anticipate significant cost or burden reduction from the transition to the EAR, most other commenters addressing these issues anticipated more significant benefits. The reform effort is not intended to make the ITAR the same as the EAR; this would not be warranted because the more restrictive ITAR controls are needed to regulate items such as fighter aircraft, submarines, and intercontinental ballistic missiles. BIS agrees that the more focused EAR technology controls will ease burdens, but still appropriately control technology for these items.

BIS does not agree with the assertion that the way the cost savings were calculated in the Commerce May 24 rule provided no meaningful data to extrapolate total process savings. Many commenters asserted that they believed their burden would be reduced by moving these items to the CCL. This commenter is correct that other commenters expressed concerns about individuals being required to file EEI in AES for exports under License Exception BAG of their personally owned firearms, and concerns about including the serial number, make, model number, and caliber of firearms in the EEI in AES. However, this final rule significantly reduces these burdens. For example, this final rule requires the U.S. Customs and Border Protection (CBP) Certification of Registration Form 4457, a form already being used by exporters. Therefore, there will be no additional burden because BIS will be requiring information already submitted by exporters to CBP for other reasons. For licensed exports, BIS also eliminated the requirement to file those additional data elements, except for temporary exports or when the Commerce license includes a condition requiring it, similar to the approach Department of State takes with provisos on its licenses.

BIS acknowledges that there will be some short-term adjustment costs. BIS also acknowledges that the EAR is a more complex control structure because with greater flexibility there is a need for additional nuances in the control structure. BIS disagrees that the rationale for the transition was not clearly demonstrated in the Commerce May 24 rule.

BIS appreciates this same commenter highlighting a key point of commonality. The commenter is correct that the Commerce license applications will continue to be reviewed by the Departments of State and Defense. This well-established interagency review process specified in both Executive Order 12981 and in the EAR helps to protect U.S. export control interests and ensures that a diversity of interests and agency expertise is being used to review license applications. BIS disagrees that the only difference is a different application. For example, the fact that

an applicant does not require a purchase order under the EAR to apply for a license allows for more companies to compete for business opportunities.

*Licensing Costs*

*Comment 22:* Many commenters asserted that the Commerce May 24 rule would transfer the cost of reviewing applications and processing licenses from gun manufacturers to taxpayers. Many commenters also asserted that with respect to firearms exports, taxpayers and the public at large should be concerned about pressures to cut corners that could result in authorization of irresponsible transfers of firearms, because BIS will not be charging fees for licensing.

*BIS response:* By statute, Congress prohibits BIS from imposing fees for any license application, authorization or other requests. This prohibition applies for submissions in connections with all items subject the EAR and is not specific to the firearms industry. BIS has effectively licensed items for several decades based on the fee free license construct that was included in the Commerce May 24 rule and in this final rule.

### Comments Specific to the Regulatory Text

*Inclusion in the "600 Series"*

*Comment 23:* One commenter requested BIS include semi-automatic firearms and related items in the "600 series" instead of in 0x5zz ECCNs.

*BIS response:* BIS does not agree. As was stated in the Commerce May 24 rule and discussed above in response to the comments, the semi-automatic firearms this final rule adds to ECCN 0A501.a have a significant worldwide market in connection with civil and recreational activities such as hunting, marksmanship, competitive shooting, and other non-military activities. For these reasons, the movement of firearms and ammunition from USML Category I and III, similar to the civilian spacecraft and related items moved from the USML and controlled on the CCL under 0x515 ECCNs, do not warrant being controlled under the "600 series."

*New ECCN 0A501: Firearms and Related Commodities*

*Comment 24:* One commenter identified an inconsistency between the Commerce May 24 rule in the "Related Controls" paragraph that stated magazines with a "capacity of 50 rounds or greater" are "subject to the ITAR." However, the proposed USML Category I(h)(1) referenced only magazines and drums with a "capacity greater than 50 rounds."

*BIS response:* This final rule corrects the EAR text to make it clear that magazines with a "capacity of greater than 50 rounds" are subject to the ITAR.

*Comment 25:* One commenter asserted there had been past issues of interpretation under the ITAR for what was meant by "complete breech mechanism" and therefore the commenter recommended defining the term under the EAR.

*BIS response:* BIS accepts the change to include a definition of "complete breech mechanisms." This final rule will add a definition for "complete breech mechanisms" to part 772 and will add double quotation marks around the term where it is used in ECCNs 0A501 and 0A502.

*Comment 26:* One commenter took issue with the use of the term "assault weapons" or "close assault weapons." This commenter asserted that the terms should be defined, or not used. This commenter requested the term "semi-automatic" rifles, pistols, or other firearm be used instead.

*BIS response:* BIS agrees and has removed the term "assault weapons" in this final rule and instead uses the term "semi-automatic," which better aligns with the terms used in the control parameters.

*Comment 27:* One commenter recommended BIS define "firearm" in harmonization with the USML.

*BIS response:* BIS does not agree the term "firearm" needs to be defined in the EAR. The term "firearms" is used in this final rule with additional technical parameters or ECCN identifiers, *e.g.,* 0A501.a, that will enable identification of these firearms. BIS does not believe the use of the term "firearms" will create confusion with the USML or the USMIL.

*Comment 28:* One commenter noted an inconsistency in the way calibers are described in the control lists under the Commerce May 24 rule. In USML Categories I and II, firearms and guns are described as "caliber .50 inclusive (12.7 mm)" and "greater than .50 caliber (12.7 mm)," respectively. In new ECCN 0A501, firearms are described in "items" paragraph .a and .b as "of caliber less than or equal to .50 inches (12.7 mm)" and "with a caliber greater than .50 inches (12.7 mm) but less than or equal to .72 inches (18.0 mm)," respectively. This commenter asserted that the caliber terms not being aligned between the control lists could cause confusion and misinterpretation of the controls between the USML and CCL, particularly in regard to the ammunition controls which follow the respective firearm controls.

*BIS response:* BIS notes that the intent of this final rule is to transfer those items previously controlled under Categories I–III that no longer warrant ITAR control, to the respective ECCNs as created under this rule to the CCL by using long-accepted industry standards of "caliber" as the defining delineation between ammunition types. BIS made changes in this final rule to use the appropriate text in this final rule to be consistent with the text used in the USML, so that .50 caliber ammunition and .50 caliber firearms will transition into their proper 0x5zz ECCNs. For example ECCN 0A501, includes all non-automatic and semi-automatic ".50 caliber (12.7mm) and less" firearms under "items" paragraph .a.

*Comment 29:* One commenter was concerned that with the proposed description of caliber in inches in ECCN 0A501, ammunition for .50 caliber Browning Machine Guns ("50 BMG") would be controlled under both 0A505 and USML Category III creating overlapping controls.

*BIS response:* BIS clarifies in this final rule that ECCN 0A501 includes all non-automatic and semi-automatic "equal to .50 caliber (12.7mm) and less" firearms under "items" paragraph .a. Therefore, this final rule also would not control the 50 BMG under ECCN 0A501.a. However, the corresponding ammunition which is used in a number of non-automatic and semi-automatic firearms will be controlled under 0A505.a, when not linked or belted.

*Comment 30:* Some commenters requested BIS revise Note 3 to 0A501 so that the definition of antique firearms is aligned with the Wassenaar Arrangement controls or alternatively that the date threshold in the definition of antique firearm in Note 3 be changed from 1890 to 1898 to align with the ITAR's exemption.

*BIS response:* BIS does not agree. Because this rule focuses on the export of firearms, it uses the year 1890 so that the United States remains consistent with its international export control commitments under the Wassenaar Arrangement, which uses 1890 as the cutoff year to identify many firearms and armaments that are not on the control list.

*Comment 31:* One commenter requested that BIS clarify where combination firearms would be controlled, noting that neither ECCN 0A501 (firearms) nor ECCN 0A502 (shotguns) refer to firearms that are a combination of shotgun and rifle, *i.e.,* that have two barrels.

*BIS response:* BIS agrees, and in this final rule adds a note to clarify that combination firearms are controlled

under ECCN 0A501.a. This final rule also adds a note under ECCN 0A502 to specify that all shotguns and ''shot-pistols'' are controlled identically.

*Comment 32:* One commenter sought clarification on the classification of detachable magazines for ECCN 0A501 firearms with a capacity of less than or equal to 16 rounds. The commenter asserted that ECCN 0A501.d explicitly lists magazines with a capacity of greater than 16 rounds, but it was not clear whether magazines with a lesser capacity are designated as EAR99 or controlled under 0A501.x.

*BIS response:* BIS agrees, and this final rule adds a new note to paragraph .d to clarify that magazines with a capacity of 16 rounds or less are classified under ECCN 0A501.x.

*Comment 33:* One commenter asserted that as currently proposed, paragraph .x would apply to parts and components specially designed for a commodity classified anywhere on the USML. This commenter recommended revising as follows: ''Parts'' and ''components'' that are ''specially designed'' for a commodity classified under paragraphs .a through .c of this entry or USML Category I and not elsewhere specified on the USML or CCL.

*BIS response:* BIS does not agree that a change is needed. Because some of the parts and components controlled under ECCN 0A501.x may be for firearms incorporated into a fully automatic firearm that is incorporated into a military vehicle (a USML Category VII commodity), the broader reference to the USML is more appropriate. The USML Order of Review and CCL Order of Review will ensure that only those parts and components intended to be classified under ECCN 0A501.x will be classified under this ''items'' paragraph.

*Comment 34:* One commenter requested revising paragraph 0A501.y by replacing the period at the end of the paragraph with the phrase ''including'' or ''as follows:'' In order to clarify whether .y is limited to the enumerated .y paragraphs, or itself is a control paragraph in which items can be controlled.

*BIS response:* BIS clarifies that the .y listings are exhaustive, and to be classified in a .y paragraph, the item needs to meet the identified description and the definition of ''specially designed.''

*Comment 35:* One commenter requested clarification of whether the .y paragraph itself serves as a catch-all for ''parts,'' ''components,'' ''accessories,'' and ''attachments.'' For example, a set of fiber-optic sights for a pistol are not

''iron sights'' as listed in .y.3, but may be a ''specially designed'' ''attachment.''

*BIS response:* BIS agrees that the introductory text of ECCN 0A501.y needs to be revised to clarify that the ''parts,'' ''components,'' ''accessories,'' and ''attachments'' ''specially designed'' therefor for the .y items are also controlled in the .y paragraphs. This final rule makes this change. BIS had previously made this same correction to the other .y paragraphs on the CCL to ensure, for example, that ''specially designed'' parts used in ''specially designed'' galleys classified under ECCN 9A610.y for military aircraft, would not be controlled in 9A610.x.

*Comment 36:* One commenter asserted that ECCN 0A501.y contains three types of commodities that have been officially determined to be EAR99 for many years: (i) .y.2—scope mounts and accessory rails; (ii) .y.3—iron sights; and (iii) .y.4—sling swivels. This commenter requested that the parts in .y paragraphs .y.2, .y.3, and .y.4 be removed from ECCN 0A501 and a note be added to confirm that they remain EAR99 items.

*BIS response:* BIS does not accept this change because it only works if the past CJs covered those items and all variants. Paragraph (b)(1) of ''specially designed'' and General Order No. 5 would not be applicable to those items not included within the scope of a CJ—meaning an item may get pulled up into .x. Therefore, to address this issue definitively this final rule keeps these items as .y items.

*License Exception LVS*

*Comment 37:* BIS received a number of comments on License Exception LVS eligibility. Some commenters supported its availability, though one commenter suggested that wholesale value rather than actual value should be used while another commenter requested higher value shipments should be authorized to Canada. One commenter recommended pegging the LVS dollar value to inflation to allow for incremental increases to match price increases over time. One commenter requested that Canada should have all of its LVS eligibility specified in its own LVS paragraph in the ECCN, distinguishing Canada's eligibility from other Country Group B countries. Some commenters raised concerns related to License Exception LVS availability, asserting that it would not curb risky exports of pistol grips and magazine clips valued at $500, that it is possible for companies or individuals to export many low-value items in one shipment without a U.S. license, and that it could fuel gun violence in Mexico and Central

America. One commenter requested reducing the LVS eligibility under ECCN 0A501 from $500 to $100, and reducing further the commodities that would be eligible.

*BIS response:* BIS agrees that License Exception LVS will be particularly useful for the firearms industry for low value shipments and believes that the license exception is properly scoped in the dollar value used and the scope of availability for the reasons outlined in the Commerce May 24 rule. BIS emphasizes as specified in the name of the license exception itself, this license exception is limited to low value shipments. This includes the total quantity for consolidated shipments, even if a shipper was consolidating several shipments. BIS also notes that an exporter is limited to twelve orders per year to the same consignee. The terms of License Exception LVS also strictly prohibit the splitting of orders to try to evade the applicable LVS dollar value. In addition, if there are questions whether an exporter has stayed within the required scope of LVS, EE can require exporters to hand over all the required recordkeeping documents related to a transaction under License Exception LVS to identify whether there has been a violation of the EAR. LVS is not currently linked to inflation, but the public may at any time make recommendations for changes to the regulations, including suggestions for revising the LVS dollar values in an ECCN.

BIS notes that only countries identified in Country Group B are eligible to receive commodities under License Exception LVS. These are countries that the U.S. Government does not have export control concerns with for purposes of the commodities that are eligible to be authorized under License Exception LVS. More sensitive commodities, such as firearms and some key components, are excluded from License Exception LVS. As noted in the Commerce May 24 rule, the ITAR has a similar type of exemption. Relatedly, BIS does not believe Canada-specific provisions are necessary in the License Exception LVS paragraph of ECCN 0A501 to specify all LVS eligibility for Canada in one stand-alone paragraph. First, it would deviate from how LVS is described in other ECCNs. Second, there is the potential that an exporter may get confused and believe LVS is available for other Country Group B countries because the same commodities were identified in more than one LVS paragraph.

Finally, it is important to note that the importing country will also have its own requirements for imports and

domestic sale and use, including for commodities such as pistol grips. While someone like a jeweler or other craftsman in the U.S. (*e.g.,* a hobbyist who enjoys engraving pistol grips with western cowboy motifs) could use License Exception LVS, it would not be available for larger transactions, such as someone wanting to export to a retail store in a foreign country.

*New ECCN 0A502: Shotguns and Certain Related Commodities*

*Comment 38:* One commenter requested revising the heading of ECCN 0A502 to specify the parts and components enumerated in the heading are shotgun parts and components.

*BIS response:* BIS agrees, and this final rule revises the heading to specify that parts and components enumerated in the heading of ECCN 0A502 are shotgun ''parts'' and ''components.'' BIS also makes one other change to address the issue of clarity raised by this commenter. This final rule adds a note to ECCN 0A501 to specify that ''shot-pistols'' will be controlled as shotguns.

*Comment 39:* One commenter requested that rather than having the items controlled contained in the ECCN heading, BIS should enumerate the shotguns in separate ''items'' paragraphs that track with the different reasons for control for the different size shotguns in the ''items'' paragraph to ease the compliance burden for exporting these shotguns.

*BIS response:* BIS does not agree. The license requirement section in this final rule is already consistent with the current control text, applying CC Column 2 and CC Column 3 as appropriate depending on the destination. BIS already uses this structure for long barreled shotguns, which this final rule moves to ECCN 0A502.

*Comment 40:* One commenter requested that the final rule define antique shotguns in ECCN 0A502 to capture those guns made ''in or before 1898,'' consistent with the definition of antique rifles and handguns in the Gun Control Act of 1968.

*BIS response:* BIS agrees, and this final rule adds a new Note 1 to 0A502 specifying that shotguns made in or before 1898 are considered antique shotguns and designated as EAR99.

*Comment 41:* One commenter requested BIS clarify the control status of accessories of optics, *e.g.,* sunshades or other anti-glare devices.

*BIS response:* BIS clarifies that sunshades or other anti-glare devices if not enumerated or otherwise described in ECCN 0A502 or any other ECCN are designated as EAR99.

*Comment 42:* One commenter requested that the description in the ''Related Controls'' paragraph of ECCN 0A502 be made consistent with how such shotguns are referred to in the revised USML Category I.

*BIS response:* BIS agrees, and this final rule removes the phrase ''combat shotguns'' wherever it appears in ECCN 0A502, including in the ''Related Controls'' paragraph. BIS in this final rule also removes references to ''combat shotguns'' in ECCN 0A505.

*Comment 43:* One commenter requested in order to have consistent controls and exceptions for similar commodities, that BIS allow the use of License Exception LVS for ECCN 0A502 parts and components to the same extent proposed for 0A501, *e.g.,* for shotgun trigger mechanisms, magazines, and magazine extensions.

*BIS response:* BIS agrees, and in this final rule revises the LVS paragraph in the License Exceptions section of ECCN 0A502 to add LVS eligibility of $500 for the same types of parts and components for ECCN 0A502 shotguns that are available for LVS under 0A501. Complete shotguns will continue to be excluded.

*Comment 44:* One commenter asserted that to facilitate the use of License Exception LVS, the ECCN 0A502 heading should be changed to ''Shotguns and related commodities (See List of Items controlled) . . .'' and then under the ''List of Items Controlled'' parts and components should be enumerated to include ''complete trigger mechanisms,'' ''magazines,'' and ''magazine extension tubes.''

*BIS response:* BIS does not agree. BIS in this final rule continues to enumerate ''parts'' and ''components'' in the heading, but in the interest of clarity it also includes the specific eligible commodities in the LVS paragraph.

*New ECCN 0A504: Optical Sighting Devices and Certain Related Commodities*

*Comment 45:* One commenter asserted that the proposed Note 1 to 0A504.f states that ''0A504.f does not control laser boresighting devices that must be placed in the bore or chamber to provide a reference for aligning the firearms sights.'' This commenter asserted there are a variety of boresighting devices that are placed over the muzzle of the barrel instead of inside the bore or chamber and perform the same function as those described in the note. For these reasons, the commenter requested that this Note be revised to read as follows: ''0A504.f does not control laser boresighting

devices that provide a reference for aligning the firearms sights. This includes any laser boresighting device, regardless of how it attaches to the firearm (*e.g.,* boresights that fit over the muzzle of the barrel), which performs the same function.''

*BIS response:* BIS does not agree. Revising Note 1 to 0A504.f would make it difficult to distinguish between what the commenter is proposing and a laser pointer. The note included in this final rule makes it clear that those commodities that are placed inside a bore or chamber would preclude its subsequent use as or with a firearm.

*Comment 46:* One commenter requested License Exception LVS should be made available for ECCN 0A504.g commodities that are similarly insignificant as those commodities eligible in ECCN 0A501.

*BIS response:* BIS agrees, and this final rule includes License Exception LVS eligibility for ''parts'' and ''components'' classified under ECCN 0A504.g.

*New ECCN 0A505: Ammunition and Certain Related Commodities*

*Comment 47:* One commenter recommended revising ECCN 0A505.a to include ammunition for firearms controlled in USML Category I that may not otherwise be captured by adding the phrase ''or USML Category I'' to clarify that ammunition for these type of firearms is also controlled under ECCN 0A505.a.

*BIS response:* BIS agrees, and this final rule incorporates the suggested text to clarify that ammunition for firearms in both ECCN 0A501 and USML Category I will be controlled under 0A505.a, provided it is not enumerated elsewhere in 0A505 or in USML Category III.

*Comment 48:* One commenter requested BIS revise ECCN 0A505 to include a note similar to the Note to 0A018.b to specify that dummy ammunition is designated EAR99.

*BIS response:* BIS agrees, and this final rule adds a Note 4 to 0A505 to specify that all dummy and blank (unless linked or belted) ammunition, not incorporating a lethal or non-lethal projectile(s) is designated EAR99.

*Comment 49:* One commenter asserted that there are several magazine manufacturers in the U.S. producing magazines of greater than 50 rounds that would benefit from also having their magazine moved to the CCL. This commenter asserted that limiting this magazine capacity to 50 rounds or less does not protect any special U.S. or allied military advantage, but magazines

of greater than 50 rounds are commonly found and manufactured worldwide.

*BIS response:* BIS does not agree. Magazines with a capacity of 50 rounds or less are appropriate on the CCL, and magazines greater than 50 rounds warrant ITAR control.

*Comment 50:* One trade association commenter noted that proposed ECCN 0A505 included an allowance for License Exception LVS of $100 for 0A505.x "parts" and "components," but that firearm parts and components under 0A501 have an LVS allowance of $500. This commenter asserted that its members feel this is an inconsistency in the treatment of related commodities. The commenter asserted that in recent years, costs related to ammunition components have been increasing, with the largest increases affecting larger caliber cartridges. This commenter asserted that the "$100 limit on LVS will be quickly met with small amounts of components, making this exception not as useful as intended." Another commenter asserted that the ITAR allows for $500 per shipment, so $100 net under EAR would be more restrictive than ITAR exemption.

*BIS response:* While the ITAR does not have an exemption for exports of ammunition parts and components, BIS agrees, and this final rule raises the LVS dollar value from $100 to $500 for ECCN 0A505.

*New ECCN 0A602: Guns and Armament*

*Comment 51:* One commenter suggested revising ECCN 0A606 to clearly identify engines for self-propelled guns and howitzers as controlled therein rather than in 0A602.

*BIS response:* BIS notes that the USML Order of Review and CCL Order of Review would likely already address this. However, this final rule adds a Related Controls paragraph (3) and a new note to ECCN 0A602.x to clarify the appropriate classification, but it does not add such a note to ECCN 0A606.

*New ECCN 0B501: Test, Inspection and Production Equipment for Firearms*

*Comment 52:* One commenter requested guidance on what is the definition of production equipment under ECCN 0B501.e. This commenter asserted that it has "many hobbyist customers who would not qualify as a gunsmith let alone as a manufacturer and tools and equipment designed for hobbyists are quite different than manufacturing equipment . . . yet we have a concern these tools will be included in 0B501.e because even the hobbyist is 'producing' a firearms part."

*BIS response:* The term "production" is a defined term in part 772.

"Production" means all production stages, such as: Product engineering, manufacture, integration, assembly (mounting), inspection, testing, and quality assurance. Part 772 also includes a definition of "production equipment" that includes tooling, templates, jigs, mandrels, moulds, dies, fixtures, alignment mechanisms, test equipment, other machinery and components therefor, limited to those specially designed or modified for "development" or for one or more phases of "production." The definition of "production equipment" in part 772 applies only in the Missile Technology Control Regime context, but for purposes of this comment, the definition of "production" and the definition of "production equipment" provides the needed guidance. BIS also emphasizes that the person using the production equipment does not change the classification of the production equipment. Importantly, domestic use— that is use of production equipment in the United States—does not implicate export controls.

*Comment 53:* One commenter requested BIS ensure there were no gaps for the production equipment controls on the CCL for USML Category I items as well as Category III items.

*BIS response:* BIS agrees. To ensure there are no gaps in production equipment for USML Category I, this final rule expands ECCN 0B501.e to include all production equipment "specially designed" for USML Category I items. It also expands ECCN 0B505.a to include all production equipment "specially designed" for USML Category III items.

*New ECCN 0B602: Test, Inspection and Production Equipment for Certain Guns and Armament*

*Comment 54:* One commenter requested adding examples of specific tooling that would be controlled under ECCN 0B602, such as a note including ECCN 0B602 boresights and units made specifically for testing purposes.

*BIS response:* BIS does not agree to this addition. As described above, part 772 defines "production" and "production equipment," so these existing definitions already address this comment.

*New ECCN 0E501: Technology for Firearms and Certain Related Items*

*Comment 55:* One commenter requested BIS clarify how "technology" is defined for 0E501 and whether shooting chronographs or empty brass cartridge annealing machines are included in the definition of "technology."

*BIS response:* BIS clarifies that the definition of "technology" in part 772 applies to ECCN 0E501 and any other Product Group E ECCNs on the CCL, including the other Product Group E ECCNs this final rule adds, *e.g.,* 0E505. In addition, BIS clarifies that shooting chronographs or empty brass cartridge annealing machines are end items and generally designated EAR99. Therefore, the examples given fall outside the Commerce definition of "technology."

*Comment 56:* BIS received a number of comments on the concept of "defense services," including concerns about the lack of defense services controls under the EAR, the potential loss of U.S. Government oversight on many types of defense services, and concerns about firearms training being provided to foreign security forces without U.S. Government approval. There were also concerns raised about the ability of U.S. companies to provide a wide range of assistance and training to foreign persons without sufficient U.S. oversight and a suggestion that the definition of "technology" be expanded to capture these defense-service type activities, such as private security contractor training of foreign police with firearms. One commenter asserted that "the proposed rule could also create an unfortunate scenario where U.S. private security contractors are able to provide services to foreign security units or militias that are otherwise prohibited from receiving training through U.S. foreign security aid."

*BIS response:* BIS clarifies that defense services is specific to the ITAR, but the EAR maintains controls related to exports, reexports, and in-country transfers of commodities, software, and technology in a number of ways. For example, a U.S. person is prohibited from engaging in exports, reexports, or in-country transfers related to certain end uses (as specified in § 744.6) or a "knowing" violation (as specified in §§ 764.2(e) and 736.2(b)(10)). In addition, as part of providing a service, a person must determine whether there will be an export, reexport, or in-country transfer of any commodities, software, or technology requiring an EAR authorization. Accordingly, although the EAR generally does not control services directly, the EAR is still highly effective at protecting U.S. export control interests implicated by the supply of services in connection with exports, reexports, or in-country transfers. The effectiveness comes by controlling the technology—*e.g.,* "technology" for how to produce a firearm. The release of technology is the key nexus where providing a service crosses over into a transaction that is

subject to the EAR and that merits control. In most cases, the analysis will focus on whether any technology that is subject to the EAR will be released as part of providing the service. The release of technology moved from USML Categories I–III will require a U.S. Government authorization, except for 0E602 technology being exported to Canada which may be exported No Licensed Required (''NLR'').

For example, providing design and development assistance, testing, and production assistance on firearms and ammunition to foreign persons would be a release of ''technology'' subject to the EAR and require an EAR authorization, unless the information being released fully met the criteria in part 734 for exclusion from the EAR. The EAR requirements would apply if the technology was being exported. The EAR requirements would also apply if the technology was being released in the United States to a foreign national as a deemed export, including technology released through training.

BIS cautions against assuming that no U.S. Government authorization is required to provide training to foreign security forces. Providing military training of foreign units and forces would still be a defense service regulated by the ITAR. Questions on whether a specific service may be a defense service should be directed to the Department of State. For purposes of the EAR, as described above, the question centers on whether any items that are subject to the EAR are provided as part of that service, and if such items are related to firearms, then U.S. Government authorization will be required.

BIS notes that if an item, such as the firearms moved to the CCL in this final rule, is being exported under the Foreign Military Sales (FMS) program, those items are not ''subject to the EAR''—meaning the EAR would not apply and for purposes of the AECA those items being exported under an FMS letter of offer and acceptance are defense articles subject to State Department controls under 22 U.S.C. 2794(3) for the specific transaction. BIS also notes that for non-FMS U.S. foreign security aid, the granting U.S. organization can include provisos as needed as part of the aid agreement that imposes any necessary restrictions the aid granting U.S. agency believes is warranted. In addition, BIS through the licensing process can impose conditions as warranted on licenses to ensure consistency with other requirements as needed. As noted above, the Department of State is a licensing review agency for Commerce licenses and can advise on

Commerce export licenses as warranted if additional conditions may be needed in furtherance of a direct commercial sale as part of U.S. foreign security aid.

*Comment 57:* One commenter asserted that because of the narrowness of the definition of ''required,'' it ''means companies may be able to provide a wide range of training activities, design and development assistance, testing, and production assistance on firearms and ammunition to foreign persons without sufficient scrutiny and oversight.''

*BIS response:* BIS does not agree. The term ''required'' is an EAR defined term and is a well understood concept used on the control lists of the multilateral export control regimes. The EAR has effectively controlled ''technology'' for various other sensitive and sometimes lethal items using the existing definition and concept of ''required.''

*Comment 58:* One commenter asserted that ''in 2016, U.S. registration for firearms manufacturing activities was deemed so important that DDTC issued specific guidance providing that a broad range of activities (*e.g.,* use of any special tooling or equipment upgrading in order to improve the capability of assembled or repaired firearms, and rechambering firearms through machining, cutting, or drilling) constitute ''manufacturing'' and required registration.'' This commenter asserted it was concerned because this 2016 guidance will not apply to Category I–III items moving to the CCL.

*BIS response:* BIS clarifies that individuals have been able to lawfully make their own firearms in the United States, but not for reselling. ATF licenses domestic manufacturers. The types of gunsmithing services described by this commenter are not considered ''production'' under the EAR.

### Revision to ECCN 0A018

*Comment 59:* Some commenters requested removing ECCN 0A018 and transferring those commodities to 0A505, so all commercial firearms, ammunition, and related items could be in one of the series of new 0x5zz ECCNs and not be left behind in legacy xY018 entries. The commenter suggested that once the items in the proposed ECCN 0A018.b are moved to 0A505, and controlled in the same manner, then 0A018 could be removed. Another commenter requested the commodities classified in ECCN 0A018.b for ''specially designed'' components should be controlled under 0A505.x. The commenter also requested that the decontrol note in ECCNs 0A018.b be transferred to 0A505 so that the current

EAR99 status of such items is maintained.

*BIS response:* BIS agrees with these requested changes. This final rule removes the items controlled under ECCN 0A018 and adds these commodities to 0A505 but retains the heading of ECCN 0A018 and adds a cross reference to ECCN 0A505. This final rule removes the commodities controlled under ECCN 0A018, because this final rule controls these commodities under 0A505.d or .x. As conforming changes, this final rule removes ECCN 0E018, because 0E505 is broad enough to control this technology and revises the heading of ECCN 0A988 to remove an outdated reference to ECCN 0A018.d.1. ECCN 0A018.d paragraph is reserved in 0A018, so this reference in 0A988 should have been updated in an earlier rule.

BIS clarifies that the control parameters of ECCN 0A505.x in this final rule are broad enough to control commodities classified in ECCN 0A018.b for ''specially designed'' components controlled under 0A505.x. without further revisions. This final rule adds a Note 4 to ECCN 0A505 to address the commenters' request related to the decontrol note in 0A018.

### Conforming Change to General Order No. 5

*Comment 60:* One commenter requested that licenses already granted under the ITAR should be grandfathered for all outstanding transactions.

*BIS response:* BIS clarifies here that this was already addressed with the revisions proposed in the Commerce May 24 rule for General Order No. 5, which adds 0x5zz ECCNs to General Order No. 5 and will be adopted in this final rule. The current General Order No. 5 includes grandfathering provisions and allows for applying for Commerce licenses once a final rule is published, but not yet effective.

### Revisions to Regional Stability Licensing Policy for Firearms and Ammunition

*Comment 61:* Several commenters raised concerns that laws against the provision of arms where certain human rights abuses are of concern may not apply to the 0x5zz ECCNs and that the role of the Bureau of Democracy, Human Rights, and Labor (DRL) at the Department of State would be diminished. One commenter asserted that the Department of State would no longer have a statutory basis for vetoing a proposed sale on human rights grounds for firearms, guns, ammunition, and related parts that move to the CCL.

*BIS response:* As described above, BIS disagrees with the assertion that there

will be less focus on protecting human rights under the EAR. This final rule will control these items for Regional Stability and the license review policy specifies that human rights concerns are considered as part of the license review process. As referenced above, the Department of State is a license review agency for Commerce licenses, and the existing E.O. 12981 and EAR provide that other license review agencies have 30 days for review of Commerce license applications. E.O. 12981 does not specify what parts of those other agencies must review a Commerce license application, but the Department of State has discretion to ensure that DRL receives and reviews Commerce licenses.

This final rule includes a license review policy for regional stability to indicate license applications will also take into consideration human rights concerns, which can be a basis for denial. BIS also notes that there is a presumption of denial policy for license applications involving narcotics traffickers, criminal organizations, and terrorists because of their frequent involvement in human rights abuses, as well as other regional stability concerns.

*Crime Control and Detection License Review Policy*

The Commerce May 24 rule did not propose changes to the crime control and detection license review policy in part 742, but commenters made recommendations in this area that are described and responded to below.

*Comment 62:* One commenter recommended that ''in order to bring the proposed regulations into alignment with provisions of the Foreign Assistance Act [22 U.S.C. 2304(a)(2), which makes explicit reference to crime control equipment under the aegis of the (expired) Export Administration Act], ECCN 0A501.a should be controlled for crime control.''

One commenter requested that BIS provide the police profession a greater, better-defined role in the evaluation of firearm export license applications and possibly form a technical advisory committee (TAC). Another commenter requested that licensing officials should consider the effect of proposed exports on local communities, public safety, peace officer safety, crime control, and control of civil disturbances to assure that the rule of law is not impaired by firearm exports.

One commenter asserted that highly destructive weapons should not be exported to civilians. This commenter recommended ''a maximum limit on firepower exported to civilians. Firearms with a muzzle energy higher than 5,000 Joules should be barred from export to non-government end-users.''

*BIS response:* BIS notes that the NS 1 and FC 1 license requirement included in this final rule for ECCN 0A501.a, as well as ECCN 0A501.b, will ensure U.S. multilateral commitments are met. In addition, the RS 1 license requirement and license review policies is revised in this final rule to further address the types of human rights concerns, as well as imposing a presumption of denial license review policies for certain types of end users of concern, such as narcotics traffickers, will ensure U.S. export control interests are protected and that exports are not approved that would otherwise not be consistent with the Foreign Assistance Act. As was discussed above, the U.S. Government agency granting aid to a foreign country will also have the ability to impose certain provisos as part of that foreign assistance agreement, and all exports made under the FMS programs are authorized by the Department of State. As warranted, there is nothing that will preclude BIS from consulting with other agencies of the U.S. Government regarding a particular license application.

BIS agrees that getting regular input from the police profession and those with expertise from the private sector will be beneficial but notes that this can be accomplished through BIS's existing TACs rather than through the creation of a new TAC. BIS notes that agency rules are regularly reviewed by BIS's EE as well as other agencies with law enforcement components.

BIS does not agree that an outright prohibition is needed to protect U.S. national security and foreign policy interests under the EAR. Imposing such a worldwide prohibition would be more restrictive than how these firearms were regulated under the ITAR and would impose significant burdens on the U.S. firearms industry that may result in significant U.S. job losses in the firearms and related industries. BIS appreciates the time and thought that went into the detailed suggested change, but an outright prohibition was not contemplated in the Commerce May 24 rule, would arbitrarily single out one industry for more restrictive control and is not needed to protect U.S. export control interests, as those interests can be served through the regulatory regime set forth in the EAR.

*License Exception TMP*

*Comment 63:* One commenter requested increasing the number of items allowed for temporary export under § 740.9(a)(5) to 100 per shipment to more closely align with commercial expectations and practices. Another commenter asserted that larger film productions such as war movies, will oftentimes require well beyond 75 firearms.

*BIS response:* BIS does not agree with expanding § 740.9(a)(5) of TMP to allow for 100 firearms per shipment or to address a particular type of export. The exhibition and demonstration authorization under paragraph (a)(5) of License Exception TMP is intended to provide for a sufficient quantity of firearms, and if an exporter needs a larger quantity, *e.g.,* 100 or even 1,000 firearms for exhibition or demonstration, that the exporter may apply for a license to authorize the export. BIS maintains the status quo for how large temporary shipments of firearms are handled under the ITAR, which is through a licensing process that allows BIS to include any additional conditions to ensure the export will not be diverted.

*Comment 64:* BIS received comments requesting modifications to License Exception TMP, including to allow for the use of License Exception TMP (§ 740.9) under paragraph (a)(10) to transfer firearms to affiliates, such as a foreign parent or subsidiary; to allow TMP paragraph (b)(1) to be used to authorize temporary import and subsequent export of items moving in transit through the United States; and to allow for temporary importation for a period of one year. BIS also received a comment requesting extensions of temporary imports imported under paragraph (b)(5) to not be more restrictive than the ITAR.

*BIS response:* BIS does not accept these changes. Under this final rule, an exporter may apply for a license to authorize these same types of exports of firearms to affiliates. In addition, BIS notes that License Exception STA is available for parts and components, *e.g.,* those that this rule will control under ECCN 0A501.x, when the export, reexport, or transfer (in-country) is to a Country Group A:5 country, including affiliates. License Exception STA is more restrictive than paragraph (a)(10) of License Exception TMP, but because of the sensitivity of the items involved it is not appropriate to allow for the paragraph (a)(10) authorization to be available. As for firearms transshipped through the United States, § 740.9 (b)(3), (4), and (5) will be available to authorize the export and will be sufficient to address concerns about such authorizations.

BIS does not accept the suggested change to the time limitation in § 740.9(b)(5) to lengthen it from one year (as included in the Commerce May 24

rule) to four years because one year will be sufficient for these types of temporary end uses in the U.S. For the same reason, BIS also does not accept the suggestion to allow for extensions of temporary imports made under paragraph (b)(5) as suggested by one commenter.

*Comment 65:* One commenter noted that the proposed additions to § 740.9 included an instruction directing temporary importers and exporters to contact CBP at the port of temporary import or export, or at the CBP website, for the proper procedures to provide any data or documentation required by BIS. The commenter suggested that BIS and CBP coordinate to create standardized instructions for all ports that can be made available online, so that each shipment does not have to be specially coordinated.

*BIS response:* BIS agrees and will take steps, in coordination with CBP, to create standardized instructions for all ports that can be posted online prior to the effective date of this final rule.

*Comment 66:* One trade association commenter asserted that ''new paragraph (b)(5) in License Exception TMP and the related provisions in § 758.10 that detail the process for temporary import and subsequent export of these items is fair and reasonable.'' This commenter asserted ''it is common practice to cite the regulatory exception for the temporarily imported commodities at the time of import, then reference the import documents at time of return export of the goods'' and does not believe the process in the Commerce May 24 rule will cause any additional burden to exporters.

*BIS response:* BIS agrees and adopts these provisions in this final rule as proposed.

*Comment 67:* One commenter requests License Exception TMP be expanded beyond paragraphs (a)(5) and (6) to also allow for use in film production for subsequent permanent return to the United States. Alternatively, one commenter requests that BIS should consider a procedure or license, similar to a DSP–73, to allow for the temporary export and re-importation of firearms. Another commenter asserted that BIS should provide additional guidance on the return of temporary exports under the new paragraph (b)(5) under License Exception TMP.

*BIS response:* BIS confirms that License Exception TMP under paragraphs (a)(5) and (6) will not be available in that type of a fact pattern, but a Commerce license could be applied for to authorize these types of exports. As noted above, Commerce licenses are flexible enough to authorize temporary exports that are not otherwise eligible for License Exception TMP. The importation into the United States after temporary export will not require a separate EAR authorization. BIS agrees providing guidance for the import of items temporarily exported will be helpful and clarifies that the import of items temporarily exported does not require an EAR authorization for import.

*License Exception GOV*

*Comment 68:* One commenter asserted that the phrase ''or other sensitive end-users'' is unclear and recommended deleting the phrase or enumerating the specific types of ineligible entities.

*BIS response:* BIS includes a parenthetical phrase in the final rule under the new Note 2 to paragraph (b)(2) to include illustrative examples of other sensitive end-users. This final rule adds the parenthetical phrase ''(*e.g.,* contractors or other governmental parties performing functions on behalf of military, police, or intelligence entities)'' after the phrase ''or other sensitive end-users'' to provide greater clarity on the other end-users that are excluded.

*License Exception BAG*

*Comment 69:* Several commenters expressed opposition to the requirement for individuals to have to file in AES for personally owned firearms and ammunition exported under License Exception BAG, that was included in the Commerce May 24 rule. The commenters expressed concerns that requiring individuals to file in AES is problematic and unduly burdensome; that there is not a genuine need for this information and would violate the spirit of congressional prohibitions against Federal firearm registries; and that Department of State and CBP already tried requiring AES filing for individuals under the ITAR and it was not workable. Commenters identified a number of issues with the AES filing system for individuals, including the cost to create accounts, the compatibility of the hardware and software, concerns that IRS and Census requirements are in conflict, and the mismatch of required information for individuals with the fields that are currently in AES that are oriented to commercial exports.

For these reasons described above, several commenters requested use of CBP Form 4457 as the permanent solution. Some commenters asserted that CBP Form 4457 serves an important purpose for some foreign governments, but could be improved by harmonizing CBP procedures for Form 4457 between different CBP offices to ensure the forms are being issued consistently. Some commenters asserted that they would support a simplified system that would be based on U.S. passports, possibly linked to an electronic version of the CBP Form 4457.

*BIS response:* BIS was aware of these types of concerns, including the recent history of this issue under the ITAR. The Commerce May 24 rule stated that whether and how BIS includes this requirement in a final rule would be based on whether CBP is able to update its processes, and other agencies as needed, to allow for individuals to easily file EEI in AES by the time a final rule is published. The Commerce May 24 rule also noted that if CBP is not able to do so, then the final rule may direct exporters to continue to use CBP's existing process, which is the use of the CBP Form 4457, until a workable solution is developed or CBP suggests an alternative simplified solution for gathering such information for temporary exports of personally-owned firearms and ammunition.

At this time, BIS notes that CBP and the U.S. Census Bureau have not made changes to the AES system on the Automated Commercial Environment (ACE) that would address the concerns expressed. Therefore, taking that into account and the comments received on the Commerce May 24 rule, this final rule does not adopt the requirement for individuals exporting their personally owned firearms and ammunition under License Exception BAG to file in AES. Instead, this final rule incorporates the requirement for individuals to file the CBP Form 4457. BIS notes that if CBP and the U.S. Census Bureau later adopt changes that would address the underlying issues, or if CBP adopts changes to the process for submitting the CBP Form 4457, then BIS would make conforming changes to the EAR.

*Comment 70:* BIS also received comments expressing concern over the availability of License Exception BAG for firearms. One commenter requested that the provision authorizing license-free exports of semi-automatic rifles by citizens and legal permanent residents should be removed, because a sufficient justification was not provided in the Commerce May 24 rule. Another commenter asserted that if a firearm is stolen or lost that is exported under License Exception BAG, there will be little that can be done to recover the weapon. The commenter also asserted it will be easier for smugglers to take advantage of License Exception BAG to facilitate trafficking. One commenter

expressed concern that foreigners temporarily in U.S. will abuse License Exception BAG. One commenter asserted that the May 24 rule would not stop non-resident aliens leaving the United States via commercial airlines from taking firearms "accessories," "attachments," "components," "parts," and ammunition with them.

*BIS response:* BIS acknowledges these concerns but disagrees that additional changes to this final rule are warranted. The availability of License Exception BAG will be made to be consistent with 22 CFR 123.17(c), which authorizes U.S. persons to take up to three non-automatic firearms and up to 1,000 cartridges therefor abroad for personal use. As far as the potential for items to be lost or stolen, License Exception BAG requires the exporter to maintain control of their personal belongings and to return with those items unless destroyed overseas and the requirements are more straightforward than a commercial transaction in which there are multiple parties. BIS notes that related to loss or theft the concern applies equally if a firearm was exported under a Commerce license. Further, the U.S. Government maintains oversight through the requirement in this final rule for the CBP Form 4457 to be filed, along with the export requirements to present the firearm to CBP prior to export under License Exception BAG. In addition, this final rule requires the serial number, make, model, and caliber of the firearm to be included on the CBP Form 4457. When the U.S. citizen or permanent resident alien returns, the U.S. Government expects and requires that the same firearm to be returned as included on the CBP Form 4457. Failure to comply with these requirements could subject a U.S. citizen or permanent resident alien to administrative and/or criminal penalties depending on the specifics of the potential violation. BIS notes that License Exception BAG for non-resident aliens will be limited to allowing nonresident aliens leaving the United States to take firearms, and ammunition controlled by ECCN 0A501 or 0A505 that they lawfully brought into the United States, under the provisions of Department of Justice regulations at 27 CFR part 478. This is an important safeguard to ensure that the items being exported under License Exception BAG are limited to those that were lawfully brought into the U.S. The availability of License Exception BAG for these non-resident aliens will also be consistent with 22 CFR 123.17(d), which authorizes foreign persons leaving the United States to take firearms and

ammunition controlled under Category I(a) of the USML (both non-automatic and semi-automatic) that they lawfully brought into the United States. The export of "accessories," "attachments," "components," and "parts" is not eligible for License Exception BAG and would require a separate U.S. Government authorization.

*Comment 71:* One commenter noted that § 740.14(c)(1) "Limits on eligibility" currently states that the items must be "owned by" the individuals rather than ITAR § 123.17(c)(3)'s focus on the person's "exclusive use" and recommended conforming the EAR with the ITAR's scope.

*BIS response:* BIS does not agree. The requirements in § 740.14(c)(1) apply to all items that subject to the EAR that are eligible, so these requirements are intended to be broader than the exclusive use limitation in paragraph (e) (Special provisions for firearms and ammunition).

*Reporting Requirements*

*Comment 72:* BIS received a number of comments related to reporting requirements. One commenter asserted that it appears that requiring conventional arms reporting for firearms to be controlled under ECCN 0A501.a and .b would add welcomed specificity to reports required by the United Nations and the Wassenaar Arrangement while another commenter was concerned that firearms are being singled out for conventional arms reporting. One commenter asserted that exporters should not have to submit reports under the conventional arms reporting for the Wassenaar Arrangement and the United Nations because BIS already has ways to obtain this information from other U.S. Government sources.

*BIS response:* BIS agrees that the conventional arms reporting requirements will improve transparency and meet U.S. Government multilateral commitments to the Wassenaar Arrangement and the United Nations. BIS notes that other USML Categories that were revised that moved items to the CCL under "600 series" and 9x515 ECCNs were not identified under the Wassenaar Arrangement or United Nations List for requiring reporting for conventional arms. Some of the USML Category I items being moved to the CCL are identified under the Wassenaar Arrangement or United Nations List for requiring conventional arms reporting and thus were included to meet U.S. Government commitments.

To ease reporting requirements on exporters as suggested by one

commenter and provide greater flexibility for industry, BIS clarifies that for the reporting required in this final rule can be accomplished in one of two ways. First, the exporter can follow the process outlined in part 743 by sending in reports to BIS with the required information. However, because of the EEI filing requirements in § 758.1(g)(4)(ii) for the firearms that require conventional arms reporting, all conventional arms reporting requirements for firearms should be able to be met by using the alternative submission method described below in the regulatory changes. Under the alternative method, the U.S. Government will rely on the EEI record in AES for firearms classified under 0A501.a and 0A501.b, by the exporter being required to always include as the first text in the Commodity Description field in AES the first six characters of the ECCN number, *i.e.,* "0A501.a" or "0A501.b."

*Comment 73:* One commenter raised questions whether the requirements of the Paperwork Reduction Act (PRA) were met for imposing a new requirement and whether this information would be needed by BIS.

*BIS response:* BIS had created this reporting requirement in the April 16, 2013, initial implementation rule, including providing estimates for the anticipated burden at that time in anticipation of the full completion of the USML to CCL review process and these end item firearms being moved to the CCL. BIS makes this clearer in this final rule, as well as describing the alternative method that will eliminate the need for any type of additional reporting and instead use the data that will be reported in the EEI filing in AES.

*Comment 74:* One commenter asserted that BIS reporting provides even less data than the Department of State 665 report and requested that BIS improve its reporting.

*BIS response:* In the past, BIS has provided similar data that is included in the Department of State 655 report in the BIS annual foreign policy report and in reports on the BIS website detailing exports by country and largest quantity of ECCNs being exported to the respective countries. Going forward under ECRA, BIS will be required to submit an annual report to Congress that will include the information specified in Section 1765 of ECRA, including implementation of end-use monitoring of military items on the EAR. BIS notes because this final rule will require EEI filing in AES for the firearms moved to the CCL and CBP Form 4457 for License Exception BAG, BIS will have data

available on exports of firearms moved from USML Category I to the CCL.

*Serial Numbers, Make, Model, and Caliber in AES (§ 758.1(g)(4))*

*Comment 75:* Several commenters asserted they were opposed to the expanded data elements (*i.e.,* serial numbers, make, model, and caliber) required as part of the EEI filing to AES for firearms that would be transferred from the USML to the CCL, suggesting that the expanded data elements would exacerbate the problems for private travelers forced to use the system and violate the spirit of congressional prohibitions against Federal firearm registries. BIS also received comments asserting that filing in AES poses an undue burden on exporters to file information that is otherwise available to U.S. Government, such as through the Gun Control Act and ATF regulations, and that it may violate the PRA because the burden is redundant. Another commenter asserted that because of AES character limitations it may be difficult or impossible to include the serial number, make, model, and caliber information. In addition, one commenter asserted that the manufacturer, model number, and caliber does not assist law enforcement verify the export because the Foreign Trade Regulations (FTR) and EAR already require that the item description entered in the EEI filing in AES conform to that shown on the license. One commenter asserted it generally supports strong oversight measures for arms transfers and from that perspective, it welcomes detailed digital record-keeping requirements. Another commenter recommended using the term ''model'' or ''model designation'' rather than ''model number,'' consistent with ATF regulations.

*BIS response:* BIS has included filing requirements only when necessary to ensure that export control concerns will be protected, including export enforcement and transparency concerns. As noted above, BIS in this final rule addresses the concerns about exports under License Exception BAG by not requiring an EEI filing in AES for such exports, though CBP Form 4457 will require information on the serial numbers, make, model, and caliber for the firearms being exported. This much more focused requirement will also be responsive to assertions that the information proposed to be collected was an undue paperwork burden on exporters.

While other Federal regulations may require similar information, BIS would not have the legal authority to subpoena or otherwise request the same information unless the records are required to be kept under the EAR. If different regulations require the same information, then there should be no additional burden on exporters or other relevant parties for maintaining this information to meet their various regulatory requirements. Typically, the EAR is flexible in how specific records are maintained since it regulates a variety of industries with different norms.

For items that are exported under a U.S. Government authorization for temporary export, it is still warranted to require that information to be filed as EEI in AES. This final rule adopts a revised requirement in § 758.1(g)(4) to limit it to temporary exports from the United States or when the license or other approval contains a condition requiring all or some of this information to be filed as EEI in AES. This final rule clarifies that a temporary export for purposes of § 758.1(g)(4) is any export whereby the EAR authorization requires subsequent return to the United States (*e.g.,* License Exception TMP or a license authorizing a temporary export). BIS notes that this revised approach scales back the reporting requirement significantly, focuses it on exports of the primary concern for ensuring the U.S. Government can confirm what was temporarily exported is what will be returned, and importantly still retains the ability of BIS to impose this condition when warranted on a case-by-case for any particular license where BIS and the other license review agencies believe requiring the filing of this information as EEI in AES is warranted. BIS is aware that the Department of State sometimes includes such a requirement as a proviso on some of its licenses or approvals for firearms, so the requirement that is included in this final rule that retains the ability of BIS to impose such a condition on Commerce licenses is consistent with licensing practices under the ITAR.

BIS has confirmed with CBP and the U.S. Census Bureau that AES on the ACE platform can accommodate EEI filers to submit the serial number, make, model, and caliber information. Under the current ITAR licensing practices, sometimes provisos are included on a State license or other approval that requires this information to be entered as EEI in AES, and BIS is not aware of the current system not permitting the proper filing of this information as EEI in AES.

BIS generally supports strong oversight. It also accepts the recommendation to adopt the term ''model'' instead of the proposed ''model number.''

*Comment 76:* Two commenters asserted that the only place where the reporting requirement of serial numbers, make, model, and caliber may be warranted was for License Exception TMP. One of these commenters noted that ''such a requirement of mandatory serial number reporting in AES might make sense only for temporary exports and imports under TMP in particular, to allow re-import procedures to be followed and verified.'' However, the requirements proposed in new §§ 758.10(b)(1)(ii) and 740.9(b)(5)(iv)(B) already cover this by requiring serial numbers as part of a complete list to be submitted to CBP at the time of import and/or export.

*BIS response:* BIS clarifies that the reference in License Exception TMP in new §§ 758.10(b)(1)(ii) and 740.9(b)(5)(iv)(B) are for information to be provided at the time of temporary import and export of firearms temporarily in the United States. The proposed requirements in § 758.10(b)(1)(ii) in the phrase ''or other appropriate import documentation (or electronic equivalents)'' and the reference to ''or electronic equivalents'' was referring to the possibility that such information could be provided to CBP in person or electronically by using the ACE portal at the time of temporary import and subsequent export, so BIS does not see an inconsistency with the proposed requirement and therefore will include the requirement in this final rule as originally proposed. BIS agrees with the commenter's assertion that for firearms temporarily exported under License Exception TMP under paragraph (a)(6), there is a possibility that in certain cases the returned firearm may not be the same. This final rule includes a Note 3 to paragraph (g)(4) in § 758.1 to provide guidance on that issue.

*Entry Clearance Requirements for Temporary Imports*

*Comment 77:* BIS received comments asserting that foreign visitors exporting personal firearms after temporary import should not have to file in AES for many of the same reasons why filing in AES for exports authorized under License Exception BAG is not appropriate. Another commenter asserted that such AES declaration requirement would discourage foreign participants from coming to the U.S. for hunting and competitive shooting.

*BIS response:* BIS does not agree with these assertions. As noted above, one of the permissible identifiers in filing in AES is a foreign passport, so the most substantive concern for individuals filing in AES does not apply for these

filings. In addition, those using License Exception TMP will generally be companies, so the concerns expressed about AES being more oriented to companies compared to individuals also does not apply. For these reasons, BIS in this final rule publishes the changes as proposed. In addition, as noted above, each country, including the United States, imposes requirements that it believes are warranted to regulate the importation and use of firearms in its country. U.S. hunters and competitive shooters that travel overseas and foreign hunters and competitive shooters who come to the United States understand that firearms are regulated.

*Comment 78:* One commenter asserted that the ATF Form 6NIA can confirm that the individual is returning with the same firearm that was brought to the U.S., so there is no need to require EEI filing in AES.

*BIS response:* BIS does not accept this change. To properly administer and enforce export controls, BIS must have access to basic information about an item and cannot solely rely on information collected by another agency, though this information, as appropriate, could supplement information collected by BIS.

*Comment 79:* One commenter asserted that the ITAR does not have the same type of EEI filing in AES requirement, so including this under the EAR would be more restrictive.

*BIS response:* BIS clarifies here that under the ITAR, the Department of State is licensing the temporary import and export, which required much of the same information requirements. The Commerce May 24 rule did not change the basic construct for how the EAR regulates imports, but BIS needed a means to track firearms temporarily entering the U.S. for subsequent export.

*Comment 80:* One commenter requested text be added to § 758.10(a)(2) to exempt from the entry clearance requirements temporary imports by nonresident aliens who temporarily import firearms under the provisions of 27 CFR 478.115(d).

*BIS response:* BIS clarifies here the purpose of § 758.10. Because a nonresident alien, *e.g.,* a foreign hunter, will need an approved Form 6NIA (ATF Form 5330.3D Application/Permit for Temporary Importation of Firearms and Ammunition by Nonimmigrant Aliens) from ATF prior to bringing the USMIL firearm or ammunition into the U.S., the ATF controls will account for the temporary import. Therefore, License Exception BAG does not need to be referenced in § 758.10. The subsequent export out of the U.S. will require an EAR authorization and would need to

be done in accordance with License Exception BAG, or some other U.S. Government authorization if License Exception BAG was not available.

*Comment 81:* One commenter asserted that the new § 758.10 ''Entry clearance requirements for temporary imports'' appears to apply to all temporary imports at the time of temporary import. This commenter asserted that as the requirements of § 758.10 should not apply to nonresident aliens temporarily importing firearms under the separate provisions of the ATF, and recommended clarifying this in the final rule.

*BIS response:* BIS agrees. This final rule clarifies that the requirements of § 758.10 do not apply to temporary imports for nonimmigrant aliens under the provisions of the Gun Control Act of 1968 and administered in part with the ATF Form 6NIA.

*Comment 82:* One commenter was concerned that the new § 758.10 ''Entry clearance requirements for temporary imports'' does not address the potential use of License Exception RPL. Specifically, proposed § 758.10(b)(1)(i) requires a statement to CBP certifying ''. . . This shipment will be exported in accordance with and under the authority of License Exception TMP,'' which would be a false certification if RPL were being used.

*BIS response:* BIS agrees and accepts adding License Exception RPL as a valid purpose for a temporary import under § 758.10. For the same reason, this final rule adds BIS licenses as a valid purpose for a temporary import under § 758.10. In addition, this final rule clarifies that a temporary import for repair or servicing in the United States does not require an EAR authorization, but the subsequent export must be authorized either as eligible for License Exception RPL or authorized under a BIS license at the time of entry. For example, a BIS license would be required at the time of entry if the repair or servicing of a temporarily imported firearm would result in enhanced capability of the item because License Exception RPL is not available for such enhancements. Instead, under this final rule, the exporter could obtain a BIS license to authorize such an export that was brought into the United States as a temporary import. Section 758.10(a)(1) addresses these types of imports for repair and servicing. For additional information, please see section Entry clearance requirements for temporary imports (§ 758.10) below that details the requirements for use of these authorizations.

*Relationship Between EAR and ATF Regulations*

*Comment 83:* One commenter requested the ATF Ruling 2004–2 be amended to account for this USML to CCL transition, in order to not be more restrictive under the EAR compared to the ITAR. The commenter asserted that the ITAR draws a clear distinction between permanent and temporary import jurisdiction in 22 CFR 120.18, although certain items regulated under the Gun Control Act or National Firearms Act, if authorized for import under those laws, continue to require transactional import approval from ATF for temporary imports unless ATF Ruling 2004–2 (April 7, 2004) permits the DSP–61 or ITAR exemption to substitute for this approval.

*BIS response:* The changes included in the Commerce May 24 rule under §§ 740.9 and 758.10 were intended to address issues related to temporary importation under the EAR. As noted above, this final rule adds License Exception RPL and BIS licenses to § 758.10 to further address issues related to temporary imports under the EAR. Other agencies will review, and if necessary, address, any effects of these final rules.

*Comment 84:* One commenter recommended coordinating proposed changes with ATF so that the corresponding changes are made to the USMIL at the same time, which would prevent businesses from having to consult both the USML and USMIL when deciding whether a transaction involves brokering.

*BIS response:* The USML and the USMIL are separate lists of AECA defense articles with both shared as well as different AECA objectives, and as such warrant the retention as separate lists.

*Comment 85:* One commenter was concerned that removing license requirements for temporary imports of the items removed from the USML would create another channel for criminal elements to obtain weapons in the U.S.

*BIS response:* BIS disagrees. Temporary imports will be addressed by BIS, and the same type of U.S. Government authorization requirement will apply for exports of items temporarily imported as other exports under the EAR.

*Comment 86:* One commenter was concerned that the Commerce May 24 rule did not provide a mechanism, such as a DSP–73, for certain firearms to be temporarily exported and subsequently returned to the U.S., given the firearm importation prohibitions under 18

U.S.C. 922(l) and 925(d)(3). This commenter asserted that unlike many other items that have transitioned from the USML to the CCL, firearms are subject to unique restrictions on the permanent import side under the jurisdiction of the ATF. This commenter asserted that the Department of State's jurisdiction over temporary exports and temporary imports has played an important role by providing companies with a viable method of bringing their guns back into the U.S. without running afoul of ATF's strict importation prohibitions and similar treatment should be retained under the EAR.

*BIS response:* BIS clarifies that BIS will require a U.S. Government authorization for temporary exports. The EAR authorizations most likely to be used to authorize temporary exports include License Exceptions BAG and TMP, as well as Commerce licenses. Therefore, BIS does have similar authorization requirements and approval mechanisms as under the ITAR. BIS notes that the import back into the U.S. will not require an EAR authorization.

*Comment 87:* One commenter asserted that a DSP–73 license is vital because it covers both the U.S. export and U.S. import requirements and the commenter is concerned without adding a similar type of authorization under the EAR that certain temporary exports for use in filming will not be possible because the return of the exported firearms would be subject to ATF's permanent import process which restricts many types of firearms pursuant to Federal law, *e.g.,* short barreled shotguns. This commenter asserted that because most firearms temporarily exported for the movie industry are either military surplus, non-sporting, or National Firearms Act weapons, of which importation is prohibited under the ATF regulations, that this is an importation issue to be addressed to ensure these types of temporary exports can still proceed under the EAR and ATF construct, similar to the ITAR and ATF construct.

*BIS response:* A Commerce license to authorize a temporary export would authorize the temporary export and require the item's return. A separate EAR authorization is not required for the import back into the United States after the temporary export since this would be covered under the scope of the authorizing export license.

*Comment 88:* One commenter requested clarification for permanent import after temporary export for repair or servicing under License Exception TMP under paragraph (a)(6). This commenter asserted it agreed with the proposed changes but requested that the subject of temporary export of firearms, specifically vintage shotguns with barrel lengths over 18 to Canada, be clearly addressed.

*BIS response:* BIS notes that the long barrel shotguns this final rule will move from ECCN 0A984 to 0A502 may require a U.S. Government authorization depending on the specifics of the export, in particular the destination for the export. Regardless of the EAR authorization used to authorize the export, a separate EAR authorization will not be required for the subsequent import into the United States.

*Comment 89:* One commenter asserted that ATF 27 CFR 478.92 includes a requirement to mark firearms being imported with the importer's name and address. This commenter was concerned that this destroys the originality and affects the value of the firearm that was temporarily exported. This commenter asserts because these long barreled shotguns fall under the EAR, the ATF will not clarify the requirement on shotguns and it creates confusion. This commenter requests the final rule to clarify this issue regarding markings for shotguns being moved from ECCN 0A984 to ECCN 0A502, as well as for the other firearms being moved from the USML to the CCL.

*BIS response:* BIS clarifies here that the EAR does not require any types of physical markings to be made on a firearm or any other commodity being temporarily exported for repair or servicing for return to the United States. For a licensed transaction in an exceptional case, a condition could potentially be placed on a Commerce license that required the exporter to make some type of physical marking on the commodity, but this would be extremely rare under BIS licensing. If additional safeguards were needed, BIS licenses would typically require additional documentation to confirm delivery verification or to require the exporter to get other written affirmations from the other parties to the transaction.

### *EAR Recordkeeping Requirements*

*Comment 90:* One commenter asserted that the GCA requires all Federal Firearm Licensees to maintain firearm records for 20 years after the date of disposition and that the proposed change requiring records under the EAR is redundant and may cause confusion because of the different record retention periods. This commenter asserted in complying with the EAR, companies may inadvertently violate the GCA.

*BIS response:* BIS does not agree. The EAR does not require records to be destroyed after five years, just that the records be kept for at least that long. Nothing in the EAR prohibits maintaining the records for longer periods.

*Comment 91:* One commenter asserted that the recordkeeping requirement for warranty certificates for people outside the U.S. would be more restrictive than the ITAR. The commenter asserted that BIS has not provided a coherent explanation for why the new recordkeeping burden makes sense, is related to exports, or would be of benefit to the enforcement of the export control laws.

*BIS response:* BIS does not agree with the requested change to remove the warranty certificate requirement as a recordkeeping requirement. As noted above by many commenters, BIS has an interest in ensuring the firearms and related items on the CCL are used by the intended end user for the intended end use, and BIS needs any information that may be relevant to the ultimate disposition of those firearms to safeguard U.S. national security. The recordkeeping requirements for the warranty certificates included in the Commerce May 24 rule and in this final rule will be an additional safeguard for EE to have further insights into where a firearm exported under a U.S. Government authorization may have ultimately ended up after export. A warranty certificate that is submitted by a person located outside the United States to a U.S. exporter is relevant to the U.S. Government for export control enforcement purposes. The ITAR and EAR control structures are not the same, so in certain cases a restriction may be more restrictive under the EAR compared to the ITAR and this is an example of where the EAR will be more restrictive, but it is still warranted in the context of the EAR.

*Comment 92:* One commenter asserted that warranties are issued by the manufacturer, not the exporter and that many manufacturers do not always issue specific ''warranty certificates'' to individuals. This commenter asserted that most manufacturers provide warranty statements in a broad boilerplate statement included in an instruction manual, or on their website. This commenter also asserted that there is thus no way to know when that information is accessed by a foreign person or sent to an address outside the U.S. One commenter asserted that a potential issue with the recordkeeping requirement of warranty certificates is that an exporter may not have a manufacturer's (or any other)

warranty certificate as part of the transaction. This commenter requested some clarification on the requirements.

*BIS response:* BIS clarifies here that the EAR recordkeeping requirements generally do not impose an affirmative duty to create a record. The recordkeeping requirements typically apply if in the normal course of your business activities related to an export, reexport, or transfer (in-country) a record is created or received that is within the scope of records that must be retained for purposes of the EAR recordkeeping requirements.

BIS confirms here that if the manufacturer is not the exporter, it is not required to keep the warranty certificate for purposes of part 762. Section 762.1(b) (Persons subject to the part) identifies the persons that are required to keep records for purposes of part 762 of the EAR.

*Comment 93:* One commenter asserted that there is the possibility that retaining such information that would be contained in a warranty certificate may violate the privacy laws of other countries, such as the General Data Protection Regulation (GDPR) (European Union (EU)).

*BIS response:* BIS is not in a position to opine on the applicability of the GDPR here but notes that parties transacting in items subject to the EAR are subject to U.S. laws and regulations, including recordkeeping requirements.

### Alignment With the Wassenaar Arrangement Munitions List

*Comment 94:* One commenter asserted that the proposed changes do not appear to be in line with established WAML I–III, suggesting that the inclusion of semi-automatic weapons in WAML1 explicitly as munitions demonstrates an intentional differentiation between military and security items, on one hand, and dual-use items on the other.

*BIS response:* On the general question of whether the changes included in the Commerce May 24 rule align with the WAML, BIS notes that Wassenaar Arrangement member countries implement the WA control lists in accordance with their own national export controls. The items being moved from USML Category II are controlled under four new ''600 series'' ECCNs. The items moved from USML Categories I and III are not controlled in the ''600 series,'' but importantly are still subject to the same NS 1 license requirement that would apply if these WAML items were added to the ''600 series.'' In addition, although not derived from the Wassenaar Arrangement, the end item firearms are subject to a license

requirement for the Firearms Convention (FC)—meaning that the end item firearms are subject to an even more restrictive license requirement under the EAR compared to the ''600 series,'' 9x515 items, and other items controlled for NS reasons on the CCL. In addition, the final rule also includes other provisions, such as requiring conventional arms reporting, that reflects U.S. Government commitments to the Wassenaar Arrangement and to the United Nations. Thus, the changes are consistent with the U.S. Government's commitments to the Wassenaar Arrangement.

*Comment 95:* One commenter asserted semi-automatic weapons used by peacekeepers, military, and police are intended to be controlled as munitions. The proposal to move semi-automatic firearms and large caliber rifles to ECCN 0A501 on the CCL does not appear to be in line with this designation.

*BIS response:* For the reasons noted above in the BIS response to Comment 1, BIS does not agree. BIS notes that the export of semi-automatic weapons used by peacekeepers, military, and police will still require U.S. Government authorization and in most cases will require an approved license under the EAR, except when destined to the U.S. Government or it is a semi-automatic weapon that was legally exported or reexported under U.S. export controls that is being returned after servicing or repair under License Exception RPL.

*Comment 96:* One commenter provided several comments related to the combined ITAR and EAR amendments to U.S. Government commitments to multilateral controls, that included 33 numbered topics listed in the order that topic appears in the WAML and then subdivided into three parts, with the following number of examples: 27 U.S. and multilateral texts are either identical or substantially equivalent; 74 US controls omit what WAML controls (or WAML omits U.S. decontrols); and 165 WAML omits what U.S. controls (or U.S. omits WAML decontrols).

*BIS response:* BIS notes that this one commenter submitted a large number of comments regarding the alignment with the WAML. For the comments where BIS does not believe any changes are needed to align with the WAML, BIS has not summarized each of those comments in this final rule because of the length of the comments, but does confirm that BIS did review each of the comments. For many of these comments, the items were already controlled prior to the effective date of this final rule or will be controlled for

NS reasons on the CCL on the effective date of this final rule, and for certain comments the ITAR retains control of the items that the commenter thought would not be adequately controlled under the USML. For the alignment with the WAML comments where the commenter has raised an issue that BIS believes warranted a change to ensure the changes in the final rule align with the WAML, those suggested changes, *e.g.,* the revisions described above to ECCN 0A018 and 0A505, are described above in greater detail, along with the BIS responses.

### Delayed Effective Date for a Final Rule

*Comment 97:* BIS received a number of recommendations on the appropriate length for the delayed effective date for the final rule, ranging from 90 to 180 days for delayed effective dates. The rationale for the shorter length was to allow small businesses to immediately benefit while those recommending longer or split effective dates suggested the time period would allow time for updates to IT systems, policies, and processes. Other commenters asserted that they supported a split implementation period (180 days for certain provisions, effective immediately or short as possible for other provisions).

*BIS response:* BIS has determined that a 45-day delayed effective date is appropriate. To address concerns that a longer delayed effective date and transition period may be warranted, BIS highlights here the importance of the various grandfathering provisions included in General Order No. 5 in Supplement No. 1 to part 736 of the EAR and in the previously published State transition guidance, that is supplemented with information on the DDTC website.

*Comment 98:* One commenter requested that BIS delay publishing a final rule until the Government Accounting Office (GAO) or the Library of Congress has publicly reported to the Congress their impact on numerous statutes referring to ''defense articles,'' because of the potential loss of so many U.S. arms export controls and likely negative impact on curbing irresponsible and illegal arms transfers.

*BIS response:* BIS welcomes the publication of the GAO report. However, the timing of the publication of a final rule and its effective date are not contingent on the publication of the GAO report.

### Description of Regulatory Changes

This final rule creates 17 new ECCNs on the CCL to control items that are being removed from the USML as

described in a final rule issued concurrently by the Department of State. BIS did not receive any comments on the proposed addition of ECCNs 0A503, 0B602, 0D501, 0D505, 0D602, 0E502, 0E504, 0E505, and 0E602 in the Commerce May 24 rule, so this final rule adopts these ECCNs as proposed, except for one clarification made to ECCN 0B602.a.8 and minor clarifications to the Related Controls paragraphs to ECCNs 0D501, 0D505, 0D602, 0E502, and 0E505. In ECCN 0B602, this final rule replaces "gun straightening presses" with the more specific control parameter "barrel straightening presses." This change is made to clarify that the straightening presses controlled under ECCN 0B602.a.8 are those for barrels. In the Related Controls paragraphs for ECCNs 0D501, 0D505, 0D602, and 0E505, this final rule removes the parenthetical phrase that references 22 CFR 121.1 and the related USML category because this information is duplicative of existing text in these Related Controls paragraphs. This final rule also revises the Related Controls paragraph in ECCN 0E502 by removing "N/A" and adding that "[t]echnical data required for and directly related to articles enumerated in USML Category I are 'subject to the ITAR.'" This clarification does not change the scope of ECCN 0E502 and simply alerts the public to review the ITAR for such technical data. BIS does not make any additional changes to proposed ECCN 0E501 and adopts it as proposed. See the Commerce May 24 rule for additional background on these provisions. BIS received comments on seven proposed ECCNs for which the agency is adopting additional changes: 0A501, 0A502, 0A504, 0A505, 0A602, 0B501, and 0B505. The summary below describes each of these ECCNs and the controls that apply to them.

*New ECCN 0A501: Firearms and Related Commodities*

This final rule adds new ECCN 0A501 and applies national security (NS Column 1), regional stability (RS Column 1), Firearms Convention (FC Column 1), United Nations (UN), and anti-terrorism (AT Column 1) reasons for control to the non-automatic and semi-automatic firearms, including rifles, carbines, revolvers or pistols listed in the ECCN entry in the regulatory text to this final rule, enumerated parts and components and to "specially designed" "parts," "components," "accessories" and "attachments" for those firearms and "parts" and "components."

This final rule adds ECCN 0A501.y and only imposes an anti-terrorism (AT

Column 1) and United Nations (UN) reasons for control and covers such items as scope mounts or accessory rails, iron sights, sling swivels, butt plates, recoil pads, bayonets, and stocks or grips that do not contain any fire control "parts" or "components."

This final rule adds a technical note to ECCN 0A501 stating that "parts" and "components" include "parts" and "components" that are common to firearms described in ECCN 0A501 and to firearms "subject to the ITAR."

It also adds another note to ECCN 0A501 to state that certain firearms and similar items are EAR99. Those items are: Antique firearms (*i.e.,* those manufactured before 1890) and reproductions thereof, muzzle loading black powder firearms except those designs based on centerfire weapons of a post 1937 design, BB guns, pellet rifles, paint ball, and all other air rifles.

In addition, for purposes of new ECCN 0A501 and the rest of the new ECCNs described below, items previously determined to be "subject to the EAR" under a commodity jurisdiction determination issued by the U.S. Department of State that were designated as EAR99 will generally not be classified in any of the new ECCNs that are being created with this final rule. As a conforming change, this final rule revises paragraph (e)(3) of General Order No. 5 to add a reference to the "0x5zz" ECCNs this final rule adds to the CCL.

This final rule adopts the following additional changes to ECCN 0A501 to respond to the comments received on the Commerce May 24 rule:

This final rule revises Related Controls paragraph (1) to clarify that the magazines that are "subject to the ITAR" are those with a capacity "greater than 50 rounds." The Commerce May 24 rule used terminology in the control parameter that created ambiguity because it was slightly different than as proposed in the State May 24 rule, so this final rule revises the EAR text based on the comments received to align with the terminology used on the ITAR.

This final rule revises "items" paragraph (a) to remove the phrase "of caliber less than or equal to .50 inches (12.7 mm)" and add in its place the phrase "equal to .50 caliber (12.7 mm) or less." In making this change, BIS uses the same control text of ".50 caliber (12.7 mm)" as used in the Department of State companion rule.

This final rule adds a Note 1 to paragraph 0A501.a. This note clarifies that combination pistols are controlled under items paragraph .a. The note also defines the term 'combination pistol' for purposes of this ECCN. A combination

pistol has at least one rifled barrel and at least one smoothbore barrel. Because of the hybrid nature of these firearms, commenters requested that this type of clarifying note be added.

This final rule adds a Note 2 to 0A501.d to address a question, raised by the commenters, whether magazines with a capacity of 16 rounds or less are controlled under 0A501.x or designated EAR99. The new note specifies that magazines with a capacity of 16 rounds or less are controlled under 0A501.x. BIS notes this was the intent of the Commerce May 24 rule, but because commenters were not sure, this rule specifies where these magazines are controlled.

This final rule revises "items" paragraph (e) to add the phrase "or machined items" to specify that ECCN 0A501.e includes those machined items even if they are not casted, forged, or stamped.

This final rule revises the introductory text of 0A501.y to add the phrase "as follows, and "parts," "components," "accessories," and "attachments" "specially designed" therefor" to clarify, consistent with the other .y paragraphs on the CCL, that the "specially designed" "parts," "components," "accessories," and "attachments" for .y items will also be controlled under this .y paragraph and not controlled under 0A501.x.

This final rule adds a new paragraph y.7 to control firearms manufactured from 1890 to 1898 and reproductions thereof. This final rule makes this change to address commenters that asserted that the year 1890 should be changed to 1898 in Note 3 to 0A501 for defining antique firearms. BIS did not accept the change because the year 1890 is based on the Wassenaar Arrangement, but does address this concern by controlling these firearms under a new .y paragraph. As a conforming change, this final rule adds a new License Requirement Note to ECCN 0A501 to specify that a license is required for exports and reexports to China of 0A501.y.7 firearms.

This final rule adds a new Note 4 to 0A501, to clarify the classification of certain muzzle loading (black powder) firearms. This is a conforming change as part of the removal of the control text of ECCN 0A018 in this final rule.

*New ECCN 0A502: Shotguns and Certain Related Commodities*

This final rule adds new ECCN 0A502 to control both the shotguns being moved from the USML that are being added to the CCL (barrel length less than 18 inches) and the shotguns and the enumerated "parts" and

''components'' controlled in ECCN 0A984 (barrel length 18 inches or greater) prior to this final rule. This final rule controls shotguns with a barrel length less than 18 inches under NS Column 1, CC Column 1, FC, UN, and AT Column 1 plus regional stability (RS Column 1). Shotguns controlled in ECCN 0A984 that are transferred to ECCN 0A502 by this final rule will retain Firearms Convention (FC), crime control (CC Column 1, 2, or 3 depending on barrel length and end user), and United Nations (UN) reasons for control. Such shotguns will not be controlled for national security reasons because they are not on the WAML.

This final rule adopts the following additional changes to ECCN 0A502 to respond to the comments received on the Commerce May 24 rule:

This final rule revises the heading of ECCN 0A502 to add the phrase ''shotguns ''parts'' and ''components,'' consisting of'' to clarify that the parts and components controlled under 0A502 are for shotguns in response to one commenter's request.

This final rule revises the LVS paragraph in the License Exception section to add License Exception LVS eligibility of $500 for certain parts and components under ECCN 0A502. The Commerce May 24 rule proposed N/A for LVS for ECCN 0A502. This final rule makes this change to create equivalent treatment for License Exception LVS for purposes of ECCNs 0A501 and 0A502. Similar to LVS eligibility in ECCN 0A501, the LVS eligibility will include all Country Group B countries and an additional paragraph that identifies other parts and components that are eligible for LVS if the ultimate destination is Canada.

This final rule revises the Related Controls paragraph to remove the phrase ''combat shotguns and'' because it is not needed as a modifier of fully automatic shotguns and the phrase is not used on the USML. This final rule also simplifies the Related Controls paragraph to use a single sentence to identify shotguns that are fully automatic as ''subject to the ITAR.''

This final rule adds a Note 1 to 0A502 to clarify that shotguns made in or before 1898 are considered antique shotguns. This note clarifies that these antique shotguns are designated as EAR99.

Lastly, in ECCN 0A502, this final rule adds a Technical Note to specify the classification of shot pistols or shotguns that have had the shoulder stock removed and a pistol grip attached. The technical note specifies these are controlled by ECCN 0A502. The

technical note also specifies that slug guns are controlled under ECCN 0A502.

*New ECCN 0A504: Optical Sighting Devices and Certain Related Commodities*

This final rule adds new ECCN 0A504 to replace ECCN 0A987, which controlled optical sighting devices for firearms. This final rule revises the reasons for control table to state specifically that the Firearms Convention (FC) reason for control applies to all paragraphs in the ECCN except 0A504.f, which controls laser pointing devices. In addition, BIS adds an RS control for certain riflescopes, which are identified in their own paragraph in the ECCN under 0A504.i in this final rule. The riflescopes in this paragraph are limited to those ''specially designed'' for use in firearms that are ''subject to the ITAR.'' This final rule includes an exclusion in the criteria of this paragraph to ensure less sensitive riflescopes that are being moved from ECCN 0A987 to 0A504 on the effective date of this final rule, that currently are not RS controlled under the EAR, will not be controlled under this paragraph. This final rule also adds a note to this paragraph (i) to specify that paragraph (a)(1) of the definition of ''specially designed'' in § 772.1 of the EAR is what is used to determine whether a riflescope is ''specially designed'' for purposes of this paragraph of ECCN 0A504.i—meaning paragraph (a)(2) and the paragraph (b) releases are not reviewed to make the ''specially designed'' determination.

This change makes clear, consistent with BIS's existing interpretation, that such devices are not optical sights and are not subject to the FC reason for control. The new number is intended to make identifying items on the CCL easier by grouping similar or related items closer to each other.

This final rule adopts the following additional changes to ECCN 0A504 to respond to the comments received on the Commerce May 24 rule:

This final rule revises the LVS paragraph in the License Exceptions section of ECCN 0A504 to add LVS eligibility of $500 for 0A504.g. Commenters requested that LVS eligibility be added for these less sensitive lenses and other optical elements controlled under 0A504.g. These commenters also requested adding LVS eligibility for consistency with the types of parts and components eligible for LVS under ECCN 0A501 in the Commerce May 24 rule. BIS agrees and adds LVS eligibility of $500 for 0A504.g in this final rule.

*New ECCN 0A505: Ammunition and Certain Related Commodities*

This final rule adds new ECCN 0A505 and imposes national security (NS Column 1), regional stability (RS Column 1), Firearms Convention (FC), United Nations (UN), and anti-terrorism (AT Column 1) controls on ammunition not enumerated on the USML, for firearms that will be classified under ECCN 0A501, and for most ''parts'' and ''components'' of such ammunition. Such ammunition included in this final rule are for small arms, in most cases, firearms of caliber not exceeding 0.50 inches, although some ammunition for firearms of caliber up to 0.72 inches is included. This final rule retains the CCL reasons for control currently found in ECCNs 0A984 and 0A986 for shotgun shells. Buckshot shotgun shells will be subject to the CC Column 1, FC Column 1, and UN reasons for control under this final rule. Other shotgun shells are subject to the FC, UN, and AT (North Korea only) reasons for control in this final rule. Only ''parts'' and ''components'' will be eligible for License Exception LVS. Ammunition for larger caliber weapons such as howitzers, artillery, cannon, mortars, and recoilless rifles will remain in USML Category III in this final rule. Ammunition that has little or no civil use or that is inherently military such as ammunition that is preassembled into links or belts, caseless ammunition, tracer ammunition, ammunition with a depleted uranium projectile or a projectile with a hardened tip or core and ammunition with an explosive projectile also remains in USML Category III. Blank ammunition for firearms controlled by ECCN 0A501 and not enumerated in Category III of the USML will be controlled for United Nations and anti-terrorism reasons only in this final rule.

This final rule adds three notes to clarify the scope of ''parts'' and ''components'' for ammunition classified under ECCN 0A505. Note 1 to 0A505.c clarifies the relationship between ECCNs 0A505 and 1A984 for shotgun shells, stating that shotgun shells that contain only chemical irritants are controlled under 1A984 and not 0A505. Separately, Note 2 to 0A505.x includes an illustrative list of the controls on ''parts'' and ''components'' in this entry, such as Berdan and boxer primers. Note 3 to 0A505.x clarifies that the controls in ECCN 0A505 include ''parts'' and ''components'' that are common to ammunition and ordnance described in this entry and to those enumerated in USML Category III.

This final rule adopts the following additional changes to ECCN 0A505 to respond to the comments received on the Commerce May 24 rule:

This final rule revises the LVS paragraph in the License Exceptions section of ECCN 0A505 to increase the LVS eligibility from $100 to $500. The Commerce May 24 rule had proposed $100, but commenters noted that the cost of these parts and components would undermine the usefulness of LVS eligibility if the $100 limitation was maintained. Some commenters provided detailed price lists to support their position that $100 of LVS eligibility would be of limited usefulness. BIS took this into account and in this final rule increases the LVS eligibility to $500 for ECCN 0A505.x. As a conforming change, because this final rule moves ECCN 0A018.b to 0A505, this final rule adds grandfathering provisions to retain LVS eligibility of $3,000 for any commodity that was classified under 0A018.b prior the effective date of this final rule.

This final rule revises ECCN 0A505.a to add the phrase "or USML Category I" to clarify that ammunition for firearms controlled under USML Category I is also controlled under 0A501.a, provided the ammunition is not otherwise excluded by the control parameters in 0A501.a, *i.e.,* being enumerated in 0A505.b, .c, .d, or in USML Category III.

This final rule adds a Note 4 to 0A505 to specify that certain types of ammunition (*i.e.,* Lead shot smaller than No. 4 Buckshot, empty and unprimed shotgun shells, shotgun wads, smokeless gunpowder, 'Dummy rounds' and blank rounds (unless linked or belted)), not incorporating a lethal or non-lethal projectile(s) are designated EAR99. This final rule also defines the terms 'dummy round or drill round.' The new note clarifies that these rounds are completely inert—meaning they contain no primer, propellant, or explosive charge. The note specifies that these types of rounds are typically used to check weapon function and for crew training.

*New ECCN 0A602: Guns and Armament*

This final rule adds new ECCN 0A602 and imposes national security (NS Column 1), regional stability (RS Column 1), United Nations (UN) and anti-terrorism (AT Column 1) controls on guns and armament manufactured between 1890 and 1919 and for military flame throwers with an effective range less than 20 meters. It imposes those same reasons for control on parts and components for those commodities and for defense articles in USML Category II if such parts or components are not

specified elsewhere on the CCL or USML. Note 3 to 0A602 confirms that black powder guns and armament manufactured in or prior to 1890 and replicas thereof designed for use with black powder propellants are designated EAR99. The guns controlled in this ECCN are between 99 and 128 years old. The parts, components, accessories, and attachments controlled in this ECCN include some that are for modern artillery. Modern artillery remains on the USML, along with the most sensitive "parts," "components," "accessories," and "attachments" for these USML items. This final rule adds a note to clarify that "parts," "components," "accessories," and "attachments" specified in USML subcategory II(j) are not subject to the EAR. The USML Order of Review and CCL Order of Review already provide guidance for making such a jurisdictional and classification determination, but to highlight that these "parts," "components," "accessories," and "attachments" are not classified under paragraph .x of 0A602, this final rule adds a note.

This final rule adopts the following additional changes to ECCN 0A602 to respond to the comments received on the Commerce May 24 rule:

This final rule revises the Related Controls paragraph of ECCN 0A602 to add a Related Controls paragraph (3). This new Related Controls paragraph provides a cross reference to ECCN 0A606 for engines that are "specially designed" for a self-propelled gun or howitzer subject to control under 0A606.a or USML Category VII. The Department of State final rule includes a similar cross reference for purposes of the USML and commenters requested the same type of note or related control pointer be added to the EAR. The Department agrees and adds Related Controls paragraph (3). As a conforming change, this final rule redesignates Note 1 to 0A602 and Note 2 to 0A602 as Notes 2 and 3, respectively.

*New ECCN 0B501: Test, Inspection, and Production Equipment for Firearms*

This final rule adds new ECCN 0B501 to cover "Test, inspection, and production 'equipment' and related commodities for the 'development' or 'production' of commodities enumerated or otherwise described in ECCN 0A501 or USML Category I." This new ECCN applies the national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) reasons for control to four specific types of machinery and to one class of items as proposed in the Commerce May 24 rule.

The four specific types of machinery are: small arms chambering machines, small arms deep hole drilling machines and drills therefor, small arms rifling machines, and small arms spill boring machines. The class of items covers dies, fixtures, and other tooling "specially designed" for the "production" of items in the State Department final rule for USML Category I or ECCN 0A501. In addition, as described below, this final rule also expands the scope of 0B501.e to include all production equipment "specially designed" for USML Category I items.

The NS and RS reasons for control do not apply to equipment for the "development" or "production" of commodities in ECCN 0A501.y because those reasons for control do not apply to the commodities in ECCN 0A501.y themselves.

The first four specific items noted above were listed in paragraphs .o, .p, .q, and .r of ECCN 2B018 prior to the effective date of this final rule, and are being listed in paragraphs .a, .b, .c, and .d of ECCN 0B501 in this final rule. In addition, the class of items in new 0B501 that was included within ECCN 2B018, paragraph .n (jigs and fixtures and other metal-working implements or "accessories" of the kinds exclusively designed for use in the manufacture of firearms, ordnance, and other stores and appliances for land, sea or aerial warfare) prior to the effective date of this final rule, will, if applicable to firearms controlled in 0A501, be subsumed in paragraph .e. Jigs, fixtures, and metal working implements currently in 2B018 that are applicable to larger guns will be controlled in ECCN 0B602 in this final rule and are discussed below.

Moving these items from 2B018 to 0B501 in this final rule retains the national security (NS Column 1), anti-terrorism (AT Column 1), and United Nations (UN) reasons for control and raises the regional stability (RS) reason for control from RS Column 2 to RS Column 1. This causes no change in destination-based license requirements, but allows consideration of whether the export or reexport could contribute to instability in any region, not just the region to which the item is exported or reexported in considering whether to approve a license.

This final rule adopts the following additional changes to ECCN 0B501 to respond to the comments received on the Commerce May 24 rule:

This final rule expands ECCN 0B501.e to include all production equipment "specially designed" for USML Category I items. This final rule adds the term production equipment to the beginning

of the control text of ECCN 0B501.e and revises the phrase ''dies, fixtures, and other tooling'' included in the Commerce May 24 rule to ''including dies, fixtures, and other tooling'' to indicate that these items are illustrative and that other types of production equipment that meet the control parameters are also controlled under ECCN 0B501.

*New ECCN 0B505: Test, Inspection, and Production Equipment for Ammunition*

This final rule adds new ECCN 0B505 to impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls on tooling, templates, jigs, mandrels, molds, dies, fixtures, alignment mechanisms, and test equipment, not enumerated in USML Category III, and ''specially designed'' ''parts'' and ''components'' therefor, that are ''specially designed'' for the ''production'' of ammunition other than for the ammunition specified in 0A505.b, .c, or .d (certain shotgun shells with buckshot and without buckshot and certain blank ammunition). In addition, as described below, this final rule also expands the scope of 0B505.a to include all production equipment ''specially designed'' for USML Category III items. Equipment for manufacturing shotgun shells that do not contain buckshot will be controlled for the AT (North Korea only) and UN reasons for control, which are the reasons for control that applied to this equipment in ECCN 0B986 prior to this final rule. ECCN 0B505 in this final rule does not include equipment for the hand loading of cartridges and shotgun shells, so this final rule specifies this in the heading.

This final rule adopts the following additional changes to ECCN 0B505 to respond to the comments received on the Commerce May 24 rule:

This final rule expands ECCN 0B505.a to include all production equipment ''specially designed'' for USML Category III items. This final rule adds the term production equipment to the beginning of the control text of ECCN 0B505.a and revises the phrase ''tooling, templates, jigs, mandrels, molds, dies, fixtures, alignment mechanisms, and test equipment'' included in the Commerce May 24 rule to ''including tooling, templates, jigs, mandrels, molds, dies, fixtures, alignment mechanisms, and test equipment'' to indicate that these items are illustrative and other types of production equipment that meet the control parameters are also controlled under ECCN 0B505.

**Revisions to Eight ECCNs**

To conform to new *Federal Register Drafting Handbook* requirements, the amendatory instructions in this final rule sets forth the entire text of eight ECCNs to be revised. BIS did not receive any comments on the proposed revisions to the following six ECCNs 0E982, 1A984, 2B004, 2B018, 2D018, and 7A611 in the Commerce May 24 rule, so this final rule revises those ECCNs as proposed. *See* the Commerce May 24 rule for additional background on these revisions.

To help the public understand what specific parts of ECCN 0A018 will be different as a result of the changes in this final rule, the narrative below describes the amendment in detail, including a conforming change made to ECCN 0A988.

*Revision to ECCN 0A018, and Conforming Change to ECCN 0A988*

With the removal of ECCN 0A984 and the addition of 0A502 described above, the Commerce May 24 rule proposed to make the conforming change of removing and reserving 0A018.c since all the items classified in 0A018.c would be classified under other entries on the CCL once a final rule was published.

This final rule adopts the following additional changes to ECCN 0A018 to respond to the comments received on the Commerce May 24 rule:

This final rule still revises ECCN 0A018, but instead of retaining the commodities under 0A018.b as was proposed in the Commerce May 24 rule, these commodities are being moved to ECCN 0A505. As a conforming change, this final rule replaces the control text of ECCN 0A018 with a statement referring readers to ECCN 0A505.

This final rule adopts the following additional changes to ECCN 0A988 to respond to the comments received on the Commerce May 24 rule:

This final rule as a conforming change revises the heading of ECCN 0A988 to remove an outdated reference to 0A018.d. ECCN 0A018.d had been previously removed and reserved, but the cross reference in 0A988 was not updated. This final rule makes that correction.

**Removal of Nine ECCNs**

The Commerce May 24 rule proposed removing nine ECCNs. BIS did not receive any comments on proposed removals of ECCNs 0A918, 0A984, 0A985, 0A986, 0A987, 0B986, 0E918, 0E984, and 0E987 in the Commerce May 24 rule, so this final rule removes those ECCNs as proposed. *See* the Commerce

May 24 rule for additional background on these removals.

**Revision of ''Published''**

This final rule adopts the following changes to part 734, and one conforming change to part 732, to respond to the comments received on the Commerce May 24 rule:

Specifically, this final rule adds a paragraph (c) to § 734.7 stating that ''software'' or ''technology'' for the production of a firearm, or firearm frame or receiver, controlled under ECCN 0A501, that is made available by posting on the internet in an electronic format and that may be directly loaded without further modification by the machine operator into a computer numerically controlled machine tool, additive manufacturing equipment, or any other equipment that makes use of the ''software'' or ''technology'' to produce the firearm frame or receiver or complete firearm, remains ''subject to the EAR.'' Also in § 734.7, this final rule as a conforming change revises the paragraph (a) introductory text to add a reference to new paragraph (c) for the exclusions that apply to paragraph (a) for what is considered ''published.'' In § 732.2 (Steps regarding scope of the EAR), under the paragraph (b) introductory text for step 2 for publicly available technology and software, this final rule also adds a reference to § 734.7(c) to specify such ''software'' or ''technology'' for the production of a firearm, or firearm frame or receiver, controlled under ECCN 0A501, as referenced in § 734.7(c)), is ''subject to the EAR.''

**Conforming Change to General Order No. 5**

BIS does not make any additional changes in this final rule to what was proposed in the Commerce May 24 rule as a result of the comments received, so these changes are adopted as proposed. This final rule amends General Order No. 5, paragraph (e)(3) (Prior commodity jurisdiction determinations), in Supplement No. 1 to part 736, to add a reference in two places to the new 0x5zz ECCNs that are being created by this rule. This change to paragraph (e)(3) is a conforming change and is needed because paragraph (e)(3) now only references the ''600 series'' and 9x515 ECCNs. 0x5zz ECCNs will include new ECCNs 0A501, 0A502, 0A504, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E502, and 0E505.

**Revisions to Regional Stability Licensing Policy for Firearms and Ammunition**

BIS does not make any additional changes in this final rule to what was proposed in the Commerce May 24 rule as a result of the comments received, so these changes are adopted as proposed. This final rule applies the regional stability licensing policy set forth in § 742.6(b)(1)(i) of the EAR to the items controlled for regional stability reasons in ECCNs 0A501, 0A504, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E504, and 0E505. That policy, which also applies to ''600 series'' and 9x515 items is case-by-case review ''to determine whether the transaction is contrary to the national security or foreign policy interests of the United States, including the foreign policy interest of promoting the observance of human rights throughout the world.'' This final rule also revises the regional stability licensing policy set forth in paragraph (b)(1)(i) that is specific to the People's Republic of China for 9x515 items. This final rule adds ECCNs 0A501, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E504, and 0E505 to this sentence to specify that these firearms and related items are to be subject to a policy of denial when destined to the People's Republic of China or a country listed in Country Group E:1. Lastly, this final rule adds a sentence to the end of paragraph (b)(1)(i) to make it explicit that applications for exports and reexports of ECCN 0A501, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E504, and 0E505 items are subject to a policy of denial when there is reason to believe the transaction involves certain parties of concern, such as criminal organizations, rebel groups, street gangs, or other similar groups or individuals, that may be disruptive to regional stability.

**Availability of License Exceptions**

Many of the items in the new ''600 series'' ECCNs generally will be eligible for the same license exceptions and subject to the same restrictions on use of license exceptions as other ''600 series'' ECCNs in this final rule. For the ECCNs on the CCL prior to the effective date of this final rule that are being renumbered and placed in closer proximity to the firearms-related items that are being removed from the USML and added to the CCL, these existing firearms-related items will continue to be eligible for the same EAR license exceptions as they were prior to the effective date of this final rule, unless otherwise restricted under § 740.2, if the requirements of the license exceptions are met.

*Restrictions on All License Exceptions*

This final rule also makes the following additional changes to part 740 to respond to the comments received on the Commerce May 24 rule by adding two new general restrictions.

In § 740.2 (Restriction on all license exceptions), this final rule adds two additional restrictions for when license exceptions may not be used. This final rule adds new paragraph (a)(21) to restrict the use of license exceptions, except for License Exception GOV under § 740.11(b)(2)(ii) for the reexport or transfer (in-country) of certain firearms classified under ECCNs 0A501 or 0A502. The restriction on the use of license exceptions applies if a part or component that is not ''subject to the ITAR,'' but would otherwise meet the criteria in USML Category I(h)(2) is incorporated into the firearm or is to be reexported or transferred (in-country) with the firearm with ''knowledge'' the part or component will be subsequently incorporated into the firearm. Because these parts or components that would otherwise meet the criteria in USML Category I(h)(2) could be used for conversion of a semi-automatic firearm to a fully automatic firearm, this final rule excludes those firearms from license exception eligibility.

In § 740.2 this final rule also adds a new paragraph (a)(22) to restrict the use of license exceptions for the export, reexport, or transfer (in-country) of any item classified under a 0x5zz ECCN when a party to the transaction is designated on the Department of the Treasury, Office of Foreign Assets Control (OFAC), Specially Designated Nationals and Blocked Persons (SDN) list under the designation [SDNT], or under the designation [SDNTK]. OFAC makes SDNT designations pursuant to the Narcotics Trafficking Sanctions Regulations, 31 CFR part 536, and SDNTK designations are made, pursuant to the Foreign Narcotics Kingpin Sanctions Regulations, 31 CFR part 598. This restriction on the use of license exceptions for these 0x5zz items will ensure that such parties designated on the SDN list will not be able to receive these 0x5zz items without a BIS license.

*License Exception: Shipments of Limited Value (LVS)*

Under this final rule, complete firearms controlled under ECCN 0A501 are not eligible for License Exception LVS, 15 CFR 740.3. Firearms ''parts,'' ''components,'' ''accessories,'' and ''attachments'' controlled under ECCN 0A501, other than receivers (frames), and ''complete breech mechanisms,'' including castings, forgings or stampings thereof, are eligible for License Exception LVS, with a limit of $500 on net value per shipment. In addition, receivers (frames), and ''complete breech mechanisms,'' including castings, forgings or stampings thereof, are eligible for License Exception LVS if the ultimate destination is Canada. This final rule states these limits in the License Exceptions paragraph of ECCN 0A501, and no revisions to the text of the license exception itself are needed to implement them. BIS believes that this provision is generally consistent with the license exemption for limited value shipments of firearms formerly found in ITAR (22 CFR 123.17(a)) (removed and reserved by the companion rule). This LVS eligibility included in this final rule is less restrictive than the former ITAR provision in two respects. First, the value limit per shipment will be $500 compared to $100 in the ITAR. Second, the LVS eligibility in the final rule allows exports of receivers and ''complete breech mechanisms'' to Canada whereas § 123.17(a) did not. However, the $500 LVS limit is based on the actual selling price or fair market value, whereas the ITAR $100 limit is based on ''wholesale'' value. In addition, with respect to Canada, an LVS limit of $500 per shipment is needed to comply with the Section 517 of the Commerce, Justice, Science, and Related Agencies Appropriations Act of 2015, which prohibits expending any appropriated funds to require licenses for the export of certain non-automatic firearms parts, components, accessories and attachments to Canada when valued at under $500.

Guns and armament and related items controlled under ECCN 0A602 are eligible for License Exception LVS, with a limit of $500 net value per shipment in this final rule.

Ammunition controlled under ECCN 0A505 are eligible for License Exception LVS; however, ammunition parts and components will be eligible with a limit of $500 (Commerce May 24 rule proposed $100, but as described below in the changes to ECCN 0A505, this final rule increases the limit of $500) net value per shipment in this final rule.

Test, inspection, and production equipment controlled under ECCNs 0B501, 0B505, and 0B602 for firearms, guns and armament, and ammunition/ ordnance are eligible for License Exception LVS with a limit of $3,000 net value per shipment, which is consistent with LVS eligibility for most 600 series ECCNs in this final rule.

*License Exception: Temporary Imports, Exports, Reexports, and Transfers (In-Country) (TMP)*

This final rule amends § 740.9 to state that License Exception TMP is not available to export or reexport the items that are the subject of this rule to destinations in Country Group D:5 (*See* Supplement No. 1 to part 740), or to Russia (Russian Federation). License Exception TMP is also not available to export or reexport some firearms and ammunition shipped from or manufactured in Russia (Russian Federation), Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan. In addition, this final rule will prohibit the use of License Exception TMP to export or reexport any item controlled by ECCN 0A501 and any shotgun with a barrel length less than 18 inches controlled under ECCN 0A502 that was shipped from or manufactured in Country Group D:5. This final rule also prohibits use of License Exception TMP to export or reexport any item controlled by ECCN 0A501 that is shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, except for any firearm model controlled by 0A501 that is also excluded under Annex A in Supplement No. 4 to part 740 (the prohibition will not apply to such firearms;); and any shotgun with a barrel length less than 18 inches controlled under 0A502 that was shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan. These prohibitions will apply to temporary exports of firearms from the United States, and the export of firearms temporarily in the United States. This final rule for consistency with the ITAR requirements for exports of firearms to Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, and Uzbekistan, removes the restriction included in the Commerce May 24 rule in paragraph (b)(5)(iii) that the firearms may not ultimately be destined to one of these seven countries from the restriction in paragraph (b)(5)(iii), but retains the restriction for Russia. This final rule makes one correction in Annex A in Supplement No. 4 to part 740 for the rifle ''VEPR Pioner'' under paragraph (b)(90) to correctly spell it as ''VEPR Pioneer.''

This final rule limits temporary exports of firearms controlled under ECCN 0A501 and any shotgun with a barrel length less than 18 inches controlled under ECCN 0A502 pursuant to License Exception TMP to exhibition and demonstration (§ 740.9(a)(5) of the EAR) and inspection, test, calibration, and repair (§ 740.9(a)(6) of the EAR). Consistent with the ITAR requirements previously applicable to temporary exports of the firearms covered by this rule (see 22 CFR 123.17(c), 123.22), exporters will continue to be required to file EEI in AES for transactions involving such firearms that are authorized pursuant to License Exception TMP (*See* § 758.1(a)(10) of the EAR).

This final rule authorizes the use of License Exception TMP for the export of ECCN 0A501 firearms temporarily in the United States for a period of not more than one year subject to the requirement that the firearms not be imported from or ultimately destined for certain proscribed or restricted countries. Certain information as described in the regulatory text will also be collected by CBP on behalf of BIS under existing or new Commerce paperwork collections. This final rule also makes eligibility to export under License Exception TMP for ECCN 0A501.a or .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 subject to the following conditions:

At the time of entry for a temporary import, the temporary importer is required to provide the required statement to CBP, as specified in paragraph (b)(5)(iv)(A).

The temporary importer is required to include on the invoice or other appropriate import-related documentation (or electronic equivalents) provided to CBP a complete list and description of the 0A501 firearms being imported, including their serial numbers, model, make, caliber, quantity, and U.S. dollar value, as specified in paragraph (b)(5)(iv)(B).

If the firearms are temporarily imported for a trade show, exhibition, demonstration, or testing, the temporary importer must provide to CBP the relevant invitation or registration documentation for the event and an accompanying letter that details the arrangements to maintain effective control of the firearms while they are in the United States, as specified in paragraph (b)(5)(iv)(C).

At the time of export, the temporary importer or its agent as specified in paragraph (b)(5)(v) are required to provide the temporary import documentation (*i.e.,* the invoice used at the time of entry for the temporary importation or other appropriate temporary import-related documentation (or electronic equivalents)) related to paragraph (b)(5)(iv)(B) to CBP. This information will be used by CBP to confirm that such firearms were in fact temporarily imported under the EAR for subsequent export under License Exception TMP.

This final rule adds a note to License Exception TMP to direct temporary importers and exporters to contact CBP at the port of import or export for the proper procedures to provide any data or documentation required by BIS.

*License Exception: Governments, International Organizations, International Inspections Under the Chemical Weapons Convention, and the International Space Station (GOV)*

This final rule revises § 740.11 to limit the applicability of License Exception GOV for firearms, ''parts'' and ''components'' controlled by ECCN 0A501 and ammunition controlled by 0A505 to exports, reexports, and transfers for official use by U.S government agencies and official and personal use by U.S. Government employees (and the immediate families and household employees of those government employees) (§ 740.11(b)(2)(i) and (ii) of the EAR). This authorization under License Exception GOV treats 0A501 firearms in the same manner that other items that are subject to the EAR may be exported to U.S. Government employees under License Exception GOV. It does not impose certain restrictions that are imposed by the former ITAR license exemption (22 CFR 123.18) (removed and reserved by companion rule) that authorized shipments consigned to and for the use of servicemen's clubs, and for service members or civilian employees if the firearms are for personal use and the shipment is accompanied by a written authorization from the commanding officer concerned. *See* the Commerce May 24 rule for additional background. License Exception GOV authorizes non-automatic and semi-automatic firearms and related ''parts'' and ''components.''

All other items that are the subject of this final rule will be subject to the limits on use of License Exception GOV that apply to 600 series items generally, *i.e.,* § 740.11(b)—to, for, or on behalf of the U.S. Government (including contractors, government employees, their families and household employees) or § 740.11(c) to a government in Country Group A:1 cooperating governments or an agency of NATO. However, this rule will add some additional restrictions for E:1 and E:2 countries. This final rule will exclude the use of License Exception GOV for any item listed in a 0x5zz ECCN for E:1 countries, unless authorized under paragraph (b)(2)(i) or

(ii) when the items are solely for U.S. Government official use. In addition, to better ensure compliance with section 1754(c) of the ECRA and address concerns with certain end users and uses in Country Group E:1 and E:2 countries, this final rule adds a new Note 2 to paragraph (b)(2), which restricts the use of License Exception GOV for E:1 and E:2 countries for multilaterally controlled items and anti-terrorism (AT) controlled items when destined to certain end users or end uses of concern.

This final rule also makes the following additional change to License Exception GOV to respond to the comments received on the Commerce May 24 rule:

In § 740.11 of License Exception GOV, this final rule revises Note 2 to paragraph (b)(2) to include illustrative examples of other sensitive end-users. This final rule adds the parenthetical phrase "(*e.g.,* contractors or other governmental parties performing functions on behalf of military, police, or intelligence entities)" after the phrase "or other sensitive end-users" to provide greater clarity on the other end-users that are excluded.

### *License Exception: Baggage (BAG)*

This final rule revises License Exception BAG, § 740.14, to allow United States citizens and permanent resident aliens leaving the United States temporarily to take up to three firearms controlled by proposed ECCN 0A501 and up to 1,000 rounds of ammunition for such firearms controlled under ECCN 0A505.a for personal use while abroad. This change to License Exception BAG is made to be consistent with former 22 CFR 123.17(c) (removed and reserved by companion rule), which authorized U.S. persons to take up to three non-automatic firearms and up to 1,000 cartridges therefor abroad for personal use. This amendment to License Exception BAG applies to both non-automatic and semi-automatic firearms.

Travelers leaving the United States temporarily are required to declare the 0A501 and 0A505 items to a CBP officer prior to departure from the United States and present the firearms, "parts," "components," "accessories," "attachments," and ammunition they are exporting to the CBP officer for inspection, confirming that the authority for the export is License Exception BAG, that the exporter is compliant with its terms. Should exporters desire to contact CBP prior to departure, contact information and a list of U.S. air, land and sea ports of entry

can be found at: *https://www.cbp.gov/contact/ports.*

This final rule also revises License Exception BAG to allow nonresident aliens leaving the United States to take firearms, "accessories," "attachments," "components," "parts," and ammunition controlled by ECCN 0A501 or 0A505 that they lawfully brought into the United States. This change is consistent with former 22 CFR 123.17(d) (removed and reserved by companion rule), which authorized foreign persons leaving the United States to take firearms and ammunition controlled under Category I(a) of the USML (both non-automatic and semi-automatic) that they lawfully brought into the United States. This final rule does not adopt any changes to the availability of License Exception BAG for shotguns and shotgun shells authorized under paragraph (e)(1) or (2).

As a clarification to License Exception BAG, this final rule adds one sentence to the introductory text of paragraph (b)(4) to highlight the special provisions that apply in paragraph (e) for firearms and ammunition and in paragraph (h) for personal protective equipment under ECCN 1A613.c or .d. This one sentence does not change the existing requirement and has been included to assist the public in better identifying these special provisions.

Consistent with the ITAR requirements previously applicable to temporary exports of the firearms and associated ammunition covered by the May 24 proposed rule, BIS proposed in the Commerce May 24 rule to modify § 758.1 of the EAR to make clear that exporters would continue to be required to file EEI in AES for transactions involving such firearms and associated ammunition that are otherwise authorized pursuant to License Exception BAG. However, for the reasons described above in the description of the comments and BIS responses, this final rule adopts an alternative approach with the addition of the new § 758.11 described immediately below.

This final rule makes the following additional changes in response to the public comments received on the Commerce May 24 rule:

As described above, this final rule removes the EEI filing requirement in AES as set forth in § 758.1(b)(9) for firearms authorized under License Exception BAG.

In response to public comments as described above, this final rule instead adds a new § 758.11 (Export clearance requirements for firearms and related items) and incorporates a requirement to use the Department of Homeland

Security, CBP Form 4457, Certificate of Registration for Personal Effects Taken Abroad) (OMB Control Number 1651–0010) for all exports of commodities controlled under ECCNs 0A501.a or .b, shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, or ammunition controlled under ECCN 0A505 except for .c, regardless of value or destination, including exports to Canada, that are authorized under License Exception BAG, as set forth in § 740.14. Section 758.11 includes four paragraphs: Paragraph (a) (Scope) specifies when these export clearance requirements apply; paragraph (b) (Required form) identifies the required form that needs to be used in connection with these exports authorized under License Exception BAG, including paragraph (b)(1) that includes a website for where to find the form, and paragraph (b)(2) that specifies the "description of articles" for firearms to be included on the CBP Form 4457; paragraph (c) provides a link for where to find additional information on the CBP Form 4457; and paragraph (d) (Return of items exported pursuant to this section) specifies the requirements for the return of items exported under License Exception BAG when the export clearance requirements in § 758.11 apply.

### *License Exception: Servicing and Replacement of Parts and Equipment (RPL)*

This final rule also adopts the following changes to License Exception RPL to respond to the comments received on the Commerce May 24 rule, that requested License Exception RPL be included as a valid purpose for a temporary import under § 758.10. As described above, BIS agreed to include License Exception RPL in § 758.10, and these changes are described below.

In § 740.10(b) (Servicing and replacement of parts and equipment), this final rule makes needed conforming changes for the addition of License Exception RPL to § 758.10 and to include similar changes as were made to License Exception TMP under § 740.9(b)(5) in the Commerce May 24 rule. This final rule adds one sentence to the end of the introductory text of § 740.10(b)(1) to specify that that additional requirements in new paragraph (b)(4) must be met in order to use License Exception RPL to authorize under paragraph (b)(2) or (3) the export of firearms controlled by ECCN 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 temporarily in the United State for servicing and replacement. This final rule adds new paragraph (b)(4) (Exports

of firearms and certain shotguns temporarily in the United States for servicing and replacement). Under the introductory text of paragraph (b)(4), this final rule imposes a requirement that the firearms and certain shotguns must be temporarily in the United States for servicing or replacement for a period not exceeding one year or the time it takes to service or replace the commodity, whichever is shorter in order to use License Exception RPL to authorize the export. This final rule adds paragraphs (b)(4)(i) and (ii) to impose restrictions for firearms shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, except for any firearm model controlled by 0A501 that is specified under Annex A in Supplement No. 4 to part 740, to impose the same types of restrictions and impose the same type of information requirements for providing information to CBP as this final rule includes for License Exception TMP under paragraph (b)(5).

*License Exception: Additional Permissive Reexports (APR)*

This final rule also adopts the following change to License Exception APR to respond to the comments received on the Commerce May 24 rule:

In § 740.16 of License Exception APR, this final rule adds commodities classified under a 0x5zz ECCN to the list of commodities excluded under paragraph (a) of License Exception APR. This final rule also adds a new paragraph (b)(2)(vi) to exclude commodities classified under a 0x5zz ECCN under paragraph (b) of License Exception APR. The Commerce May 24 rule did not propose these exclusions from License Exception APR, but BIS identified these two paragraphs of License Exception APR as two authorizations that were not intended to be available under the Commerce May 24 rule, but based on the stated criteria prior to the effective date of this final rule would have been available. Therefore, this final rule makes these changes to ensure the authorizations available for reexports and transfers (in-country) will be equivalent to those available for exports.

*License Exception STA*

BIS did not receive any comments on the proposed changes to License Exception STA, § 740.20, in the Commerce May 24 rule, so this final rule adopts those changes as proposed. This final rule revises the regulations at § 740.20 to make firearms controlled under ECCN 0A501 and most "parts," "components," "accessories," and

"attachments" controlled under ECCN 0A501 ineligible for License Exception STA. Only those "parts," "components," "accessories," and "attachments" that are controlled under paragraph .x are eligible for export under License Exception STA. Items controlled under ECCNs 0A502 and 0A503 are also excluded from STA eligibility.

**Support Documentation for Firearms, Parts, Components, Accessories, and Attachments Controlled by ECCN 0A501**

BIS did not receive any comments on this proposed change to § 748.12 in the Commerce May 24 rule, so the change is published in this final rule as proposed. This final rule requires that for commodities controlled by ECCN 0A501 that are the subject of export or reexport transactions for which a license is required, the exporter or reexporter must obtain, prior to submitting an application, an import permit (or copy thereof) if the importing country requires such permits for import of firearms. That import permit is a record that must be kept by the exporter or reexporter as required by part 762 of the EAR. The purpose of this requirement is to assure foreign governments that their regulations concerning the importation of firearms are not circumvented. To implement this change, this final rule revises § 748.12 to include the commodities controlled under ECCNs 0A501 (except 0A501.y), 0A502, 0A504 (except 0A504.f), and 0A505 (except 0A505.d) within the list of commodities that are subject to the requirement and adds a new paragraph (e) requiring that import certificates or permits be obtained from countries other than OAS member states if those states require such a certificate or permit.

**Licenses for Firearms and Ammunition Will Be Limited to the Authorized End Use and End Users**

BIS did not receive any comments on these statements of EAR licensing policy in the Commerce May 24 rule but restates them here to assist the public. Consistent with other BIS licenses, including "600 series" and 9x515 items, licenses for firearms and ammunition that move from the USML to the CCL are limited to the authorized end use and end users specified on the license and supporting documentation submitted as part of the license application. This means any change in the authorized end use or end user for a licensed transaction will require a BIS authorization. This existing requirement of BIS licenses is specified in § 750.7(a) and on the boiler plate text included on

all BIS licenses. These requirements are also applied to firearms and ammunition licenses. A change in end use or end user, including a change of authorized end use or end user within a single foreign country for a firearm or ammunition authorized under a BIS license, requires a BIS authorization. BIS does not adopt any changes in this final rule to these well-established and understood requirements on using BIS licenses. Applicants for firearms and ammunition licenses are also advised that BIS continues to exercise its authority, as specified in § 748.11 in the Note 2 to paragraph (a), on a case-by-case basis to require a Statement by Ultimate Consignee and Purchaser as warranted.

The exporter, reexporter, or transferor using a BIS license, including for firearms and ammunition licenses, is also required, pursuant to § 750.7(a), to inform the other parties identified on the license, such as the ultimate consignees and end users of the license's scope and of the specific conditions applicable to them. As an additional safeguard for firearms and ammunition licenses, BIS will include, when warranted, a license condition requiring the exporter, reexporter, or transferor to obtain from the other parties identified on the license a written confirmation that those other parties have received and agree to the terms and conditions of the license. For example, the condition may state "Prior to using this license, the exporter (reexporter or transferor) and other parties to the license must agree to the conditions in writing and the exporter (reexporter or transferor) must keep this on file with their other records." The documents described in this paragraph are required to be kept for EAR recordkeeping purposes under part 762 of the EAR.

**Conventional Arms Reporting for Certain Exports of ECCN 0A501.a and .b Commodities**

In § 743.4 (Conventional arms reporting), this final rule revises paragraphs (c)(1)(i) and (c)(2)(i) to add ECCN 0A501.a and .b as commodities that require Wassenaar Arrangement reporting and United Nations reporting under this conventional arms reporting section of the EAR. This requirement assists the U.S. Government to meet its multilateral commitments for the special reporting requirements for exports of certain items listed on the WAML and the United Nations Register of Conventional Arms when these items are authorized for export under License Exceptions LVS, TMP, RPL, STA, or GOV (see part 740 of the EAR) or the

Validated End-User authorization (see § 748.15 of the EAR) and for United Nations reporting. License Exceptions LVS and STA are identified in § 743.4(b)(1), but because ECCN 0A501.a and .b commodities are not eligible for those two license exceptions, the reporting requirements under § 743.4(c)(1)(i) and (c)(2)(i) are limited to exports authorized License Exceptions TMP, GOV, and RPL or the Validated End-User authorization. This final rule also adds contact information for these reports.

This final rule also makes the following additional change to § 743.4 to respond to the comments received on the Commerce May 24 rule:

Commenters requested that BIS use information required to be submitted in the EEI filing in AES to pull the conventional arms reporting data directly in order to eliminate the need for exporters to submit separate reports to BIS. BIS agreed and this final rule revises three paragraphs in § 743.4 to adopt an alternative method for BIS to receive the information that is required for conventional arms reporting. This rule revises paragraph (a) to add four sentences at the end of the paragraph. These four sentences specify that if the exporter follows the requirements specified in this section for the alternative submission method described in new paragraph (h) (Alternative submission method), that separate reporting does not need to be made to BIS for purposes of § 743.4. Because of the EEI filing requirements in AES in new § 758.1(g)(4)(ii) for the firearms that require conventional arms reporting, all conventional arms reporting requirements for firearms should be able to be met by using the alternative submission method. Under paragraph (b) (Requirements), this final rule adds a reference to meeting the reporting requirement by using the alternative submission method in new paragraph (h).

This final rule adds paragraph (h) that describes the requirements for the alternative submission method. To use the alternative reporting method, each time the exporter files an EEI record in AES, the exporter must include as the first text in the Commodity Description field in AES the first six characters of the ECCN number, *i.e.,* "0A501.a" or "0A501.b." In addition, the exporter must document for recordkeeping requirements under the EAR that for purposes of the conventional arms reporting requirements under part 743, it has decided to use the alternate submission method by taking steps to identify the end item firearms in the EEI filing in AES that will enable the U.S.

Government to pull the data and meet national reporting commitments to the Wassenaar Arrangement and the United Nations.

As a conforming change, in § 758.1 (The Electronic Export Enforcement (EEI) filing to the Automated Export System (AES)), this final rule adds a new paragraph (g)(4)(ii) (Identifying end item firearms by "items" level classification or other control descriptor in the EEI filing in AES). Exporters must include the six character ECCN classification (*i.e.,* 0A501.a or 0A501.b), as the first text to appear in the Commodity description block in the EEI filing in AES. Exporters for shotguns controlled under 0A502 must include the phrase "0A502 barrel length less than 18 inches" as the first text to appear in the Commodity description block in the EEI filing in AES. This information will be used by BIS as referenced in § 743.4(h) for conventional arms reporting.

**Changes to Export Clearance Requirements for Firearms Being Moved to the CCL (Part 758)**

In § 758.1, this final rule adopts changes to clarify that a filing of EEI in AES will be required for exports of the firearms transferred from the USML pursuant to this rule regardless of value or destination, including exports to Canada. As noted above, this requirement applies, as was the case under the ITAR prior to the effective date of this final rule, for temporary exports of such items pursuant to License Exception TMP, but not for License Exception BAG.

In addition, this final rule expands the data elements required as part of an EEI filing to AES filing for these firearms to include serial numbers, make, model and caliber. This requirement will ensure law enforcement officials are able to effectively verify that firearms exports are properly authorized and in conformance with all applicable regulations, including those associated with the temporary export and subsequent return of controlled firearms and unused ammunition.

This final rule also makes the following additional changes to § 758.1(b)(10) and (c)(1) to respond to the comments received on the Commerce May 24 rule regarding the concerns for individuals having to file EEI in AES:

In § 758.1, this final rule revises new paragraph (b)(10) that was included in the Commerce May 24 rule, but adds it as new paragraph (b)(9). This final rule excludes exports authorized under License Exception BAG from the EEI

filing requirement in AES. As a conforming change, this final rule revises paragraph (c)(1) to eliminate the restriction from the exemption for License Exception BAG. This final rule makes this change because of excluding License Exception BAG from paragraph (b)(9) means the general exemption for not filing EEI in AES for these firearms authorized under License Exception BAG, should be available, so this final rule makes this conforming change. This final rule adds a new Note to paragraph (c)(1) to add a cross reference to the export clearance requirements that are specific to firearms exported under License Exception BAG.

This final rule also makes the following additional changes to § 758.1(g)(4) to respond to the comments received on the Commerce May 24 rule regarding concerns for having to include the manufacture, model, caliber, and serial number in the EEI filing in AES:

In § 758.1(g)(4) (Exports of Firearms and Related Items), this final rule adds a new paragraph (g)(4)(i) (Identifying end item firearms by manufacturer, model, caliber, and serial number in the EEI filing in AES) to narrow the requirement for when firearms must be identified by manufacture, model, caliber, and serial number in the EEI filing in AES to License Exception TMP or a BIS license that contains a condition requiring all or some of this information to be filed as EEI in AES.

**Entry Clearance Requirements for Temporary Imports (§ 758.10)**

Temporary imports are transactions that involve both the temporary entry of an item into the U.S. from a foreign country and the subsequent export of that item from the U.S. To preserve the treatment of temporary import transactions for items in this rule that will transfer from the USML in the ITAR to become subject to the EAR, BIS imposes a temporary imports entry clearance requirement in this final rule by adding new § 758.10. This new section is limited to items in this rule that are both "subject to the EAR" and on the USMIL in 27 CFR 447.21. To allow such items to temporarily enter the U.S., this final rule imposes a process to collect identifying information for the sole purpose of tracking items being temporarily imported for subsequent export. BIS does not impose a license requirement for such imports, but this information is necessary to facilitate the export after a temporary import. The entry clearance requirement is an EAR requirement and any false representation made under the new § 758.10 will be a violation of the EAR.

This final rule also makes the following additional change to § 758.10 to respond to the comments received on the Commerce May 24 rule:

In § 758.10, this final rule adds an exclusion to the entry clearance requirements proposed in the Commerce May 24 rule to clarify that firearms ''subject to the EAR'' brought into the United States by nonimmigrant aliens under the provisions of Department of Justice regulations at 27 CFR part 478 are not subject to these same entry clearance requirements for temporary imports. This final rule makes this change for consistency with License Exception BAG under paragraph (e) and because ATF regulations address nonimmigrant aliens temporarily bringing these types of firearms into the United States, so the requirements in § 758.10 do not need to apply.

In § 758.10, this final rule clarifies the penultimate sentence and the last sentence of paragraph (a) by removing references to ''permanent return'' and ''permanent import'' after items are temporarily exported under an EAR authorization, *e.g.,* License Exception TMP or a Commerce license. This clarification is made because the inbound portion of a temporary export is covered by the temporary export authorization, so it not accurate to describe those as a ''permanent return'' or as a ''permanent import.''

Also in § 758.10, this final rule clarifies the introductory text of paragraph (b) by deleting the title ''the Port Directors'' before U.S. Customs and Border Protection. This change is made because U.S. Customs and Border Protection Center Directors may also have an enforcement role in addition to Port Directors, so referencing U.S. Customs and Border Protection is sufficient. In paragraph (b)(2), this final rule revises the phrase ''as requested by CBP'' with the phrase ''upon request by CBP.'' In the last sentence of paragraph (b)(2), this final rule removes the word ''inspection'' after the phrase ''additional requirements,'' because the word was not intended to be included in the cross reference to § 758.1(g)(4).

This final rule also revises § 758.10 to add references to License Exception RPL and BIS licenses as two additional EAR authorizations as valid purposes for a temporary import under this section. This final rule does this by revising paragraph (b)(1)(i) to broaden the number of permissible statements to allow for three statements (instead of the single statement that was included in the Commerce May 24 rule). This final rule adds new paragraphs (b)(1)(i)(A) (to account for License

Exception TMP under 15 CFR 740.9(b)(5)), (b)(1)(i)(B) (to account for the addition of License Exception RPL under 15 CFR 740.10(b)), and (b)(1)(i)(C) (to account for BIS licenses) to add the three statements. The three statements are substantively the same, and the only difference is the EAR authorization being referenced in the statement. As a conforming change, this final rule adds a new paragraph (b)(1)(iv) that applies if the item being temporarily imported under § 758.10 is for servicing or replacement. Under this new paragraph (b)(1)(iv) at the time of temporary import, the name, address and contact information of the organization or individual in the U.S. that will be receiving the item for servicing or replacement must be provided to CBP. Lastly, as an additional conforming change, this final rule adds a new Note 2 to paragraph (b)(1) to impose exclusions, similar to those imposed on License Exception TMP that limit the availability of License Exception RPL for temporary imports of certain firearms shipped from or manufactured in listed countries.

*Unique Application and Submission Requirements for Licenses*

This final rule also adopts the following changes for BIS license applications in response to comments received. As described above, BIS agreed to include changes in § 758.10 to account for temporary imports that would require a BIS license for subsequent export.

In Supplement No. 2 to part 748—Unique Application and Submission Requirements, this final rule adds a new paragraph (z) (Exports of firearms and certain shotguns temporarily in the United States) describing a certification requirement for applicants to include in Block 24 of the BIS license application. The certification requirement is an acknowledgement by the applicant that the firearms in the application will not be shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, except for any firearm model controlled by 0A501 that is specified under Annex A in Supplement No. 4 to part 740. The certification also requires that the applicant and other parties to the transaction will comply with the requirements in paragraphs (z)(2)(i) and (ii) of Supplement No. 2 to part 748. This final rule adds paragraph (z)(2) (*Requirements*) to describe the requirements that will be applicable for any license for the export of firearms controlled by ECCN 0A501.a or .b, or shotguns with a barrel length less than

18 inches controlled in ECCN 0A502 that will be temporarily imported to the United States. These requirements impose the same type of requirements as this final rule includes for License Exception TMP under paragraph (b)(5) and License Exception RPL under paragraph (b)(4), but does so by imposing the certification requirement in paragraph (z)(1). BIS will include a standard condition that will require compliance with the requirements in paragraphs (z)(2)(i) and (ii).

**Changes to EAR Recordkeeping Requirements for Firearms Being Moved to the CCL (Part 762)**

BIS does not make any additional changes in this final rule to what was proposed in the Commerce May 24 rule as a result of the comments received, so these changes are adopted as proposed. In part 762 (Recordkeeping), this final rule adopts two changes to the recordkeeping requirements under the EAR. These changes specify that certain records, that are already created and kept in the normal course of business, must be kept by the ''exporter'' or any other party to the transaction (*see* § 758.3 of the EAR), that creates or receives such records.

Specifically, in § 762.2 (Records to be retained), this final rule redesignates paragraph (a)(11) as (a)(12) and adds a new paragraph (a)(11) to specify the following information must be kept as an EAR record: Serial number, make, model, and caliber for any firearm controlled in ECCN 0A501.a and for shotguns with barrel length less than 18 inches controlled in 0A502. The ''exporter'' or any other ''party to the transaction'' that creates or receives such records is the person responsible for retaining this record.

In § 762.3 (Records exempt from recordkeeping requirements), this final rule narrows the scope of an exemption from the EAR recordkeeping requirements for warranty certificates. This final rule narrows this exclusion to specify the exclusion from the recordkeeping requirements does not apply (meaning the record will need to be kept under the recordkeeping requirements) for warranty certificates for any firearm controlled in ECCN 0A501.a and for shotguns with barrel length less than 18 inches controlled in 0A502, when the certificate issued is for an address located outside the United States. This is an expansion of the EAR recordkeeping requirements, but because warranty certificates are already created and kept as part of normal business recordkeeping purposes, this expansion is not anticipated to create any new or increased burden under the

EAR, because it is a document that is created in the normal course of business and should be easily accessible. These recordkeeping requirements will assist the United States Government because it is important for law enforcement to have access to this information.

### Conforming Change To Add a New Definition for Use in ECCNs 0A501 and 0A502 (§ 772.1)

This final rule also adds a new definition to the definition part of the EAR to respond to the comments received on the Commerce May 24 rule:

In § 772.1 (Definitions of terms as used in the Export Administration Regulations), this final rule adds a definition of "complete breech mechanisms." The new definition specifies that this is a mechanism for opening and closing the breech of a breech-loading firearm, especially of a heavy-caliber weapon. As a conforming change, this final rule also adds double quotation marks around the term where it is used in ECCNs 0A501 and 0A502.

### Export Control Reform Act of 2018

On August 13, 2018, the President signed into law the John S. McCain National Defense Authorization Act for Fiscal Year 2019, which included the Export Control Reform Act of 2018 (ECRA) (50 U.S.C. 4801–4852) that provides the legal basis for BIS's principal authorities and serves as the authority under which BIS issues this rule. As set forth in Section 1768 of ECRA, all delegations, rules, regulations, orders, determinations, licenses, or other forms of administrative action that have been made, issued, conducted, or allowed to become effective under the Export Administration Act of 1979 (50 U.S.C. 4601 *et seq.*) (as in effect prior to August 13, 2018 and as continued in effect pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*) and Executive Order 13222 of August 17, 2001, 3 CFR, 2001 Comp., p. 783 (2002), as amended by Executive Order 13637 of March 8, 2013, 78 FR 16129 (March 13, 2013), and as extended by the Notice of August 8, 2018, 83 FR 39871 (August 13, 2018)), or the Export Administration Regulations, and are in effect as of August 13, 2018, shall continue in effect according to their terms until modified, superseded, set aside, or revoked under the authority of ECRA.

### Executive Order Requirements

Executive Orders 13563 and 12866 direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distribute impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. This final rule has been designated a "significant regulatory action," although not economically significant, under section 3(f) of Executive Order 12866. Although the items identified in this final rule have been determined to no longer warrant ITAR control by the President, the proliferation of such items has been identified as a threat to domestic and international security if not classified and controlled at the appropriate level under the EAR. Commerce estimates that the combined effect of all rules to be published adding items removed from the ITAR to the EAR will increase the number of license applications to be submitted to BIS by approximately 30,000 annually.

This final rule does not contain policies with Federalism implications as that term is defined under E.O. 13132.

To control these items under the EAR that no longer warrant ITAR control, appropriate controls on the CCL needed to be included in the Department of Commerce final rule. This includes creating new ECCNs and revising certain existing ECCNs, as well as making other changes to the EAR to control items that will be moved from these three USML categories to the CCL once the section 38(f) notification process is completed and a final rule is published and becomes effective. Adding new controls and other requirements to the EAR imposes regulatory burdens on exporters and some other parties involved with those items, but compared to the burdens these exporters and other parties faced under the ITAR, these regulatory burdens, including financial costs, will be reduced significantly. The EAR is a more flexible regulatory structure whereby the items can still be controlled appropriately, but in a much more efficient way that will significantly reduce the burdens on exporters and other parties compared to the regulatory burdens they faced when the items were "subject to the ITAR." Deregulatory does not mean a decontrol of these items.

For those items in USML Categories I, II, and III that will move by this rule to the CCL, BIS will be collecting the necessary information using the form associated with OMB Control No. 0694–0088. BIS estimates that this form takes approximately 43.8 minutes for a manual or electronic submission. Using the State Department's estimate that 10,000 license applications annually will move from the USML to the CCL and BIS's estimate in this final rule that 6,000 of the 10,000 license applications will require licenses under the EAR, that constitutes a burden of 4,380 hours for this collection under the EAR. Those companies are currently using the State Department's forms associated with OMB Control No. 1405–0003 for which the burden estimate is 1 hour per submission, which for 10,000 applications results in a burden of 10,000 hours. Thus, subtracting the BIS burden hours of 4,380 from the State Department burden hours of 10,000, the burden is reduced by 5,620 hours. The other 4,000 applicants may use license exceptions under the EAR or the "no license required" designation, so these applicants will not be required to submit license applications under the EAR.

In addition to the reduced burden hours of 5,620 hours, there will also be direct cost savings to the State Department that will result from the 10,000 license applications no longer being required under the ITAR once these items are moved to the EAR. The Department of State charges a registration fee to apply for a license under the ITAR. Pursuant to the AECA, ITAR, and associated delegations of authority, every person who engages in the business of brokering activities, manufacturing, exporting, or temporarily importing any defense articles or defense services must register with the Department of State and pay a registration fee. The Department of State adopted the current fee schedule to align the registration fees with the cost of licensing, compliance, and other related activities. The Department of Commerce will incur additional costs to administer these controls and process license applications. However, the Department of Commerce does not charge a registration fee to apply for a license under the EAR, and we are unable to estimate the increase in costs to the Department of Commerce to process the new license applications. Therefore, we are unable to provide an estimate of the net change in resource costs to the government from moving these items from the ITAR to the EAR. It is the case, however, that the movement of these items from the ITAR will result in a permanent and recurring direct transfer of $2,500,000 per year from the government to the exporting public, less the increased cost to taxpayers, because they will no longer

pay fees to the State Department for licenses and there is no fee charged by the Department of Commerce to apply for a license.

*Estimated Cost Savings*

For purposes of E.O. 13771 of January 30, 2017 (82 FR 9339), the Department of State and Department of Commerce final rules are expected to be ''net deregulatory actions.'' The Department of Commerce has conducted this analysis in close consultation with the Department of State, because of how closely linked the two final rules are for the regulated public and the burdens imposed under the U.S. export control system.

E.O. 13771 and guidance provided to the agencies on interpreting the intended scope of the E.O. do not use the term ''net deregulatory action,'' but rather refer to deregulatory actions. As outlined above, the Departments of State and Commerce final rules are closely linked and are best viewed as a consolidated deregulatory action although being implemented by two different agencies. Also, as noted above, items may not be subject to both sets of regulations. Therefore, the movement of a substantial number of items from the USML determined to no longer warrant ITAR control to the CCL will result in a significant reduction of regulatory burden for exporters and other persons involved with such items that were previously ''subject to the ITAR.''

For purposes of E.O. 13771, the Departments of State and Commerce have agreed to equally share the cost burden reductions that will result from the publication of these two integral deregulatory actions. The Department of State will receive 50% and the Department of Commerce will receive 50% for purposes of calculating the deregulatory benefit of these two integral actions.

*Under this agreed formulation, the burden reductions will be calculated as follows:*

For purposes of the Department of Commerce, the ''net deregulatory actions'' will result in a permanent and recurring cost savings of $1,250,000 per year, and a reduction in burden hours by 2,810 hours. The reduction in burden hours by 2,810 will result in an additional cost savings of [1] $126,281 to the exporting public. The total cost savings will be $1,376,281 in present (2017) dollars. To allow for cost

comparisons under E.O. 13771, the value of these costs savings in 2016 dollars is $1,353,574. Assuming a 7% discount rate, the present value of these cost savings in perpetuity is $19,336,771. Since the costs savings of this rule are expected to be permanent and recurring, the annualized value of these cost savings is also $1,353,574 in 2016 dollars.

For purposes of the Department of State, the ''net deregulatory actions'' will result in a permanent and recurring cost savings of $1,250,000 per year, and a reduction in burden hours by 2,810 hours. The reduction in burden hours by 2,810 will result in an additional cost savings of $126,281 to the exporting public. The total cost savings will be $1,376,281 in present (2017) dollars. To allow for cost comparisons under E.O. 13771, the value of these costs savings in 2016 dollars is $1,353,574. Assuming a 7% discount rate, the present value of these cost savings in perpetuity is $19,336,771. Since the costs savings of this rule are expected to be permanent and recurring, the annualized value of these cost savings is also $1,353,574 in 2016 dollars.

The Department of Commerce in the Commerce May 24 rule welcomed comments from the public on the analysis under E.O. 13771 described here. The Commerce May 24 rule noted that it would be helpful to receive comments from companies that will no longer need to register with the Department of State because the company only deals with items under USML Category I, II, and/or III that will move to the CCL. Comments were also encouraged on any of the other collections that may be relevant for the items that will move from the USML to the CCL. The Commerce May 24 rule also noted that it would be helpful to receive data on Department of State forms that will no longer need to be submitted.

**Paperwork Reduction Act Requirements**

Notwithstanding any other provision of law, no person may be required to respond to or be subject to a penalty for failure to comply with a collection of information, subject to the requirements of the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 *et seq.*) (PRA), unless that collection of information displays a currently valid OMB control number.

This final regulation involves four collections currently approved by OMB under these BIS collections and control numbers: Simplified Network Application Processing System (control number 0694–0088), which includes, among other things, license

applications; License Exceptions and Exclusions (control number 0694–0137); Import Certificates and End-User Certificates (control number 0694–0093); Five Year Records Retention Period (control number 0694–0096); and the U.S. Census Bureau collection for the Automated Export System (AES) Program (control number 0607–0152).

This final rule will affect the information collection, under control number 0694–0088, associated with the multi-purpose application for export licenses. This collection carries a burden estimate of 43.8 minutes for a manual or electronic submission for a burden of 31,833 hours. BIS believes that the combined effect of all rules to be published adding items removed from the ITAR to the EAR will be an increase in the number of license applications to be submitted by approximately 30,000 annually, resulting in an increase in burden hours of 21,900 (30,000 transactions at 43.8 minutes each) under this control number. For those items in USML Categories I, II, and III that will move by this rule to the CCL, the State Department estimates that 10,000 applicants annually will move from the USML to the CCL. BIS estimates that 6,000 of the 10,000 applicants will require licenses under the EAR, resulting in a burden of 4,380 hours under this control number. Those companies are currently using the State Department's forms associated with OMB Control No. 1405–0003 for which the burden estimate is 1 hour per submission, which for 10,000 applications results in a burden of 10,000 hours. Thus, subtracting the BIS burden hours of 4,380 from the State Department burden hours of 10,000, the burden will be reduced by 5,620 hours. (*See* the description above for the E.O. 13771 analysis for additional information on the cost benefit savings and designation of the two rules as ''net deregulatory actions''.)

This final rule will also affect the information collection under control number 0694–0137, addressing the use of license exceptions and exclusions. Some parts and components formerly on the USML, and ''software'' and ''technology'' for firearms and their parts and components formerly on the USML, will become eligible for License Exception STA under this final rule. Additionally, test, inspection and production equipment, and ''software'' and ''technology'' related to those firearms and ''parts'' may become eligible for License Exception STA. BIS believes that the increased use of License Exception STA resulting from the combined effect of all rules to be

---

[1] The Department of Commerce used the Department of State's estimate that the burden hour cost for completing a license application is $44.94 per hour. Multiplied by the estimated burden hour savings of 2,810 equals a cost savings to the public of $126,281.

published adding items removed from the ITAR to the EAR will increase the burden associated with control number 0694–0137 by about 23,858 hours (20,450 transactions at 1 hour and 10 minutes each).

BIS expects that this increase in burden as a result of the increased use of License Exception STA will be more than offset by a reduction in burden hours associated with approved collections related to the ITAR. This final rule addresses controls on firearms and ''parts,'' production equipment and ''parts'' and related ''software'' and ''technology'' and specifically non-automatic and semi-automatic firearms and their ''parts'' and ''parts,'' ''components,'' ''attachments,'' and ''accessories'' that are used in both semi-automatic and fully automatic firearms. BIS has made this determination on the basis that with few exceptions, the ITAR allows exemptions from license requirements only for exports to Canada, and requires a specific State Department authorization for most exports of firearms used for hunting and recreational purposes and exports of ''parts,'' ''components,'' ''attachments,'' and ''accessories'' that are common to military fully automatic firearms and their semi-automatic civilian counterparts, even when destined to NATO and other close allies and also requires State Department authorization for the exports necessary to produce ''parts'' and ''components'' for defense articles in the inventories of the United States and its NATO and other close allies. However, under the EAR, as specified in this final rule, a number of low-level parts will be eligible for export under License Exception STA and will therefore not require a license to such destinations.

This final rule will also affect the information collection under control number 0694–0096, for the five-year recordkeeping retention because of two changes this rule will make to part 762 of the EAR. This rule adds a new paragraph (a)(11) to § 762.2 to specify the following information must be kept as an EAR record: Serial number, make, model, and caliber for any firearm controlled in ECCN 0A501.a and for shotguns with barrel length less than 18 inches controlled in 0A502. This rule will also require warranty certificates for these items to be retained for EAR recordkeeping. However, because these records are already created and kept as part of normal business recordkeeping, this expansion is not anticipated to create any new or increased burden under the EAR.

Even in situations in which a license will be required under the EAR, the

burden will likely be reduced compared to a license requirement under the ITAR. In particular, license applications for exports of ''technology'' controlled by ECCN 0E501 will likely be less complex and burdensome than the authorizations required to export ITAR-controlled technology, *i.e.,* Manufacturing License Agreements and Technical Assistance Agreements (as a result of the differences in the scope of the ITAR's and the EAR's technology controls).

This final rule will affect the information collection under control number 0694–0093, import certificates and end-user certificates because of the changes included in this final rule. First, this regulation will require that for shipments requiring a license of firearms, ''parts,'' ''components,'' ''accessories,'' and ''attachments'' controlled under ECCN 0A501, the exporter must obtain a copy of the import certificate or permit if the importing country requires one for importing firearms. License applications for which an import or end-user certificate is already required under § 748.12 of the EAR will not be subject to this new requirement. BIS expects that this requirement will result in no change in the burden under control number 0694–0093. Second, this final rule also will require that prior to departure, travelers leaving the United States and intending to temporarily export firearms, parts, and components controlled under ECCN 0A501 under License Exception BAG declare the firearms and parts to a CBP officer and present the firearms and parts to the CBP officer for inspection. As the State Department also requires that persons temporarily exporting firearms, parts, and components declare the items to CBP, BIS does not expect that the requirement in this final rule will result in a change in burden under control number 0694–0093.

Third, this final rule will affect the information collection under control number 0694–0093 by creating a new temporary import entry clearance requirement by adding § 758.10. This new section will be limited to items in this rule that are both ''subject to the EAR'' and on the United States Munitions Import List (USMIL) in 27 CFR 447.21. To allow such items to temporarily enter the U.S., this rule implements a process to collect identifying information for the sole purpose of tracking items being temporarily imported for subsequent export under License Exceptions TMP, RPL, and BIS licenses. BIS will not impose a license requirement for such imports, but collecting this information

will be necessary to facilitate the export after a temporary import. The temporary import entry clearance requirement in § 758.10 will also conform to the requirements in License Exception TMP under § 740.9(b)(5), License Exception RPL under § 740.9(b)(4), and for BIS licenses under paragraph (z) in Supplement No. 2 to part 748, so providing this information to CBP at entry after a temporary import will facilitate the export phase of a temporary import under License Exceptions TMP, RPL and BIS licenses. At the time of entry for a temporary import, the importer will need to provide a statement to CBP indicating that this shipment was being temporarily imported in accordance with the EAR for subsequent export in accordance with and under the authority of License Exceptions TMP, RPL, or a BIS license. The entry clearance requirement will be an EAR requirement and any false representation made under the new § 758.10 will be a violation of the EAR. The importer will also need to provide CBP an invoice or other appropriate import-related documentation (or electronic equivalents) that includes a complete list and description of the items being imported, including their model, make, caliber, serial numbers, quantity, and U.S. dollar value. If imported for a trade show, exhibition, demonstration, or testing, the temporary importer will need to provide CBP with the relevant invitation or registration documentation for the event and an accompanying letter that details the arrangements to maintain effective control of the firearms while they are temporarily in the United States. If imported for servicing or replacement, the temporary importer will need to provide CBP with the name, address and contact information (telephone number and/or email) of the organization or individual in the U.S. that will be receiving the item for servicing or replacement. Lastly, at the time of exportation, upon request by CBP, the exporter, or an agent acting on his or her behalf, will have to provide the entry document number or a copy of the CBP document under which the ''item'' ''subject to the EAR'' on the USMIL was temporarily imported under this entry clearance requirement. As the State Department also requires that persons temporarily importing items in this rule provide the same type of information to CBP, BIS expects that the requirement in this final rule will result in a change in burden under control number 0694–0093, but because of the decrease under the burden imposed

under the State collection, the burden on the public will not change.

This final rule will also affect the information collection under control number 0607–0152, for filing EEI in AES because of one change this final rule makes to part 758 of the EAR. Under new § 758.1(b)(9), EEI will be required for all exports of items controlled under ECCNs 0A501.a or .b, shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, or ammunition controlled under ECCN 0A505 except for .c, regardless of value or destination, including exports to Canada. Exports of these USML firearms and ammunition prior to moving to the CCL required filing EEI in AES for all items "subject to the ITAR," so the burden in this collection will not change for the exporter.

This final rule includes a requirement that, for all exports of temporary exports from the United States or when the license or other approval contains a condition requiring all or some of this information to be filed as EEI in AES of items controlled under ECCNs 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, in addition to any other required data for the associated EEI filing requirements, the exporter must provide to CBP the serial number, make, model, and caliber for each firearm being exported. The Department of Commerce is carrying over the existing CBP filing requirements for items transferred from the USML to the CCL. The Department of Homeland Security currently is collecting these data elements for firearms "subject to the ITAR" under OMB Control Number 1651–0010 (CBP Form 4457, Certificate of Registration for Personal Effects Taken Abroad). There is no change to the information being collected or to the burden hours as a result of this rule. Separate from this rule, CBP will update the information collection to reflect the use of AES or some other simplified electronic alternative to CBP Form 4457.

Any comments regarding the collection of information associated with this final rule, including suggestions for reducing the burden, may be sent to Jasmeet K. Seehra, Office of Management and Budget (OMB), by email to *Jasmeet_K._Seehra@ omb.eop.gov,* or by fax to (202) 395– 7285.

## Administrative Procedure Act and Regulatory Flexibility Act Requirements

Pursuant to section 1762 of the Export Control Reform Act of 2018 (Title XVII, Subtitle B of Pub. L. 115–232), which was included in the John S. McCain National Defense Authorization Act for Fiscal Year 2019, this action is exempt from the Administrative Procedure Act (APA) (5 U.S.C. 553) requirements for notice of proposed rulemaking, opportunity for public participation, and delay in effective date.

Because a notice of proposed rulemaking and an opportunity for public comment are not required to be given for this rule by the APA or any other law, the analytical requirements of the Regulatory Flexibility Act, 5 U.S.C. 601, *et seq.,* are not applicable. Accordingly, no regulatory flexibility analysis is required and none has been prepared.

## List of Subjects

*15 CFR Parts 732, 740, and 748*

Administrative practice and procedure, Exports, Reporting and recordkeeping requirements.

*15 CFR Part 734*

Administrative practice and procedure, Exports, Inventions and patents, Research, Science and technology.

*15 CFR Parts 736 and 772*

Exports.

*15 CFR Part 742*

Exports, Terrorism.

*15 CFR Part 743*

Administrative practice and procedure, Reporting and recordkeeping requirements.

*15 CFR Part 744*

Exports, Reporting and recordkeeping requirements, Terrorism.

*15 CFR Parts 746 and 774*

Exports, Reporting and recordkeeping requirements.

*15 CFR Part 758*

Administrative practice and procedure, Exports, Reporting and recordkeeping requirements.

*15 CFR Part 762*

Administrative practice and procedure, Business and industry, Confidential business information, Exports, Reporting and recordkeeping requirements.

For the reasons stated in the preamble, parts 732, 734, 736, 740, 742, 743, 744, 746, 748, 758, 762, 772, and 774 of the Export Administration Regulations (15 CFR parts 730–774) are amended as follows:

## PART 732—STEPS FOR USING THE EAR

■ 1. The authority citation for 15 CFR part 732 is revised to read as follows:

**Authority:** 50 U.S.C. 4801–4852; 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783.

■ 2. Section 732.2 is amended by adding one sentence to the end of paragraph (b) introductory text to read as follows:

### § 732.2   Steps regarding scope of the EAR.

\*      \*      \*      \*      \*

(b) \* \* \* The following also remains subject to the EAR: "Software" or "technology" for the production of a firearm, or firearm frame or receiver, controlled under ECCN 0A501, as referenced in § 734.7(c) of the EAR).

\*      \*      \*      \*      \*

## PART 734—SCOPE OF THE EXPORT ADMINISTRATION REGULATIONS

■ 3. The authority citation for 15 CFR part 734 is revised to read as follows:

**Authority:** 50 U.S.C. 4801–4852; 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* E.O. 12938, 59 FR 59099, 3 CFR, 1994 Comp., p. 950; E.O. 13020, 61 FR 54079, 3 CFR, 1996 Comp., p. 219; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; E.O. 13637, 78 FR 16129, 3 CFR, 2014 Comp., p. 223; Notice of November 12, 2019, 84 FR 61817 (November 13, 2019).

■ 4. Section 734.7 is amended by revising paragraph (a) introductory text and adding paragraph (c) to read as follows:

### § 734.7   Published.

(a) Except as set forth in paragraphs (b) and (c) of this section, unclassified "technology" or "software" is "published," and is thus not "technology" or "software" subject to the EAR, when it has been made available to the public without restrictions upon its further dissemination such as through any of the following:

\*      \*      \*      \*      \*

(c) The following remains subject to the EAR: "software" or "technology" for the production of a firearm, or firearm frame or receiver, controlled under ECCN 0A501, that is made available by posting on the internet in an electronic format, such as AMF or G-code, and is ready for insertion into a computer numerically controlled machine tool, additive manufacturing equipment, or any other equipment that makes use of the "software" or "technology" to

produce the firearm frame or receiver or complete firearm.

## PART 736—GENERAL PROHIBITIONS

■ 5. The authority citation for 15 CFR part 736 is revised to read as follows:

**Authority:** 50 U.S.C. 4801–4852; 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* E.O. 12938, 59 FR 59099, 3 CFR, 1994 Comp., p. 950; E.O. 13020, 61 FR 54079, 3 CFR, 1996 Comp., p. 219; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; E.O. 13338, 69 FR 26751, 3 CFR, 2004 Comp., p. 168; Notice of May 8, 2019, 84 FR 20537 (May 10, 2019); Notice of November 12, 2019, 84 FR 61817 (November 13, 2019).

■ 6. Supplement No. 1 to part 736 is amended by revising paragraph (e)(3) to read as follows:

## Supplement No. 1 to Part 736—General Orders

\* \* \* \* \*

(e) \* \* \*

(3) *Prior commodity jurisdiction determinations.* If the U.S. State Department has previously determined that an item is not subject to the jurisdiction of the ITAR and the item was not listed in a then existing ''018'' series ECCN (for purposes of the ''600 series'' ECCNs, or the 0x5zz ECCNs) or in a then existing ECCN 9A004.b or related software or technology ECCN (for purposes of the 9x515 ECCNs), then the item is per se not within the scope of a ''600 series'' ECCN, a 0x5zz ECCN, or a 9x515 ECCN. If the item was not listed elsewhere on the CCL at the time of such determination (*i.e.,* the item was designated EAR99), the item shall remain designated as EAR99 unless specifically enumerated by BIS or DDTC in an amendment to the CCL or to the USML, respectively.

\* \* \* \* \*

## PART 740—LICENSE EXCEPTIONS

■ 7. The authority citation for 15 CFR part 740 continues to read as follows:

**Authority:** 50 U.S.C. 4801–4852; 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* 22 U.S.C. 7201 *et seq.;* E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783.

■ 8. Section 740.2 is amended by adding paragraphs (a)(21) and (22) to read as follows:

## § 740.2   Restrictions on all License Exceptions.

(a) \* \* \*

(21) The reexport or transfer (in-country) of firearms classified under ECCNs 0A501 or 0A502 if a part or component that is not ''subject to the ITAR,'' but would otherwise meet the criteria in USML Category I(h)(2) (*i.e.,* parts and components specially designed for conversion of a semiautomatic firearm to a fully

automatic firearm) is incorporated into the firearm or is to be reexported or transferred (in-country) with the firearm with ''knowledge'' the part or component will be subsequently incorporated into the firearm. (*See* USML Category I(h)(2)). In such instances, no license exceptions are available except for License Exception GOV (§ 740.11(b)(2)(ii)).

(22) The export, reexport, or transfer (in-country) of any item classified under a 0x5zz ECCN when a party to the transaction is designated on the Department of the Treasury, Office of Foreign Assets Control (OFAC), Specially Designated Nationals and Blocked Persons (SDN) list under the designation [SDNT], pursuant to the Narcotics Trafficking Sanctions Regulations, 31 CFR part 536, or under the designation [SDNTK], pursuant to the Foreign Narcotics Kingpin Sanctions Regulations, 31 CFR part 598.

\* \* \* \* \*

■ 9. Section 740.9 is amended by:
■ a. Adding five sentences at the end of paragraph (a) introductory text;
■ b. Adding one sentence at the end of paragraph (b)(1) introductory text;
■ c. Adding paragraph (b)(5); and
■ d. Redesignating notes 1 through 3 to paragraph (b) as notes 2 through 4 to paragraph (b).

The additions read as follows:

## § 740.9   Temporary imports, exports, reexports, and transfers (in-country) (TMP).

\* \* \* \* \*

(a) \* \* \* This paragraph (a) does not authorize any export of a commodity controlled under ECCNs 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502 to, or any export of such an item that was imported into the United States from, a country in Country Group D:5 (Supplement No. 1 to this part), or from Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan. The only provisions of this paragraph (a) that are eligible for use to export such items are paragraph (a)(5) of this section (''Exhibition and demonstration'') and paragraph (a)(6) of this section (''Inspection, test, calibration, and repair''). In addition, this paragraph (a) may not be used to export more than 75 firearms per shipment. In accordance with the requirements in § 758.1(b)(9) and (g)(4) of the EAR, the exporter or its agent must provide documentation that includes the serial number, make, model, and caliber of each firearm being exported by filing these data elements in an EEI filing in AES. In accordance with the exclusions in License Exception TMP under paragraph (b)(5) of this

section, the entry clearance requirements in § 758.1(b)(9) do not permit the temporary import of: Firearms controlled in ECCN 0A501.a or .b that are shipped from or manufactured in a Country Group D:5 country, or that are shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan (except for any firearm model designation (if assigned) controlled by 0A501 that is specified under Annex A in Supplement No. 4 to this part); or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that are shipped from or manufactured in a Country Group D:5 country, or from Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, because of the exclusions in License Exception TMP under paragraph (b)(5) of this section.

\* \* \* \* \*

(b) \* \* \*

(1) \* \* \* No provision of paragraph (b) of this section, other than paragraph (b)(3), (4), or (5), may be used to export firearms controlled by ECCN 0A501.a, .b, or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502.

\* \* \* \* \*

(5) *Exports of firearms and certain shotguns temporarily in the United States.* This paragraph (b)(5) authorizes the export of no more than 75 end item firearms per shipment controlled by ECCN 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that are temporarily in the United States for a period not exceeding one year, provided that:

(i) The firearms were not shipped from or manufactured in a U.S. arms embargoed country, *i.e.,* destination listed in Country Group D:5 in Supplement No. 1 to this part;

(ii) The firearms were not shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, except for any firearm model controlled by 0A501 that is specified under Annex A in Supplement No. 4 to this part; and

(iii) The firearms are not ultimately destined to a U.S. arms embargoed country, *i.e.,* destination listed in Country Group D:5 in Supplement No. 1 to this part, or to Russia;

(iv) When the firearms entered the U.S. as a temporary import, the temporary importer or its agent:

(A) Provided the following statement to U.S. Customs and Border Protection: ''This shipment will be exported in

accordance with and under the authority of License Exception TMP (15 CFR 740.9(b)(5))'';

(B) Provided to U.S. Customs and Border Protection an invoice or other appropriate import-related documentation (or electronic equivalents) that includes a complete list and description of the firearms being temporarily imported, including their model, make, caliber, serial numbers, quantity, and U.S. dollar value; and

(C) Provided (if temporarily imported for a trade show, exhibition, demonstration, or testing) to U.S. Customs and Border Protection the relevant invitation or registration documentation for the event and an accompanying letter that details the arrangements to maintain effective control of the firearms while they are in the United States; and

(v) In addition to the export clearance requirements of part 758 of the EAR, the exporter or its agent must provide the import documentation related to paragraph (b)(5)(iv)(B) of this section to U.S. Customs and Border Protection at the time of export.

**Note 1 to paragraph (b)(5):** In addition to complying with all applicable EAR requirements for the export of commodities described in paragraph (b)(5) of this section, exporters and temporary importers should contact U.S. Customs and Border Protection (CBP) at the port of temporary import or export, or at the CBP website, for the proper procedures for temporarily importing or exporting firearms controlled in ECCN 0A501.a or .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502, including regarding how to provide any data or documentation required by BIS.

\* \* \* \* \*

■ 10. Section 740.10 is amended by:
■ a. Adding one sentence at the end of paragraph (b)(1); and
■ b. Adding paragraph (b)(4).
The additions read as follows:

### § 740.10 License Exception Servicing and replacement of parts and equipment (RPL).

\* \* \* \* \*
(b) \* \* \*
(1) \* \* \* The export of firearms controlled by ECCN 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 temporarily in the United States for servicing and replacement may be exported under paragraph (b)(2) or (3) of this section only if the additional requirements in paragraph (b)(4) of this section are also met.

\* \* \* \* \*
(4) This paragraph (b)(4) authorizes the export of firearms controlled by ECCN 0A501.a or .b, or shotguns with a barrel length less than 18 inches

controlled in ECCN 0A502 that are temporarily in the United States for servicing or replacement for a period not exceeding one year or the time it takes to service or replace the commodity, whichever is shorter, provided that the requirements of paragraph (b)(2) or (3) of this section are met and:

(i) The firearms were not shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, except for any firearm model controlled by 0A501 that is specified under Annex A in Supplement No. 4 to this part;

(ii) When the firearms entered the U.S. as a temporary import, the temporary importer or its agent:

(A) Provided the following statement to U.S. Customs and Border Protection: ''This shipment will be exported in accordance with and under the authority of License Exception RPL (15 CFR 740.10(b))'';

(B) Provided to U.S. Customs and Border Protection an invoice or other appropriate import-related documentation (or electronic equivalents) that includes a complete list and description of the firearms being temporarily imported, including their model, make, caliber, serial numbers, quantity, and U.S. dollar value; and

(C) Provided (if temporarily imported for servicing or replacement) to U.S. Customs and Border Protection the name, address and contact information (telephone number and/or email) of the organization or individual in the U.S. that will be receiving the item for servicing or replacement; and

(iii) In addition to the export clearance requirements of part 758 of the EAR, the exporter or its agent must provide the import documentation related to paragraph (b)(4)(iii)(B) of this section to U.S. Customs and Border Protection at the time of export.

**Note 1 to paragraph (b)(4):** In addition to complying with all applicable EAR requirements for the export of commodities described in paragraph (b)(4) of this section, exporters and temporary importers should contact U.S. Customs and Border Protection (CBP) at the port of temporary import or export, or at the CBP website, for the proper procedures for temporarily importing or exporting firearms controlled in ECCN 0A501.a or .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502, including regarding how to provide any data or documentation required by BIS.

\* \* \* \* \*

■ 11. Section 740.11 is amended by:
■ a. Adding two sentences at the end of the introductory text;

■ b. Adding note 2 to paragraph (b)(2); and
■ c. Redesignating note 1 to paragraph (c)(1) as note 3 to paragraph (c)(1) and notes 1 and 2 to paragraph (e) as notes 4 and 5 to paragraph (e).
The additions read as follows:

### § 740.11 Governments, international organizations, international inspections under the Chemical Weapons Convention, and the International Space Station (GOV).

\* \* \* Commodities listed in ECCN 0A501 are eligible only for transactions described in paragraphs (b)(2)(i) and (ii) of this section. Any item listed in a 0x5zz ECCN for export, reexport, or transfer (in-country) to an E:1 country is eligible only for transactions described in paragraphs (b)(2)(i) and (ii) solely for U.S. Government official use of this section.

\* \* \* \* \*

**Note 2 to paragraph (b)(2):** Items controlled for NS, MT, CB, NP, FC, or AT reasons may not be exported, reexported, or transferred (in-country) to, or for the use of military, police, intelligence entities, or other sensitive end users (*e.g.,* contractors or other governmental parties performing functions on behalf of military, police, or intelligence entities) of a government in a Country Group E:1 or E:2 country.

\* \* \* \* \*

■ 12. Section 740.14 is amended by revising paragraph (b)(4) introductory text and paragraph (e) heading and adding paragraphs (e)(3) and (4) to read as follows:

### § 740.14 Baggage (BAG).

\* \* \* \* \*
(b) \* \* \*
(4) *Tools of trade.* Usual and reasonable kinds and quantities of tools, instruments, or equipment and their containers and also technology for use in the trade, occupation, employment, vocation, or hobby of the traveler or members of the household who are traveling or moving. For special provisions regarding firearms and ammunition, see paragraph (e) of this section. For special provisions regarding encryption commodities and software subject to EI controls, see paragraph (f) of this section. For a special provision that specifies restrictions regarding the export or reexport of technology under this paragraph (b)(4), see paragraph (g) of this section. For special provisions regarding personal protective equipment under ECCN 1A613.c or .d, see paragraph (h) of this section.

\* \* \* \* \*
(e) *Special provisions for firearms and ammunition.* \* \* \*
(3) A United States citizen or a permanent resident alien leaving the

United States may export under this License Exception firearms, ''parts,'' ''components,'' ''accessories,'' or ''attachments'' controlled under ECCN 0A501 and ammunition controlled under ECCN 0A505.a, subject to the following limitations:

(i) Not more than three firearms and 1,000 rounds of ammunition may be taken on any one trip.

(ii) ''Parts,'' ''components,'' ''accessories,'' and ''attachments'' exported pursuant to this paragraph (e)(3) must be of a kind and limited to quantities that are reasonable for the activities described in paragraph (e)(3)(iv) of this section or that are necessary for routine maintenance of the firearms being exported.

(iii) The commodities must be with the person's baggage.

(iv) The commodities must be for the person's exclusive use and not for resale or other transfer of ownership or control. Accordingly, except as provided in paragraph (e)(4) of this section, firearms, ''parts,'' ''components,'' ''accessories,'' ''attachments,'' and ammunition, may not be exported permanently under this License Exception. All firearms, ''parts,'' ''components,'' ''accessories,'' or ''attachments'' controlled under ECCN 0A501 and all unused ammunition controlled under ECCN 0A505.a exported under this License Exception must be returned to the United States.

(v) Travelers leaving the United States temporarily are required to declare the firearms, ''parts,'' ''components,'' ''accessories,'' ''attachments,'' and ammunition being exported under this License Exception to a Customs and Border Protection (CBP) officer prior to departure from the United States and present such items to the CBP officer for inspection, confirming that the authority for the export is License Exception BAG and that the exporter is compliant with its terms.

(4) A nonimmigrant alien leaving the United States may export or reexport under this License Exception only such firearms controlled under ECCN 0A501 and ammunition controlled under ECCN 0A505 as he or she brought into the United States under the relevant provisions of Department of Justice regulations at 27 CFR part 478.

\*    \*    \*    \*    \*

■ 13. Section 740.16 is amended by revising paragraphs (a)(2) and (b)(2)(iv) and (v) and adding paragraph (b)(2)(vi) to read as follows:

### § 740.16   Additional permissive reexports (APR).

\*    \*    \*    \*    \*

(a) \* \* \*

(2) The commodities being reexported are not controlled for NP, CB, MT, SI, or CC reasons or described in ECCNs 0A919, 3A001.b.2 or b.3 (except those that are being reexported for use in civil telecommunications applications), 6A002, 6A003; or commodities classified under a 0x5zz ECCN; and

\*    \*    \*    \*    \*

(b) \* \* \*

(2) \* \* \*

(iv) Commodities described in ECCN 0A504 that incorporate an image intensifier tube;

(v) Commodities described in ECCN 6A002; or

(vi) Commodities classified under a 0x5zz ECCN.

\*    \*    \*    \*    \*

■ 14. Section 740.20 is amended by revising paragraph (b)(2)(ii) to read as follows:

### § 740.20   License Exception Strategic Trade Authorization (STA).

\*    \*    \*    \*    \*

(b) \* \* \*

(2) \* \* \*

(ii) License Exception STA may not be used for:

(A) Any item controlled in ECCNs 0A501.a, .b, .c, .d, or .e; 0A981; 0A982; 0A983; 0A503; 0E504; 0E982; or

(B) Shotguns with barrel length less than 18 inches controlled in 0A502.

\*    \*    \*    \*    \*

■ 15. Add Supplement No. 4 to part 740 to read as follows:

### Supplement No. 4 to Part 740—Annex A Firearm Models

(a) *Pistols/revolvers.*
(1) German Model P08 Pistol = SMCR.
(2) IZH 34M, .22 Target pistol.
(3) IZH 35M, .22 caliber Target pistol.
(4) Mauser Model 1896 pistol = SMCR.
(5) MC–57–1 pistol.
(6) MC–1–5 pistol.
(7) Polish Vis Model 35 pistol = SMCR.
(8) Soviet Nagant revolver = SMCR.
(9) TOZ 35, .22 caliber Target pistol.
(10) MTs 440.
(11) MTs 57–1.
(12) MTs 59–1.
(13) MTs 1–5.
(14) TOZ–35M (starter pistol).
(15) Biathlon–7K.
(b) *Rifles.*
(1) BARS–4 Bolt Action carbine.
(2) Biathlon target rifle, .22.
(3) British Enfield rifle = SMCR.
(4) CM2, .22 target rifle (also known as SM2, .22).
(5) German model 98K = SMCR.
(6) German model G41 = SMCR.
(7) German model G43 = SMCR.
(8) IZH–94.
(9) LOS–7, bolt action.
(10) MC–7–07.
(11) MC–18–3.
(12) MC–19–07.

(13) MC–105–01.
(14) MC–112–02.
(15) MC–113–02.
(16) MC–115–1.
(17) MC–125/127.
(18) MC–126.
(19) MC–128.
(20) Saiga.
(21) Soviet Model 38 carbine = SMCR.
(22) Soviet Model 44 carbine = SMCR.
(23) Soviet Model 91/30 rifle = SMCR.
(24) TOZ 18, .22 bolt action.
(25) TOZ 55.
(26) TOZ 78.
(27) Ural Target, .22lr.
(28) VEPR rifle.
(29) Winchester Model 1895, Russian Model rifle = SMCR.
(30) Sever—double barrel.
(31) IZH18MH single barrel break action.
(32) MP–251 over/under rifle.
(33) MP–221 double barrel rifle.
(34) MP–141K.
(35) MP–161K.
(36) MTs 116–1.
(37) MTs 116M.
(38) MTs 112–02.
(39) MTs 115–1.
(40) MTs 113–02.
(41) MTs 105–01.
(42) MTs 105–05.
(43) MTs 7–17 combination gun.
(44) MTs 7–12–07 rifle/shotgun.
(45) MTs 7–07.
(46) MTs 109–12–07 rifle.
(47) MTs 109–07 rifle.
(48) MTs 106–07 combination.
(49) MTs 19–97.
(50) MTs 19–09.
(51) MTs 18–3M.
(52) MTs 125.
(53) MTs 126.
(54) MTs 127.
(55) Berkut–2.
(56) Berkut–2M1.
(57) Berkut–3.
(58) Berkut–2–1.
(59) Berkut–2M2.
(60) Berkut–3–1.
(61) Ots–25.
(62) MTs 20–07.
(63) LOS–7–1.
(64) LOS–7–2.
(65) LOS–9–1.
(66) Sobol (Sable).
(67) Rekord.
(68) Bars–4–1.
(69) Saiga.
(70) Saiga–M.
(71) Saiga 308.
(72) Saiga–308–1.
(73) Saiga 308–2.
(74) Saiga–9.
(75) Korshun.
(76) Ural–5–1.
(77) Ural 6–1.
(78) Ural–6–2.
(79) SM–2.
(80) Biatlon–7–3.
(81) Biatlon–7–4.
(82) Rekord–1.
(83) Rekord–2.
(84) Rekord–CISM.
(85) Rekord–1–308.
(86) Rekord–2–308.
(87) Rekord–1–308–CISM.

(88) VEPR.
(89) VEPR Super.
(90) VEPR Pioneer.
(91) VEPR Safari.
(92) TOZ 109.
(93) KO 44–1.
(94) TOZ 78–01.
(95) KO 44.
(96) TOZ 99.
(97) TOZ 99–01.
(98) TOZ 55–01 Zubr.
(99) TOZ 55–2 Zubr.
(100) TOZ 120 Zubr.
(101) MTs 111.
(102) MTs 109.
(103) TOZ 122.
(104) TOZ 125.
(105) TOZ 28.
(106) TOZ 300.

## PART 742—CONTROL POLICY—CCL BASED CONTROLS

■ 16. The authority citation for part 742 is revised to read as follows:

**Authority:** 50 U.S.C. 4801–4852; 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* 22 U.S.C. 3201 *et seq.;* 42 U.S.C. 2139a; 22 U.S.C. 7201 *et seq.;* 22 U.S.C. 7210; Sec. 1503, Pub. L. 108–11, 117 Stat. 559; E.O. 12058, 43 FR 20947, 3 CFR, 1978 Comp., p. 179; E.O. 12851, 58 FR 33181, 3 CFR, 1993 Comp., p. 608; E.O. 12938, 59 FR 59099, 3 CFR, 1994 Comp., p. 950; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Presidential Determination 2003–23, 68 FR 26459, 3 CFR, 2004 Comp., p. 320; Notice of November 12, 2019, 84 FR 61817 (November 13, 2019).

■ 17. Section 742.6 is amended by revising the first and sixth sentences of paragraph (b)(1)(i) and adding a seventh sentence at the end of paragraph (b)(1)(i) to read as follows:

### § 742.6   Regional stability.

\*    \*    \*    \*    \*

(b) \* \* \*

(1) \* \* \*

(i) Applications for exports and reexports of ECCN 0A501, 0A504, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E504, and 0E505 items; 9x515 items and ''600 series'' items and will be reviewed on a case-by-case basis to determine whether the transaction is contrary to the national security or foreign policy interests of the United States, including the foreign policy interest of promoting the observance of human rights throughout the world. \* \* \* When destined to the People's Republic of China or a country listed in Country Group E:1 in Supplement No. 1 to part 740 of the EAR, items classified under ECCN 0A501, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E504, and 0E505 or any 9x515 ECCN will be subject to a policy of denial. In addition, applications for exports and reexports of ECCN 0A501, 0A505, 0B501, 0B505,

0D501, 0D505, 0E501, 0E504, and 0E505 items when there is reason to believe the transaction involves criminal organizations, rebel groups, street gangs, or other similar groups or individuals, that may be disruptive to regional stability, including within individual countries, will be subject to a policy of denial.

\*    \*    \*    \*    \*

■ 18. Section 742.7 is amended by revising paragraphs (a)(1) through (4) and (c) to read as follows:

### § 742.7   Crime control and detection.

(a) \* \* \*

(1) Crime control and detection instruments and equipment and related ''technology'' and ''software'' identified in the appropriate ECCNs on the CCL under CC Column 1 in the Country Chart column of the ''License Requirements'' section. A license is required to countries listed in CC Column 1 (Supplement No. 1 to part 738 of the EAR). Items affected by this requirement are identified on the CCL under the following ECCNs: 0A502, 0A504, 0A505.b, 0A978, 0A979 0E502, 0E505 (''technology'' for ''development'' or for ''production'' of buckshot shotgun shells controlled under ECCN 0A505.b), 1A984, 1A985, 3A980, 3A981, 3D980, 3E980, 4A003 (for fingerprint computers only), 4A980, 4D001 (for fingerprint computers only), 4D980, 4E001 (for fingerprint computers only), 4E980, 6A002 (for police-model infrared viewers only), 6E001 (for police-model infrared viewers only), 6E002 (for police-model infrared viewers only), and 9A980.

(2) Shotguns with a barrel length greater than or equal to 24 inches, identified in ECCN 0A502 on the CCL under CC Column 2 in the Country Chart column of the ''License Requirements'' section regardless of end user to countries listed in CC Column 2 (Supplement No. 1 to part 738 of the EAR).

(3) Shotguns with barrel length greater than or equal to 24 inches, identified in ECCN 0A502 on the CCL under CC Column 3 in the Country Chart column of the ''License Requirements'' section only if for sale or resale to police or law enforcement entities in countries listed in CC Column 3 (Supplement No. 1 to part 738 of the EAR).

(4) Certain crime control items require a license to all destinations, except Canada. These items are identified under ECCNs 0A982, 0A503, and 0E982. Controls for these items appear in each ECCN; a column specific to these controls does not appear in the Country

Chart (Supplement No. 1 to part 738 of the EAR).

\*    \*    \*    \*    \*

(c) *Contract sanctity.* Contract sanctity date: August 22, 2000. Contract sanctity applies only to items controlled under ECCNs 0A982, 0A503, and 0E982 destined for countries not listed in CC Column 1 of the Country Chart (Supplement No. 1 to part 738 of the EAR).

\*    \*    \*    \*    \*

■ 19. Section 742.17 is amended by revising the first sentence of paragraph (a) and paragraph (f) to read as follows:

### § 742.17   Exports of firearms to OAS member countries.

(a) *License requirements.* BIS maintains a licensing system for the export of firearms and related items to all OAS member countries. \* \* \*

\*    \*    \*    \*    \*

(f) *Items/Commodities.* Items requiring a license under this section are ECCNs 0A501 (except 0A501.y), 0A502, 0A504 (except 0A504.f), and 0A505 (except 0A505.d). (See Supplement No. 1 to part 774 of the EAR).

\*    \*    \*    \*    \*

### § 742.19   [Amended]

■ 20. Section 742.19(a)(1) is amended by:

■ a. Removing ''0A986'' and adding in its place ''0A505.c''; and

■ b. Removing ''0B986'' and adding in its place ''0B505.c''.

## PART 743—SPECIAL REPORTING AND NOTIFICATION

■ 21. The authority citation for 15 CFR part 743 is revised to read as follows:

**Authority:** 50 U.S.C. 4801–4852; 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; E.O. 13637, 78 FR 16129, 3 CFR, 2014 Comp., p. 223.

■ 22. Section 743.4 is amended by:

■ a. In paragraph (a):

■ i. Removing ''(c)(1)'' and ''(c)(2)'' and adding in their places ''(c)(1) of this section'' and ''(c)(2) of this section,'' respectively; and

■ ii. Adding four sentences to the end of the paragraph;

■ b. Redesignating the note to paragraph (a) as note 1 to paragraph (a) and removing ''§ 743.4'' in newly redesignated note 1 and adding ''this section'' in its place;

■ c. Revising paragraph (b) introductory text;

■ d. Adding paragraphs (c)(1)(i) and (c)(2)(i);

■ e. Redesignating the note to paragraph (e)(1)(ii) as note 2 to paragraph (e)(1)(ii);

■ e. Revising paragraph (h); and
■ f. Adding paragraph (i).

The additions and revisions read as follows:

### § 743.4 Conventional arms reporting.

(a) * * * This section does not require reports when the exporter uses the alternative submission method described under paragraph (h) of this section. The alternative submission method under paragraph (h) requires the exporter to submit the information required for conventional arms reporting in this section as part of the required EEI submission in AES, pursuant to § 758.1(b)(9) of the EAR. Because of the requirements in § 758.1(g)(4)(ii) of the EAR for the firearms that require conventional arms reporting of all conventional arms, the Department of Commerce believes all conventional arms reporting requirements for firearms will be met by using the alternative submission method. The Department of Commerce leaves standard method for submitting reports in place in case any additional items are moved from the USML to the CCL, that may require conventional arms reporting.

* * * * *

(b) *Requirements.* You must submit one electronic copy of each report required under the provisions of this section, or submit this information using the alternative submission method specified in paragraph (h) of this section, and maintain accurate supporting records (see § 762.2(b) of the EAR) for all exports of items specified in paragraph (c) of this section for the following:

* * * * *

(c) * * *
(1) * * *
(i) ECCN 0A501.a and .b.

* * * * *

(2) * * *
(i) ECCN 0A501.a and .b.

* * * * *

(h) *Alternative submission method.* This paragraph (h) describes an alternative submission method for meeting the conventional arms reporting requirements of this section. The alternative submission method requires the exporter, when filing the required EEI submission in AES, pursuant to § 758.1(b)(9) of the EAR, to include the six character ECCN classification (*i.e.,* 0A501.a or 0A501.b) as the first text to appear in the Commodity description block. If the exporter properly includes this information in the EEI filing in AES, the Department of Commerce will be able to obtain that export information directly from AES to meet the U.S.

Government's commitments to the Wassenaar Arrangement and United Nations for conventional arms reporting. An exporter that complies with the requirements in § 758.1(g)(4)(ii) of the EAR does not have to submit separate annual and semi-annual reports to the Department of Commerce pursuant to this section.

(i) *Contacts.* General information concerning the Wassenaar Arrangement and reporting obligations thereof is available from the Office of National Security and Technology Transfer Controls, Tel.: (202) 482–0092, Fax: (202) 482–4094. Information concerning the reporting requirements for items identified in paragraphs (c)(1) and (2) of this section is available from the Office of Nonproliferation and Treaty Compliance (NPTC), Tel.: (202) 482–4188, Fax: (202) 482–4145.

## PART 744—CONTROL POLICY: END-USER AND END-USE BASED

■ 23. The authority citation for 15 CFR part 744 is revised to read as follows:

**Authority:** 50 U.S.C. 4801–4852; 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* 22 U.S.C. 3201 *et seq.;* 42 U.S.C. 2139a; 22 U.S.C. 7201 *et seq.;* 22 U.S.C. 7210; E.O. 12058, 43 FR 20947, 3 CFR, 1978 Comp., p. 179; E.O. 12851, 58 FR 33181, 3 CFR, 1993 Comp., p. 608; E.O. 12938, 59 FR 59099, 3 CFR, 1994 Comp., p. 950; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13099, 63 FR 45167, 3 CFR, 1998 Comp., p. 208; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; E.O. 13224, 66 FR 49079, 3 CFR, 2001 Comp., p. 786; Notice of September 19, 2019, 83 FR 49633 (September 20, 2019); Notice of November 12, 2019, 84 FR 61817 (November 13, 2019).

### § 744.9 [Amended]

■ 24. Section 744.9 is amended by removing ''0A987'' from paragraphs (a)(1) introductory text and (b) and adding in its place ''0A504''.

## PART 746—EMBARGOES AND OTHER SPECIAL CONTROLS

■ 25. The authority citation for 15 CFR part 746 continues to read as follows:

**Authority:** 50 U.S.C. 4801–4852; 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* 22 U.S.C. 287c; Sec 1503, Pub. L. 108–11, 117 Stat. 559; 22 U.S.C. 2151 note; 22 U.S.C. 6004; 22 U.S.C. 7201 *et seq.;* 22 U.S.C. 7210; E.O. 12854, 58 FR 36587, 3 CFR, 1993 Comp., p. 614; E.O. 12918, 59 FR 28205, 3 CFR, 1994 Comp., p. 899; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; E.O. 13338, 69 FR 26751, 3 CFR, 2004 Comp., p 168; Presidential Determination 2003–23, 68 FR 26459, 3 CFR, 2004 Comp., p. 320; Presidential Determination 2007–7, 72 FR 1899, 3 CFR, 2006 Comp., p. 325; Notice of May 8, 2019, 84 FR 20537 (May 10, 2019).

### § 746.3 [Amended]

■ 26. Section 746.3 is amended by removing ''0A986'' from paragraph (b)(2) and adding in its place ''0A505.c''.

### § 746.7 [Amended]

■ 27. Section 746.7(a)(1) is amended by:
■ a. Adding ''0A503,'' immediately before ''0A980''; and
■ b. Removing ''0A985,''.

## PART 748—APPLICATIONS (CLASSIFICATION, ADVISORY, AND LICENSE) AND DOCUMENTATION

■ 28. The authority citation for 15 CFR part 748 is revised to read as follows:

**Authority:** 50 U.S.C. 4801–4852; 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783.

■ 29. Section 748.12 is amended by:
■ a. Revising the section heading;
■ b. Adding introductory text;
■ c. Revising paragraphs (a) introductory text and (a)(1);
■ d. Redesignating the note to paragraph (c)(8) as note 1 to paragraph (c)(8); and
■ e. Adding paragraph (e).

The revisions and additions read as follows.

### § 748.12 Firearms import certificate or import permit.

License applications for certain firearms and related commodities require support documents in accordance with this section. For destinations that are members of the Organization of American States (OAS), an FC Import Certificate or equivalent official document is required in accordance with paragraphs (a) through (d) of this section. For other destinations that require a firearms import or permit, the firearms import certificate or permit is required in accordance with paragraph (e) of this section.

(a) *Requirement to obtain document for OAS member states.* Unless an exception in § 748.9(c) applies, an FC Import Certificate is required for license applications for firearms and related commodities, regardless of value, that are destined for member countries of the OAS. This requirement is consistent with the OAS Model Regulations described in § 742.17 of the EAR.

(1) *Items subject to requirement.* Firearms and related commodities are those commodities controlled for ''FC Column 1'' reasons under ECCNs 0A501 (except 0A501.y), 0A502, 0A504 (except 0A504.f), or 0A505 (except 0A505.d).

* * * * *

(e) *Requirement to obtain an import certificate or permit for other than OAS member states.* If the country to which

firearms, parts, components, accessories, and attachments controlled under ECCN 0A501, or ammunition controlled under ECCN 0A505, are being exported or reexported requires that a government-issued certificate or permit be obtained prior to importing the commodity, the exporter or reexporter must obtain and retain on file the original or a copy of that certificate or permit before applying for an export or reexport license unless:

(1) A license is not required for the export or reexport; or

(2) The exporter is required to obtain an import or end-user certificate or other equivalent official document pursuant to paragraphs (a) thorough (d) of this section and has, in fact, complied with that requirement.

(3)(i) The number or other identifying information of the import certificate or permit must be stated on the license application.

(ii) If the country to which the commodities are being exported does not require an import certificate or permit for firearms imports, that fact must be noted on any license application for ECCN 0A501 or 0A505 commodities.

**Note 2 to paragraph (e).** Obtaining a BIS Statement by Ultimate Consignee and Purchaser pursuant to § 748.11 does not exempt the exporter or reexporter from the requirement to obtain a certification pursuant to paragraph (a) of this section because that statement is not issued by a government.

■ 30. Supplement No. 2 to part 748 is amended by adding paragraph (z) to read as follows:

**Supplement No. 2 to Part 748—Unique Application and Submission Requirements**

\*    \*    \*    \*    \*

(z) *Exports of firearms and certain shotguns temporarily in the United States—* (1) *Certification.* If you are submitting a license application for the export of firearms controlled by ECCN 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that will be temporarily in the United States, *e.g.,* for servicing and repair or for intransit shipments, you must include the following certification in Block 24:

The firearms in this license application will not be shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, except for any firearm model controlled by 0A501 that is specified under Annex A in Supplement No. 4 to part 740. I and the parties to this transaction will comply with the requirements specified in paragraphs (z)(2)(i) and (ii) of Supplement No. 2 to part 748.

(2) *Requirements.* Each approved license for commodities described under this paragraph (z) must comply with the

requirements specified in paragraphs (z)(2)(i) and (ii) of this supplement.

(i) When the firearms enter the U.S. as a temporary import, the temporary importer or its agent must:

(A) Provide the following statement to U.S. Customs and Border Protection: ''This shipment is being temporarily imported in accordance with the EAR. This shipment will be exported in accordance with and under the authority of BIS license number (provide the license number) (15 CFR 750.7(a) and 758.4);''

(B) Provide to U.S. Customs and Border Protection an invoice or other appropriate import-related documentation (or electronic equivalents) that includes a complete list and description of the firearms being temporarily imported, including their model, make, caliber, serial numbers, quantity, and U.S. dollar value; and

(C) Provide (if temporarily imported for servicing or replacement) to U.S. Customs and Border Protection the name, address, and contact information (telephone number and/or email) of the organization or individual in the U.S. that will be receiving the item for servicing or replacement); and

(ii) In addition to the export clearance requirements of part 758 of the EAR, the exporter or its agent must provide the import documentation related to paragraph (z)(2)(i)(B) of this supplement to U.S. Customs and Border Protection at the time of export.

**Note 1 to paragraph (z):** In addition to complying with all applicable EAR requirements for the export of commodities described in paragraph (z) of this supplement, exporters and temporary importers should contact U.S. Customs and Border Protection (CBP) at the port of temporary import or export, or at the CBP website, for the proper procedures for temporarily importing or exporting firearms controlled in ECCN 0A501.a or .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502, including regarding how to provide any data or documentation required by BIS.

**PART 758—EXPORT CLEARANCE REQUIREMENTS**

■ 31. The authority citation for part 758 is revised to read as follows:

**Authority:** 50 U.S.C. 4801–4852; 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783.

■ 32. Section 758.1 is amended by:
■ a. Revising paragraphs (b)(7) and (8);
■ b. Adding paragraph (b)(9);
■ c. Revising paragraph (c)(1);
■ d. Adding paragraph (g)(4); and
■ e. Redesignating note to paragraph (h)(1) as note 3 to paragraph (h)(1).

The revisions and additions read as follows:

**§ 758.1    The Electronic Export Enforcement (EEI) filing to the Automated Export System (AES).**

\*    \*    \*    \*    \*

(b) \* \* \*

(7) For all items exported under authorization Validated End-User (VEU);

(8) For all exports of tangible items subject to the EAR where parties to the transaction, as described in § 748.5(d) through (f) of the EAR, are listed on the Unverified List (Supplement No. 6 to part 744 of the EAR), regardless of value or destination; or

(9) For all exports, except for exports authorized under License Exception BAG, as set forth in § 740.14 of the EAR, of items controlled under ECCNs 0A501.a or .b, shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, or ammunition controlled under ECCN 0A505 except for .c, regardless of value or destination, including exports to Canada.

(c) \* \* \*

(1) License Exception Baggage (BAG), as set forth in § 740.14 of the EAR. See 15 CFR 30.37(x) of the FTR;

**Note 1 to paragraph (c)(1):** See the export clearance requirements for exports of firearms controlled under ECCNs 0A501.a or .b, shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, or ammunition controlled under ECCN 0A505, authorized under License Exception BAG, as set forth in § 740.14 of the EAR.

\*    \*    \*    \*    \*

(g) \* \* \*

(4) *Exports of firearms and related items.* This paragraph (g)(4) includes two separate requirements under paragraphs (g)(4)(i) and (ii) of this section that are used to better identify exports of certain end item firearms under the EAR. Paragraph (g)(4)(i) of this section is limited to certain EAR authorizations. Paragraph (g)(4)(ii) of this section applies to all EAR authorizations that require EEI filing in AES.

(i) *Identifying end item firearms by manufacturer, model, caliber, and serial number in the EEI filing in AES.* For any export authorized under License Exception TMP or a BIS license authorizing a temporary export of items controlled under ECCNs 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, in addition to any other required data for the associated EEI filing, you must report the manufacturer, model, caliber, and serial number of the exported items. The requirements of this paragraph (g)(4)(i) also apply to any other export authorized under a BIS license that includes a condition or proviso on the license requiring the submission of this information specified in paragraph (g) of this section when the EEI is filed in AES.

(ii) *Identifying end item firearms by "items" level classification or other control descriptor in the EEI filing in AES.* For any export of items controlled under ECCNs 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, in addition to any other required data for the associated EEI filing, you must include the six character ECCN classification (*i.e.,* 0A501.a, or 0A501.b), or for shotguns controlled under 0A502 the phrase "0A501 barrel length less than 18 inches" as the first text to appear in the Commodity description block in the EEI filing in AES. (*See* § 743.4(h) of the EAR for the use of this information for conventional arms reporting).

**Note 2 to paragraph (g)(4):** If a commodity described in paragraph (g)(4) of this section is exported under License Exception TMP under § 740.9(a)(6) of the EAR for inspection, test, calibration, or repair is not consumed or destroyed in the normal course of authorized temporary use abroad, the commodity must be disposed of or retained in one of the ways specified in § 740.9(a)(14)(i), (ii), or (iii) of the EAR. For example, if a commodity described in paragraph (g)(4) was destroyed while being repaired after being exported under § 740.9(a)(6), the commodity described in paragraph (g)(4) would not be required to be returned. If the entity doing the repair returned a replacement of the commodity to the exporter from the United States, the import would not require an EAR authorization. The entity that exported the commodity described in paragraph (g)(4) and the entity that received the commodity would need to document this as part of their recordkeeping related to this export and subsequent import to the United States.

*       *       *       *       *

■ 33. Add § 758.10 to read as follows:

**§ 758.10  Entry clearance requirements for temporary imports.**

(a) *Scope.* This section specifies the temporary import entry clearance requirements for firearms "subject to the EAR" that are on the United States Munitions Import List (USMIL, 27 CFR 447.21), except for firearms "subject to the EAR" that are temporarily brought into the United States by nonimmigrant aliens under the provisions of Department of Justice regulations at 27 CFR part 478 (*See* § 740.14(e) of the EAR for information on the export of these firearms "subject to the EAR"). These firearms are controlled in ECCN 0A501.a or .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502. Items that are temporarily exported under the EAR must have met the export clearance requirements specified in § 758.1.

(1) An authorization under the EAR is *not* required for the temporary import of

"items" that are "subject to the EAR," including for "items" "subject to the EAR" that are on the USMIL. Temporary imports of firearms described in this section must meet the entry clearance requirements specified in paragraph (b) of this section.

(2) Permanent imports are regulated by the Attorney General under the direction of the Department of Justice's Bureau of Alcohol, Tobacco, Firearms and Explosives (see 27 CFR parts 447, 478, 479, and 555).

(b) *EAR procedures for temporary imports and subsequent exports.* To the satisfaction of U.S. Customs and Border Protection, the temporary importer must comply with the following procedures:

(1) At the time of entry into the U.S. of the temporary import:

(i) Provide one of the following statements specified in paragraph (b)(1)(i)(A), (B), or (C) of this section to U.S. Customs and Border Protection:

(A) "This shipment is being temporarily imported in accordance with the EAR. This shipment will be exported in accordance with and under the authority of License Exception TMP (15 CFR 740.9(b)(5));"

(B) "This shipment is being temporarily imported in accordance with the EAR. This shipment will be exported in accordance with and under the authority of License Exception RPL (15 CFR 740.10(b));" or

(C) "This shipment is being temporarily imported in accordance with the EAR. This shipment will be exported in accordance with and under the authority of BIS license number (provide the license number) (15 CFR 750.7(a) and 758.4);"

(ii) Provide to U.S. Customs and Border Protection an invoice or other appropriate import-related documentation (or electronic equivalents) that includes a complete list and description of the firearms being temporarily imported, including their model, make, caliber, serial numbers, quantity, and U.S. dollar value;

(iii) Provide (if temporarily imported for a trade show, exhibition, demonstration, or testing) to U.S. Customs and Border Protection the relevant invitation or registration documentation for the event and an accompanying letter that details the arrangements to maintain effective control of the firearms while they are in the United States; or

(iv) Provide (if temporarily imported for servicing or replacement) to U.S. Customs and Border Protection the name, address and contact information (telephone number and/or email) of the organization or individual in the U.S.

that will be receiving the item for servicing or replacement).

**Note 1 to paragraph (b)(1):** In accordance with the exclusions in License Exception TMP under § 740.9(b)(5) of the EAR, the entry clearance requirements in § 758.1(b)(9) do not permit the temporary import of: Firearms controlled in ECCN 0A501.a or .b that are shipped from or manufactured in a Country Group D:5 country; or that are shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan (except for any firearm model controlled by 0A501 that is specified under Annex A in Supplement No. 4 to part 740 of the EAR); or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that are shipped from or manufactured in a Country Group D:5 country, or from Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, because of the exclusions in License Exception TMP under § 740.9(b)(5).

**Note 2 to paragraph (b)(1):** In accordance with the exclusions in License Exception RPL under § 740.10(b)(4) and Supplement No. 2 to part 748, paragraph (z), of the EAR, the entry clearance requirements in § 758.1(b)(9) do not permit the temporary import of: Firearms controlled in ECCN 0A501.a or .b that are shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan (except for any firearm model controlled by 0A501 that is specified under Annex A in Supplement No. 4 to part 740 of the EAR); or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that are shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, because of the exclusions in License Exception RPL under § 740.10(b)(4) and Supplement No. 2 to part 748, paragraph (z), of the EAR.

(2) At the time of export, in accordance with the U.S. Customs and Border Protection procedures, the eligible exporter, or an agent acting on the filer's behalf, must as required under § 758.1(b)(9) file the export information with CBP by filing EEI in AES, noting the applicable EAR authorization as the authority for the export, and provide, upon request by CBP, the entry document number or a copy of the CBP document under which the "item" subject to the EAR" on the USMIL was temporarily imported. *See* also the additional requirements in § 758.1(g)(4).

■ 34. Add § 758.11 to read as follows:

**§ 758.11  Export clearance requirements for firearms and related items.**

(a) *Scope.* The export clearance requirements of this section apply to all exports of commodities controlled under ECCNs 0A501.a or .b, shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, or

ammunition controlled under ECCN 0A505 except for .c, regardless of value or destination, including exports to Canada, that are authorized under License Exception BAG, as set forth in § 740.14 of the EAR.

(b) *Required form.* Prior to making any export described in paragraph (a) of this section, the exporter is required to submit a properly completed Department of Homeland Security, CBP Form 4457, (Certificate of Registration for Personal Effects Taken Abroad) (OMB Control Number 1651–0010), to the U.S. Customs and Border Protection (CBP), pursuant to 19 CFR 148.1, and as required by this section.

(1) *Where to obtain the form?* The CBP Certification of Registration Form 4457 can be found on the following CBP website: *https://www.cbp.gov/document/forms/form-4457-certificate-registration-personal-effects-taken-abroad.*

(2) *Required "description of articles" for firearms to be included on the CBP Form 4457.* For all exports of firearms controlled under ECCNs 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, the exporter must provide to CBP the serial number, make, model, and caliber for each firearm being exported by entering this information under the "Description of Articles" field of the CBP Form 4457, Certificate of Registration for Personal Effects Taken Abroad.

(c) *Where to find additional information on the CBP Form 4457?* See the following CBP website page for additional information: *https://help.cbp.gov/app/answers/detail/a_id/323/~/traveling-outside-of-the-u.s.-temporarily-taking-a-firearm%2C-rifle%2C-gun%2C.*

(d) *Return of items exported pursuant to this section.* The exporter when returning with a commodity authorized under License Exception BAG and exported pursuant this section, is required to present a copy of the CBP Form 4457, Certificate of Registration for Personal Effects Taken Abroad) (OMB Control Number 1651–0010), to CBP, pursuant to 19 CFR 148.1, and as required by this section.

## PART 762—RECORDKEEPING

■ 35. The authority citation for part 762 is revised to read as follows:

**Authority:** 50 U.S.C. 4801–4852; 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783.

■ 36. Section 762.2 is amended by removing "and," at the end of paragraph (a)(10), redesignating paragraph (a)(11)

as paragraph (a)(12), and adding a new paragraph (a)(11) to read as follows:

### § 762.2   Records to be retained.

(a) * * *

(11) The serial number, make, model, and caliber for any firearm controlled in ECCN 0A501.a and for shotguns with barrel length less than 18 inches controlled in 0A502 that have been exported. The "exporter" or any other party to the transaction (*see* § 758.3 of the EAR), that creates or receives such records is a person responsible for retaining this record; and

* * * * *

■ 37. Section 762.3 is amended by revising paragraph (a)(5) to read as follows:

### § 762.3   Records exempt from recordkeeping requirements.

(a) * * *

(5) Warranty certificate, except for a warranty certificate issued for an address located outside the United States for any firearm controlled in ECCN 0A501.a and for shotguns with barrel length less than 18 inches controlled in 0A502;

* * * * *

## PART 772—DEFINITIONS OF TERMS

■ 38. The authority citation for part 772 is revised to read as follows:

**Authority:** 50 U.S.C. 4801–4852; 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783.

■ 39. In § 772.1:
■ a. The definition of "Complete breech mechanisms" is added in alphabetical order; and
■ b. In the definition of "Specially designed," note 1 is amended by removing "0B986" and adding in its place "0B505.c".

The addition reads as follows:

### § 772.1   Definitions of terms as used in the Export Administration Regulations (EAR).

* * * * *

*Complete breech mechanisms.* The mechanism for opening and closing the breech of a breech-loading firearm, especially of a heavy-caliber weapon.

* * * * *

## PART 774—THE COMMERCE CONTROL LIST

■ 40. The authority citation for 15 CFR part 774 is revised to read as follows:

**Authority:** 50 U.S.C. 4801–4852; 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* 10 U.S.C. 8720; 10 U.S.C. 8730(e); 22 U.S.C. 287c, 22 U.S.C. 3201 *et seq.;* 22 U.S.C. 6004; 42 U.S.C. 2139a; 15 U.S.C. 1824; 50 U.S.C. 4305; 22

U.S.C. 7201 *et seq.;* 22 U.S.C. 7210; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783.

■ 41. In Supplement No. 1 to part 774, Category 0, revise Export Control Classification Number (ECCN) 0A018 to read as follows:

### Supplement No. 1 to Part 774—The Commerce Control List

* * * * *

**0A018   Items on the Wassenaar Munitions List (see List of Items Controlled)**

No items currently are in this ECCN. See ECCN 0A505 for "parts" and "components" for ammunition that, immediately prior to March 9, 2020, were classified under 0A018.b.

■ 42. In Supplement No. 1 to part 774, Category 0, add, between entries for ECCNs 0A018 and 0A521, entries for ECCNs 0A501, 0A502, 0A503, 0A504, and 0A505 to read as follows:

**0A501   Firearms (except 0A502 shotguns) and related commodities as follows (see List of Items Controlled)**

**License Requirements**

*Reason for Control:* NS, RS, FC, UN, AT

| Control(s) | Country chart (see supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry except 0A501.y. | NS Column 1 |
| RS applies to entire entry except 0A501.y. | RS Column 1 |
| FC applies to entire entry except 0A501.y. | FC Column 1 |
| UN applies to entire entry. | See § 746.1 of the EAR for UN controls. |
| AT applies to entire entry. | AT Column 1 |

*License Requirement Note:* In addition to using the Commerce Country Chart to determine license requirements, a license is required for exports and reexports of ECCN 0A501.y.7 firearms to the People's Republic of China.

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*LVS:* $500 for 0A501.c, .d, and .x.
$500 for 0A501.c, .d, .e, and .x if the ultimate destination is Canada.
*GBS:* N/A
*CIV:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in this entry.

**List of Items Controlled**

*Related Controls:* (1) Firearms that are fully automatic, and magazines with a capacity of greater than 50 rounds, are "subject to the ITAR." (2) See ECCN 0A502 for

shotguns and their ''parts'' and ''components'' that are subject to the EAR. Also see ECCN 0A502 for shot-pistols. (3) See ECCN 0A504 and USML Category XII for controls on optical sighting devices.
*Related Definitions:* N/A.
*Items:*

a. Non-automatic and semi-automatic firearms equal to .50 caliber (12.7 mm) or less.

**Note 1 to paragraph 0A501.a:** '*Combination pistols*' are controlled under ECCN 0A501.a. A *'combination pistol' (a.k.a., a combination gun)* has at least one rifled barrel and at least one smoothbore barrel (generally a shotgun style barrel).

b. Non-automatic and non-semi-automatic rifles, carbines, revolvers or pistols with a caliber greater than .50 inches (12.7 mm) but less than or equal to .72 inches (18.0 mm).

c. The following types of ''parts'' and ''components'' if ''specially designed'' for a commodity controlled by paragraph .a or .b of this entry, or USML Category I (unless listed in USML Category I(g) or (h)): Barrels, cylinders, barrel extensions, mounting blocks (trunnions), bolts, bolt carriers, operating rods, gas pistons, trigger housings, triggers, hammers, sears, disconnectors, pistol grips that contain fire control ''parts'' or ''components'' (*e.g.,* triggers, hammers, sears, disconnectors) and buttstocks that contain fire control ''parts'' or ''components.''

d. Detachable magazines with a capacity of greater than 16 rounds ''specially designed'' for a commodity controlled by paragraph .a or .b of this entry.

**Note 2 to paragraph 0A501.d:** Magazines with a capacity of 16 rounds or less are controlled under 0A501.x.

e. Receivers (frames) and ''complete breech mechanisms,'' including castings, forgings stampings, or machined items thereof, ''specially designed'' for a commodity controlled by paragraph .a or .b of this entry.

f. through w. [Reserved]

x. ''Parts'' and ''components'' that are ''specially designed'' for a commodity classified under paragraphs .a through .c of this entry or the USML and not elsewhere specified on the USML or CCL.

y. Specific ''parts,'' ''components,'' ''accessories'' and ''attachments'' ''specially designed'' for a commodity subject to control in this ECCN or common to a defense article in USML Category I and not elsewhere specified in the USML or CCL as follows, and ''parts,'' ''components,'' ''accessories,'' and ''attachments'' ''specially designed'' therefor.

y.1. Stocks or grips, that do not contain any fire control ''parts'' or ''components'' (*e.g.,* triggers, hammers, sears, disconnectors);''

y.2. Scope mounts or accessory rails;

y.3. Iron sights;

y.4. Sling swivels;

y.5. Butt plates or recoil pads;

y.6. Bayonets; and

y.7. Firearms manufactured from 1890 to 1898 and reproductions thereof.

**Technical Note 1 to 0A501:** The controls on ''parts'' and ''components'' in ECCN 0A501 include those ''parts'' and ''components'' that are common to firearms described in ECCN 0A501 and to those firearms ''subject to the ITAR.''

**Note 3 to 0A501:** Antique firearms (*i.e.,* those manufactured before 1890) and reproductions thereof, muzzle loading black powder firearms except those designs based on centerfire weapons of a post 1937 design, BB guns, pellet rifles, paint ball, and all other air rifles are EAR99 commodities.

**Note 4 to 0A501:** Muzzle loading (black powder) firearms with a caliber less than 20 mm that were manufactured later than 1937 that are used for hunting or sporting purposes that were not ''specially designed'' for military use and are not ''subject to the ITAR'' nor controlled as shotguns under ECCN 0A502 are EAR99 commodities.

**0A502 Shotguns; shotguns ''parts'' and ''components,'' consisting of complete trigger mechanisms; magazines and magazine extension tubes; ''complete breech mechanisms;'' except equipment used exclusively to treat or tranquilize animals, and except arms designed solely for signal, flare, or saluting use.**

**License Requirements**

*Reason for Control:* RS, CC, FC, UN, AT, NS

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to shotguns with a barrel length less than 18 inches (45.72 cm). | NS Column 1 |
| RS applies to shotguns with a barrel length less than 18 inches (45.72 cm). | RS Column 1 |
| FC applies to entire entry. | FC Column 1 |
| CC applies to shotguns with a barrel length less than 24 in. (60.96 cm) and shotgun ''components'' controlled by this entry regardless of end user. | CC Column 1 |
| CC applies to shotguns with a barrel length greater than or equal to 24 in. (60.96 cm), regardless of end user. | CC Column 2 |
| CC applies to shotguns with a barrel length greater than or equal to 24 in.. (60.96 cm) if for sale or resale to police or law enforcement. | CC Column 3 |
| UN applies to entire entry. | See § 746.1(b) of the EAR for UN controls |
| AT applies to shotguns with a barrel length less than 18 inches (45.72 cm). | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*LVS:* $500 for 0A502 shotgun ''parts'' and ''components,'' consisting of complete trigger mechanisms; magazines and magazine extension tubes.

$500 for 0A502 shotgun ''parts'' and ''components,'' consisting of complete trigger mechanisms; magazines and magazine extension tubes, ''complete breech mechanisms'' if the ultimate destination is Canada.
*GBS:* N/A
*CIV:* N/A

**List of Items Controlled**

*Related Controls:* Shotguns that are fully automatic are ''subject to the ITAR.''
*Related Definitions:* N/A
*Items:* The list of items controlled is contained in the ECCN heading.

**Note 1 to 0A502:** Shotguns made in or before 1898 are considered antique shotguns and designated as EAR99.

**Technical Note:** Shot pistols or shotguns that have had the shoulder stock removed and a pistol grip attached are controlled by ECCN 0A502. Slug guns are also controlled under ECCN 0A502.

**0A503 Discharge type arms; non-lethal or less-lethal grenades and projectiles, and ''specially designed'' ''parts'' and ''components'' of those projectiles; and devices to administer electric shock, for example, stun guns, shock batons, shock shields, electric cattle prods, immobilization guns and projectiles; except equipment used exclusively to treat or tranquilize animals, and except arms designed solely for signal, flare, or saluting use; and ''specially designed'' ''parts'' and ''components,'' n.e.s.**

**License Requirements**

*Reason for Control:* CC, UN

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| CC applies to entire entry. | A license is required for ALL destinations, except Canada, regardless of end use. Accordingly, a column specific to this control does not appear on the Commerce Country Chart. (See part 742 of the EAR for additional information) |
| UN applies to entire entry. | See § 746.1(b) of the EAR for UN controls |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*LVS:* N/A
*GBS:* N/A
*CIV:* N/A

**List of Items Controlled**

*Related Controls:* Law enforcement restraint devices that administer an electric shock are controlled under ECCN 0A982. Electronic devices that monitor and report a person's location to enforce restrictions on movement for law enforcement or penal reasons are controlled under ECCN 3A981.

*Related Definitions:* N/A

*Items:* The list of items controlled is contained in the ECCN heading.

**0A504   Optical sighting devices for firearms (including shotguns controlled by 0A502); and ''components'' as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* FC, RS, CC, UN

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| RS applies to paragraph .i. | RS Column 1 |
| FC applies to paragraphs .a, .b, .c, .d, .e, .g, and .i of this entry. | FC Column 1 |
| CC applies to entire entry. | CC Column 1 |
| UN applies to entire entry. | See §746.1(b) of the EAR for UN controls |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*LVS:* $500 for 0A504.g.
*GBS:* N/A
*CIV:* N/A

**List of Items Controlled**

*Related Controls:* (1) See USML Category XII(c) for sighting devices using second generation image intensifier tubes having luminous sensitivity greater than 350 μA/lm, or third generation or higher image intensifier tubes, that are ''subject to the ITAR.'' (2) See USML Category XII(b) for laser aiming or laser illumination systems ''subject to the ITAR.'' (3) Section 744.9 of the EAR imposes a license requirement on certain commodities described in 0A504 if being exported, reexported, or transferred (in-country) for use by a military end-user or for incorporation into an item controlled by ECCN 0A919.

*Related Definitions:* N/A

*Items:*

a. Telescopic sights.

b. Holographic sights.

c. Reflex or ''red dot'' sights.

d. Reticle sights.

e. Other sighting devices that contain optical elements.

f. Laser aiming devices or laser illuminators ''specially designed'' for use on firearms, and having an operational wavelength exceeding 400 nm but not exceeding 710 nm.

**Note 1 to 0A504.f:** 0A504.f does not control laser boresighting devices that must be placed in the bore or chamber to provide a reference for aligning the firearms sights.

g. Lenses, other optical elements and adjustment mechanisms for articles in paragraphs .a, .b, .c, .d, .e, or .i.

h. [Reserved]

i. Riflescopes that were not ''subject to the EAR'' as of March 8, 2020 and are ''specially designed'' for use in firearms that are ''subject to the ITAR.''

**Note 2 to paragraph i:** For purpose of the application of ''specially designed'' for the riflescopes controlled under 0A504.i, paragraph (a)(1) of the definition of ''specially designed'' in §772.1 of the EAR is what is used to determine whether the riflescope is ''specially designed.''

**0A505   Ammunition as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* NS, RS, CC, FC, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to 0A505.a and .x. | NS Column 1 |
| RS applies to 0A505.a and .x. | RS Column 1 |
| CC applies to 0A505.b. | CC Column 1 |
| FC applies to entire entry except 0A505.d. | FC Column 1 |
| UN applies to entire entry. | See §746.1 of the EAR for UN controls |
| AT applies to 0A505.a, .d, and .x. | AT Column 1 |
| AT applies to 0A505.c | A license is required for items controlled by paragraph .c of this entry to North Korea for anti-terrorism reasons. The Commerce Country Chart is not designed to determine AT licensing requirements for this entry. See §742.19 of the EAR for additional information. |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*LVS:* $500 for items in 0A505.x, except $3,000 for items in 0A505.x that, immediately prior to March 9, 2020, were classified under 0A018.b. (*i.e.,* ''Specially designed'' components and parts for ammunition, except cartridge cases, powder bags, bullets, jackets, cores, shells, projectiles, boosters, fuses and components, primers, and other detonating devices and ammunition belting and linking machines (all of which are ''subject to the ITAR''). (See 22 CFR parts 120 through 130))

*GBS:* N/A
*CIV:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§740.20(c)(2) of the EAR) may not be used for any item in 0A505.

**List of Items Controlled**

*Related Controls:* (1) Ammunition for modern heavy weapons such as howitzers, artillery, cannon, mortars and recoilless rifles as well as inherently military ammunition types such as ammunition preassembled into links or belts, caseless ammunition, tracer ammunition, ammunition with a depleted uranium projectile or a projectile with a hardened tip or core and ammunition with an explosive projectile are ''subject to the ITAR.'' (2) Percussion caps, and lead balls and bullets, for use with muzzle-loading firearms are EAR99 items.

*Related Definitions:* N/A

*Items:*

a. Ammunition for firearms controlled by ECCN 0A501 or USML Category I and not enumerated in paragraph .b, .c, or .d of this entry or in USML Category III.

b. Buckshot (No. 4 .24'' diameter and larger) shotgun shells.

c. Shotgun shells (including less than lethal rounds) that do not contain buckshot; and ''specially designed'' ''parts'' and ''components'' of shotgun shells.

**Note 1 to 0A505.c:** Shotgun shells that contain only chemical irritants are controlled under ECCN 1A984.

d. Blank ammunition for firearms controlled by ECCN 0A501 and not enumerated in USML Category III.

e. through w. [Reserved]

x. ''Parts'' and ''components'' that are ''specially designed'' for a commodity subject to control in this ECCN or a defense article in USML Category III and not elsewhere specified on the USML, the CCL or paragraph .d of this entry.

**Note 2 to 0A505.x:** The controls on ''parts'' and ''components'' in this entry include Berdan and boxer primers, metallic cartridge cases, and standard metallic projectiles such as full metal jacket, lead core, and copper projectiles.

**Note 3 to 0A505.x:** The controls on ''parts'' and ''components'' in this entry include those ''parts'' and ''components'' that are common to ammunition and ordnance described in this entry and to those enumerated in USML Category III.

**Note 4 to 0A505:** Lead shot smaller than No. 4 Buckshot, empty and unprimed shotgun shells, shotgun wads, smokeless gunpowder, 'Dummy rounds' and blank rounds (unless linked or belted), not incorporating a lethal or non-lethal projectile(s) are designated EAR99. A 'dummy round or drill round' is a round that is completely inert, *i.e.,* contains no primer, propellant, or explosive charge. It is typically used to check weapon function and for crew training.

■ 43. In Supplement No. 1 to part 774, Category 0, add, between entries for ECCNs 0A521 and 0A604, an entry for ECCN 0A602 to read as follows:

**0A602   Guns and Armament as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry. | NS Column 1 |
| RS applies to entire entry. | RS Column 1 |

**Federal Register** / Vol. 85, No. 15 / Thursday, January 23, 2020 / Rules and Regulations    **4183**

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| UN applies to entire entry. | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*LVS:* $500
*GBS:* N/A
*CIV:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0A602.

**List of Items Controlled**

*Related Controls:* (1) Modern heavy weapons such as howitzers, artillery, cannon, mortars, and recoilless rifles are ''subject to the ITAR.'' (2) See ECCN 0A919 for foreign-made ''military commodities'' that incorporate more than a *de minimis* amount of U.S.-origin ''600 series'' items. (3) See ECCN 0A606 for engines that are ''specially designed'' for a self-propelled gun or howitzer subject to control under paragraph .a of this ECCN or USML Category VII.
*Related Definitions:* N/A
*Items:*
    a. Guns and armament manufactured between 1890 and 1919.
    b. Military flame throwers with an effective range less than 20 meters.
    c. through w. [Reserved]
    x. ''Parts'' and ''components'' that are ''specially designed'' for a commodity subject to control in paragraphs .a or .b of this ECCN or a defense article in USML Category II and not elsewhere specified on the USML or the CCL.
    **Note 1 to 0A602.x:** Engines that are ''specially designed'' for a self-propelled gun or howitzer subject to control under paragraph .a of this ECCN or a defense article in USML Category VII are controlled under ECCN 0A606.x.
    **Note 2 to 0A602:** ''Parts,'' ''components,'' ''accessories,'' and ''attachments'' specified in USML subcategory II(j) are subject to the controls of that paragraph.
    **Note 3 to 0A602:** Black powder guns and armament manufactured in or prior to 1890 and replicas thereof designed for use with black powder propellants are designated EAR99.

## Supplement No. 1 to Part 774— [Amended]

■ 44. In Supplement No. 1 to part 774, Category 0, remove ECCNs 0A918, 0A984, 0A985, 0A986, and 0A987.

■ 45. In Supplement No. 1 to part 774, Category 0, revise ECCN 0A988 to read as follows:

**0A988    Conventional military steel helmets.**

    No items currently are in this ECCN. See ECCN 1A613.y.1 for conventional steel helmets that, immediately prior to July 1, 2014, were classified under 0A988.

■ 46. In Supplement No. 1 to part 774, Category 0, add, before the entry for ECCN 0B521, entries for ECCNs 0B501 and 0B505 to read as follows:

**0B501    Test, inspection, and production ''equipment'' and related commodities for the ''development'' or ''production'' of commodities enumerated or otherwise described in ECCN 0A501 or USML Category I as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry except equipment for ECCN 0A501.y. | NS Column 1 |
| RS applies to entire entry except equipment for ECCN 0A501.y. | RS Column 1 |
| UN applies to entire entry. | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*LVS:* $3000
*GBS:* N/A
*CIV:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used to ship any item in this entry.

**List of Items Controlled**

*Related Controls:* N/A
*Related Definitions:* N/A
*Items:*
    a. Small arms chambering machines.
    b. Small arms deep hole drilling machines and drills therefor.
    c. Small arms rifling machines.
    d. Small arms spill boring machines.
    e. Production equipment (including dies, fixtures, and other tooling) ''specially designed'' for the ''production'' of the items controlled in 0A501.a through .x. or USML Category I.

**0B505    Test, inspection, and production ''equipment'' and related commodities ''specially designed'' for the ''development'' or ''production'' of commodities enumerated or otherwise described in ECCN 0A505 or USML Category III, except equipment for the hand loading of cartridges and shotgun shells, as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to paragraphs .a and .x. | NS Column 1 |
| RS applies to paragraphs .a and .x. | RS Column 1 |
| UN applies to entire entry. | See § 746.1 of the EAR for UN controls |
| AT applies to paragraphs .a, .d, and .x. | AT Column 1 |
| AT applies to paragraph .c. | A license is required for export or reexport of these items to North Korea for anti-terrorism reasons |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*LVS:* $3000
*GBS:* N/A
*CIV:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0B505.

**List of Items Controlled**

*Related Controls:* N/A
*Related Definitions:* N/A
*Items:*
    a. Production equipment (including tooling, templates, jigs, mandrels, molds, dies, fixtures, alignment mechanisms, and test equipment), not enumerated in USML Category III that are ''specially designed'' for the ''production'' of commodities controlled by ECCN 0A505.a or .x or USML Category III.
    b. Equipment ''specially designed'' for the ''production'' of commodities in ECCN 0A505.b.
    c. Equipment ''specially designed'' for the ''production'' of commodities in ECCN 0A505.c.
    d. Equipment ''specially designed'' for the ''production'' of commodities in ECCN 0A505.d.
    e. through .w [Reserved]
    x. ''Parts'' and ''components'' ''specially designed'' for a commodity subject to control in paragraph .a of this entry.

■ 47. In Supplement No. 1 to part 774, Category 0, add, between entries for ECCNs 0B521 and 0B604, an entry for ECCN 0B602 to read as follows:

**0B602    Test, inspection, and production ''equipment'' and related commodities ''specially designed'' for the ''development'' or ''production'' of commodities enumerated or otherwise described in ECCN 0A602 or USML Category II as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry. | NS Column 1 |
| RS applies to entire entry. | RS Column 1 |
| UN applies to entire entry. | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*LVS:* $3000
*GBS:* N/A
*CIV:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0B602.

**List of Items Controlled**

*Related Controls:* N/A
*Related Definitions:* N/A
*Items:*
a. The following commodities if "specially designed" for the "development" or "production" of commodities enumerated in ECCN 0A602.a or USML Category II:
a.1. Gun barrel rifling and broaching machines and tools therefor;
a.2. Gun barrel rifling machines;
a.3. Gun barrel trepanning machines;
a.4. Gun boring and turning machines;
a.5. Gun honing machines of 6 feet (183 cm) stroke or more;
a.6. Gun jump screw lathes;
a.7. Gun rifling machines; and
a.8. Barrel straightening presses.
b. Jigs and fixtures and other metal-working implements or accessories of the kinds exclusively designed for use in the manufacture of items in ECCN 0A602 or USML Category II.
c. Other tooling and equipment, "specially designed" for the "production" of items in ECCN 0A602 or USML Category II.
d. Test and evaluation equipment and test models, including diagnostic instrumentation and physical test models, "specially designed" for items in ECCN 0A602 or USML Category II.

**Supplement No. 1 to Part 774— [Amended]**

■ 48. In Supplement No. 1 to part 774, Category 0, remove ECCN 0B986.

■ 49. In Supplement No. 1 to part 774, Category 0, add, between the entries for ECCNs 0D001 and 0D521, entries for ECCNs 0D501 and 0D505 to read as follows:

**0D501** "**Software**" "**specially designed**" for the "development," "production," operation, or maintenance of commodities controlled by 0A501 or 0B501.

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry except "software" for commodities in ECCN 0A501.y or equipment in ECCN 0B501 for commodities in ECCN 0A501.y. | NS Column 1 |
| RS applies to entire entry except "software" for commodities in ECCN 0A501.y or equipment in ECCN 0B501 for commodities in ECCN 0A501.y. | RS Column 1 |
| UN applies to entire entry. | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*CIV:* N/A
*TSR:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any "software" in 0D501.

**List of Items Controlled**

*Related Controls:* "Software" required for and directly related to articles enumerated in USML Category I is "subject to the ITAR".
*Related Definitions:* N/A
*Items:* The list of items controlled is contained in this ECCN heading.

**0D505** "**Software**" "**specially designed**" for the "development," "production," operation, or maintenance of commodities controlled by 0A505 or 0B505.

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to "software" for commodities in ECCN 0A505.a and .x and equipment in ECCN 0B505.a .and .x. | NS Column 1 |
| RS applies to "software" for commodities in ECCN 0A505.a and .x and equipment in ECCN 0B505.a and .x. | RS Column 1 |
| UN applies to entire entry. | See § 746.1 of the EAR for UN controls |
| AT applies to "software" for commodities in ECCN 0A505.a, .d, or .x and equipment in ECCN 0B505.a, .d, or .x. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*CIV:* N/A
*TSR:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any "software" in 0D505.

**List of Items Controlled**

*Related Controls:* "Software" required for and directly related to articles enumerated in USML Category III is "subject to the ITAR".
*Related Definitions:* N/A
*Items:* The list of items controlled is contained in this ECCN heading.

■ 50. In Supplement No. 1 to part 774, Category 0, add, between the entries for ECCNs 0D521 and 0D604, an entry for ECCN 0D602 to read as follows:

**0D602** "**Software**" "**specially designed**" for the "development," "production," operation or maintenance of commodities controlled by 0A602 or 0B602 as follows (see List of Items Controlled).

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry. | NS Column 1 |
| RS applies to entire entry. | RS Column 1 |
| UN applies to entire entry. | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*CIV:* N/A
*TSR:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0D602.

**List of Items Controlled**

*Related Controls:* (1) "Software" required for and directly related to articles enumerated in USML Category II is "subject to the ITAR". (2) See ECCN 0A919 for foreign-made "military commodities" that incorporate more than a *de minimis* amount of U.S.-origin "600 series" items.

**Federal Register** / Vol. 85, No. 15 / Thursday, January 23, 2020 / Rules and Regulations **4185**

*Related Definitions:* N/A

*Items:* "Software" "specially designed" for the "development," "production," operation, or maintenance of commodities controlled by ECCN 0A602 and ECCN 0B602.

## Supplement No. 1 to Part 774—[Amended]

■ 51. In Supplement No. 1 to part 774, Category 0, remove ECCN 0E018.

■ 52. In Supplement No. 1 to part 774, Category 0, add, between the entries for ECCNs 0E001 and 0E521, entries for ECCNs 0E501, 0E502, 0E504, and 0E505 to read as follows:

**0E501** "**Technology**" "**required**" **for the** "**development,**" "**production,**" **operation, installation, maintenance, repair, or overhaul of commodities controlled by 0A501 or 0B501 as follows (see List of Items Controlled).**

### License Requirements

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry. | NS Column 1 |
| RS applies to entire entry. | RS Column 1 |
| UN applies to entire entry. | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry. | AT Column 1 |

### List Based License Exceptions (See Part 740 for a Description of All License Exceptions)

*CIV:* N/A
*TSR:* N/A

### Special Conditions for STA

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any "technology" in ECCN 0E501.

### List of Items Controlled

*Related Controls:* Technical data required for and directly related to articles enumerated in USML Category I are "subject to the ITAR."
*Related Definitions:* N/A
*Items:*
a. "Technology" "required" for the "development" or "production" of commodities controlled by ECCN 0A501 (other than 0A501.y) or 0B501.
b. "Technology" "required" for the operation, installation, maintenance, repair, or overhaul of commodities controlled by ECCN 0A501 (other than 0A501.y) or 0B501.

**0E502** "**Technology**" "**required**" **for the** "**development**" **or** "**production**" **of commodities controlled by 0A502.**

### License Requirements

*Reason for Control:* CC, UN

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| CC applies to entire entry. | CC Column 1 |
| UN applies to entire entry. | See § 746.1(b) of the EAR for UN controls |

### List Based License Exceptions (See Part 740 for a Description of All License Exceptions)

*CIV:* N/A
*TSR:* N/A

### List of Items Controlled

*Related Controls:* Technical data required for and directly related to articles enumerated in USML Category I are "subject to the ITAR".
*Related Definitions:* N/A
*Items:* The list of items controlled is contained in the ECCN heading.

**0E504** "**Technology**" "**required**" **for the** "**development**" **or** "**production**" **of commodities controlled by 0A504 that incorporate a focal plane array or image intensifier tube.**

### License Requirements

*Reason for Control:* RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| RS applies to entire entry. | RS Column 1 |
| UN applies to entire entry. | See § 746.1(b) of the EAR for UN controls |
| AT applies to entire entry. | AT Column 1 |

### List Based License Exceptions (See Part 740 for a Description of All License Exceptions)

*CIV:* N/A
*TSR:* N/A

### List of Items Controlled

*Related Controls:* N/A
*Related Definitions:* N/A
*Items:* The list of items controlled is contained in the ECCN heading.

**0E505** "**Technology**" "**required**" **for the** "**development,**" "**production,**" **operation, installation, maintenance, repair, overhaul, or refurbishing of commodities controlled by 0A505.**

### License Requirements

*Reason for Control:* NS, RS, UN, CC, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to "technology" for "development," "production," operation, installation, maintenance, repair, overhaul, or refurbishing commodities in 0A505.a and .x; for equipment for those commodities in 0B505; and for "software" for that equipment and those commodities in 0D505. | NS Column 1 |
| RS applies to entire entry except "technology" for "development," "production," operation, installation, maintenance, repair, overhaul, or refurbishing commodities in 0A505.a and .x; for equipment for those commodities in 0B505 and for "software" for those commodities and that equipment in 0D505. | RS Column 1 |
| UN applies to entire entry. | See § 746.1 of the EAR for UN controls |
| CC applies to "technology" for the "development" or "production" of commodities in 0A505.b. | CC Column 1 |
| AT applies to "technology" for "development," "production," operation, installation, maintenance, repair, overhaul, or refurbishing commodities in 0A505.a, .d, and .x. | AT Column 1 |

### List Based License Exceptions (See Part 740 for a Description of All License Exceptions)

*CIV:* N/A
*TSR:* N/A

### Special Conditions for STA

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any "technology" in 0E505.

### List of Items Controlled

*Related Controls:* Technical data required for and directly related to articles enumerated in USML Category III are "subject to the ITAR".
*Related Definitions:* N/A
*Items:* The list of items controlled is contained in this ECCN heading.

■ 53. In Supplement No. 1 to part 774, Category 0, add, between the entries for

ECCNs 0E521 and 0E604, an entry for ECCN 0E602:

**0E602**  ''Technology'' ''required'' for the ''development,'' ''production,'' operation, installation, maintenance, repair, overhaul, or refurbishing of commodities controlled by 0A602 or 0B602, or ''software'' controlled by 0D602 as follows (see List of Items Controlled).

#### License Requirements

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry. | NS Column 1 |
| RS applies to entire entry. | RS Column 1 |
| UN applies to entire entry. | See §746.1 of the EAR for UN controls |
| AT applies to entire entry. | AT Column 1 |

#### List Based License Exceptions (See Part 740 for a Description of All License Exceptions)

*CIV:* N/A
*TSR:* N/A

#### Special Conditions for STA

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0E602.

#### List of Items Controlled

*Related Controls:* Technical data directly related to articles enumerated in USML Category II are ''subject to the ITAR.''
*Related Definitions:* N/A
*Items:* ''Technology'' ''required'' for the ''development,'' ''production,'' operation, installation, maintenance, repair, or overhaul of commodities controlled by ECCN 0A602 or 0B602, or ''software'' controlled by ECCN 0D602.

#### Supplement No. 1 to Part 774— [Amended]

■ 54. In Supplement No. 1 to part 774, Category 0, remove ECCN 0E918.

■ 55. In Supplement No. 1 to part 774, Category 0, revise ECCN 0E982 to read as follows:

**0E982**  ''Technology'' exclusively for the ''development'' or ''production'' of equipment controlled by 0A982 or 0A503.

#### License Requirements

*Reason for Control:* CC

| Control(s) |
|---|
| CC applies to ''technology'' for items controlled by 0A982 or 0A503. A license is required for ALL destinations, except Canada, regardless of end use. Accordingly, a column specific to this control does not appear on the Commerce Country Chart. (See part 742 of the EAR for additional information.) |

#### List Based License Exceptions (See Part 740 for a Description of All License Exceptions)

*CIV:* N/A
*TSR:* N/A

#### List of Items Controlled

*Related Controls:* N/A
*Related Definitions:* N/A
*Items:*
    The list of items controlled is contained in the ECCN heading.

#### Supplement No. 1 to Part 774— [Amended]

■ 56. In Supplement No. 1 to part 774, Category 0, remove ECCNs 0E984 and 0E987.

■ 57. In Supplement No. 1 to part 774, Category 1, revise ECCN 1A984 to read as follows:

**1A984**  Chemical agents, including tear gas formulation containing 1 percent or less of orthochlorobenzalmalononitrile (CS), or 1 percent or less of chloroacetophenone (CN), except in individual containers with a net weight of 20 grams or less; liquid pepper except when packaged in individual containers with a net weight of 3 ounces (85.05 grams) or less; smoke bombs; non-irritant smoke flares, canisters, grenades and charges; and other pyrotechnic articles (excluding shotgun shells, unless the shotgun shells contain only chemical irritants) having dual military and commercial use, and ''parts'' and ''components'' ''specially designed'' therefor, n.e.s.

#### License Requirements

*Reason for Control:* CC

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| CC applies to entire entry. | CC Column 1 |

#### List Based License Exceptions (See Part 740 for a Description of All License Exceptions)

*LVS:* N/A
*GBS:* N/A
*CIV:* N/A

#### List of Items Controlled

*Related Controls:* N/A
*Related Definitions:* N/A
*Items:*
    The list of items controlled is contained in the ECCN heading.

■ 58. In Supplement No. 1 to part 774, Category 2, revise ECCN 2B004 to read as follows:

**2B004**  Hot ''isostatic presses'' having all of the characteristics described in the list of items controlled, and ''specially designed'' ''components'' and ''accessories'' therefor.

#### License Requirements

*Reason for Control:* NS, MT NP, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry. | NS Column 2 |
| MT applies to entire entry. | MT Column 1 |
| NP applies to entire entry, except 2B004.b.3 and presses with maximum working pressures below 69 MPa. | NP Column 1 |
| AT applies to entire entry. | AT Column 1 |

#### List Based License Exceptions (See Part 740 for a Description of All License Exceptions)

*LVS:* N/A
*GBS:* N/A
*CIV:* N/A

#### List of Items Controlled

*Related Controls:* (1) See ECCN 2D001 for software for items controlled under this entry. (2) See ECCNs 2E001 (''development''), 2E002 (''production''), and 2E101 (''use'') for technology for items controlled under this entry. (3) For ''specially designed'' dies, molds and tooling, see ECCNs 0B501, 0B602, 0B606, 1B003, 9B004, and 9B009. (4) For additional controls on dies, molds and tooling, see ECCNs 1B101.d, 2B104, and 2B204. (5) Also see ECCNs 2B117 and 2B999.a.
*Related Definitions:* N/A
*Items:*
    a. A controlled thermal environment within the closed cavity and possessing a chamber cavity with an inside diameter of 406 mm or more; *and*
    b. Having any of the following:
    b.1. A maximum working pressure exceeding 207 MPa;
    b.2. A controlled thermal environment exceeding 1,773 K (1,500 °C); *or*
    b.3. A facility for hydrocarbon impregnation and removal of resultant gaseous degradation products.

    **Technical Note:** The inside chamber dimension is that of the chamber in which both the working temperature and the working pressure are achieved and does not include fixtures. That dimension will be the smaller of either the inside diameter of the pressure chamber or the inside diameter of the insulated furnace chamber, depending on which of the two chambers is located inside the other.

■ 59. In Supplement No. 1 to part 774, Category 2, revise ECCN 2B018 to read as follows:

**2B018**  Equipment on the Wassenaar Arrangement Munitions List.

    No commodities currently are controlled by this entry. Commodities formerly controlled by paragraphs .a through .d, .m, and .s of this entry are controlled in ECCN 0B606. Commodities formerly controlled by paragraphs .e through .l of this entry are controlled by ECCN 0B602. Commodities formerly controlled by paragraphs .o through

.r of this entry are controlled by ECCN 0B501. Commodities formerly controlled by paragraph .n of this entry are controlled in ECCN 0B501 if they are "specially designed" for the "production" of the items controlled in ECCN 0A501.a through .x or USML Category I and controlled in ECCN 0B602 if they are of the kind exclusively designed for use in the manufacture of items in ECCN 0A602 or USML Category II.

■ 60. In Supplement No. 1 to part 774, Category 2, revise ECCN 2D018 to read as follows:

**2D018** "**Software**" **for the** "**development,**" "**production,**" **or** "**use**" **of equipment controlled by 2B018.**

No software is currently controlled under this entry. See ECCNs 0D501, 0D602, and 0D606 for software formerly controlled under this entry.

■ 61. In Supplement No. 1 to part 774, Category 2, revise ECCN 2E001 to read as follows:

**2E001** "**Technology**" **according to the General Technology Note for the** "**development**" **of equipment or** "**software**" **controlled by 2A (except 2A983, 2A984, 2A991, or 2A994), 2B (except 2B991, 2B993, 2B996, 2B997, 2B998, or 2B999), or 2D (except 2D983, 2D984, 2D991, 2D992, or 2D994).**

**License Requirements**

*Reason for Control:* NS, MT, NP, CB, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
| --- | --- |
| NS applies to "technology" for items controlled by 2A001, 2B001 to 2B009, 2D001 or 2D002. | NS Column 1 |
| MT applies to "technology" for items controlled by 2B004, 2B009, 2B104, 2B105, 2B109, 2B116, 2B117, 2B119 to 2B122, 2D001, or 2D101 for MT reasons. | MT Column 1 |
| NP applies to "technology" for items controlled by 2A225, 2A226, 2B001, 2B004, 2B006, 2B007, 2B009, 2B104, 2B109, 2B116, 2B201, 2B204, 2B206, 2B207, 2B209, 2B225 to 2B233, 2D001, 2D002, 2D101, 2D201, or 2D202 for NP reasons. | NP Column 1 |
| NP applies to "technology" for items controlled by 2A290, 2A291, or 2D290 for NP reasons. | NP Column 2 |
| CB applies to "technology" for equipment controlled by 2B350 to 2B352, valves controlled by 2A226 having the characteristics of those controlled by 2B350.g, and software controlled by 2D351. | CB Column 2 |
| AT applies to entire entry. | AT Column 1 |

**Reporting Requirements**

See § 743.1 of the EAR for reporting requirements for exports under License Exceptions, and Validated End-User authorizations.

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*CIV:* N/A
*TSR:* Yes, except N/A for MT

**Special Conditions for STA**

*STA:* License Exception STA may not be used to ship or transmit "technology" according to the General Technology Note for the "development" of "software" specified in the License Exception STA paragraph in the License Exception section of ECCN 2D001 or for the "development" of equipment as follows: ECCN 2B001 entire entry; or "Numerically controlled" or manual machine tools as specified in 2B003 to any of the destinations listed in Country Group A:6 (See Supplement No. 1 to part 740 of the EAR).

**List of Items Controlled**

*Related Controls:* See also 2E101, 2E201, and 2E301
*Related Definitions:* N/A
*Items:*

The list of items controlled is contained in the ECCN heading.

**Note 1 to 2E001:** ECCN 2E001 includes "technology" for the integration of probe systems into coordinate measurement machines specified by 2B006.a.

■ 62. In Supplement No. 1 to part 774, Category 2, revise ECCN 2E002 to read as follows:

**2E002** "**Technology**" **according to the General Technology Note for the** "**production**" **of equipment controlled by 2A (except 2A983, 2A984, 2A991, or 2A994), or 2B (except 2B991, 2B993, 2B996, 2B997, 2B998, or 2B999).**

**License Requirements**

*Reason for Control:* NS, MT, NP, CB, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
| --- | --- |
| NS applies to "technology" for equipment controlled by 2A001, 2B001 to 2B009. | NS Column 1 |
| MT applies to "technology" for equipment controlled by 2B004, 2B009, 2B104, 2B105, 2B109, 2B116, 2B117, or 2B119 to 2B122 for MT reasons. | MT Column 1 |
| NP applies to "technology" for equipment controlled by 2A225, 2A226, 2B001, 2B004, 2B006, 2B007, 2B009, 2B104, 2B109, 2B116, 2B201, 2B204, 2B206, 2B207, 2B209, 2B225 to 2B233 for NP reasons. | NP Column 1 |
| NP applies to "technology" for equipment controlled by 2A290 or 2A291 for NP reasons. | NP Column 2 |
| CB applies to "technology" for equipment Controlled by 2B350 to 2B352 and for valves controlled by 2A226 having the characteristics of those controlled by 2B350.g. | CB Column 2 |
| AT applies to entire entry. | AT Column 1 |

**Reporting Requirements**

See § 743.1 of the EAR for reporting requirements for exports under License Exceptions, and Validated End-User authorizations.

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*CIV:* N/A
*TSR:* Yes, except N/A for MT

**Special Conditions for STA**

*STA:* License Exception STA may not be used to ship or transmit "technology" according to the General Technology Note for the "production" of equipment as follows: ECCN 2B001 entire entry; or "Numerically controlled" or manual machine tools as specified in 2B003 to any of the destinations listed in Country Group A:6 (See Supplement No. 1 to part 740 of the EAR).

**List of Items Controlled**

*Related Controls:* N/A
*Related Definitions:* N/A
*Items:*

**4188**   **Federal Register** / Vol. 85, No. 15 / Thursday, January 23, 2020 / Rules and Regulations

The list of items controlled is contained in the ECCN heading.

■ 63. In Supplement No. 1 to part 774, Category 7, revise ECCN 7A611 to read as follows:

**7A611   Military fire control, laser, imaging, and guidance equipment, as follows (see List of Items Controlled).**

### License Requirements

*Reason for Control:* NS, MT, RS, AT, UN

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry except 7A611.y. | NS Column 1 |
| MT applies to commodities in 7A611.a that meet or exceed the parameters in 7A103.b or .c. | MT Column 1 |
| RS applies to entire entry except 7A611.y. | RS Column 1 |
| AT applies to entire entry. | AT Column 1 |
| UN applies to entire entry except 7A611.y. | See § 746.1(b) of the EAR for UN controls |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*LVS:* $1500
*GBS:* N/A
*CIV:* N/A

### Special Conditions for STA

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 7A611.

### List of Items Controlled

*Related Controls:* (1) Military fire control, laser, imaging, and guidance equipment that are enumerated in USML Category XII, and technical data (including software) directly related thereto, are subject to the ITAR. (2) See Related Controls in ECCNs 0A504, 2A984, 6A002, 6A003, 6A004, 6A005, 6A007, 6A008, 6A107, 7A001, 7A002, 7A003, 7A005, 7A101, 7A102, and 7A103. (3) See ECCN 3A611 and USML Category XI for controls on countermeasure equipment. (4) See ECCN 0A919 for foreign-made ''military commodities'' that incorporate more than a *de minimis* amount of U.S. origin ''600 series'' controlled content.
*Related Definitions:* N/A
*Items:*

a. Guidance or navigation systems, not elsewhere specified on the USML, that are ''specially designed'' for a defense article on the USML or for a 600 series item.

b. to w. [RESERVED]

x. ''Parts,'' ''components,'' ''accessories,'' and ''attachments,'' including accelerometers, gyros, angular rate sensors, gravity meters (gravimeters), and inertial measurement units (IMUs), that are ''specially designed'' for defense articles controlled by USML Category XII or items controlled by 7A611, and that are NOT:

1. Enumerated or controlled in the USML or elsewhere within ECCN 7A611;

2. Described in ECCNs 6A007, 6A107, 7A001, 7A002, 7A003, 7A101, 7A102, or 7A103; or

3. Elsewhere specified in ECCN 7A611.y or 3A611.y.

y. Specific ''parts,'' ''components,'' ''accessories,'' and ''attachments'' ''specially designed'' for a commodity subject to control in this ECCN or a defense article in Category XII and not elsewhere specified on the USML or in the CCL, as follows, and ''parts,'' ''components,'' ''accessories,'' and ''attachments'' ''specially designed'' therefor:

y.1 [RESERVED]

Dated: January 10, 2020.

**Richard E. Ashooh,**
*Assistant Secretary for Export Administration.*

[FR Doc. 2020–00573 Filed 1–17–20; 11:15 am]
**BILLING CODE 3510–33–P**